**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEF VAN DUPPEN, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>MYLAN N.V., MYLAN INC., HEATHER BRESCH, and JOHN D. SHEEHAN,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Stef Van Duppen ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mylan N.V. and Mylan Inc., analysts' reports and advisories about Mylan N.V. and Mylan Inc., and information readily

1

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired ordinary shares of Mylan N.V. and/or common stock of Mylan N.V.'s predecessor, Mylan Inc., between February 28, 2013 and October 7, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Mylan N.V. and Mylan Inc. conduct business in this district and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased ordinary shares of Mylan N.V. and/or common stock of Mylan Inc. at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant Mylan N.V., together with its subsidiaries, develops, licenses, manufactures, markets, and distributes generic, branded generic, and specialty pharmaceuticals worldwide. Mylan N.V. is incorporated in the Netherlands with principal executive offices located at Building 4, Trident Place, Mosquito Way, Hatfield, Hertfordshire, AL10 9UL, England and its global headquarters located in Canonsburg, Pennsylvania. On February 27, 2015, Mylan N.V. succeeded Mylan Inc. as the SEC registrant. On March 2, 2015, Mylan N.V.'s ordinary shares began trading on NASDAQ under the ticker symbol "MYL".

8.      Defendant Mylan Inc. is an indirect wholly owned subsidiary of Mylan N.V. Mylan Inc. is incorporated in Pennsylvania with principal executive offices located at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317 and an office located at 405 Lexington Avenue, Floor 52, New York, New York 10174. Prior to February 27, 2015, Mylan Inc. preceded Mylan N.V. as the SEC registrant. On July 13, 2014, Mylan N.V. and Mylan Inc. entered into a merger agreement, as amended on November 4, 2014, with Abbott Laboratories "Abbott") to acquire Abbott's non-U.S. developed markets specialty and branded generics business (the "EPD Business") in an all-stock transaction (the "Merger"). In connection with the closing of the Merger on February 27, 2015, Abbott transferred the EPD Business to Mylan N.V. in exchange for 110 million ordinary shares of Mylan N.V. Mylan Inc. became an indirect

3

wholly owned subsidiary of Mylan N.V., and each share of Mylan Inc. common stock issued and outstanding immediately prior to the effective time of the Merger was cancelled and automatically converted into one Mylan N.V. ordinary share. As a result, Mylan Inc. and Abbott's EPD Business were reorganized under Mylan N.V. and were to be led by the former officers and directors of Mylan Inc. Mylan Inc.'s common stock traded on NASDAQ under the ticker symbol "MYL" until February 27, 2015.

9.      Defendant Heather Bresch ("Bresch") has been the Chief Executive Officer ("CEO") and director of Mylan N.V. since March 2015, and the CEO and director of Mylan Inc. from January 1, 2012 until March 2015.

10.     Defendant John D. Sheehan ("Sheehan") served as the Chief Financial Officer ("CFO") and Executive Vice President of Mylan N.V. from March 2015 until April 1, 2016 and as the CFO and Executive Vice President of Mylan Inc. from April 1, 2010 until March 2015.

11.     Defendants Bresch and Sheehan are sometimes referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)     directly participated in the management of Mylan N.V. and Mylan Inc.;

(b)     was directly involved in the day-to-day operations of Mylan N.V. and Mylan Inc. at the highest levels;

(c)     was privy to confidential proprietary information concerning Mylan N.V. and Mylan Inc. and their businesses and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

4

(e)     was directly or indirectly involved in the oversight or implementation of Mylan N.V. and Mylan Inc.'s internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Mylan N.V. and Mylan Inc.; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

13.     Mylan N.V. and Mylan Inc. are liable for the acts of the Individual Defendants and their employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of Mylan N.V. and Mylan Inc. are similarly imputed to Mylan N.V. and Mylan Inc. under *respondeat superior* and agency principles.

15.     Defendants Mylan N.V., Mylan Inc., and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

### Medicaid Drug Rebate Program

16.     Since acquiring EpiPen® Auto-Injector and EpiPen Jr® Auto-Injector (collectively, "EpiPen") in 2007, Mylan N.V. and Mylan Inc. have classified it as a "non-innovator" drug for purposes of the Medicaid Drug Rebate Program.

17.     A "non-innovator" drug is a generic drug product that has a great deal of competition in the marketplace.

18.     An "innovator" drug is a brand drug product with little or no competition in the marketplace.

19.     Under the Medicaid Drug Rebate Program, states receive a rebate of 13% of the average manufacturer price ("AMP") for non-innovator multiple source drugs and a higher rebate of 23.1% of the AMP or the difference between the AMP and the best price per unit adjusted by the Consumer Price Index for All Urban Consumers for innovator multiple source drugs.

