UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Mylan N.V. Securities Litigation | No. 16-cv-07926 (JPO) |

**REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants*

September 22, 2017

# TABLE OF CONTENTS

SUPPLEMENTAL TABLE OF ABBREVIATIONS ...................................................................... ii

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT .....................................................................................................1

ARGUMENT ...................................................................................................................................1

    I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) ..................1

        A.    Defendants Were Not Required To Disclose the Alleged Wrongdoing. ..........................................................................................................1

        B.    Plaintiffs Have Not Sufficiently Pleaded Scienter. .......................................6

        C.    Plaintiffs' Loss Causation Allegations Are Deficient. .................................8

    II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a). .................9

    III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER ISRAELI LAW. ...................9

        A.    The Israeli Law Claim Fails on Jurisdictional Grounds. .............................9

        B.    The Israeli Law Claim Fails under *Forum Non Conveniens*. ....................10

CONCLUSION ..............................................................................................................................10

**SUPPLEMENTAL TABLE OF ABBREVIATIONS**

| | |
|---|---|
| Agmon Decl. | Declaration of Adv. Zvi Agmon (in Support of Defendants' Motion to Dismiss), dated May 30, 2017 [Dkt. #48] |
| CW | Plaintiffs' purported "Confidential Witness" (*see* Compl. ¶¶ 110-11, 332-33) |
| Defs.' Br. or Defendants' Opening Brief | Memorandum of Law in Support of Defendants' Motion to Dismiss, dated May 30, 2017 [Dkt. #46] |
| Licht Decl. | Declaration of Prof. Amir N. Licht (in Opposition to Defendants' Motion to Dismiss), dated July 8, 2017 [Dkt. #51] |
| Pls.' Br. | Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated August 8, 2017 [Dkt. #49] |

Terms defined in the Table of Abbreviations and body of Defendants' Opening Brief have the same meanings here.

---

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-md-2481, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .........................................................................................9

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) ......................................................................2, 4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................................5

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*,
  137 S. Ct. 1773 (2017) ................................................................................................9

*Brown v. Lockheed Martin Corp.*,
  814 F.3d 619 (2d Cir. 2016) .......................................................................................9

*CLAL Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*,
  No. 09-cv-2255, 2011 WL 5331648 (S.D.N.Y. Sept. 28, 2011) ...............................10

CC (TA) 28811-02-16 *Damti v. MannKind Corp.* (2016) (Isr.) .........................................10

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) .........................................................................................4

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ................................................................................................3

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  No. 15-cv-6369, 2017 WL 1498055 (S.D.N.Y. Apr. 26, 2017) ..................................6

*Kalnit v. Eichler*,
  99 F. Supp. 2d 327 (S.D.N.Y. 2000) ..........................................................................7

*LaSala v. UBS, AG*,
  510 F. Supp. 2d 213 (S.D.N.Y. 2007) ......................................................................10

*Low v. Robb*,
  No. 11-cv-2321, 2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) ....................................5

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006) .......................................................................................3

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) .................................................................. 1, 6

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) .................................................................................................. 10

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) .................................................................. 1, 3

*In re Propranolol Antitrust Litig.*,
    No. 16-cv-9901, 2017 WL 1287515 (S.D.N.Y. Apr. 6, 2017) ....................................5

*In re PXRE Grp., Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ......................................................................7

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Acta Vis, PLC*,
    Nos. 15-cv-6549, *et al.*, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) ....................4

*Solent Freight Servs., Ltd. v. Alberty*,
    914 F. Supp. 2d 312 (E.D.N.Y. 2012) ......................................................................5

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ......................................................................8

*In re Tamoxifen Citrate Antitrust Litig.*,
    277 F. Supp. 2d 121 (E.D.N.Y. 2003) ......................................................................4

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ......................................................................................7

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ......................................................................................3

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) ....................................................................................5

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ......................................................................2

