UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE MYLAN N.V. SECURITIES
LITIGATION

16-CV-7926 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

This case is a securities class action against the drug manufacturer Mylan N.V. and several of its officers. The Complaint alleges that Mylan knowingly misclassified the EpiPen for purposes of Medicaid rebates; that Mylan entered into anticompetitive agreements to inflate drug prices; and that after committing these illegal acts, Mylan made materially misleading statements about its conduct to investors, in violation of U.S. and Israeli securities laws.

Mylan now moves to dismiss the complaint. For the reasons that follow, the motion is granted in part and denied in part.

## I.      Background

The following facts are taken from the Amended Class Action Complaint (the "Complaint") and are assumed true for purposes of this motion. (*See* Dkt. No. 39 ("Compl.").)

Mylan develops, licenses, manufactures, markets, and distributes brand-name and generic pharmaceuticals worldwide. (Compl. ¶ 2.) This action arises out of Mylan's conduct regarding a few drugs in particular: the branded drug EpiPen Auto-Injector ("EpiPen") and the generic drugs albuterol sulfate, benazepril, clomipramine, divalproex, doxycycline hyclate delayed release ("Doxy DR"), and propranolol. (*Id.*)

Mylan is a public company, trading on both the NASDAQ Global Select Market ("NASDAQ") and the Tel Aviv Stock Exchange ("TASE").  (Compl. ¶ 25.)  Lead Plaintiffs Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., Phoenix Insurance Company Ltd., Meitav DS Provident Funds and Pension Ltd., and Dan Kleinerman ("Plaintiffs") bring this action on behalf of themselves and a class of individuals who purchased the common stock of Mylan N.V. or Mylan, Inc. between February 21, 2012, and January 29, 2017, on the NASDAQ or the TASE.  (Compl. ¶ 1.)  Plaintiffs bring suit against Mylan N.V. and Mylan, Inc. (Mylan N.V.'s predecessor and now its subsidiary), and Mylan executives Heather Bresch, Mylan's Chief Executive Officer ("CEO") since January 2012; Paul B. Campbell, Mylan's Chief Accounting Officer since May 2015; Robert J. Coury, Mylan's CEO from September 2002 through January 2012; Kenneth S. Parks, Mylan's Chief Financial Officer ("CFO") since June 2016; and John D. Sheehan, Mylan's CFO from April 2010 until April 2016 (collectively, "Mylan").  (Compl. ¶¶ 26–32.)

A.      **Mylan's Allegedly Unlawful Conduct**

The conduct giving rise to this action falls into two categories of alleged wrongdoing: (1) Medicaid misclassification and (2) antitrust violations.

First, the Complaint alleges that Mylan unlawfully misclassified the EpiPen as a generic drug for purposes of the Medicaid Drug Rebate Program ("MDRP").  (Compl. ¶ 5.)  The MDRP requires pharmaceutical companies to give the Centers for Medicare & Medicaid Services ("CMS"), the agency that administers Medicaid, a rebate on their drugs.  (*See* Compl. ¶ 41.)  Rebate rates are set by law, and they vary based on whether the drug in question is a single source drug ("S drug"), an innovator multiple source drug ("I drug"), or a noninnovator multiple source drug ("N drug").  (Compl. ¶ 44.)  Guidance from CMS indicates that "[i]n general, those products that are approved under a New Drug Application (NDA) need to be reported to CMS as

either single source (S) or innovator multiple source (I) and those products approved under an Abbreviated New Drug Application (ANDA) need to be reported to CMS as non-innovator multiple source (N)."[1] (Compl. ¶ 48.) The rebates for S and I drugs are higher than the rebates for N drugs, so Mylan's decision to classify the EpiPen as an N drug allegedly saved the company over $700 million. (Compl. ¶ 53.)

The Complaint alleges that CMS expressly informed Mylan that it had misclassified the EpiPen as an N drug. On March 16, 2009, the Department of Health and Human Services Inspector General ("HHS IG") provided CMS with a list of eight misclassified drugs, including the EpiPen. (Compl. ¶ 65.) Sometime after this disclosure, and on "multiple occasions," CMS informed Mylan that the EpiPen was incorrectly classified. (*Id.*) The Complaint further alleges that Mylan received a subpoena from the Department of Justice ("DOJ") in November 2014 regarding an investigation into whether the EpiPen was properly classified. (Compl. ¶ 72.) On October 7, 2016, Mylan announced that it had agreed to a $465 million settlement with the DOJ and other government agencies (Compl. ¶ 85) in which Mylan agreed to reclassify the EpiPen but did not admit to any wrongdoing (Dkt. No. 54-1).[2]

Second, the Complaint alleges that Mylan entered into a number of anticompetitive agreements to inflate the prices of various drugs. Plaintiffs allege two violations specific to the EpiPen: (1) that Mylan's settlement of a patent infringement suit against Teva Pharmaceuticals ("Teva") included an unlawful "pay for delay" clause that obligated Teva to delay introduction

---

[1] NDAs cover "new drug[s]" and ANDAs cover "generic drug product[s]." FDA, "Types of Applications," https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ HowDrugsareDevelopedandApproved/ApprovalApplications/default.htm. The parties dispute whether the EpiPen was misclassified.

[2] On consent of both parties, the Court takes judicial notice of Mylan's August 31, 2017, press release finalizing the terms of the settlement. (*See* Dkt. Nos. 53–55.)

of a generic EpiPen competitor (Compl. ¶¶ 93–100), and (2) that Mylan entered into exclusive dealing agreements with schools that prevented the schools from purchasing EpiPen competitor-products (Compl. ¶¶ 101–02). Plaintiffs further allege that in the generic drug market, Mylan entered into agreements with its competitors (1) to allocate the market for Doxy DR (Compl. ¶¶ 112–26), and (2) to fix the prices of albuterol sulfate, benazepril, clomipramine, divalproex, and propranolol (Compl. ¶¶ 127–60).

The Complaint cites a number of DOJ, congressional, and state investigations into potential anticompetitive conduct by pharmaceutical companies, including Mylan, in the generic drug market. (Compl. ¶¶ 188–200.)[3] However, throughout the class period, Mylan was never— and, as of today, never has been—found liable for the misconduct alleged by Plaintiffs. (Dkt. No. 12–13.)

### B.    Mylan's Statements to Investors

While intentional misclassification and anticompetitive conduct are both unlawful in their own right, illegal conduct does not in of itself constitute a securities-law violation. Instead, Plaintiffs allege that Mylan misled investors about its misclassification of the EpiPen and its anticompetitive agreements. (Compl. ¶¶ 76, 92, 185–86.) Plaintiffs have identified a long list of allegedly misleading statements spanning the five-year class period. (*See* Compl. ¶¶ 201–297.) These statements can be divided into the following categories.[4]

---

[3]        Additionally, on consent of the parties, the Court takes judicial notice of (1) the fact that a press release was issued by the Attorney General of Connecticut, on behalf of 46 state attorneys general, announcing their intention to file an amended complaint against Mylan and other drug companies in an antitrust suit, and (2) the fact that the proposed amended complaint in that suit was filed. (Dkt. Nos. 61-1 & 61-2; *see also* Dkt. Nos. 61 & 63.)

[4]        For a complete list of each allegedly misleading statement, see Appendix A to this Opinion and Order.

1.  Statements of Income.  Mylan stated its financial and operating results in Annual Reports on Form 10-K, in Quarterly Reports on Form 10-Q, and in Current Reports on Form 8-K.

2.  Statements Explaining Income.  Mylan's Current Reports (Form 8-K) and a quarterly earnings call described the causes and sources of Mylan's financial performance.

3.  Statements Explaining the Market.  Mylan's Annual Reports (Form 10-K) contained descriptions of the U.S. pharmaceutical market—for example, characterizing the market as "very competitive" and "highly sensitive to price."  (Compl. ¶¶ 225, 244, 262, 283.)

4.  Statements of Rebate Rates.  Mylan's Annual Reports (Form 10-K) also stated the Medicaid rebate rates for "products marketed under ANDAs" and "Medicaid-reimbursed non-innovator products."  (*E.g.*, Compl. ¶¶ 203, 260.)  None of the Annual Reports stated Mylan's classification of the EpiPen or the rebate rate that Mylan had paid to CMS.

5.  Statements of Rebate Complexity and Regulatory Risk.  Mylan included statements in both its Annual Reports (Form 10-K) and Quarterly Reports (Form 10-Q) characterizing the Medicaid rebate program as "complex" and warning that its rebate calculations were "subject to . . . review and challenge by the applicable governmental agencies" and that "a governmental authority may take a position contrary to a positon we have taken."  (Compl. ¶¶ 205, 210, 215, 227, 246, 264, 269, 287.)