20.     Since 2007 Mylan N.V. and Mylan Inc. have only paid the lower rebate for "non-innovator" drugs—13% of the AMP—for EpiPen.

21.     Manufacturers that fail to accurately report product and pricing data to the Medicaid Drug Rebate Program and pay sufficient rebates may be subject to liability under the False Claims Act, a penalty of up to $100,000 per item of false information under the Rebate Agreement or other government actions or claims.

### Mylan's Earnings From EpiPen

22.     According to *Bloomberg*, researcher ABR|Healthco stated that Mylan Inc.'s earnings from EpiPen alone accounted for 40% of Mylan Inc.'s operating profit in 2014.

23.     A significant portion of Mylan Specialty's (Mylan N.V.'s wholly owned subsidiary) revenues are derived through the sale of the EpiPen.

24.     For the period ended December 31, 2015, Mylan Specialty's revenues represented approximately 12% of Mylan N.V.'s total consolidated revenues.

**Materially False and Misleading Statements**

25.     On February 28, 2013, Mylan Inc. filed a Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K") with the SEC, which provided its year-end financial results and position and stated that its internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2012. The 2012 10-K was signed by Defendants Bresch and Sheehan. The 2012 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bresch and Sheehan attesting to the accuracy of financial reporting, the disclosure of any material changes to Mylan Inc.'s internal controls over financial reporting, and the disclosure of all fraud.

26.     The 2012 10-K stated the risks involved in fulfilling Mylan Inc.'s "reporting and payment obligations with respect to Medicare and/or Medicaid reimbursement and rebates and other governmental programs", stating in pertinent part that:

> ***OUR REPORTING AND PAYMENT OBLIGATIONS UNDER THE MEDICARE AND/OR MEDICAID REBATE PROGRAM AND OTHER GOVERNMENTAL PURCHASING AND REBATE PROGRAMS ARE COMPLEX AND MAY INVOLVE SUBJECTIVE DECISIONS THAT COULD CHANGE AS A RESULT OF NEW BUSINESS CIRCUMSTANCES, NEW REGULATORY GUIDANCE, OR ADVICE OF LEGAL COUNSEL. ANY DETERMINATION OF FAILURE TO COMPLY WITH THOSE OBLIGATIONS COULD SUBJECT US TO PENALTIES AND SANCTIONS WHICH COULD HAVE A MATERIAL ADVERSE EFFECT ON OUR BUSINESS, FINANCIAL POSITION AND RESULTS OF OPERATIONS, AND THE MARKET VALUE OF OUR COMMON STOCK COULD DECLINE.***
>
> The regulations regarding reporting and payment obligations with respect to Medicare and/or Medicaid reimbursement and rebates and other governmental programs are complex. Because our processes for these calculations and the judgments involved in making these calculations involve, and will continue to involve, subjective decisions and complex methodologies, these calculations are subject to the risk of errors.

27.    On February 27, 2014, Mylan Inc. filed a Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K") with the SEC, which provided its year-end financial results and position and stated that its internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2013. The 2013 10-K was signed by Defendants Bresch and Sheehan. The 2013 10-K also contained signed SOX certifications by Defendants Bresch and Sheehan attesting to the accuracy of financial reporting, the disclosure of any material changes to Mylan Inc.'s internal controls over financial reporting, and the disclosure of all fraud.

28.    The 2013 10-K stated the risks involved in fulfilling Mylan Inc.'s "reporting and payment obligations with respect to a pharmaceutical company's participation in federal health care programs, including Medicare and Medicaid", stating in pertinent part that:

> *OUR REPORTING AND PAYMENT OBLIGATIONS RELATED TO OUR PARTICIPATION IN FEDERAL HEALTH CARE PROGRAMS, INCLUDING MEDICARE AND MEDICAID, ARE COMPLEX AND OFTEN INVOLVE SUBJECTIVE DECISIONS THAT COULD CHANGE AS A RESULT OF NEW BUSINESS CIRCUMSTANCES, NEW REGULATIONS OR AGENCY GUIDANCE, OR ADVICE OF LEGAL COUNSEL. ANY FAILURE TO COMPLY WITH THOSE OBLIGATIONS COULD SUBJECT US TO INVESTIGATION, PENALTIES, AND SANCTIONS.*
>
> Federal laws regarding reporting and payment obligations with respect to a pharmaceutical company's participation in federal health care programs, including Medicare and Medicaid, are complex. Because our processes for calculating applicable government prices and the judgments involved in making these calculations involve subjective decisions and complex methodologies, these calculations are subject to risk of errors and differing interpretations.