*In re Yukos Oil Co. Sec. Litig.*,
    No. 04-cv-5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ............................ 3, 4

**Statutes & Rules**

28 U.S.C. § 1367(c) ............................................................................................................9

**PRELIMINARY STATEMENT**

Plaintiffs' attempt to repackage as securities fraud unproven allegations of wrongdoing that have nothing to do with Mylan's disclosures fails.  Plaintiffs have not adequately alleged *any* underlying wrongdoing, *any* false or misleading statements or omissions, or *any* inference that Defendants acted with scienter.  Were allegations like Plaintiffs' sufficient, every unproven claim against a company under *non*-securities laws would give rise to a claim under *securities* laws as well, unless the company publicly accused itself of the non-securities wrongdoing—even if it did nothing wrong.  That is not the law.  The Complaint should be dismissed.[1]

**ARGUMENT**

I.  **PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b).**

　　A.　**Defendants Were Not Required To Disclose the Alleged Wrongdoing.**

Plaintiffs concede that the securities laws impose no duty to disclose alleged, unadjudicated wrongdoing.  (Pls.' Br. at 6.)  Nonetheless, Plaintiffs claim that Defendants were obligated to disclose the supposed wrongdoing because, once a company speaks on a topic, it must tell the "'whole truth'".  (*Id.*)  This argument cannot save Plaintiffs' Complaint.

As an initial matter, the alleged instances in which Defendants "spoke" were only general statements about the MDRP (and its risks) (*e.g.*, Compl. ¶¶ 203, 205), competition (*e.g.*, *id.* ¶ 225), EpiPen (*e.g.*, *id.* ¶¶ 223, 242) and revenues (*e.g.*, *id.* ¶ 254).  These statements are "too tenuous to give rise to a duty to disclose" the alleged misconduct, especially where Mylan has *never* admitted to, or been found liable for or guilty of, *any* misconduct.  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 582 (S.D.N.Y. 2016).[2]

---

[1] Because Plaintiffs cannot cure the deficiencies in their Complaint, dismissal should be with prejudice. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 410 (S.D.N.Y. 2006); [Dkt. #55].

[2] Plaintiffs continue to claim that Mylan's accurate revenue and income statements are actionable because they purportedly included revenue derived from unlawful activity. (Pls.' Br. at 7 n.4, 10.)  As explained below and in

More importantly, these general, alleged misrepresentations would be material *only* if the undisclosed conduct were actually unlawful. Thus, Plaintiffs are obligated to plead facts sufficient to show wrongdoing. *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish [the alleged wrongdoing], then . . . securities law claims premised on the nondisclosure of the [wrongdoing] are fatally flawed.").

For example, with respect to EpiPen classification, Plaintiffs confirm that their theory is that Mylan's disclosures were misleading because "Mylan misclassified the EpiPen". (Pls.' Br. at 8.) In other words, Plaintiffs' entire theory of securities fraud turns (as it must) on the allegation that Mylan did in fact knowingly misclassify EpiPen.[3] But Plaintiffs barely even try to rebut Defendants' clear showing that the MDRP regime is complicated and unclear.[4] Plaintiffs also do not (because they cannot) deny that EpiPen's classification was based on a written "decision" by CMS that it was "entirely fitting and proper". [Dkt. #50-1]; (Defs.' Br. at 3). Instead, they stake their case on an allegation that CMS purportedly informed Mylan of the alleged misclassification at some later (but unspecified) time, and that this superseded the earlier written decision. (Pls.' Br. at 16 & n.15.) But Plaintiffs do not specify when this alleged

---

Defendants' Opening Brief, however, this assumes misconduct that Plaintiffs have failed to plead. By contrast, in Plaintiffs' cited case, *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 395 (S.D.N.Y. 2005), defendants had entered into consent decrees *admitting* to misconduct. Not so here. [*See* Dkt. ##54-1, 54-2.]