6.  Code of Conduct and Business Ethics.  Throughout the class period, Mylan's Code of Conduct and Business Ethics stated that "Mylan is committed to complying with applicable antitrust and fair competition laws."  (Compl. ¶ 296.)

## C.    Procedural History

Plaintiffs are all purchasers of Mylan's common stock.  Plaintiff Stef Van Duppen filed an action against Mylan N.V., Mylan Inc., Heather Bresch, and John Sheehan on October 11,

2016. (Dkt. No. 1.)  Separately, Plaintiff Landon W. Perdue filed an action against Mylan N.V.,

Mylan Inc., Heather Bresch, Paul B. Campbell, Robert J. Coury, Kenneth S. Parks, and John D.

Sheehan on October 13, 2016. *See Perdue v. Mylan N.V.*, No. 16 Civ. 8000, Dkt. No. 1.  By

Order dated January 9, 2017, the Court consolidated the two cases for pre-trial purposes,

appointed Lead Plaintiffs, and approved Lead Counsel.  (Dkt. No. 26.)

Lead Plaintiffs subsequently filed the Amended Class Action Complaint (Dkt. No. 39)

asserting claims under: (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants; (2)

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual Defendants; and (3)

Section 1 of the Israeli Securities Law of 1968, against all Defendants.

Defendants have jointly moved to dismiss all claims for failure to state a claim upon

which relief can be granted and to dismiss claims under the Israeli Securities Law for lack of

subject matter jurisdiction, for lack of personal jurisdiction, and on *forum non conveniens*

grounds.  (Dkt. No. 45.)

## II.     U.S. Securities Law Claims

### A.     Legal Standard

Plaintiffs' primary cause of action asserts a securities fraud claim under Rule 10b-5(b) for

"mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading . . . in connection with the purchase or sale of any security."  17

C.F.R. § 240.10b-5.  "To state a claim under these provisions, a plaintiff must show '(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Menaldi v. Och-Ziff*

*Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 576 (S.D.N.Y. 2016) (quoting *Stoneridge Inv.*

*Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157 (2008)).

Claims for securities fraud are subject to the heightened pleading standards of Federal

Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See*

Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4. A claim for securities fraud must "specify each

statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u–4(b)(1); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."); *Rombach v. Chang*,

355 F.3d 164, 170 (2d Cir. 2004). The PSLRA further requires that "the complaint shall, with

respect to each act or omission alleged to violate [the Exchange Act], state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u–4(b)(2).

Plaintiffs' second claim arises under § 20(a) of the Exchange Act. Section 20(a) imposes

liability on "every person who, directly or indirectly, controls any person liable" for securities

fraud. 15 U.S.C. § 78t(a). "As a general rule, there can be no control person liability without a

'primary violation' of the Exchange Act." *Menaldi*, 164 F. Supp. 3d at 576 (quoting *Wilson v.*

*Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011)). The parties agree that Plaintiff's

§ 10(b) and § 20(a) claims rise and fall together.

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). When considering a motion to dismiss, courts "must accept as true all of the factual allegations contained in the complaint," *Twombly*, 550 U.S. at 572 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)), and must draw "all inferences in the light most favorable to the non-moving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (Sotomayor, J.).

On a 12(b)(6) motion, a court may "look[] only to the complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the complaint; and matters of which judicial notice may be taken." *Rhee-Karn v. Burnett*, No. 13 Civ. 6132, 2014 WL 4494126, at *3 (S.D.N.Y. Sept. 12, 2014) (citing *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)).

### B.    Material Misrepresentations

The failure to disclose a material fact does not necessarily make its omission untrue or misleading. "[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Instead, "omissions are actionable under § 10(b) only when a corporation has a duty to disclose." *Menaldi*, 164 F. Supp. 3d at 579.

A company has a duty to disclose material information "when (1) a statute or regulation requires disclosure or (2) disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts." *Id.* In most circumstances, a company does not have to speak. But "'once a company speaks on an issue or topic, there is a duty to tell the whole

truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (alteration in original) (quoting *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014)). "[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it—or other statements made—materially misleading." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008). This is, in short, a rule against telling "half-truths." *In re Vivendi*, 838 F.3d at 240.

One expression of this principle is the rule that corporations are under no general duty "to disclose corporate mismanagement or uncharged criminal conduct." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016). "[T]he federal securities laws do not require a company to accuse itself of wrongdoing." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006). Consequently, to impose securities law liability on a corporation for failure to disclose underlying unlawful conduct, a plaintiff must plead with particularity the affirmative statements that were made misleading by the defendant's failure to disclose the alleged wrongdoing. *See Menaldi*, 164 F. Supp. 3d at 578–80. Additionally—and perhaps obviously—such statements cannot be misleading if the misconduct did not happen; consequently, a plaintiff must adequately plead that the misconduct did, in fact, occur.[5] *Id.*

The Complaint identifies a long list of statements that were allegedly made materially misleading by Mylan's failure to disclose its underlying wrongdoing. These statements fall into six categories: statements of Mylan's income ("Statements of Income"); statements explaining

---

[5]     Because the question of underlying illegality overlaps with—and in many ways is overtaken by—the separate requirement of scienter, the Court considers these questions together.

the sources of Mylan's income ("Statements Explaining Income"); statements describing the market in which Mylan sold its products ("Statement Explaining the Market"); statements of the Medicaid rebate rates ("Statements of Rebate Rates"); statements indicating the complexity and regulatory risk associated with calculating Medicaid rebate rates ("Statements of Rebate Complexity and Regulatory Risk"); and Mylan's Code of Conduct and Business Ethics. The Complaint alleges that each category of statement is a half-truth that, once made, gave rise to a duty to make additional disclosures about Mylan's EpiPen classification and anticompetitive agreements.

### 1. Statements of Income and Statements Explaining Income

In its various periodic financial disclosures, Mylan made (a) statements of income on its Forms 10-K and 10-Q and (b) statements explaining income on its Forms 8-K.[6] The Complaint alleges that these statements

> were misleading because they failed to disclose: (1) that Mylan's net income and revenue were inflated because Mylan knowingly had misclassified the EpiPen for the purposes of the MDRP, and accordingly overcharged Medicaid for its EpiPen purchases; and (2) that this knowing misclassification created an acute risk that the Company would be required to pay steep regulatory fines as a penalty for its illegal conduct, which would ultimately be deducted as a charge against the firm's reported net income.

(*E.g.*, Compl. ¶ 202.) For statements beginning with Mylan's August 1, 2013 Form 8-K, the Complaint additionally alleges that the statements "were misleading because they failed to disclose . . . (3) [that] Mylan's income and revenue were inflated as a result of Mylan's anticompetitive activity, including allocation of the market for, and price fixing of, generic drugs." (*E.g.*, Compl. ¶ 234.)

---

[6] Mylan also offered an explanation of income in its August 2015 quarterly earnings call. (Compl. ¶ 274.)

The quantitative statements of earnings contained in Mylan's Forms 10-K and 10-Q are not actionable. Plaintiffs do not allege that Mylan's annual and quarterly earnings reports were themselves false, and "[a]ccurate statements about past performance are self evidently not actionable under the securities laws." *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004). Instead, Plaintiffs argue that providing income and revenue information, without a disclosure that those figures were inflated due to illegal conduct, was misleading. But the mere statement of historical financial information does not give rise to a duty to disclose illegal conduct that may have contributed to that performance. *See In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) ("[T]he isolated statement of actual revenues allegedly generated by improper activities does not create Section 10(b) liability.").

Mylan's Forms 8-K, however, go one step further. These Current Reports explained the sources and causes of Mylan's financial success. For example, Mylan's August 2013 Form 8-K stated, "The most significant contributor to Specialty segment revenues continues to be the EPIPEN® Auto-Injector, sales of which increased as a result of favorable pricing and volume." (Compl. ¶ 232.) In the next paragraph, Mylan went on to state that "[a]djusted gross margins were positively impacted in the current quarter as a result of the increase in sales of the EPIPEN® Auto-Injector and margins on new products, which was offset [by] the impact of unfavorable pricing on existing products in all regions within our Generics segment." (*Id.*)

Unlike Mylan's statements *of* income on Forms 10-K and 10-Q, Mylan's statements *explaining* income "put the sources of [Mylan's] revenue at issue." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005). "[W]here a company puts at issue the cause of its financial success, it may mislead investors if the company fails to

disclose that a material source of its success is the use of improper or illegal business practices."