29.    On March 2, 2015, Mylan Inc. filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided its year-end financial results and position and stated that its internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2014. The 2014 10-K was signed by

Defendants Bresch and Sheehan. The 2014 10-K also contained signed SOX certifications by Defendants Bresch and Sheehan attesting to the accuracy of financial reporting, the disclosure of any material changes to Mylan Inc.'s internal controls over financial reporting, and the disclosure of all fraud.

30.     The 2014 10-K stated the risks involved in fulfilling Mylan Inc.'s "reporting and payment obligations with respect to a pharmaceutical company's participation in federal health care programs, including Medicare and Medicaid", stating in pertinent part that:

> ***OUR REPORTING AND PAYMENT OBLIGATIONS RELATED TO OUR PARTICIPATION IN FEDERAL HEALTH CARE PROGRAMS, INCLUDING MEDICARE AND MEDICAID, ARE COMPLEX AND OFTEN INVOLVE SUBJECTIVE DECISIONS THAT COULD CHANGE AS A RESULT OF NEW BUSINESS CIRCUMSTANCES, NEW REGULATIONS OR AGENCY GUIDANCE, OR ADVICE OF LEGAL COUNSEL. ANY FAILURE TO COMPLY WITH THOSE OBLIGATIONS COULD SUBJECT US TO INVESTIGATION, PENALTIES, AND SANCTIONS.***
>
> Federal laws regarding reporting and payment obligations with respect to a pharmaceutical company's participation in federal health care programs, including Medicare and Medicaid, are complex. Because our processes for calculating applicable government prices and the judgments involved in making these calculations involve subjective decisions and complex methodologies, these calculations are subject to risk of errors and differing interpretations.

31.     On February 16, 2016, Mylan N.V. filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided it's year-end financial results and position and stated that its internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2015. The 2015 10-K was signed by Defendants Bresch and Sheehan. The 2015 10-K also contained signed SOX certifications by Defendants Bresch and Sheehan attesting to the accuracy of financial reporting, the disclosure of any material changes to Mylan N.V.'s internal controls over financial reporting, and the disclosure of all fraud.

32. The 2015 10-K stated the risks involved in fulfilling Mylan N.V.'s "reporting and payment obligations with respect to a pharmaceutical company's participation in federal healthcare programs, including Medicare and Medicaid", stating in pertinent part that:

> *OUR REPORTING AND PAYMENT OBLIGATIONS RELATED TO OUR PARTICIPATION IN U.S. FEDERAL HEALTHCARE PROGRAMS, INCLUDING MEDICARE AND MEDICAID, ARE COMPLEX AND OFTEN INVOLVE SUBJECTIVE DECISIONS THAT COULD CHANGE AS A RESULT OF NEW BUSINESS CIRCUMSTANCES, NEW REGULATIONS OR AGENCY GUIDANCE, OR ADVICE OF LEGAL COUNSEL. ANY FAILURE TO COMPLY WITH THOSE OBLIGATIONS COULD SUBJECT US TO INVESTIGATION, PENALTIES, AND SANCTIONS.*
>
> Federal laws regarding reporting and payment obligations with respect to a pharmaceutical company's participation in federal healthcare programs, including Medicare and Medicaid, are complex. Because our processes for calculating applicable government prices and the judgments involved in making these calculations involve subjective decisions and complex methodologies, these calculations are subject to risk of errors and differing interpretations.

33. The statements referenced in ¶¶ 25 – 32 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Mylan N.V. and Mylan Inc.'s business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Mylan N.V. and Mylan Inc. incorrectly classified EpiPen as a generic under the Medicaid Drug Rebate Program, which was financially consequential for federal and state governments as it reduced the amount of quarterly rebates Mylan N.V. and Mylan Inc. owed for EpiPen; (2) between 2011 through 2015, Mylan N.V. and Mylan Inc. paid a lower rebate of 13% when it should have been paying a higher rebate of 23.1% or more; (3) the incorrect classification appears to have cost the federal government more than $100 million in the last five years alone; (4) in turn, Mylan N.V. and Mylan Inc.

lacked effective internal controls over financial reporting; and (5) as a result, Mylan N.V. and Mylan Inc.'s public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

34.    On September 2, 2016, an article was published by *Inside Health Policy* stating that the Centers for Medicare & Medicaid Services ("CMS") "informed Mylan that it incorrectly classified EpiPen as a generic under the Medicaid rebate program, which caused financial consequences for federal and state governments by reducing the amount of quarterly rebates Mylan owed for its product."