[3] Plaintiffs do not allege that the challenged statements could have been false or misleading, or that Defendants could have acted with scienter, without Defendants having known about the supposed underlying wrongdoing.

[4] For example, Plaintiffs do not dispute that (i) only drugs approved under an "original" NDA qualify as innovators; (ii) the term "original" is not defined in the statute; (iii) CMS has recognized that the term "original" has "created ambiguity" and is in need of clarification; (iv) CMS has recognized that not all NDAs are "original"; and (v) whether an NDA is "original" depends on "the unique facts and circumstances" of a drug's approval. (Defs.' Br. at 2, 6-7.) Notably, Plaintiffs claim that "Defendants have not advanced . . . any argument for why EpiPen . . . was not marketed under an 'original' NDA". (Pls.' Br. at 16 n.15.) To be clear, EpiPen was approved in the 1980s pursuant to a 505(b)(2) application, which, among other unique circumstances surrounding EpiPen's approval, suggests that EpiPen was *not* marketed under an "original" NDA. (Defs.' Br. at 7.)

communication between CMS and Mylan occurred, who at Mylan was allegedly informed of the supposed misclassification, or the form in which the alleged communication was made. (*See id.*; Compl. ¶ 65.)  And, even if CMS raised questions about classification at some unspecified point, being told that a classification may be incorrect is not the same as knowing that it is— particularly where the regime is unclear and there is no allegation that CMS formally changed its written decision on EpiPen classification.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016).[5]  Put simply, Plaintiffs have alleged no facts showing that Defendants knew they were misclassifying EpiPen.  *See Nokia*, 423 F. Supp. 2d at 392-94 (finding that plaintiffs failed to plead falsity with "adequate specificity" because they did not sufficiently "assert when [d]efendants allegedly knew" facts rendering their statements false).

Plaintiffs try to sidestep their deficient allegations by claiming that whether Mylan *knowingly* misclassified EpiPen is relevant only to scienter—and not to falsity.  (Pls.' Br. at 8-9.)  While Plaintiffs' failure to plead scienter on this same theory does, indeed, independently foreclose their Complaint (*see* Section I.B), a failure to disclose purported wrongdoing—in this instance, the alleged misclassification—is false or misleading under the securities laws only where the alleged misconduct was clearly unlawful.  *See In re Yukos Oil Co. Sec. Litig.*, No. 04-cv-5243, 2006 WL 3026024, at *15-16 (S.D.N.Y. Oct. 25, 2006).  Where the law is complicated

---

[5] Plaintiffs also launch an evidentiary challenge to the long-standing CMS decision—which Defendants did not attach to their motion, but which Plaintiffs "located . . . online" and submitted themselves.  (Pls.' Br. at 15); [Dkt. #50-1].  This is a straw man.  Whether the CMS decision is "official" and whether there is "additional documentation" are beside the point; a prior CMS "decision" that it was "entirely fitting and proper" to classify EpiPen as Mylan did is plainly relevant to Mylan's knowledge regarding whether EpiPen was misclassified.  And, given Plaintiffs' repeated references to the 2016 8-K (Ex. 2; Compl. ¶¶ 85, 311 & n.57) and Inside Health Policy article (Ex. 3; Compl. ¶¶ 18, 308 & n.54), each of which expressly references this CMS decision, the Court may of course consider the decision as incorporated by reference, *see Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  Also, because Plaintiffs rely "heavily upon the terms and effect" of both the 2016 8-K and the Inside Health Policy article in their loss causation allegations (Compl. ¶¶ 308, 311), they are "integral" to the Complaint and should be considered, *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006); (*see* Defs.' Br. at 3 n.2).  Plaintiffs plead no facts challenging the authenticity of either the 2016 8-K or the Inside Health Policy article.