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008).

Mylan's Forms 8-K squarely put its sources of income at issue.  For example, attributing EpiPen's strength to "favorable pricing and volume" (Compl. ¶ 232) may have been misleading in the absence of an additional statement disclosing that the EpiPen's strength was *also* due to anticompetitive agreements and knowingly miscalculated Medicaid rebates.  Similarly, stating that the generics segment faced "unfavorable pricing" (*id.*) may have been misleading in the absence of a disclosure that low prices were mitigated by price-fixing agreements.  Mylan's repeated use of causal language such as "as a result of," "primarily the result of," "driven by," and "due to" exacerbates this problem.  (*E.g.*, Compl. ¶¶ 207, 251.)

However, Mylan's statements explaining income created no duty to disclose that its "knowing misclassification created an acute risk that [Mylan] would be required to pay steep regulatory fines as a penalty." (*E.g.*, Compl. ¶ 202.)  Mylan's statements disclosing some sources of past income created a duty to tell the whole truth about past sources of income.  But Mylan's statements explaining past income do not obligate Mylan to disclose *future risk*.  Mylan must tell the whole truth about only the topics it raises.

In sum, the Court concludes that Mylan's statements explaining income were misleading because Mylan failed to disclose that "Mylan's net income and revenue were inflated because Mylan knowingly had misclassified the EpiPen" (*e.g.*, Compl ¶ 201) and that "Mylan's income and revenue were inflated as a result of Mylan's anticompetitive activity" (*e.g.*, Compl. ¶ 232). Mylan is not, however, liable for statements of income made in its Forms 10-K and 10-Q; nor is it liable for failing to disclose an "acute risk" of fines in its Forms 8-K.

## 2.    Statements Explaining the Market

In four of Mylan's five Annual Reports issued during the class period, the company described the market in which it sold the EpiPen and generic drugs. These descriptions emphasized the competitive nature of the U.S. pharmaceutical market and the means by which Mylan competed with other drug companies. In each of these Form 10-Ks, Mylan stated (with a few minor variations irrelevant to the instant motion):

> Our ***primary competitors*** include other generic companies (both major multinational generic drug companies and various local generic drug companies) and branded drug companies that continue to sell or license branded pharmaceutical products after patent expirations and other statutory expirations. In the branded space, ***key competitors*** are generally other branded products that ***compete based on their clinical characteristics and benefits***.
>
> ***Competitive factors*** in the major markets in which we participate can be summarized as follows:
>
> United States. ***The U.S. pharmaceutical industry is very competitive***. Our competitors vary depending upon therapeutic areas and product categories. ***Primary competitors include the major manufacturers of brand name and generic pharmaceuticals***.
>
> ***The primary means of competition are innovation and development, timely FDA approval, manufacturing capabilities, product quality, marketing, portfolio offering size, customer service, reputation and price***. The environment of the U.S. pharmaceutical marketplace is ***highly sensitive to price***. ***To compete effectively***, ***we rely on cost-effective manufacturing processes to meet the rapidly changing needs of our customers around a reliable, high quality supply of generic pharmaceutical products***. With regard to our Specialty Segment business, ***significant sales and marketing effort is required*** to be directed to each targeted customer segment in order ***to compete effectively***.
>
> ***Our competitors include other generic manufacturers***, as well as ***brand companies that license their products*** to generic manufacturers prior to patent expiration or as relevant patents expire. . . .

(Compl. ¶¶ 225 (emphasis added); *see also* 244, 262, 283.)  The Complaint alleges that these statements

> were misleading because they failed to disclose: (1) that among the primary means by which Mylan competed was through use of anticompetitive agreements [regarding the EpiPen] . . . ; (2) that Mylan had engaged in collusive anticompetitive activity with other drug companies, including (a) allocating the markets for certain generic drugs . . . and (b) colluding with other drug companies to fix the prices of certain generic drugs; (3) that as a result of this anticompetitive activity, the markets for certain generic drugs sold by Mylan were not competitive; and (4) that while absent anti-competitive conduct, "the U.S. pharmaceutical marketplace [was] highly sensitive to price," the price-fixing cartel of which Mylan was a participant controlled the prices of certain generic drugs for which demand was relatively inelastic, allowing the price-fixing cartel to increase prices for those drugs exponentially without generating a proportionate drop in demand.

(Compl. ¶¶ 226, 245, 263, 284.)

Plaintiffs are correct.  "[E]ven though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990).

Mylan's Annual Reports are replete with statements that characterize the markets for Mylan's EpiPen and generic drugs as "very competitive" and "highly sensitive to price."  These statements detail the "primary means of competition" that Mylan employs to survive in those markets and identifies Mylan's "primary competitors" as both brand-name and generic drug manufacturers.  If, as Plaintiffs allege, Mylan was engaged in a variety of anticompetitive practices—often in collusion with Mylan's competitors—then these statements are misleading in the absence of a disclosure of that anticompetitive conduct.  *See In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (holding that statements

14

that identified "'intense' competition" with a "primary . . . competitor" and described the importance of price to consumers were misleading because a "price-fixing agreement between [the company and its competitor] had eliminated price competition"); *see also Menkes v. Stolt-Nielsen S.A.*, No. 03 Civ. 409, 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005).

### 3. Statements of Rebate Rates

In each of Mylan's Annual Reports during the class period, it described the rebate rates that pharmaceutical companies are required to remit to Medicaid. In Mylan's 2012, 2013, and 2014 Form 10-Ks, it stated that "[t]he required rebate is currently 13% . . . for sales of Medicaid-reimbursed products marketed under ANDAs" and that "[s]ales of Medicaid-reimbursed products marketed under NDAs require manufacturers to rebate . . . 23%." (Compl. ¶¶ 203, 223, 242.) In its 2015 and 2016 Form 10-Ks, Mylan substituted the phrase "Medicaid-reimbursed non-innovator products" for "products marketed under ANDAs" and "Medicaid-reimbursed innovator or single-source products" for "products marketed under NDAs." (Compl. ¶¶ 260, 285.) The Complaint alleges that these statements "were misleading because they failed to disclose that Mylan marketed EpiPen under an NDA but rebated Medicaid only 13% of the average manufacturer's price for sales of Medicaid-reimbursed products." (Compl. ¶¶ 204, 224, 243, 261, 286.)

In its first three Annual Reports, Mylan stated a simple rule: *If ANDA, then 13%.* This statement is true, but was made misleading by Mylan's failure to disclose that this formula was untrue in the case of the EpiPen, which was marketed under an NDA but rebated at 13%. Mylan's last two Annual Reports are less blatantly misleading, stating instead: *If N drug, then 13%.* Mylan did, in fact, classify EpiPen as an N drug and rebate at 13%. However, read in the context of Mylan's previous three Annual Reports, a reasonable investor would likely infer that if ANDA-marketed drugs are rebated at 13%, and N drugs are marketed at 13%, then N drugs

are those drugs that are marketed under ANDAs. In other words: If ANDA equals 13%, and N

drug equals 13%, then ANDA-marketed drugs and N drugs are equivalents. That was not true in

the case of the EpiPen, which was marketed under an NDA but rebated at the N drug rate.

Consequently, each of Mylan's Form 10-K Annual Reports contained statements that, absent a

clear statement of the EpiPen rebate rate, could have misled a reasonable investor as to the rate at

which Mylan was rebating the EpiPen.

### 4. Statements of Rebate Complexity and Regulatory Risk

In eight different Annual and Quarterly Reports on Forms 10-K and 10-Q, Mylan made

statements describing the complexity of calculating Medicaid rebate rates and the risk that

Mylan's calculations could be incorrect. The following statement from Mylan's February 2012

10-K is representative:

> OUR REPORTING AND PAYMENT OBLIGATIONS UNDER
> THE MEDICARE AND/OR MEDICAID REBATE PROGRAM
> AND OTHER GOVERNMENTAL PURCHASING AND
> REBATE PROGRAMS *ARE COMPLEX AND MAY INVOLVE
> SUBJECTIVE DECISIONS THAT COULD CHANGE* AS A
> RESULT OF NEW BUSINESS CIRCUMSTANCES, NEW
> REGULATORY GUIDANCE, OR ADVICE OF LEGAL
> COUNSEL. *ANY DETERMINATION OF FAILURE TO
> COMPLY WITH THOSE OBLIGATIONS COULD SUBJECT
> US TO PENALTIES AND SANCTIONS* WHICH COULD HAVE
> A MATERIAL ADVERSE EFFECT ON OUR BUSINESS,
> FINANCIAL POSITION AND RESULTS OF OPERATIONS,
> AND THE MARKET VALUE OF OUR COMMON STOCK
> COULD DECLINE.
>
> . . .
>
> The regulations regarding reporting and payment obligations with
> respect to Medicare and/or Medicaid reimbursement and rebates and
> other governmental programs are complex. Because our processes
> for these calculations and the judgments involved in making these
> calculations involve, and will continue to involve, subjective
> decisions and complex methodologies, *these calculations are
> subject to the risk of errors*. In addition, *they are subject to review
> and challenge by the applicable governmental agencies* . . . .