35.    On this news, shares of Mylan N.V. fell $1.95 per share or over 4% from its previous closing price to close at $39.97 per share on September 2, 2016, damaging investors

36.    On October 5, 2016, during aftermarket hours, *Bloomberg* published an article citing a letter, dated October 5, 2016, issued by the Acting Administrator of CMS to Senator Ron Wyden of Oregon (the "CMS letter") which stated that CMS "has expressly told Mylan that the product [EpiPen] is incorrectly classified. This incorrect classification has financial consequences for the amount that federal and state governments spend because it reduces the amount of quarterly rebates Mylan owes for EpiPen...At this time, CMS cannot comment on the total amount of rebates owed by Mylan related to this incorrect classification."

37.    The CMS letter also stated that Mylan N.V. may be subject to liability under the False Claims Act as a result of its incorrect classification of EpiPen, stating in pertinent part that:

> Under the Medicaid statute, regulation, guidance, and the rebate agreement that participating manufacturers sign, it is the manufacturer's responsibility to report accurate product and pricing data to the Medicaid Drug Rebate Program and pay proper rebate amounts. When it comes to CMS's attention that the manufacturer's categorization is incorrect, CMS notifies the manufacturer and tries to reach an agreement. Manufacturers that fail to accurately report product and pricing data to the rebate program and pay insufficient rebates may be subject to liability under

the False Claims Act, a penalty of up to $100,000 per item of false information under the Rebate Agreement, or other government actions or claims.

38.    The CMS letter also stated that due to the incorrect classification of EpiPen as a generic (non-innovator) drug, between 2011 through 2015, Mylan N.V. and Mylan Inc. paid a smaller rebate of 13%, or about $163 million, when it should have been paying a rebate of 23.1% or more.

39.    On October 6, 2016, *The Fiscal Times* published an article titled "Lawmakers Say EpiPen Maker Bilked Medicare for More than $100 Million", stating that "[t]he incorrect classification appears to have cost the federal government more than $100 million in the last five years alone."

40.    On these news shares of Mylan N.V. fell $2.09 or approximately 5% over two trading days to close at $35.94 on October 7, 2016, further damaging investors.

41.    On October 7, 2016, during aftermarket hours, Mylan N.V. announced that it has reached a $465 million settlement with the U.S. Department of Justice ("DOJ") and other government agencies that will resolve questions that have been raised about the classification of EpiPen, for purposes of the Medicaid Drug Rebate Program.

42.    On October 7, 2016, during aftermarket hours, Mylan N.V. filed a Form 8-K with the SEC stating that "EpiPen Auto-Injector will begin being classified as an innovator drug on April 1, 2017." The Form 8-K also disclosed that Mylan was being investigated by the Division of Enforcement at the SEC "concerning Mylan products sold and related to the Medicaid Drug Rebate Program", stating in pertinent part:

> The terms of the settlement do not provide for any finding of wrongdoing on the part of Mylan Inc. or any of its affiliated entities or personnel. The question in the underlying matter was whether EpiPen Auto-Injector was properly classified with the Centers for Medicaid and Medicare Services ("CMS") as a non-innovator drug under the applicable definition in the Medicaid Rebate statute and subject to

the formula that is used to calculate rebates to Medicaid for such drugs. EpiPen Auto-Injector has been classified with CMS as a non-innovator drug since before Mylan acquired the product in 2007 based on longstanding written guidance from the federal government.

The settlement terms provide for resolution of all potential rebate liability claims by federal and state governments as to whether the product should have been classified as an innovator drug for CMS purposes, and subject to a higher rebate formula. Consistent with the recent CMS rule regarding the classification of drugs for rebate purposes, EpiPen Auto-Injector will begin being classified as an innovator drug on April 1, 2017. In connection with the settlement, Mylan expects to enter into a corporate integrity agreement with the Office of Inspector General of the Department of Health and Human Services. Mylan will continue to work with the government to finalize the settlement.

Also on October 7, 2016, Mylan received a document request from the Division of Enforcement at the Securities and Exchange Commission ("SEC") seeking communications with the CMS and documents concerning Mylan products sold and related to the Medicaid Drug Rebate Program, and any related complaints. Mylan intends to fully cooperate with the SEC's investigation.