3

and unclear—and other facts, such as a written decision from the government, suggest that the action was lawful—a claim for securities fraud based on non-disclosure of the alleged wrongdoing fails. *Id.* (dismissing securities claim premised on nondisclosure of wrongdoing where wrongdoing was only a "speculative possibility"). That is particularly true where, as here, defendants "disclose[d] the risks attendant" to a potential finding of wrongdoing. *Id.* at *16. Indeed, Mylan repeatedly warned investors that its "reporting and payment obligations under the Medicare and/or Medicaid rebate program . . . are complex and may involve subjective decisions that could change as a result of . . . new regulatory guidance". (*E.g.*, Compl. ¶¶ 205, 210; *see* note 9.)

With respect to the alleged EpiPen "pay-for-delay" and exclusive dealing agreements with schools, Plaintiffs barely even bother to argue that they have sufficiently alleged misconduct, relegating that entire point to a footnote. (*See* Pls.' Br. at 10 n.8.) Their primary argument is that these alleged agreements had to be disclosed even if they were completely lawful, citing to *Axis*. (*Id.* at 9.) But *Axis* itself forecloses this argument. There, plaintiffs alleged that, because defendant did not disclose alleged "anticompetitive agreements", statements about defendant's competitive advantages and "the competitive nature of the . . . industry" were misleading. *Axis*, 456 F. Supp. 2d at 581-82. The court dismissed the complaint because plaintiffs had failed sufficiently to plead the existence of any unlawful agreements. *Id.* at 599. Plaintiffs point to no meaningful difference between their claims and those in *Axis*.[6]

---

[6] The argument—again, in a footnote (Pls.' Br. at 10 n.8)—that Plaintiffs have adequately pleaded wrongdoing with respect to these agreements fails. Plaintiffs' "pay-for-delay" allegations fail because they do not allege that any purported payment was large and unexplained, or had anticompetitive effects. *Sergeants Benevolent Ass'n Health & Welfare Fund v. Acta Vis, PLC*, Nos. 15-cv-6549, *et al.*, 2016 WL 4992690, at *13 (S.D.N.Y. Sept. 13, 2016). Indeed, given Teva's unrelated failure to secure FDA approval for its generic drug, Plaintiffs cannot allege that Mylan caused any harm. *See In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 137 (E.D.N.Y. 2003). Plaintiffs' exclusive dealing allegations fail because such agreements are presumptively legal, and the allegations of harm to competition in the relevant market are conclusory. *See E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006). The argument that, because their Complaint "does not allege any *pro*competitive

Plaintiffs also plead no facts to substantiate their conclusory allegation that Mylan engaged in market allocation of doxycycline—arguing that, because their allegations were copied wholesale from an unadjudicated complaint in another case, they state a claim. (Pls.' Br. at 11, 20 n.18.) But allegations copied from an unresolved complaint are immaterial, and the fact that allegations are taken from a different, unadjudicated case certainly does not render them actionable under the securities laws. *See Low v. Robb*, No. 11-cv-2321, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012).[7] Finally, Plaintiffs' attempt to recast copy-and-paste pleadings for multiple generic drugs as "detailed allegations" tending to establish "plus factors" supporting an inference of a price-fixing conspiracy fails. (Pls.' Br. at 12.) Plaintiffs concede that they allege no direct evidence of a conspiracy (*id.* at 13), and they do not refute that they have pleaded no facts sufficient to exhibit unlawful parallel price movements (Defs.' Br. at 11 n.8).[8]

---

effects", "a reasonable jury could find that these agreements had a net *anti*competitive effect" (Pls.' Br. at 10 n.8 (emphases added)), is specious. It is Plaintiffs' burden to allege *harm to competition*, which they have not done, before a factfinder even gets to alleged *pro*competitive justifications. *See Solent Freight Servs., Ltd. v. Alberty*, 914 F. Supp. 2d 312, 321-24 (E.D.N.Y. 2012); *United States v. Microsoft*, 253 F.3d 34, 58-59 (D.C. Cir. 2001).