Should there be ambiguity with regard to how to properly calculate and report payments — and even in the absence of any such ambiguity — *a governmental authority may take a position contrary to a position we have taken* . . . .

(Compl. ¶ 205 (emphasis added and brackets omitted); *see also* Compl. ¶¶ 210, 215, 227, 246, 264, 269, 287.) Beginning with its February 2014 Form 10-K, Mylan added that "ANY FAILURE TO COMPLY WITH THOSE OBLIGATIONS COULD SUBJECT US TO *INVESTIGATION*, PENALTIES, AND SANCTIONS." (Compl. ¶¶ 246, 264, 269, 287 (emphasis added).)

The Complaint alleges that these statements were misleading because (1) "the classification of the EpiPen was not complex and did not involve subjective decisions" and "Mylan's classification of the EpiPen was not subject to 'differing interpretations,'" (2) a government authority, namely the HHS IG and CMS, had already taken a position contrary to Mylan's and, starting with Mylan's March 2015 Form 10-K, the DOJ had already subjected Mylan to an investigation, and (3) "Mylan had in fact already failed to comply" with its obligations under the rebate program and that the disclosed "'risk of error already had materialized." (Compl. ¶¶ 206, 211, 216, 228, 247, 265, 270, 288.)

Plaintiffs' first set of allegations fail. Mylan's statements about the complexity, ambiguity, and subjectivity of the rebate calculation are statements of opinion. "A plaintiff who asserts that a statement of opinion or belief . . . is an '*untrue statement* of a material fact' . . . must do more than allege that the underlying fact is false . . . . Rather, such a plaintiff must plead facts that, if true, would be sufficient to show that the speaker did not 'actually hold[] the stated belief' . . . ." *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 252 (S.D.N.Y. 2015) (brackets in original) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 (2015)). While Plaintiffs allege that Mylan knowingly

misclassified the EpiPen, they do not adequately and separately allege that Mylan knowingly misclassified the EpiPen *and believed the classification scheme to be simple, unambiguous, or objective*.[7]

As to Plaintiffs' second set of allegations, there is some disagreement among courts in this circuit over whether cautionary statements can give rise to liability when they disclose the future risk of a present fact. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360–63 (S.D.N.Y. 2008) (describing the disagreement). Mylan argues that the "risk disclosures about dangers of regulatory noncompliance [are] not actionable" (Dkt. No. 46 at 8 n.7), while Plaintiffs respond that "statements that a company faces risk of a contingency that in fact has already occurred are misleading" (Dkt. No. 49 at 7 n.4.)

"In all cases, however, the court must keep in mind" that the test is whether a "reasonable investor could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (emphasis omitted). The question, therefore, is not whether a statement of risk is *per se* actionable, but rather whether Mylan's statement of risk could have misled a reasonable investor. *See Menaldi*, 164 F. Supp. 3d at 581 ("[A] duty to disclose can arise when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief.") In many cases, general or boilerplate disclosures of future regulatory risk would not cause a reasonable investor to believe that the company faced no current regulatory risks. *See In re FBR*, 544 F. Supp. 2d at 362. However, the more specific the caution, the more likely it is to mislead a reasonable investor. For example, a caution that "input prices may rise next quarter" would not cause a reasonable

---

[7]        Indeed, Plaintiffs appear to abandon this claim in their opposition brief. (*See* Dkt. No. 49 at 7 (listing four categories of misleading statements relating to EpiPen, none of which included statements regarding complexity).)

investor to conclude that the prices of all inputs had remained flat or declined in the previous quarter. *See In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203, 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010). But a caution that "the price of our primary input may rise above $5 next quarter" could certainly cause a reasonable investor to conclude that the price was, at present, $4.99 or less.

The Court concludes that Mylan's statements regarding the risk that "a governmental authority may take a . . . contrary" position and the risk that it "could [be] subject[ed] . . . to investigation" both fall on the potentially misleading side of the line. A reasonable investor could have concluded from Mylan's statement that although the government "may" disagree with Mylan, and "could" open an investigation, such unfavorable events had not yet occurred. In this context, "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (quoting *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 371 (E.D. Pa. 1997)); *cf. Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Regarding Plaintiffs' third set of allegations, an investor could not reasonably interpret Mylan's caution that rebate calculations are "subjective," "complex," and "subject to the risk of errors" as a statement that its current calculations were—as an objective matter—correct and compliant. Unlike Mylan's warning about the risk of specific adverse regulatory actions, its general caution about the chance of rebate inaccuracy *specifically disclaimed* the interpretation that such inaccuracy was not yet existing.

Instead, the only reasonable inference an investor could have drawn is much narrower: That, at the time of the disclosure, Mylan did not *affirmatively know* that the EpiPen was misclassified. While warning that the rebate calculation *could be wrong* does not imply that the rebate calculation is correct, such a warning does imply that the rebate calculation *could also be correct*. If Mylan knew for certain that the EpiPen was misclassified, then warning about the "risk of errors" could have mislead a reasonable investor as to Mylan's then-existing knowledge. Thus, Plaintiffs' third set of allegations survive only to the extent that Mylan misrepresented its knowledge about the EpiPen's misclassification.

### 5.     Code of Conduct and Business Ethics

Finally, the Complaint alleges that Mylan's Code of Conduct and Business Ethics, which stated that "Mylan is committed to complying with applicable antitrust and fair competition laws," was materially misleading for failure to disclose Mylan's anticompetitive activities. (Compl. ¶¶ 296–97.)

This claim fails. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)); *see also Singh v. Cigna Corp.*, No. 16 Civ. 182, 2017 WL 4318057, at *11 (D. Conn. Sept. 28, 2017) ("Although the Code of Ethics was made publicly available on the website and therefore was open for an investor to peruse, there is no reasonable investor who would rely on such 'puffery' . . . .").

## C.  Scienter and Underlying Misconduct

For each misleading statement, Plaintiffs must allege that Defendants acted with the necessary scienter.  "The requisite state of mind in a Rule 10b–5 action is 'an intent to deceive, manipulate or defraud.'"  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit.  Recklessness is defined as 'at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *ECA*, 553 F.3d at 198 (internal citation omitted) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

The requisite scienter "can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Ganino*, 228 F.3d at 168–69 (internal citation omitted) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

To establish scienter under the motive prong, the Complaint must allege that the officers in question "benefitted in some concrete and personal way from the purported fraud."  *Novak*, 216 F.3d at 307–08.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry.  Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  *ECA*, 553 F.3d at 198 (internal citations omitted).  Plaintiffs do not make any allegations of motive with respect to any individual Defendant.

Alternatively, Plaintiffs can plead scienter under the circumstantial evidence prong, although "[w]here motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)) (internal quotation marks omitted). "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

To adequately plead scienter, the Complaint must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

Plaintiffs have identified four categories of actionable statements which could have misled the reasonable investor about: (1) the rate at which Mylan rebated the EpiPen, (2) whether a government agency had expressed disagreement with or opened an investigation into Mylan's rebate calculation, (3) whether Mylan had knowingly misclassified the EpiPen, and (4) whether Mylan had entered into anticompetitive agreements with respect to the EpiPen and generic drugs. *See supra* Part II.B. For ease of reference, the Court will call these categories of statements

Rebate Statements, Regulatory Risk Statements, Misclassification Statements, EpiPen Antitrust Statements, and Generic Drugs Antitrust Statements.

For some of these categories, whether Mylan acted with the requisite state of mind in making misleading statements hinges, at least in part, on whether underlying unlawful conduct occurred. Thus, where appropriate, the Court conducts its analysis of illegality and scienter together.