43.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Mylan N.V.'s ordinary shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Mylan N.V. ordinary shares and/or Mylan Inc. common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of Mylan N.V. and Mylan Inc., at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mylan N.V. ordinary shares and Mylan Inc.

common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mylan N.V. and Mylan Inc. or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Mylan N.V. and Mylan Inc.;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused Mylan N.V. and Mylan Inc. to issue false and misleading SEC filings and public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

- whether the prices of Mylan N.V. ordinary shares and the prices of Mylan Inc. common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

50.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Mylan N.V. ordinary shares are traded in efficient markets, and Mylan Inc. common stock was traded in efficient markets;

- Mylan N.V. ordinary shares and Mylan Inc. common stock were liquid and traded with moderate to heavy volume during the Class Period;

- Mylan N.V. ordinary shares and Mylan Inc. common stock were traded on the NASDAQ and were covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Mylan N.V. ordinary shares and Mylan Inc. common stock; and

- Plaintiff and members of the Class purchased and/or sold Mylan N.V. ordinary shares and/or Mylan Inc. common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

51. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

53. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54. This Count is asserted against Mylan N.V., Mylan Inc., and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55. During the Class Period, Mylan N.V., Mylan Inc., and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56. Mylan N.V., Mylan Inc., and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Mylan N.V. ordinary shares and/or Mylan Inc. common stock during the Class Period.

57.    Mylan N.V., Mylan Inc., and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Mylan N.V. and Mylan Inc. were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Mylan N.V. and Mylan Inc., their control over, and/or receipt and/or modification of Mylan N.V.'s and Mylan Inc.'s allegedly materially misleading statements, and/or their associations with Mylan N.V. and Mylan Inc. which made them privy to confidential proprietary information concerning Mylan N.V. and Mylan Inc., participated in the fraudulent scheme alleged herein.

58.    Individual Defendants, who are the senior officers and/or directors of Mylan N.V. and Mylan Inc., had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Mylan N.V. and Mylan Inc. personnel to members of the investing public, including Plaintiff and the Class.

59.    As a result of the foregoing, the market price of Mylan N.V. ordinary shares and Mylan Inc. common stock was artificially inflated during the Class Period. In ignorance of the

falsity of Mylan N.V.'s, Mylan Inc.'s, and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Mylan N.V.'s ordinary shares and/or Mylan Inc.'s common stock during the Class Period, in purchasing Mylan N.V.'s ordinary shares and/or Mylan Inc. common stock at prices that were artificially inflated as a result of Mylan N.V.'s, Mylan Inc.'s, and the Individual Defendants' false and misleading statements.

60.     Had Plaintiff and the other members of the Classes been aware that the market price of Mylan N.V.'s ordinary shares and/or the market price of Mylan Inc.'s common stock had been artificially and falsely inflated by Mylan N.V.'s, Mylan Inc.'s, and the Individual Defendants' misleading statements and by the material adverse information which Mylan N.V., Mylan Inc., and the Individual Defendants did not disclose, they would not have purchased Mylan N.V.'s ordinary shares and/or Mylan Inc.'s common stock at the artificially inflated prices that they did, or at all.

61.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Classes have suffered damages in an amount to be established at trial.

62.     By reason of the foregoing, Mylan N.V., Mylan Inc. and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Classes for substantial damages which they suffered in connection with their purchases of Mylan ordinary shares and/or Mylan Inc. common stock during the Class Period.

## <u>COUNT II</u>

**Violation of Section 20(a) of The Exchange Act
Against The Individual Defendants**

63.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.    During the Class Period, the Individual Defendants participated in the operation and management of Mylan N.V. and Mylan Inc., and conducted and participated, directly and indirectly, in the conduct of Mylan N.V.'s and Mylan Inc.'s business affairs. Because of their senior positions, they knew the adverse non-public information regarding Mylan N.V.'s and Mylan Inc.'s business practices.

65.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Mylan N.V.'s and Mylan Inc.'s financial condition and results of operations, and to correct promptly any public statements issued by Mylan N.V. and Mylan Inc. which had become materially false or misleading.

66.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mylan N.V. and Mylan Inc. disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Mylan N.V. and Mylan Inc. to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Mylan N.V. and Mylan Inc. within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mylan N.V. ordinary shares and the market price of Mylan Inc. common stock.

67.    Each of the Individual Defendants, therefore, acted as a controlling person of both Mylan N.V. and Mylan Inc. By reason of their senior management positions and/or being

directors of Mylan N.V. and Mylan Inc., each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Mylan N.V. and Mylan Inc. to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Mylan N.V. and Mylan Inc. and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mylan N.V. and Mylan Inc.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 11, 2016                         Respectfully submitted,

                                                **THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Laurence Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*