[7] Plaintiffs also continue to rely on former Heritage employees' guilty pleas to allege market allocation of doxycycline, and state in a conclusory fashion that Mylan was "included". (Compl. ¶ 199; *see* Pls.' Br. at 11.) But the admission Plaintiffs cite makes no mention of Mylan. (Compl. ¶ 200.) And the decision Plaintiffs rely on for this argument, *In re Propranolol Antitrust Litig.*, No. 16-cv-9901, 2017 WL 1287515 (S.D.N.Y. Apr. 6, 2017), did not even address supposed market allocation of doxycycline.

[8] That is, Plaintiffs fail to rebut Defendants' showing that (i) the alleged price movements are consistent with lawful activity, (ii) it is legally insufficient to rely on allegations that price increases followed industry conferences, and (iii) allegations of oligopoly do not alone support an inference of price-fixing. (*Id.* at 11-12 & nn.8-9.) Instead, Plaintiffs claim that their allegations of price-fixing somehow survive because different allegations in a different case (*Propranolol*) withstood a motion to dismiss. (Pls.' Br. at 12 & n.12.) But, of course, it is irrelevant that a *different* court found *different* allegations sufficient—particularly where a multidistrict litigation panel is considering whether that different court's ruling should be given effect. And, even if the *Propranolol* ruling is given effect in that other case, it is distinguishable from this case for numerous reasons. For example, in finding that the complaint before it pleaded facts sufficient to find inter-firm communications, *Propranolol* relied on detailed allegations of defendants' participation in trade association meetings, including attendees' names, job titles and roles in setting prices. *See* 2017 WL 1287515, at *7 & n.14. Here, by contrast, Plaintiffs do not allege which Mylan employees attended which meetings, never mind their titles or whether they were responsible for pricing. (*See* Compl. ¶¶ 176-79.) More persuasive is *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481, 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014), in which the court rejected allegations that did not explain "who was on a particular . . . committee at a particular time" or "which suspect action by committee members or others within their control occurred"—as well as other cases, overlooked in *Propranolol*, that establish that trade meetings are insufficient to plead an antitrust conspiracy, *see, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 n.12 (2007).

5

Plaintiffs fail to allege facts requiring disclosure of any supposed misconduct.

B.     **Plaintiffs Have Not Sufficiently Pleaded Scienter.**

Plaintiffs' Section 10(b) claim fails for a second independent reason—they have failed to plead with particularity facts giving rise to a strong inference that Defendants acted with scienter.

Critically, Plaintiffs do not dispute that Defendants had no motive to commit the alleged fraud or that, absent motive, "'the strength of [Plaintiffs'] circumstantial allegations [of scienter] must be correspondingly greater'". (Defs.' Br. at 14.) But Plaintiffs' allegations—a string of debunked scienter theories, cobbled together in the hope that something will stick—fail.[9]

***DOJ Investigations and Settlement.***  Plaintiffs do not dispute that government investigations "'cannot bolster allegations of scienter that do not exist'" and "'are just that, investigations'". (Defs.' Br. at 17.) Similarly, the DOJ settlement does not give rise to an inference of scienter (*id.*), as companies settle matters for many reasons other than because they are liable. Indeed, the DOJ itself stated in its press release announcing the settlement that "[t]he claims settled by th[e] agreement are *allegations only*, and there has been *no determination of liability*". [Dkt. #54-2 (emphases added).] The DOJ investigations and settlement—with *no* admission of wrongdoing—fail to create any inference of scienter, let alone a strong one. The far stronger inference is that Defendants believed they were complying with the law (including