### 1.    Rebate Statements and Regulatory Risk Statements

Mylan's Rebate Statements and Regulatory Risk Statements are potentially material even in the absence of illegal conduct. Mylan's statements in these two categories were misleading because they gave the investor the false impression that (1) the EpiPen was being rebated at 23% and (2) Mylan's rebate calculation had not yet been contradicted by CMS and was not yet subject to a DOJ investigation. Even if Mylan's rebate rate was legally correct, Mylan nevertheless faced a risk of liability. A reasonable investor certainly could have found information about that liability "important in deciding how to act," *ECA*, 553 F.3d at 197 (brackets omitted), and disclosure of the EpiPen's real rebate rate and the existence of significant governmental scrutiny could have "significantly altered the 'total mix' of information made available" to a reasonable investor, *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted). Thus, Mylan's Rebate Statements and Regulatory Risk Statements need not be illegal to be materially misleading.

Construing all inferences in Plaintiffs' favor, the Court has no trouble concluding that Plaintiffs have adequately pleaded scienter with respect to Mylan's Rebate Statements and Regulatory Risk Statements. It requires no stretch of the imagination to infer that, due to their positions at the company and the importance of EpiPen to Mylan's operations, Defendants "knew facts or had access to information suggesting that their public statements" about the

EpiPen rebate rate and the existence of adverse regulatory activity "were not accurate." *Novak*, 216 F.3d at 311. With respect to the rebate rate, the individual Defendants almost certainly had access to the information that Mylan was rebating EpiPen at 13%. (Compl. ¶ 330.) Similarly, with respect to regulatory scrutiny, the Complaint alleges that "CMS repeatedly informed Mylan that Mylan was misclassifying the EpiPen" and that Defendants were notified of the DOJ investigation by a subpoena in November 2014. (Compl. ¶ 331.)

Consequently, Plaintiffs have plausibly alleged with particularity that Defendants were at least reckless with respect to their Rebate Statements and Regulatory Risk Statements because "the danger was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978), *amended sub nom. Rolf v. Blyth Eastman Dillon & Co.*, No. 77-7104, 1978 WL 4098 (2d Cir. May 22, 1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)).

### 2. Misclassification Statements

Mylan's Misclassification Statements are materially misleading only if the EpiPen was, in fact, misclassified—and knowingly done so. Plaintiffs allege that Mylan's Misclassification Statements were misleading because the company failed to disclose that "Mylan knowingly had misclassified the EpiPen." (*E.g.*, Compl. ¶ 202.) Mylan never affirmatively represented that the EpiPen was classified correctly; indeed, it warned investors that the EpiPen rebate rate was subject to error. Because Mylan warned investors that its rebate rate could be incorrect, Mylan's statements could mislead a reasonable investor only as to Mylan's *knowledge about* EpiPen's alleged misclassification—not the fact of misclassification alone.

Consequently, to state a claim for violation of the securities laws for Mylan's Misclassification Statements, Plaintiffs must adequately plead that (1) the EpiPen was, in fact, misclassified, (2) that Mylan knew EpiPen was misclassified, and (3) that Mylan acted with the

requisite scienter in misleading investors about Mylan's knowledge of the misclassification. These three requirements are all the harder to demonstrate because Plaintiffs must plead not only Mylan's knowledge of the *fact* of Mylan's classification as an N drug, but also—more significantly—knowledge of the *legal conclusion* that such a classification was incorrect.

At this stage of the litigation, Plaintiffs have succeeded in clearing these high hurdles. Plaintiffs offer the following pieces of circumstantial evidence to create "a strong inference" of scienter: (1) the individual Defendants' high-level positions at Mylan, (2) the importance of the EpiPen to Mylan's business, (3) the individual Defendants' signed certifications ("SOX certifications") of Mylan's Forms 10-K and 10-Q, (4) notification by CMS that the EpiPen was misclassified, and (5) receipt of the DOJ subpoena. (Compl. ¶¶ 325–31.)

The most important of these pieces of evidence is the allegation that CMS "repeatedly informed Mylan that Mylan was misclassifying the EpiPen for purposes of the MDRP." (Compl. ¶ 331.) The Complaint alleges that the HHS IG identified the EpiPen as a misclassified drug in March 2009, and that sometime thereafter, CMS "on multiple occasions, provided guidance to . . . Mylan on the proper classification of drugs and . . . expressly told Mylan that [the EpiPen] is incorrectly classified." (Comp. ¶ 65 (alterations in original) (quoting Letter from Andrew Slavitt, CMS Acting Administrator, to Ron Wyden, U.S. Senator (Oct. 5, 2016)).) Unlike other government *investigations*, which generally do not demonstrate scienter, the CMS communication reflected a final determination that Mylan had incorrectly classified EpiPen. *Cf. Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[T]he government investigations cannot bolster allegations of scienter that do not exist, and, as currently plead[ed], the government investigations are just that, investigations.").

Plaintiffs' other pieces of circumstantial evidence bolster the inference of scienter. The individual Defendants' position at the company, the importance of EpiPen to Mylan's bottom line, and Defendants' SOX certifications all give rise to the strong inference that the individual Defendants knew that EpiPen's was classified as an N drug, knew that it was being rebated at 13%, and knew that Mylan had been informed by CMS that the EpiPen's classification was incorrect. *Cf. Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (declining to infer scienter from Defendants' management roles when "Plaintiff [had] not 'specifically identified any reports or statements' or any dates or time frame in which Defendants were put on notice of contradictory information" (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008))). Furthermore, although "the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter," Mylan's receipt of a DOJ subpoena in 2014 "may be considered by the Court as part of its analysis." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013).

Mylan argues that the EpiPen could not have been knowingly misclassified both because the classification rules are complex and because Mylan relied on "longstanding advice from CMS" indicating that the EpiPen was classified correctly. (Dkt. No. 46 at 6–8.) Mylan may yet be proven correct. But at this stage of the litigation, Plaintiffs have plausibly pleaded that underlying misconduct occurred and that "the inference of scienter is as compelling as the opposing inference of the non-fraudulent intent of the Individual Defendants." *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *12 (S.D.N.Y. Apr. 21, 2016). Whether the EpiPen was misclassified, and whether the individual Defendants had knowledge of such misclassification, is appropriately the subject of discovery.

### 3. EpiPen Antitrust Statements

The Complaint alleges that Mylan entered into two anticompetitive agreements with respect to the EpiPen. But Plaintiffs have failed to plausibly allege that either kind of agreement violated the antitrust laws.

First, Plaintiffs allege that a 2012 settlement agreement with the generic drug manufacturer Teva likely contained a "pay-for-delay" provision "that required Mylan to give Teva a monetary payment in consideration for Teva's agreement to delay introducing its generic epinephrine autoinjector." (Compl. ¶ 97.)

However, these types of "reverse payment" settlement agreements are not presumptively unlawful, but are instead subject to the fact-intensive rule-of-reason antitrust analysis. *See F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 159 (2013). To determine whether a reverse payment violates the antitrust laws, a court must consider "its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Id.* The Complaint makes no allegations of these sorts. Instead, it offers only the conclusory allegations that (1) a "'pay-for-delay' agreement . . . violates antitrust laws where, as here, the monetary payment is offered as consideration primarily to achieve the anticompetitive effect of delaying the entry of a competitive drug into the market" and (2) that Mylan was "able to increase the price of the EpiPen by more than 400% between 2009 and 2016." (Compl. ¶¶ 97, 100.) Even drawing all inferences in favor of Plaintiffs, the Court cannot construe these bare statements as plausibly

alleging that the alleged pay-for-delay scheme[8] is unlawfully anticompetitive under the multifactor *Actavis* test.

Second, Plaintiffs allege that Mylan "thwarted competition against the EpiPen by requiring schools . . . to sign exclusive dealing agreements with Mylan" that prevented the schools from purchasing products that competed with EpiPen within the next year. (Compl. ¶ 101.) Plaintiffs allege that these arrangements violated Section 2 of the Sherman Act.[9]

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To allege a violation of Section 2, a plaintiff "must show harm to competition in the relevant market." *Solent Freight Servs., Ltd. Inc. v. Alberty*, 914 F. Supp. 2d 312, 323 (E.D.N.Y. 2012); *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) ("A viable claim under Section 2 . . . must . . . show a harm to competition."). "[I]t usually does not further harm competition for a monopolist in one market to leverage its advantage into a monopoly in a downstream market," and exclusive-dealing agreements "may . . . have pro-competitive purposes and effects, such as assuring steady supply, affording protection against price fluctuations, reducing selling expenses, and promoting stable, long-term business relationships." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 508 & n.4 (2d Cir. 2004). Therefore, as a

---

[8]     Because the terms of the settlement agreement are confidential, the Complaint alleges that it "likely contained" a pay-for-delay provision. (Compl. ¶ 97.)