---

[9] Plaintiffs mistakenly claim that Defendants have conceded that Plaintiffs' allegations relating to the DOJ Investigation and the alleged post-1997 CMS communication are actionable. (Pls.' Br. at 7-8, 14.) These allegations (like all of the others) fail because Plaintiffs have not pleaded scienter—including because of the CMS decision that Mylan's EpiPen classification was correct—and the latter fails also on falsity. (Defs.' Br. at 6-7, 14; Section I.A.) Furthermore, Plaintiffs' reliance on *Menaldi* to claim that Mylan had to disclose either the DOJ Investigation or the alleged CMS communication sooner is misplaced. (Pls.' Br. at 7-8, 14.) In *Menaldi*, this Court held that there was no duty to disclose government inquiries, but where defendants stated that they were "not currently subject to any pending regulatory . . . proceedings" that may be "material"—but were—they triggered a duty to disclose. 164 F. Supp. 3d at 583-84. Here, Mylan repeatedly disclosed, among other things, that its MDRP practices are "subject to review and challenge" by government agencies, that such investigations "may have material" effects on Mylan, and that agencies "that have commenced . . . an investigation" could seek penalties. (*E.g.*, Compl. ¶ 269.) This language conveys "current investigative activity"; it is not actionable. *In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15-cv-6369, 2017 WL 1498055, at *13 (S.D.N.Y. Apr. 26, 2017); (Section I.A).

the CMS decision), and settled (as Mylan announced at the time) simply to "'bring[] closure to th[e] matter . . . [and] to allow [the company] to move forward'". [Dkt. #54-1.]

***CMS Communication.*** Plaintiffs' alleged "supersed[ing]" CMS communication (Pls.' Br. at 14) fails to create any inference of scienter because, among other reasons, Plaintiffs do not allege when it occurred, who received it or its form.[10] (*See* Section I.A; note 9.)

***Core Operations.*** Plaintiffs also rely on a discredited "core operations" theory, claiming that the importance of EpiPen and other products to Mylan "buttress[es]" the conclusion that Defendants knowingly misled investors. (Pls.' Br. at 17-18, 20.) But again, Plaintiffs have not adequately alleged that Mylan committed any legal violations—let alone with *knowledge*. (*See* Section I.A.) The importance of the drugs to Mylan is irrelevant. (*See* Defs.' Br. at 16-17.)

***CW Statements.*** Plaintiffs' supposed CW likewise fails to create any inference of scienter. The CW states simply that pricing "was always a topic" (as one would expect in a for-profit company), and that pricing decisions were discussed by top-level management (again, no surprise). (Compl. ¶¶ 110-11, 332-33.) But alleging general involvement in *internal* pricing decisions—which is all the CW does—comes nowhere close to alleging that Defendants had knowledge of alleged price-fixing, market allocation or other anticompetitive activity *with competitors*, and has nothing to do with EpiPen's MDRP classification.[11] Without knowledge of

---

[10] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (finding that, to allege scienter with sufficient particularity, plaintiffs must identify "specific contradictory information" available at "*the same time*" defendants spoke, and "vague dates" are not sufficient).

[11] Plaintiffs do not dispute that, without other allegations sufficient to establish scienter, they "'cannot raise an inference of fraudulent intent based on the signing of [SOX] certification[s]'" (Defs.' Br. at 16), or that accusations founded on no more than a defendant's corporate position are given no weight (*id.* at 15). Plaintiffs' bald statements—for example, that they have established "conscious misbehavior" and that "Defendants 'knew facts or had access to information' regarding Mylan's anticompetitive activity" (Pls.' Br. at 19)—are too conclusory ever to establish scienter, *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 335 (S.D.N.Y. 2000).

the actual alleged wrongdoing, Plaintiffs' allegations fail. (*See* note 3.)

Plaintiffs' allegations do not—alone or holistically—create an inference that Defendants acted recklessly or with intent. On that basis alone, the Complaint should be dismissed.