[9]     The Complaint also alleges that the exclusive dealing arrangements violate Section 3 of the Clayton Act, but Plaintiffs have waived this claim by failing to respond to Defendants' contrary arguments in their motion-to-dismiss briefing. (*See* Dkt. No. 46 at 9; Dkt. No. 49 at 10 n.8.) Regardless, the Court concludes that the Complaint does not adequately allege a violation of Section 3 because it fails to allege that "the competition foreclosed by the contract[s] . . . constitute[s] a substantial share of the relevant market." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961).

general rule, exclusive-dealing agreements are "presumptively legal." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997).

Plaintiffs have failed to allege that Mylan's exclusive-dealing agreements had "an actual adverse effect on competition as a whole in the relevant market," *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998), or that the arrangements' "anticompetitive effects outweigh [their] procompetitive effects," *E & L Consulting, Ltd.*, 472 F.3d at 29 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)). The Complaint's allegation that Mylan's school contracts "foreclosed a substantial portion of the market for school purchases of epinephrine autoinjectors" (Compl. ¶ 102) is conclusory and fails to support a plausible inference of illegality.

Alternatively, Plaintiffs argue that Mylan's failure to disclose the pay-for-delay and exclusive-dealing agreements is misleading, even if those agreements are entirely legal, because "Mylan's failure to list [such] agreements as among the means by which it competed misled investors into believing that Mylan did not employ such agreements, when in fact it did." (Dkt. No. 49 at 9.)

Plaintiffs' argument goes too far. The Complaint alleges that Mylan's Statements Explaining Income were misleading because "Mylan's income and revenue were *inflated* as a result of Mylan's anticompetitive activity" (*e.g.*, Compl. ¶ 234 (emphasis added)), and that Mylan's Statements Explaining the Market were misleading because they failed to disclose "that among the primary means by which Mylan competed was through use of *anticompetitive agreements*" and "that Mylan had engaged in *collusive anticompetitive activity* with other drug companies" in the generics market (*e.g.*, Compl. ¶ 226 (emphasis added)). In short, the Complaint alleges that Mylan's statements were misleading because they failed to disclose that

*illegal means* had inflated Mylan's margins and altered the market. Nothing in the Complaint explains why Mylan's statements would be materially misleading if the agreements were, as a legal matter, not unlawfully anticompetitive.[10] Plaintiff's newfound theory of liability, raised for the first time in their opposition to Defendants' motion to dismiss, comes too late.

Finally, even if the Complaint adequately pleaded underlying unlawful conduct, it has not alleged with particularity that Defendants acted with the requisite scienter. Plaintiffs' sparse allegations of illegality cannot give rise to a strong inference that Mylan was reckless in its failure to disclose the existence of either the pay-for-delay or exclusive-dealing agreements. *See Novak*, 216 F.3d at 308 (defining recklessness as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" (alteration in original) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978))).

### 4. Generic Drugs Antitrust Statements

#### a. Underlying Misconduct

The Complaint alleges that Mylan engaged in two different kinds of anticompetitive activities in the market for generic drugs. Plaintiffs plausibly allege that both types of unlawful conduct occurred.[11]

First, Plaintiffs allege that Mylan executives entered into an unlawful agreement with executives at Heritage Pharmaceuticals, Inc. to allocate the market for Doxy DR. (Compl.

---

[10] Even if such allegations could be teased out of the Complaint, the Court is constrained from doing so because a claim for securities fraud must allege with particularity "the reason or reasons why [each] statement is misleading." 15 U.S.C. § 78u–4(b)(1).

[11] The parties dispute whether, in securities fraud actions premised on a failure to disclose underlying criminal conduct, the underlying conduct is subject to heightened pleading standards or plausibility pleading analysis. The Court need not decide this issue because it concludes that Plaintiffs have satisfied either standard.

¶¶ 112–26.)  Relying on information contained in a joint complaint filed by the attorneys general many different states (Compl. ¶ 113), Plaintiffs allege that Jason Malek, Vice President of Commercial Operations at Heritage, and Jeffrey Glazer, Heritage's President and CEO, initiated discussions with Mylan about a market allocation scheme in May 2013 (Compl. ¶¶ 115–16). Communicating via LinkedIn and telephone, "Heritage and Mylan executives agreed to allocate the market for Doxy DR," which included a commitment by Mylan "to 'walk away' from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business." (Compl. ¶ 115–18.)  When a dispute over the arrangement arose in November 2013, Heritage executives "contacted Mylan directly to address the situation." (Compl. ¶ 119.)  The Complaint cites two internal Heritage communications and one email to Mylan which confirm Mylan's participation in Heritage's market allocation scheme.  (Compl. ¶¶ 119, 122, 126.)

These allegations are sufficient to plausibly plead the existence of a market allocation arrangement between Mylan and Heritage.  The Complaint alleges how the agreement was made, when the agreement was made, and the rough contours of the agreement—certainly "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  To be sure, Plaintiffs' allegations leave the reader wanting to know more.  But "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*  The Complaint exceeds this standard.

Second, Plaintiffs allege that Mylan agreed with other drug companies to fix the prices of five generic drugs: albuterol sulfate, benazepril, clomipramine, divalproex, and propranolol. (Compl. ¶¶ 127–60.)  The Complaint offers no direct evidence of conspiracy.  Instead, it identifies parallel price movements for each of the drugs, all characterized by a sharp spike over

the course of several months (*see* Compl. ¶¶ 131, 137, 143, 149, 155), and additional factors that tend to indicate conscious agreement to raise prices (*see* Compl. ¶¶ 161–84).

"[C]onscious parallelism . . . is not in itself unlawful." *Twombly*, 550 U.S. at 553–54 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)) (internal quotation marks omitted). "Accordingly, to prove an antitrust conspiracy, 'a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy.'" *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)). "Circumstances that may raise an inference of conspiracy include 'a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'" *Id.* (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). Plaintiffs must allege "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (quoting 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1425, at 167–185 (2d ed. 2003)).

Viewed in the light most favorable to Plaintiffs, the facts alleged in the Complaint meet this burden. The Complaint alleges specific features of the generic drug market that gave Mylan a motive to conspire to fix prices, including:

> (1) a high degree of industry concentration; (2) high barriers to entry; (3) demand inelasticity; (4) the lack of available substitutes; (5) a high degree of interchangeability between the goods of cartel participants; (6) ease of, and opportunities for intercompetitor contacts and communication; (7) sufficient numbers to drive competition; (8) absence of departures from the market; (9) absence

of non-conspiring competitors; (10) size of price increases; and (11) reimbursement of generic drugs.

(Compl. ¶ 162.)  *See also In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017) ("Defendants are correct that the bare allegation that defendants operate in an oligopolistic market is insufficient to establish a common motive to conspire.  Instead, a plaintiff must allege facts, specific to the market at issue, suggesting that the defendants had an incentive to manipulate prices." (internal citation omitted)).  Furthermore, the Complaint alleges that because generic drugs are easily substitutable, they compete primarily on price.  (Comp. ¶ 161.) Consequently, "[i]n a market free of collusion, if one generic drug marketer raises its prices significantly above those of its competitors, that marketer will lose market share." (*Id.*)  The importance of price in the generics market, coupled with the lack of an external triggering event (e.g., a supply shortage or spike in demand), supports the inference that Mylan's sudden price increases "would have been against its self-interest in the absence of price collusion." (*Id.*)

### b.      Scienter

With respect to Mylan's Generic Drugs Antitrust Statements, the crux of Plaintiffs' scienter allegations rely on the allegations of a "confidential witness" ("CW").  (Compl. ¶¶ 110–11; 332–33.)  CW worked at Mylan from 2010 until October 2015 as Director of Costing and later as Director of Production Planning.  (Compl. ¶ 110.)  At times, CW worked directly with Defendant Sheehan and attended company-wide meetings involving Mylan's CEO and CFO. (Compl. ¶¶ 110–11.)  CW allegedly reports that "pricing decisions at Mylan occurred frequently and involved all of Mylan's top executives" and that "the CEO and CFO . . . reviewed any price adjustments and had the last word on pricing decisions for Mylan's drugs."  (Compl. ¶ 111.) When it came to price, "[e]verything went up through the top." (*Id.*)

With respect to price-fixing, these allegations are sufficient to support a "strong inference" that the individual Defendants either consciously participated in price-fixing, or were at least reckless in ignoring information indicating that price-fixing was occurring. Based on CW's personal observations at meetings with Mylan's CEO and CFO, he alleges that individuals serving in those positions certainly had access to, and actively participated in, pricing decisions. Although CW does not directly allege that the individual Defendants agreed to fix prices, the Complaint persuasively alleges that in the absence of a collusive agreement, Mylan's dramatic price increases would have been against corporate self-interest. (Comp. ¶ 161.) Consequently, the inference that Defendants knew about such price-fixing agreements is "at least as compelling as any opposing inference" that they approved economically irrational price hikes. *Tellabs, Inc.*, 551 U.S. at 314.