### C. Plaintiffs' Loss Causation Allegations Are Deficient.

Even if the Court does not dismiss the Complaint—though, under settled law, it should— nearly 85% of Plaintiffs' claimed losses (across 12 supposed "corrective" disclosures) should be dismissed due to Plaintiffs' failure adequately to allege loss causation. (Defs.' Br. at 20-22.)[12]

The first six alleged corrective disclosures (all from August 2016) reported only on EpiPen price increases and potential explanations. (Compl. ¶¶ 302-07.) But EpiPen's price was never concealed—and neither Plaintiffs' Complaint nor the "corrections" it cites says *anything* to tie the price increases to Mylan's supposed anticompetitive activity. In other words, Plaintiffs supply no reason at all to believe that the increases had anything to do with the alleged fraud. (Defs.' Br. at 20.) The seventh alleged correction, an October 12, 2016 article analyzing the DOJ settlement (Compl. ¶¶ 313-14), also does not establish loss causation because Mylan had announced that settlement five days earlier, on October 7 (*id.* ¶ 311), and old news is not corrective.[13] The eighth and ninth supposed corrections, November 2016 news reports of the DOJ investigation into generic drug pricing (Compl. ¶¶ 315-18), are deficient because those "disclosures" were also merely repackaged discussions—of an investigation that Mylan had

---

[12] Plaintiffs do not plead *any* corrective disclosures related to EpiPen agreements with schools—so their allegations relating to such agreements must be dismissed. (*Id.* at 8-9.) As Plaintiffs concede, their Complaint on this point alleges "corrective" disclosures relating only to anticompetitive activity *generally*. (*See* Pls.' Br. at 21 n.20 (citing Compl. ¶¶ 323-24 ("On January 30, 2017, Bloomberg News reported that Mylan had received a request for information from the FTC regarding whether Mylan had engaged in anticompetitive activity, including entering pay-for-delay agreements, relating to the EpiPen.")).) Clearly, this does not suffice.

[13] Plaintiffs must use this October 12 article because Mylan's stock price actually *increased* (by 12%) after it announced the DOJ settlement on October 7. (Defs.' Br. at 21 n.12.) That the October 12 article speculated that the settlement "might require Mylan to pay much more" (Pls.' Br. at 21) does not make it new, *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 352 (S.D.N.Y. 2015) (holding that report "speculati[ng] about the size of a possible fine" is not a new disclosure).

previously disclosed in its filings. The remaining three "corrections" are similarly deficient.[14]

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a).

Because Plaintiffs' Section 10(b) claim (Count I) fails, their Section 20(a) claim (Count II) fails. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

## III. PLAINTIFFS FAIL TO STATE A CLAIM UNDER ISRAELI LAW.

### A. The Israeli Law Claim Fails on Jurisdictional Grounds.

This Court lacks personal jurisdiction over Defendants with respect to the Israeli law claim. (Defs.' Br. at 23.) Plaintiffs cannot establish *general* jurisdiction because Defendants are not "essentially at home" in New York.[15] Plaintiffs cannot establish *specific* jurisdiction because any contacts Mylan has with New York are unrelated to this claim—which concerns trades in Israel. Plaintiffs argue that, where a defendant has substantial contacts with the forum state—which Plaintiffs have failed to plead—courts "accept a more attenuated relation between the defendant's contacts with the forum and the plaintiff's cause of action". (Pls.' Br. at 23.) But the Supreme Court recently rejected this same "sliding scale" approach. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1781 (2017).[16]

---

[14] These final three "corrections", news articles from October 5 and 7, 2016 and January 10, 2017 (*id.* ¶¶ 310, 311, 321), were based on already public information—specifically, a September 2, 2016 article that addressed facts similar to those in the October articles (*id.* ¶ 308), and a December 14, 2016 article that addressed facts similar to the January 10 article (*id.* ¶ 319). Again, gloss on already public information is not corrective.