With respect to Mylan's Doxy DR market-allocation agreement, however, Plaintiffs do not adequately plead scienter. CW alleges only that the individual Defendants participated in pricing decisions. CW does not allege that the individual Defendants participated in decisions about which markets or customers to target for the sale of *any* generic drug, much less Doxy DR in particular. And the Complaint's allegations about the underlying market-allocation agreement identify only amorphous Mylan "employees" and "executives."[12] Finally, although the Complaint notes subsequent government investigations into Mylan's conduct in the generics

---

[12]    For the same reasons, the Complaint also fails to sufficiently plead corporate scienter. *See Wyche v. Advanced Drainage Sys., Inc.*, No. 15 Civ. 5955, 2017 WL 971805, at *15 n.9 (S.D.N.Y. Mar. 10, 2017), *aff'd*, No. 17-743-cv, 2017 WL 4570663 (2d Cir. Oct. 13, 2017) (concluding that allegations of the actions of "unnamed employees" did not give rise to corporate scienter because, "though there is no specific seniority formula for scienter, these employees are clearly not identified with the requisite particularity that would permit the Court to infer that their seniority is sufficient").

market, "government investigations cannot bolster allegations of scienter that do not exist." *Lipow*, 131 F. Supp. 3d at 167.

### D. Loss Causation

"Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). "[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (second alteration in original) (internal citations omitted) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). At the motion to dismiss stage, the Court must determine whether the complaint has sufficiently pleaded that "that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." *Id.*

Plaintiffs plausibly allege that Mylan's misstatements about rebate rates, regulatory risk, misclassification, and generic drug price-fixing all "concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell*, 396 F.3d at 175. Plaintiffs allege, for example, that disclosures of EpiPen's rebate rate and CMS's adverse regulatory determination caused Mylan's share price to fall 4.65% in September 2016 and another 3.13% in October 2016. (Compl. ¶¶ 308–10.) Similarly, disclosure of the suspected price-fixing scheme caused Mylan's stock to drop 6.9% and then another 1.64% in November 2016. (Compl. ¶¶ 315–18.)

These allegations are sufficient, at this stage, "to provide [the] defendant[s] with some indication of the loss and the causal connection that the plaintiff has in mind." *Fin. Guar. Ins.*

*Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015).  Having concluded that

Plaintiffs have sufficiently pleaded loss causation, the Court defers questions about the

robustness of Plaintiffs' selection of corrective disclosures to a later stage of litigation, after the

aid of discovery.

**III.     Israeli Securities Law Claim**

In addition to U.S. securities-law claims brought on behalf of individuals who purchased

Mylan stock on the NASDAQ, Plaintiffs also assert a third cause of action under Israeli

securities laws on behalf of individuals who purchased Mylan stock on the Tel Aviv Stock

Exchange.  The Court declines to exercise supplemental jurisdiction over this Israeli law claim.

For claims not falling within a court's original jurisdiction,[13] the federal supplemental

jurisdiction statute provides that "the district courts shall have supplemental jurisdiction over all

other claims that are so related to claims in the action within such original jurisdiction that they

form part of the same case or controversy."  28 U.S.C. § 1367(a).  Section 1367(c), however,

gives district courts discretion to refuse to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,

---

[13]     The Court notes that it is possible that Plaintiffs' Israeli law claim could fall within the Court's original diversity jurisdiction.  It appears that at least one defendant, Mylan Inc., is a citizen of New York because its principal place of business is located in this state.  (Compl. ¶ 27.)  But because the Complaint does not allege the citizenship of the plaintiffs or the individual Defendants, the Court cannot determine whether complete or minimal diversity exists.  *See* 28 U.C.C. § 1332(a), (d).  Because "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998), the Court presumes that the only possible basis for jurisdiction over the Israeli claim is supplemental jurisdiction, as alleged in the Complaint.  (*See* Compl. ¶ 22.)  Furthermore, the Court notes that although it does not reach Defendants' motion to dismiss under the doctrine of *forum non conveniens*, several of the factors compelling the Court to decline supplemental jurisdiction would also weigh in favor of a dismissal on those alternative grounds.

> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367; *see also Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 confirms the discretionary nature of supplemental jurisdiction . . . ." (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)) (internal quotation marks omitted)).

Both the first and fourth factors compel the Court to decline to exercise supplemental jurisdiction. First, Plaintiffs' Israeli law claim raises a complex issue of foreign law.[14] Specifically, Plaintiffs' claim calls on this Court to decide whether Israeli courts would apply U.S. securities law or Israeli securities law to a "dual listed" company such as Mylan. Plaintiffs cite three district-level decisions by Israeli courts applying U.S. law, but these decisions are not precedential. *See* CC (TA) 28811/16 *Damati v. Mankind Corp.* ¶ 80 (2016) (Isr.) (Dkt. No. 60-2) ("According to the Israeli legal system, decisions of a district court do not constitute accepted legal theory and do not obligate other instances that rule on the same issue . . . ."). And the Israeli Supreme Court has recently and explicitly stated that this choice-of-law issue is an open question:

> The question of what the applicable law is in a claim such . . . which relates to a "dual" company that is listed on both the stock exchange in Israel and on a stock exchange in the United States, is indeed a question that has not yet been finally answered in the settled law in

---

[14] "While many of the cases refer to supplemental jurisdiction over 'state claims,' Section 1367 applies to 'all other claims' and therefore the same analysis would also apply to foreign law claims." *Roman y Gordillo, S.C. v. The Bank of New York Mellon Corp.*, No. 12 Civ. 212, 2015 WL 5786460, at *21 n.29 (S.D.N.Y. Sept. 29, 2015).

> Israel.  It is not a simple question, and the discussion of it must take
> into account a variety of considerations.

CA 28811/16 *Damti v. MannKind Corp.* ¶ 45 (2016) (Isr.) (Dkt. No. 57-1).  The Court agrees

with the *Damati* district court, which candidly opined that "it is not possible to determine, solely

on the basis of the language of the law, what law applies to the question of liability for the

reporting of dual-listed companies" because "the language of the law can bear" opposing

interpretations.  CC (TA) 28811/16 *Damati v. Mankind Corp.* ¶ 28 (2016) (Isr.).  Consequently,

the Court believes it better to decline to exercise supplemental jurisdiction, and to leave this

novel question of Israeli law to the Israeli Supreme Court to answer in the first instance.

Furthermore, the Court concludes that this case presents the kind of "exceptional

circumstances" offering "compelling reasons for declining jurisdiction" under § 1367(c)(4).

Two separate class actions are currently pending in Israeli courts, both brought by purchasers of

Mylan's stock on the TASE and both raising claims similar to those in Plaintiffs' Complaint.[15]

(*See* Dkt. No. 52, at 1–3.)  Israeli courts are better equipped than this Court to offer Israeli

plaintiffs an appropriate forum to litigate their claims under Israeli law.  As the Supreme Court

has observed:

> Like the United States, foreign countries regulate their domestic
> securities exchanges and securities transactions occurring within
> their territorial jurisdiction.  And the regulation of other countries
> often differs from ours as to what constitutes fraud, what disclosures
> must be made, what damages are recoverable, what discovery is
> available in litigation, what individual actions may be joined in a
> single suit, what attorney's fees are recoverable, and many other
> matters.

---

[15]     By letter dated March 18, 2018, Plaintiffs' counsel in the Israeli class actions
represented to the Court that they "intend to stay" those actions.  (Dkt. No. 68 at 2.)  However,
even if the Israeli courts grant such a stay, the remaining § 1367(c) considerations still counsel in
favor of declining to exercise supplemental jurisdiction over Plaintiffs' Israeli law claims.

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 269 (2010). (*See also* Dkt. No 52, at 6 (describing Israel's streamlined system for distributing damage awards to shareholders).)  In the interests of international comity, this Court hesitates to impinge on Israeli courts' ability to adjudicate the claims of their own citizens under their own securities laws—even if Israel has chosen, as a matter of *Israeli law*, to apply U.S. securities law.  "[R]espect for foreign law would be completely subverted if foreign claims were allowed to be piggybacked into virtually every American securities fraud case, imposing American procedures, requirements, and interpretations . . . ."  *In re Toyota Motor Corp. Sec. Litig.*, No. 10 Civ. 922, 2011 WL 2675395, at *7 (C.D. Cal. July 7, 2011).