[15] *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016). Plaintiffs misstate the standard for general jurisdiction—claiming that it may be predicated on "continuous and systematic" contacts with New York. (Pls.' Br. at 22 n.22.) In fact, general jurisdiction exists only when a "corporation's affiliations with the State are *so* continuous and systematic *as to render it essentially at home* in the forum". *Brown*, 814 F.3d at 627. "[E]xcept in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' *only* where it is *incorporated* or maintains its *principal place of business*." *Id.* (emphases added). Neither Mylan N.V. nor Mylan Inc. is incorporated or has its principal place of business in New York. (*See* 2014 10-K (Ex. 6).) And maintaining offices and leasing property in New York (Compl. ¶ 27) do not render Mylan "essentially at home" here, *Brown*, 814 F.3d at 627. Plaintiffs plead nothing at all about the domiciles or contacts of any of the Individual Defendants.

[16] If the Court dismisses Counts I and II (the U.S. claims), then clearly there is no supplemental jurisdiction over Count III (the Israeli claim). But, even if the Court permits Counts I and II to proceed, it still should decline to exercise supplemental jurisdiction over Count III. In response, Plaintiffs argue that the Israeli claim is "identical" to the U.S. claims. (Pls.' Br. at 24.) This misses the point. Even assuming that Count III involves the same case or controversy, courts decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) over foreign claims

9

### B.      The Israeli Law Claim Fails under *Forum Non Conveniens*.

Incredibly, Plaintiffs do not address the overwhelming comity interest in having a claim under *Israeli* law, brought by *Israeli* investors, regarding trades on an *Israeli* exchange, decided by an *Israeli* court.  Instead, Plaintiffs argue against dismissal because U.S. law will supposedly apply to their claim.  (Pls.' Br. at 22, 25.)  But application of U.S. law to Count III is far from settled and "not a simple question", CC (TA) 28811-02-16 *Damti v. MannKind Corp.* ¶ 45 (2016) (Isr.) [Dkt. ##57, 57-1]; and, if the Court permits the claim to proceed, it will have to determine what Israeli law would say about which law applies—which further supports dismissal, *see LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 246 (S.D.N.Y. 2007).[17]  Also, Plaintiffs say that there is "no serious dispute" that an Israeli court would recognize a U.S. judgment on Count III (Pls.' Br. at 25), but their expert concedes that this is not certain, stating only that there is "every reason to believe" it would (Licht Decl. ¶ 85).  Given that Plaintiffs and their counsel informed the Court that they sought to represent a TASE class only *after* they had become lead, and where an Israeli court deciding whether to enforce a U.S. judgment will consider whether investors "were appropriately represented" (Agmon Decl. ¶¶ 10-12), Defendants are rightly concerned about double exposure [Dkt. #57]; (Defs.' Br. at 25).  Count III should be in Israel.

### CONCLUSION

The Court should dismiss the Complaint in its entirety, and with prejudice.

---

brought by foreign plaintiffs concerning conduct causing purported harm abroad.  (Defs.' Br. at 23-24.)

[17] If Plaintiffs are right that U.S. law would apply to Count III, then that count should be dismissed under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), which requires U.S. courts to dismiss U.S. securities claims by foreign plaintiffs for losses on foreign exchanges.  *See CLAL Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*, No. 09-cv-2255, 2011 WL 5331648, at *2 (S.D.N.Y. Sept. 28, 2011); (*see also* Compl. ¶¶ 367-68 (pleading that Count III is satisfied because Defendants allegedly violated Sections 10(b) and 20(a))).  That an Israeli court has found that *Morrison* does not preclude the application of U.S. securities laws in an *Israeli* proceeding (Pls.' Br. at 24 n.24) is irrelevant to whether *Morrison* precludes such application in this Court.  It does.  Furthermore, while Plaintiffs claim that dismissal would harm Israeli investors (Pls.' Br. at 25), petitioners in actions in *Israel* have made the far stronger argument that litigating Count III here could leave investors unprotected [Dkt. #52].

September 22, 2017

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by
　　　　　　　　*/s/ Sandra C. Goldstein*
　　　　　　　　Sandra C. Goldstein
　　　　　　　　Kevin J. Orsini
　　　　　　　　Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
sgoldstein@cravath.com
korsini@cravath.com

*Attorneys for Defendants*

11