On the other side of the ledger, the United States has only a minimal interest, if any, in providing a forum to litigate the claims of foreign stockholders under foreign securities laws.  *See Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F. Supp. 2d 374, 388 (S.D.N.Y. 2000); *see also Morrison*, 561 U.S. at 270 ("While there is no reason to believe that the United States has become the Barbary Coast for those perpetrating frauds on foreign securities markets, some fear that it has become the Shangri–La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets.").  And, finally, declining jurisdiction over the Israeli Plaintiffs avoids the risk of exposing Defendants to inconsistent or double liability.

To be sure, "declining jurisdiction outside the ambit of 1367(c)(1)-(3) appears as the exception rather than the rule."  *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998).  But in this instance, "to further the 'values of economy, convenience, fairness, and comity,'" the Court concludes that "any exercise of supplemental jurisdiction

should be declined." *Roman Y Gordillo, S.C.*, 2014 WL 3507300, at \*12 (quoting *Itar-Tass Russian News Agency*, 140 F.3d at 448).

Accordingly, Count Three of the Complaint is dismissed.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss the Amended Class Action Complaint is GRANTED in part and DENIED in part. Defendants shall file an answer to the surviving claims by two weeks from the date of this order.

The Clerk of Court is directed to close the motion at Docket Number 45.

SO ORDERED.

Dated: March 28, 2018
New York, New York

_____
J. PAUL OETKEN
United States District Judge

## Appendix A: Allegedly Misleading Statements

| Statement | Complaint Paragraph | Type of Statement | Plaintiffs' Reason(s)  Why the Statement Is Misleading |
|---|---|---|---|
| Feb. 21, 2012 Form 10-K | 201 | Statement of Income | Failed to disclose that: (1) Net income and revenue were inflated due to EpiPen misclassification (2) Misclassification created an acute risk of future fines |
| Apr. 26, 2012 Form 8-K | 207 | Statement Explaining Income | |
| Apr. 27, 2012 Form 10-Q | 208 | Statement of Income | |
| July 26, 2012 Form 8-K | 212 | Statement Explaining Income | |
| July 26, 2012 Form 10-Q | 213 | Statement of Income | |
| Oct. 25, 2012 Form 8-K | 217 | Statement Explaining Income | |
| Oct. 25, 2012 Form 10-Q | 218 | Statement of Income | |
| Feb. 27, 2013 Form 8-K | 220 | Statement Explaining Income | |
| Feb. 28, 2013 Form 10-K | 221 | Statement of Income | |
| May 2, 2013 Form 8-K | 229 | Statement Explaining Income | |
| May 2, 2013 Form 10-Q | 230 | Statement of Income | |
| Aug. 1, 2013 Form 8-K | 232 | Statement Explaining Income | Failed to disclose that: (1) Net income and revenue were inflated due to EpiPen misclassification (2) Misclassification created an acute risk of future fines (3) Income and revenue were inflated as a result of anticompetitive conduct |
| Aug. 1, 2013 Form 10-Q | 233 | Statement of Income | |
| Oct. 31, 2013 Form 8-K | 235 | Statement Explaining Income | |
| Oct. 31, 2013 Form 10-Q | 236 | Statement of Income | |
| Feb. 27, 2014 Form 8-K | 238–39 | Statement Explaining Income | |
| Feb. 27, 2014 Form 10-K | 240 | Statement of Income | |
| May 1, 2014 Form 8-K | 248 | Statement Explaining Income | |
| May 1, 2014 Form 10-Q | 249 | Statement of Income | |
| Aug. 7, 2014 Form 8-K | 251 | Statement Explaining Income | |
| Aug. 7, 2014 Form 10-Q | 252 | Statement of Income | |
| Oct. 30, 2014 Form 8-K | 254 | Statement Explaining Income | |

| | | | |
|---|---|---|---|
| Nov. 5, 2014 Form 10-Q | 255 | Statement of Income | |
| Mar. 2, 2015 Form 8-K | 257 | Statement Explaining Income | |
| Mar. 2, 2015 Form 10-K | 258 | Statement of Income | |
| May 5, 2015 Form 8-K | 266 | Statement Explaining Income | |
| May 8, 2015 Form 10-Q | 267 | Statement of Income | |
| Aug. 6, 2015 Form 8-K | 271 | Statement Explaining Income | |
| Aug. 6, 2015 Form 10-Q | 272 | Statement of Income | |
| Oct. 30, 2015 Form 8-K | 276 | Statement Explaining Income | |
| Oct. 30, 2015 Form 10-Q | 277 | Statement of Income | |
| Feb. 10, 2016 Form 8-K | 279–80 | Statement Explaining Income | |
| Feb. 10, 2016 Form 10-K | 281 | Statement of Income | |
| May 3, 2016 Form 8-K | 289 | Statement Explaining Income | |
| May 3, 2016 Form 10-Q | 290 | Statement of Income | |
| Aug. 9, 2016 Form 8-K | 292–93 | Statement Explaining Income | |
| Aug. 9, 2016 Form 10-Q | 294 | Statement of Income | |
| Aug. 6, 2015 Q2 Earnings Call | 274 | Statement Explaining Income | (4) Failed to disclose that Mylan's margins were inflated as a result of anticompetitive activity |
| Feb. 21, 2012 Form 10-K | 203 | Statement of Rebate Rates | (5) Failed to disclose that Mylan rebated EpiPen at 13% |
| Feb. 28, 2013 Form 10-K | 223 | Statement of Rebate Rates | |
| Feb. 27, 2014 Form 10-K | 242 | Statement of Rebate Rates | |
| Mar. 2, 2015 Form 10-K | 260 | Statement of Rebate Rates | |
| Feb. 16, 2016 Form 10-K | 285 | Statement of Rebate Rates | |
| Feb. 21, 2012 Form 10-K | 205 | Statement of Rebate Complexity and Regulatory Risk | Failed to disclose that: (6) Mylan had already failed to comply (7) Classification was neither complex nor subjective |
| Apr. 27, 2012 Form 10-Q | 210 | Statement of Rebate Complexity | (8) Classification was not subject to a "risk" of error because it had already occurred |

| | | | |
|---|---|---|---|
| | | and Regulatory Risk | (9) Classification was not subject to different interpretations |
| July 26, 2012 Form 10-Q | 215 | Statement of Rebate Complexity and Regulatory Risk | (10) Government authority had already taken a contrary position (HHS IG and CMS) |
| Feb. 28, 2013 Form 10-K | 227 | Statement of Rebate Complexity and Regulatory Risk | |
| Feb. 27, 2014 Form 10-K | 246 | Statement of Rebate Complexity and Regulatory Risk | |
| Mar. 2, 2015 Form 10-K | 264 | Statement of Rebate Complexity and Regulatory Risk | Failed to disclose that: (6) Mylan had already failed to comply (7) Classification was neither complex nor subjective |
| May 8, 2015 Form 10-Q | 269 | Statement of Rebate Complexity and Regulatory Risk | (8) Classification was not subject to a "risk" of error because it had already heard (9) Classification was not subject to different interpretations |
| Feb. 16, 2016 Form 10-K | 287 | Statement of Rebate Complexity and Regulatory Risk | (10) Government authority had already taken a contrary position (HHS IG and CMS) (11) Mylan was already under investigation by the DOJ |
| Feb. 28, 2013 Form 10-K | 225 | Statement Explaining the Market | Failed to disclose that: (12) Among the primary means by which Mylan competed was through the use of anticompetitive agreements with respect to EpiPen |
| Feb. 27, 2014 Form 10-K | 244 | Statement Explaining the Market | (13) Mylan had engaged in collusive anticompetitive activity with respect to generic drugs, including (a) market allocation, and (b) price fixing |
| Mar. 2, 2015 Form 10-K | 262 | Statement Explaining the Market | (14) As a result of Mylan's anticompetitive activity, markets for certain generic drugs were not competitive |
| Feb. 16, 2016 Form 10-K | 283 | Statement Explaining the Market | (15) As a result of Mylan's price-fixing, markets for certain generic drugs were not "highly sensitive to price" |

| Code of Conduct and Business Ethics | 296 | Code of Conduct and Business Ethics | Failed to disclose that:<br>(16) Mylan was violating antitrust laws<br>(12) Mylan competed through the use of anticompetitive agreements with respect to EpiPen<br>(13) Mylan had engaged in collusive anticompetitive activity with respect to generic drugs, including (a) market allocation, and (b) price fixing |
|---|---|---|---|