UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Mylan N.V. Securities Litigation | Case No. 1:16-CV-07926 (JPO)<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS IN PART THE SECOND AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page(s)**

I.  PRELIMINARY STATEMENT ........................................................................ 1

II.  STATEMENT OF FACTS ............................................................................ 3

    A.  Mylan Excluded Sanofi from the Market for Epinephrine Autoinjectors by Offering Anticompetitive Rebates to Third-Party Payors Conditioned on Excluding Sanofi's Auvi-Q ........................................................................ 3

    B.  Mylan Conspired with Other Drug Companies To Allocate the Market for Doxy DR To Maintain Its Price at a Supracompetitive Level ............................... 5

    C.  Mylan Agreed with Competitors to Fix the Price of Glip-Met, Verapamil and Doxy Mono ........................................................................ 7

        1.  Glipizide-Metformin ........................................................................ 8

        2.  Verapamil ........................................................................ 8

        3.  Doxycycline Monohydrate ........................................................................ 9

    D.  In August 2016, Mylan's Stock Dropped When Its Anticompetitive Conduct Relating to EpiPen Was Partially Revealed and Risks Materialized ...................... 9

    E.  On October 31, 2017, Mylan's Stock Dropped Upon Revelation of Additional Allegations by the CT AG ........................................................................ 9

III.  ARGUMENT:  DEFENDANTS FURTHER VIOLATED SECTION 10(b) BY FAILING TO DISCLOSE THE COMPANY'S ANTICOMPETITIVE ACTIVITY RELATING TO EPIPEN AND CERTAIN GENERIC DRUGS .................................. 10

    A.  Plaintiffs Adequately Allege Numerous Misleading Statements and Omissions ........................................................................ 10

        1.  Mylan Misled Investors About Its Exclusionary Rebates for the EpiPen ........................................................................ 10

        2.  Mylan Misled Investors About Its Allocation of the Market for Doxy DR and Its Price Fixing of Glip-Met, Verapamil and Doxy Mono ........................................................................ 13

        3.  Mylan's Statements Explaining the Reasons for Its Income Are Actionable ........................................................................ 15

        4.  Statements by Malik Are Misleading Insofar as They Are Statements of How Mylan Competes or Reasons for Mylan's Performance .............. 16

    B.  Defendants Acted with Scienter ........................................................................ 16

        1.  Defendants Knew About Mylan's Exclusionary Rebates ........................ 17

        2.  Defendants, Including Defendant Malik, Unquestionably Knew About Mylan's Allocation of the Market for Doxy DR ...................................... 18

3.      The SAC Adequately Pleads Scienter with Respect to Mylan's Price-Fixing of Glip-Met, Verapamil and Doxy Mono ...................................... 20

4.      Mylan's Widespread Anticompetitive Schemes Reinforce the Strong Inference of Scienter for All Such Activity .............................................. 21

C.      Plaintiffs Have Adequately Pleaded Loss Causation for Each of the Dates Specified in the Amended Complaint .................................................... 22

1.      Plaintiffs Have Adequately Pleaded Loss Causation with Respect to Statements Made Between February 2012 and March 2013 ................... 22

2.      Plaintiffs Have Adequately Pleaded Losses Based on the October 31, 2017 Corrective Disclosure ....................................................................... 23

IV.     ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED VIOLATIONS OF SECTION 20(a) BY THE INDIVIDUAL DEFENDANTS, INCLUDING MALIK ....... 24

V.      CONCLUSION .................................................................................................... 25

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AC or FAC** | Amended Class Action Complaint for Violation of Securities Laws (March 20, 2017) [Dkt. 39] |
| **Actavis** | Actavis Generics |
| **Amended Complaint** | Amended Class Action Complaint for Violation of Securities Laws (March 20, 2017) [Dkt. 39] |
| **Class Period** | February 21, 2012 to October 30, 2017, inclusive |
| **Company** | Mylan N.V. and/or Mylan Inc. |
| **CT AG** | Attorney General of the State of Connecticut |
| **CW** | Confidential Witness (described in SAC ¶ 121) |
| **Defendants** | Mylan N.V., Mylan Inc., Heather Bresch, Robert J. Coury, Paul B. Campbell, Kenneth S. Parks, and John D. Sheehan |
| **Defs.' Mem.** | Memorandum of Law in Support of Defendants' Partial Motion to Dismiss [Dkt. 96] |
| **DOJ** | U.S. Department of Justice |
| **Doxy DR** | doxycycline hyclate delayed release |
| **Doxy Mono** | doxycycline monohydrate |
| **EpiPen** | EpiPen Auto-Injector® and EpiPen Jr. Auto-Injector® |
| **Exchange Act** | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| **FDA** | U.S. Food and Drug Administration |
| **Glip-Met** | glipizide-metformin |
| **Heritage** | Heritage Pharmaceuticals Inc. |
| **Individual Defendants** | Heather Bresch, Robert J. Coury, Paul B. Campbell, Kenneth S. Parks, John D. Sheehan and Rajiv Malik |
| **Mayne** | Mayne Pharma (USA), Inc. |
| **MTD Op.** | March 28, 2018 Opinion and Order [Dkt. 69] |
| **Mylan** | Mylan N.V. and/or Mylan Inc. |
| **Plaintiffs** | Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., Phoenix Insurance Company Ltd., Meitav DS Provident Funds and Pension Ltd. and Dan Kleinerman |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 |
| **SAC** | Second Amended Class Action Complaint for Violation of Securities Laws (July 6, 2018) [Dkt. 89] |
| **Sanofi** | Sanofi-Aventis S.A. |
| **Section 1** | Sherman Antitrust Act of 1890, 15 U.S.C. § 1 |
| **Section 2** | Sherman Antitrust Act of 1890, 15 U.S.C. § 2 |
| **Sherman Act** | Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-7 |
| **State AGs** | The Attorneys General serving as Plaintiffs in *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 2:17-cv-03768, including those of Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, |

|  | Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington and Wisconsin. |
| --- | --- |
| **State AGs' Complaint** | Consolidated Amended Complaint, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056 [Dkt. No. 1] (D. Conn. Dec. 14, 2016) |
| **State AGs' AC** | [Proposed] Consolidated Amended Complaint in *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 2:17-cv-03768 [Dkt. No. 3] (E.D. Pa. Oct. 31, 2017) |
| **SOX** | Sarbanes-Oxley Act of 2002 |
| **SEC** | United States Securities and Exchange Commission |
| **Section 10(b)** | Securities Exchange Act, 15 U.S.C. § 78j(b) |
| **Section 20(a)** | Securities Exchange Act, 15 U.S.C. § 78t(a) |
| **Teva** | Teva Pharmaceutical Industries Ltd. |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraha v. Colonial Parking, Inc.*,
   243 F. Supp. 3d 179 (D.D.C. 2017) ..................................................................................19

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   615 F. App'x 44 (2d Cir. 2015) ......................................................................................25

*Acticon AG v. China N. E. Petroleum Holdings, Ltd.*,
   692 F.3d 34 (2d Cir. 2012) .............................................................................................23

*Anwar v. Fairfield Greenwich, Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010) ...........................................................................25

*Arcadia Aviation PHF, LLC v. Aero-Smith, Inc.*,
   No. 12-cv-6177, 2013 WL 3717651 (S.D.N.Y. July 16, 2013) ......................................23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................14

*Berger v. Apple REIT Ten, Inc.*,
   563 F. App'x 81 (2d Cir. 2014) .......................................................................................10

*Dial Corp. v. News Corp.*,
   165 F. Supp. 3d 25 (S.D.N.Y. 2016) ..............................................................................12

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) .................................................................................................22, 24

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ...........................................................................................16

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
   821 F.3d 394 (3d Cir. 2016) ...........................................................................................13

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   783 F.3d 395 (2d Cir. 2015) ...........................................................................................22

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ...........................................................................................24

*HSH Nordbank AG v. RBS Holdings USA Inc.*,
   No. 13-cv-3303 (PGG), 2015 U.S. Dist. LEXIS 36087 (S.D.N.Y. Mar. 20,
   2015) ...............................................................................................................................19

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)........................................................................17

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)........................................................................18

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006).................................................................11, 14

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)........................................................................19

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust*
  *Litig.*, No. 17-md-2785, 2017 U.S. Dist. LEXIS 209710
  (D. Kan. Dec. 21, 2017).................................................................2, 5, 11, 12, 13, 19

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust*
  *Litig.*, No. 17-md-02785, 2018 U.S. Dist. LEXIS 140323
  (D. Kan. Aug. 20, 2018) .......................................................................... 11, 19, 21

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012)........................................................................19

*In re Herbal Supplements Mktg. & Sales Practices Litig.*,
  No. 15-cv-5070, 2017 U.S. Dist. LEXIS 76207 (N.D. Ill. May 19, 2017)................19

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)..................................................................18, 22

*In re London Silver Fixing, Ltd. Antitrust Litig.*
  No. 14-md-2573, 2018 WL 3585277 (S.D.N.Y. July 25, 2018). ..............................15

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010)........................................................................24

*In re Namenda Direct Purchaser Antitrust Litig.*,
  No. 15-cv-7488-CM, 2017 U.S. Dist. LEXIS 83446 (S.D.N.Y. May 23, 2017)........13

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 619 (S.D.N.Y. 2014)....................................................................19, 20

*In re Par Pharm., Inc. Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990)..............................................................................14

*In re Salix Pharm., Ltd.*,
  No. 14-cv-8925, 2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016) ..............17

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   No. 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504
   (S.D.N.Y. Aug. 30, 2000) ........................................................................................14

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)......................................................................10, 15, 22

*Katz v. Image Innovations, Inc.*,
   542 F. Supp. 2d 269 (S.D.N.Y. 2008)....................................................................25

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976)....................................................................................20

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)....................................................................................18

*Low v. Robb*,
   No. 11-cv-2321, 2012 U.S. Dist. LEXIS 6836 (S.D.N.Y. Jan. 20, 2012) ..............20

*Martinez v. LVNV Funding LLC*,
   No. 14-CV-00677 (RRM) (ST), 2016 U.S. Dist. LEXIS 136613 (E.D.N.Y.
   Sept. 30, 2016) ........................................................................................................19

*Mayor & Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)..............................................................................14, 15

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016).......................................................11, 14, 17

*Menkes v. Stolt-Nielsen S.A.*,
   No. 3:03-CV-409(DJS), 2005 U.S. Dist. LEXIS 28208
   (D. Conn. Nov. 10, 2005) .......................................................................................14

*Meyer v. JinkoSolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)....................................................................................10

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................17

*Rodriguez v. City of N.Y.*,
   No. 16-cv-00214, 2016 WL 3264166 (E.D.N.Y. June 13, 2016)...........................19

*RSM Production Corp. v. Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009)....................................................................20

*Sanofi-Aventis U.S. LLC v. Mylan Inc.*,
   No. 2:17-cv-02452 (D.N.J. Apr. 24, 2017) ..............................................................5

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)............................................................................................14

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015)...............................................................................19

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961).........................................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).........................................................................................................21

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)...........................................................................................11

*VNB Realty, Inc. v. Bank of Am. Corp.*,
   No. 11 Civ. 6805 (DLC), 2013 U.S. Dist. LEXIS 132250
   (S.D.N.Y. Sept. 16, 2013)................................................................................................19

*Youngers v. Virtus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016)...............................................................................19

**Statutes**

15 U.S.C. § 78u-4(e)(1) .........................................................................................................23

Sherman Act Section 1...........................................................................................................14

Sherman Act Section 2.....................................................................................................11, 12

**Rules**

Fed. R. Civ. P. 8 ....................................................................................................................22

Fed. R. Civ. P. 9(b) ...............................................................................................................25

Fed. R. Civ. P. 11 ..................................................................................................................19

Fed. R. Civ. P. 12(g) .............................................................................................................23

**Other Authorities**

5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1384 (3d
   ed. 2018) ..........................................................................................................................23

ABA Mod. R. Prof. Conduct 3.3 ...........................................................................................19

## I.    PRELIMINARY STATEMENT

In its March 28, 2018 Opinion, the Court sustained the majority of the allegations in the Amended Complaint.  The Court found that Plaintiffs had adequately pleaded that Defendants had repeatedly misled investors for years about their classification of the EpiPen for the purposes of the MDRP.  MTD Op. 15-20, 24-25.  The Court also found that Plaintiffs had adequately pleaded that Defendants had colluded with competitors to fix the price of five generic drugs and had misleadingly concealed that activity from investors.  MTD Op. 11-15, 30-34.  However, the Court dismissed certain portions of the FAC.  The Court found that Plaintiffs had not adequately alleged that Defendants had engaged in an illegal pay-for-delay scheme with Teva, or that Defendants had entered into anticompetitive exclusive dealing agreements with schools for EpiPen. Accordingly, the Court found that Plaintiffs had not adequately pleaded any misrepresentations or omissions relating to Mylan's anticompetitive activity to further the success of EpiPen.  MTD Op. 27-30.  Also, while the Court found that Plaintiffs had adequately alleged that Mylan had agreed to allocate the market for Doxy DR with competitors, the Court found that Plaintiffs had not adequately pleaded Defendants' scienter with respect to this conduct.  MTD Op. 31, 34-35.

The SAC alleges numerous newly discovered facts that address these deficiencies.  Most significantly, the SAC alleges that Defendants participated in further anticompetitive activity to ensure the success of EpiPen.  The moment a strong competitor to EpiPen—Sanofi's Auvi-Q— emerged on the market, Mylan began to offer massive rebates on EpiPen to third-party payors expressly contingent on their excluding this competing product from their formularies.  A federal district court recently held, correctly, that Sanofi's pleading of this same conduct stated a claim

for Mylan's violation of antitrust laws.[1]   Yet regardless of whether Mylan's anticompetitive rebates violated antitrust laws (they did), Mylan misled investors, among other ways, by failing to disclose that it competed through offering these exclusionary rebates for EpiPen.

The SAC also plainly cures the deficiency the Court found in the FAC's allegations of Defendants' scienter with respect to Mylan's agreement to allocate the market for Doxy DR. The SAC alleges in detail, with reference to specific phone conversations and emails, that Mylan's President, Defendant Malik, personally participated in discussions furthering Mylan's allocation of the market for this drug.   The SAC also newly alleges, with reference to particular conversations on specific dates, that Mylan expressly agreed with competitors to fix the price of three additional generic drugs:   Glip-Met, Verapamil and Doxy Mono.

In response to these robust, well-pleaded and damning new allegations, Defendants reflexively fire off a scattershot motion to dismiss in part.   Defendants hit next to nothing.[2] While Plaintiffs provide detailed responses below to each of Defendants' arguments, Defendants' broadest concern seems to be that the SAC alleges "various unrelated forms of alleged anticompetitive activity and regulatory investigation."   (Defs.' Mem. 1.)   Here, Defendants are correct:   the array of Mylan's violations of law currently subject to government investigations and civil suits is dizzying.   Nevertheless, as a legal matter, this class action focuses narrowly on one set of wrongdoing by Mylan—its misrepresentations and omissions to the market about its wrongdoing.   That the SAC contains so many allegations of underlying wrongdoing is a testament not to some gift for pleading on the part of Plaintiffs, but to the breadth and depth of the wrongful means the Company uses to compete.

---

[1] *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-02785, 2017 U.S. Dist. LEXIS 209710, at *77-78 (D. Kan. Dec. 21, 2017).

[2] Plaintiffs agree that Defendant Malik may be held liable only for claims based on statements made on or after July 7, 2013.   (Defs.' Mem. 24-25.)

## II.   STATEMENT OF FACTS

Beyond the extensive allegations in the FAC already sustained by the Court,[3] the SAC details several additional bases for Defendants' liability, including misrepresentations and omissions relating to:  (1) Mylan's anticompetitive conduct with respect to EpiPen, including offering rebates conditioned on excluding Sanofi from the market for epinephrine autoinjectors, (2) its allocating the market for Doxy DR and the personal involvement of Defendant Malik in that scheme, and (3) its fixing the price of three additional generic drugs, Glip-Met, Verapamil and Doxy Mono.   The SAC also alleges one additional stock price drop as a result of Defendants' fraud.

### A.   Mylan Excluded Sanofi from the Market for Epinephrine Autoinjectors by Offering Anticompetitive Rebates to Third-Party Payors Conditioned on Excluding Sanofi's Auvi-Q

From 2013 to 2015, commercial insurance companies and pharmaceutical benefit managers (who manage the pharmacy benefits of group health plan sponsors) (together "third-party payors") accounted for 71% of the market for epinephrine autoinjectors in the U.S.  (SAC ¶ 101.)  Given the dominance of commercial third-party payors in the market for epinephrine autoinjectors, a drug company seeking to enter this market must have its drug included on the lists of drugs for reimbursement maintained by third-party payors (their "formularies").  (SAC ¶ 102.)  These formularies are tiered according to required co-payments, so consumers are incentivized to select drugs on tiers with lower co-pays.  (*Id*.)  If a drug is wholly excluded from a third-party payor's formulary, the drug is often too expensive for patients to purchase.  (*Id*.)

Mylan has monopoly power in the market for epinephrine autoinjectors.  (SAC ¶ 100.) Since Mylan acquired EpiPen, the product has accounted for more than 90% of the U.S. market

---

[3] Plaintiffs incorporate by reference the Statement of Facts in Plaintiffs' Opposition to Defendants Motion to Dismiss the Amended Complaint [Dkt. 49].

for these devices, and Mylan has increased the price for EpiPen more than 500%.  (*Id*.)

In January 2013, the drug company Sanofi-Aventis U.S. LLC ("Sanofi") introduced an epinephrine autoinjector, the Auvi-Q, to compete with the EpiPen and sold it for roughly the same price as the EpiPen's.  (SAC ¶ 103.)  The Auvi-Q was a superior autoinjector to the EpiPen in several ways, including that the device was smaller, easier to carry, and provided audible instructions that panicked first-time users could follow without reading directions.  (*Id*.)  This innovative device sold successfully in the first few months following its release.  (*Id*.)

Mylan responded to this new competitive threat by excluding the Auvi-Q from the market.  (SAC ¶ 104.)  Shortly following the release of the Auvi-Q, Mylan began offering massive rebates to third-party payors on the express condition that the third-party payors not include the Auvi-Q in their formularies.  (*Id*.)  These highly unusual rebates amounted to 30% or more of the price that Mylan otherwise would have offered.  (*Id*.)  Mylan had no legitimate business reason to offer these unprecedented rebates conditioned expressly on excluding the Auvi-Q from the market; they were offered to block that device from competing.  (*Id*.)

Due to Mylan's price increases, the net, after-rebate price of EpiPen actually *rose* after Mylan began its exclusionary rebates.  (SAC ¶ 105.)  Mylan offered no rebates when it sold the EpiPen in 2012 for around $200, but when Mylan began to offer a 30% rebate on the EpiPen and increased its price to around $300 by 2014, the net price of EpiPen rose to $210.  (*Id*.)

Sanofi was unable to offer massive rebates on Auvi-Q in line with those offered by Mylan for EpiPen.  (SAC ¶ 106.)  Given Mylan's monopoly market share, the opportunity cost to third-party payors of foregoing Mylan's rebates was very significant.  (*Id*.)  As the Auvi-Q held only around 10% of the market, Sanofi would have had to offer rebates far greater than Mylan's (and far in excess of its revenues from Auvi-Q) in order to match the total value of Mylan's

rebates that the payor would have to forego in order to buy the Auvi-Q.  (*Id*.)

Mylan successfully blocked Auvi-Q from accessing nearly 50% of the U.S. market for epinephrine autoinjectors.  (SAC ¶ 107.)   In 2014, Mylan's anticompetitive rebates blocked Auvi-Q from about 45% of the individuals covered by commercial payors.  (*Id*.)   In certain states in which third-party payors that did not cover Auvi-Q due to Mylan's exclusionary rebates were particularly pervasive, Sanofi's Auvi-Q was blocked from significantly more than 50% of the market.  (*Id*.)   Moreover, the decisions of third-party payors not to cover Auvi-Q also led doctors to decline to prescribe Sanofi's product, which led to Mylan's effectively excluding the Auvi-Q from well over 50% of the national market for epinephrine autoinjectors.  (SAC ¶ 108.)

When Mylan's conditional rebates blocking Auvi-Q took effect around December 2013, Auvi-Q's U.S. commercial payor market share in the market for epinephrine autoinjectors dropped by nearly 50%, from about 13% to 7% by early 2014.  (SAC ¶ 110.)  By April 2014, Auvi-Q's national market share across all payors had slid from 11% in mid-2013 to only 6%, while its market share in 2014 had been projected by Sanofi to exceed 20%.  (*Id*.)  By October 2015, Auvi-Q's national market share was less than half of what Sanofi had projected.  (*Id*.)

Ultimately, in October 2015, Sanofi was forced not to relaunch Auvi-Q due to the impact of Mylan's anticompetitive rebates.  (SAC ¶ 113.)  In April 2017, Sanofi sued Mylan for antitrust violations,[4] and on December 21, 2017, the district court held that Sanofi had adequately pleaded antitrust claims based on substantially the same facts as those alleged here.[5]  (*Id*.)

### B.    Mylan Conspired with Other Drug Companies To Allocate the Market for Doxy DR To Maintain Its Price at a Supracompetitive Level

In mid-2013, Heritage executives began to reach out to Mylan executives in an effort to

---

[4] *See Sanofi-Aventis U.S. LLC v. Mylan Inc*., No. 17-cv-02763-FLW (D.N.J. Apr. 24, 2017), consolidated under *In re:  EpiPen Marketing, Sales Practices and Antitrust Litigation*, No. 17-md-2785 (D. Kan.).

[5] *See In re EpiPen*, 2017 U.S. Dist. LEXIS 209710, at **77-78.

divide the market for Doxy DR in order to refrain from competing with each other on prices. (SAC ¶ 126.)  In April 2013, Jason Malek, Vice President of Commercial Operations at Heritage ("Malek") and Heritage CEO Jeffrey Glazer ("Glazer") met with two executive of Heritage's parent company, Emcure, and discussed their plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition between them.  (SAC ¶ 127.) The group initially decided that Satish Mehta ("Mehta"), the CEO of Emcure, would reach out to Defendant Rajiv Malik, President and Executive Director of Mylan, to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.  (*Id*.)

On May 7, 2013, Glazer emailed Malik in an effort to discuss dividing the market for doxycycline.  (SAC ¶ 129.)  Malik responded with a phone number where he could be reached in England.  (*Id*.)  Malik and Glazer spoke the next day.  (*Id*.)  During this call, Glazer explained to Malik that Heritage had strong business relationships with two of Mylan's Doxy DR customers—a large wholesaler and a large retail pharmacy—and that Heritage intended to pursue Mylan's business at those two accounts.  (SAC ¶ 130.)  These two accounts represented approximately thirty-percent of the market.  (*Id*.)

Malik agreed to give up the two accounts to Heritage, and to allocate the market for Doxy DR between Heritage and Mylan.  (SAC ¶ 131.)  Malik specifically cited Heritage's prior agreement to allow Mylan to enter the market for another drug without competition as a reason that Mylan would give up market share to Heritage in this instance.  (*Id*.)  Malik told Glazer that he would let others at Mylan know of the plan.  (*Id*.)

On July 8, 2013, Heritage submitted a proposal letter to the large retail pharmacy account to obtain its Doxy DR business.  (SAC ¶ 140.)  Concurrently, both Heritage and Emcure kept Mylan updated on Heritage's efforts.  (SAC ¶ 141.)  Heritage particularly wanted to ensure that

Mylan was committed and would cede the pharmacy account to Heritage.  (*Id*.)  Thus, on July 18, 2013, Mehta spoke to Malik to obtain his assurance.  (*Id*.)  The substance of their conversation was conveyed by Emcure personnel to Glazer by email shortly thereafter.  (*Id*.)

In February 2014, Mayne also entered the market for Doxy DR.  (SAC ¶ 146.)  Mayne approached Heritage even before it began selling the generic drug, in an attempt to obtain some of Heritage's market share, for example, on a phone call on January 7, 2014. (*Id*.)  Shortly thereafter, Mayne made an unsolicited bid for the Doxy DR business of a large drug wholesaler. (SAC ¶ 147.)  The bid prompted the wholesaler to approach Mylan, its supplier at the time of Doxy DR, and Heritage, to see whether they would submit competing bids.  (*Id*.)  Internally at Heritage, Malek noted that Heritage had sufficient supply of Doxy DR to meet the requirements of the wholesaler and to place a bid for those requirements, but Malek and others at Heritage worried that Mylan would perceive such a bid as an attack on Mylan's Doxy DR business in violation of the market allocation agreement between Heritage and Mylan.  (SAC ¶ 148.)  Accordingly, the day after these internal discussions at Heritage took place, Heritage responded to the wholesaler that it declined to place a bid for its Doxy DR business.  (*Id*.)

In late March 2014, Heritage learned that Mayne had made an unsolicited bid for Doxy DR to one of Heritage's large nationwide pharmacy accounts.  (SAC ¶ 149.)  This conflict was resolved when Mayne agreed to walk away from the large account.  (*Id*.)

Mylan and Heritage continued to honor their agreement to allocate market share of Doxy DR and to avoid competing against each other.  (SAC ¶ 152.)  For example, on August 29, 2014, Malek emailed a contact at Mylan and indicated that their agreement was still in effect.  (*Id*.)

C.   **Mylan Agreed with Competitors to Fix the Prices of Glip-Met, Verapamil and Doxy Mono**

Beginning in 2013 and continuing throughout the Class Period, Mylan entered into and

maintained price-fixing agreements with the other major participants in the markets for three additional generic drugs: Glip-Met, Verapamil and Doxy Mono. (SAC ¶¶ 187, 192, 195.)

### 1.      Glipizide-Metformin

An employee at Mylan and an employee at Heritage reached an agreement on a call on April 23, 2014 to raise prices for Glip-Met, in addition to Verapamil and Doxy Mono. (SAC ¶ 193.) Shortly following the call, the employee at Heritage sent an email to Malek. (*Id.*) Mylan was also in frequent communication during this period with the only other competitor for Glip-Met, Teva. (*Id.*) For example, employees with responsibility for Glip-Met at Mylan spoke to employees at Teva multiple times on May 9, 2014, including on one call that lasted more than seven minutes. (*Id.*) The two firms communicated frequently throughout the rest of 2014. (*Id.*)

Between July 1 and 9, 2014, Heritage increased the price nationwide on Glip-Met for at least 27 different customers by as much as 100%. (SAC ¶ 193.) In accordance with their agreement, neither Mylan nor Teva significantly challenged Heritage on its price increases. (*Id.*)

### 2.      Verapamil

The employee at Heritage responsible for communicating with Actavis about Verapamil called Actavis on April 22, 2014, and they spoke for more than nine minutes. (SAC ¶ 196.) On this call, Heritage and Actavis reached an agreement to raise the price of Verapamil. (*Id.*) The Actavis employee then spread news of the agreement internally, as evidenced by an email dated April 28, 2014 regarding potential price increases. (*Id.*)

Then, in coordinated fashion, an employee at Mylan and an employee at Heritage reached an agreement on a call on April 23, 2014 to raise prices for Verapamil. (SAC ¶ 197.) Immediately following the call, the employee at Heritage contacted Malek by email. (*Id.*) On May 6, 2014, an employee at Actavis who had received the April 28, 2014 email described above called an employee at Mylan and left a message. (SAC ¶ 198.) The employee at Mylan

returned the call on May 9, 2014, and the two spoke for three minutes, and they spoke again on May 19, 2014 for about seven minutes and communicated often in the following months.  (*Id*.)

On May 8, 2014, Malek emailed the sales team at Heritage and asked them to confirm from which competitors they had been able to obtain agreements relating to the planned price increases in certain generic drugs.  (SAC ¶ 199.)  On May 9, 2014, Heritage held a conference call, on which it was made clear that Verapamil was on the list of drugs targeted for a price increase.  (*Id*.)  In 2014, Heritage raised the price for Verapamil for at least one customer as part of its price increase initiative.  (SAC ¶ 200.)

### 3.   Doxycycline Monohydrate

An employee at Mylan and an employee at Heritage reached an agreement on a call on April 23, 2014 to raise prices for Doxy Mono.  (SAC ¶ 190.)  Shortly following the call, the employee at Heritage sent an email to Malek.  (*Id*.)

### D.   In August 2016, Mylan's Stock Dropped When Its Anticompetitive Conduct Relating to EpiPen Was Partially Revealed and Risks Materialized

In late August 2016, a series of news articles highlighted Mylan's 500% increase in the price of EpiPen.  (SAC ¶¶ 302-07.)  The same week, U.S. Senators called for government investigations, including an FTC investigation, into Mylan's conduct and whether Mylan had violated antitrust laws to be able to raise the price of this drug so massively.  (SAC ¶ 305.)  These articles and announcements were partial revelations of Mylan's anticompetitive activity relating to EpiPen, and were materializations of related undisclosed risks.  Upon these revelations, Mylan's stock price dropped precipitously $6.17 or 12.51% between August 19 and August 24, 2016.

### E.   On October 31, 2017, Mylan's Stock Dropped Upon Revelation of Additional Allegations by the CT AG

On October 31, 2017, the CT AG announced that the States were filing an amended

complaint in the States' suit against Mylan, and attached a copy of the proposed amended complaint.  (SAC ¶ 394.)   The State AGs' AC contained numerous detailed and damning allegations never previously revealed, based on internal emails and other documents, including, *inter alia*, that the President of Mylan, Defendant Malik, had personally participated in the Company's illegal market allocation activity.  (*Id*.)  The State AGs' AC also alleged for the first time that Mylan had participated in fixing the price of three additional generic drugs.  (*Id*.)  On this news, Mylan's shares fell $2.53, or 6.62%.  (*Id*.)

### III.   ARGUMENT:  DEFENDANTS FURTHER VIOLATED SECTION 10(b) BY FAILING TO DISCLOSE THE COMPANY'S ANTICOMPETITIVE ACTIVITY RELATING TO EPIPEN AND CERTAIN GENERIC DRUGS

#### A.   Plaintiffs Adequately Allege Numerous Misleading Statements and Omissions

The first element of a Section 10(b) claim requires a qualifying "misstatement[] or omission[]," which is any one that "viewed as a whole, would have misled a reasonable investor." *Berger v. Apple REIT Ten, Inc*., 563 F. App'x 81, 83 (2d Cir. 2014).   "It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth" on the issue or topic.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016); *see Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).

##### 1.   Mylan Misled Investors About Its Exclusionary Rebates for the EpiPen

Mylan repeatedly misled investors during the Class Period regarding its exclusionary rebates for the EpiPen by making statements regarding, for example, the means Mylan used to compete, while omitting to disclose that Mylan competed by offering rebates to third-party payors conditioned on exclusivity to block Sanofi from the market.  (*See, e.g.*, SAC ¶¶ 303-04.)

Defendants argue that their misstatements and omissions relating to Mylan's conditional rebates are only actionable if these rebates constitute a formal antitrust violation under U.S.

antitrust law.  (Defs.' Mem. 5-6.)  However, Section 10(b) requires only that Plaintiffs allege a misleading statement; a plaintiff need adequately allege an antitrust violation in connection with a Section 10(b) claim only if the alleged misleading statements are false *solely* because the defendant *committed an antitrust violation*.  *See In re AXIS Capital Holdings Ltd. Sec. Litig*., 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (requiring adequate antitrust allegations because claims were "entirely dependent" on antitrust violation); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (same).  Here, Mylan's failure to list its conditional rebates as among the means by which it competed and among the reasons for its success misled investors regarding the source of the Company's success and the nature of its competitive activity.  As the SAC now clearly alleges (*e.g.*, SAC ¶ 14), these omissions were misleading regardless of whether or not the conditional rebates constituted antitrust violations.

In any event, Plaintiffs have adequately pleaded that Mylan's conditional rebates violated antitrust laws, in particular, Section 2 of the Sherman Act.  (SAC ¶¶ 103-14.)  Indeed, the district court overseeing the antitrust suit by Sanofi and the consumer class against Mylan already has ruled that allegations substantially the same as those alleged in the SAC sufficiently state a claim for Mylan's violation of Section 2.  *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, No. 17-cv-02785, 2017 U.S. Dist. LEXIS 209710, at **63-69 (D. Kan. Dec. 21, 2017); *In re EpiPen*, No. 17-md-02785, 2018 U.S. Dist. LEXIS 140323, at **52-64 (D. Kan. Aug. 20, 2018).

The holdings in the *In re EpiPen* cases are sound.  A firm violates Section 2 "when it acquires or maintains . . . a monopoly by engaging in exclusionary conduct" that has a net "anticompetitive effect." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Defendants do not (and cannot) dispute that Mylan has a monopoly in the market for epinephrine autoinjectors.  (SAC ¶ 100.)  Mylan maintained its monopoly by engaging in exclusionary

conduct; the Company offered irresistible rebates to third-party payors that were conditioned on their excluding Sanofi's Auvi-Q (and often other epinephrine autoinjectors as well) from their formularies, and those rebates effectively excluded Auvi-Q from the market.  (SAC ¶¶ 104-06.)  Mylan's conduct had an anticompetitive effect.  Through its conduct Mylan was able to increase the price of EpiPen by more than 500%, and even increased the net, after-rebate price of EpiPen.  (SAC ¶ 100, 105.)  Mylan also stifled innovation by effectively blocking the innovative Auvi-Q from over 50% of the market nationwide.  (SAC ¶¶ 103, 107-08.)   Accordingly, Mylan's exclusionary conduct harmed competition and violated Section 2.  *See* 2017 U.S. Dist. LEXIS 209710, at *63-69.

In response, Defendants argue first that the Court's prior holding with respect to Mylan's exclusive dealing agreements with schools is somehow applicable to Mylan's exclusionary rebates to third-party payors.  (Defs.' Mem. 7-8.)   To the contrary, while exclusive dealing agreements are indeed "presumptively legal," MTD Op. 29, here Mylan's exclusionary rebates substantially foreclosed competition (SAC ¶¶ 107-13), including by preventing Sanofi from developing a "critical mass" of customers, so the presumption of legality is overcome.  *In re EpiPen*, 2017 U.S. Dist. LEXIS 209710, at **46-47 ("the probable effect of Mylan's rebate program—conditioned on exclusivity—substantially foreclosed competition") (citing *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 31 (S.D.N.Y. 2016)); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  Likewise, the SAC alleges with specificity the form and manner in which these rebates were offered, and alleges that this exclusionary conduct harmed competition (SAC ¶¶ 104-113).  That is, the SAC pleads with specificity what the Court found the FAC had failed to plead regarding Mylan's agreements with schools.  MTD Op. 29.

Defendants also argue that Plaintiffs have failed to allege that the "anticompetitive effects

[of its exclusionary rebates] outweigh[ed] [any] procompetitive effects." (Defs.' Mem. 8.) Defendants are wrong. Plaintiffs clearly allege that "Mylan's rebates did not have any procompetitive effects," and explain in particular that Mylan's rebates actually caused the price of EpiPen to increase. (SAC ¶ 105.) Plaintiffs have no further burden at the pleading stage to allege that Mylan's rebates had no procompetitive effects. *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488-CM, 2017 U.S. Dist. LEXIS 83446, at *32-33 (S.D.N.Y. May 23, 2017) ("[O]nce a plaintiff establishes that a monopolist's conduct is anticompetitive or exclusionary, the monopolist may proffer 'nonpretextual' procompetitive justifications . . . . The plaintiff may then either rebut those justifications or demonstrate that the anticompetitive harm outweighs the procompetitive benefit."). Here, Defendants fail even to proffer any procompetitive justification.

Finally, Defendants argue that because the Third Circuit has found that certain rebates offered by non-party Sanofi in a wholly different context are legal, the rebates offered by Mylan here must also have been legal. (Defs.' Mem. 7-8.) This argument flatly fails because unlike Mylan's rebates, Sanofi's rebates that the Third Circuit found to be legal did not exclude competitors from the market. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 400 (3d Cir. 2016) ("In essence, the contract did not prohibit members from putting other anticoagulant drugs on their formularies, but did prohibit them from favoring those drugs over Lovenox."). Indeed, this same argument was rejected by the Court overseeing Sanofi's antitrust lawsuit against Mylan. *In re EpiPen*, 2017 U.S. Dist. LEXIS 209710, at **37-40 & n.3.

### 2. Mylan Misled Investors About Its Allocation of the Market for Doxy DR and Its Price Fixing of Glip-Met, Verapamil and Doxy Mono

Defendants also repeatedly misled investors by describing the means by which Mylan competed, the competition it faced, and the sources of its income, yet omitting the crucial facts

13

that it competed through anticompetitive agreements to allocate the market for Doxy DR and to fix the price of Glip-Met, Verapamil and Doxy Mono.[6]  (SAC ¶¶ 123-52; 187-200.)

Defendants argue again that their misstatements and omissions relating to Mylan's price-fixing activity are only actionable if such activity formally violated antitrust laws.  (Defs.' Mem. 6.)  However, as explained above, *see supra*, Part II.A.1, a plaintiff need allege an antitrust violation in connection with a Section 10(b) claim only if the alleged misleading statements are false *solely* because the defendant *committed an antitrust violation*.  *See In re AXIS*, 456 F. Supp. 2d at 585; *Menaldi*, 164 F. Supp. 3d at 578.

In any event, the Court already has found that Plaintiffs have adequately pleaded the existence of an illegal market allocation agreement, MTD Op. 31, and Plaintiffs also have now adequately pleaded that Defendants violated antitrust law, including Sherman Act Section 1, in fixing the prices of Glip-Met, Verapamil and Doxy Mono.  "[T]o survive a motion to dismiss [a Section 1 price-fixing claim], plaintiffs need only plead 'enough factual matter (taken as true) to suggest that an agreement was made . . . .'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "'Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate' . . . .  [F]or example . . . a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor & Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

Plaintiffs plausibly plead the existence of an express agreement between Mylan and its competitors to fix the prices of Glip-Met, Verapamil and Doxy Mono.  Indeed, the SAC alleges

---

[6] *See, e.g.*, *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00-cv-1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at **11, 13-14 (S.D.N.Y. Aug. 30, 2000) (declining to dismiss a securities fraud claim where a corporation stated that competition with its competitor was "intense" when in fact the two corporations had entered into a price fixing agreement); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990); *Menkes v. Stolt-Nielsen S.A.*, No. 3:03-CV-409(DJS), 2005 U.S. Dist. LEXIS 28208, at **24-25 (D. Conn. Nov. 10, 2005) (description of the pricing environment as "tight" and subject to continued "pressure" was actionable).

the specific phone call on which Mylan agreed to fix the prices of these drugs:  on April 23, 2014, an employee at Mylan and the employee at Heritage with primary responsibility for pricing of Glip-Met, Verapamil and Doxy Mono held a telephone call on which the two expressly agreed to raise the prices of these drugs.  (SAC ¶¶ 189, 193, 197.)  Immediately following this call, the Heritage employee emailed Malek, a central participant in the price-fixing activity the Court already has found to have been adequately pleaded.  MTD Op. 31-33. Moreover, the sellers of each of these drugs, including Mylan, were in frequent contact with each other around the time of the April 23, 2014 call, as detailed in the SAC.  (*See, e.g.*, SAC ¶¶ 188-89; 193, 196-99.)  These allegations are "independently adequate" to plead the existence of a price-fixing agreement.[7]  *Citigroup, Inc.*, 709 F.3d at 136.

### 3.     Mylan's Statements Explaining the Reasons for Its Income Are Actionable

As the Court has held, Mylan's statements explaining the reasons for its income are actionable because in failing to disclose its exclusionary rebates (and price-fixing activities), Mylan failed to tell the whole truth about the reasons for its past sources of income.  MTD Op. 11-12.  Mylan's statements explaining the reasons for its income would be actionable even if Mylan's highly suspicious exclusionary rebates (and price-fixing) did not constitute antitrust violations (they do).  While this Court has held that Mylan was not obligated to disclose *that* its past conduct put it at risk of future regulatory scrutiny, MTD Op. 12, Mylan nevertheless had to disclose such past conduct, regardless of whether that highly suspicious conduct formally constituted an antitrust violation, because disclosure was necessary to tell the whole truth about the reasons for its past sources of income.  *See, e.g.*, *In re Vivendi*, 838 F.3d at 258.

---

[7] Defendants puzzlingly cite *In re London Silver Fixing, Ltd. Antitrust Litigation* for the proposition that communications that do not reference an agreement to fix prices do not adequately support a claim for price-fixing. No. 14-md-2573, 2018 WL 3585277, at *6-9 (S.D.N.Y. July 25, 2018).  Here, the SAC does allege communications that do reference an express agreement to fix prices.  (SAC ¶¶ 189, 193, 197.)

Defendants' argument that such omissions are not actionable because Mylan was not obligated to disclose future risk conflates the falsity and materiality requirements of Section 10(b).  (Defs.' Mem. 12.)   Mylan's statements explaining the reasons for its income were *misleading* because they omitted Mylan's *past conduct*, including the means it used to compete. Mylan's past conduct was *material* to investors, regardless of whether the conduct formally constituted an antitrust violation, because at a minimum the conduct put the Company at *risk of future regulatory scrutiny*, even though Mylan was not obligated to spell out that future risk to investors.  Defendants were required to disclose past conduct impacting sources of income, MTD Op. 11, but did not, and Defendants do not challenge the materiality of such omissions.[8]

### 4.   Statements by Malik Are Misleading Insofar as They Are Statements of How Mylan Competes or Reasons for Mylan's Performance

Defendants concede, as they must, that statements by Defendant Malik were misleading to the extent those statements gave reasons for Mylan's financial performance, yet failed to disclose that Mylan's results were achieved through anticompetitive means, including exclusionary rebates, market allocation and price fixing.  (Defs.' Mem. 17-18.)   Defendants wrongly argue, however, that those statements by Defendant Malik nevertheless are not actionable because, according to Defendants, the SAC fails adequately to allege that Malik acted with scienter.  (Defs.' Mem. 18-23.)  It does, as explained below.  *See infra*, Part III.B.

### B.   Defendants Acted with Scienter

The second element of Plaintiffs' Section 10(b) claim that Defendants challenge is scienter.  In the Second Circuit, a strong inference of scienter "can be established by alleging facts to show . . . strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198

---

[8] Defendants do not challenge the materiality of any of the misstatements or omissions alleged in the SAC.

(2d Cir. 2009); *Menaldi*, 164 F. Supp. 3d at 585.  Conscious misbehavior encompasses, among other things, "deliberate illegal behavior," *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Recklessness with respect to an omission is adequately pleaded where the "plaintiff has pleaded facts demonstrating that [the defendant] had access to information indicating that [the omission] was [misleading]." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005).

### 1.    Defendants Knew About Mylan's Exclusionary Rebates

Defendants were well aware of the massive rebates that the Company offered to third-party payors contingent on their excluding Sanofi from the market for epinephrine autoinjectors. As the Court already has held, the SAC adequately alleges that Mylan's CEO and CFO "certainly had access to, and actively participated in, pricing decisions." MTD Op. 34.  As CW makes clear, "pricing decisions at Mylan occurred frequently and involved all of Mylan's top executives," and "the CEO and CFO . . . reviewed any price adjustments and had the last word on pricing decision for Mylan's drugs."  When it came to price, "[e]verything went up through the top."  (SAC ¶¶ 122, 404.)  Accordingly, Mylan's top executives, including the Individual Defendants, each certainly knew about, or at a minimum, recklessly disregarded, the massive rebates Mylan offered to third-party payors on purchases of the Company's key drug, EpiPen.

Moreover, though not required to do so, Plaintiffs have pleaded adequately that Defendants violated antitrust laws through their use of these exclusionary rebates.  *See supra*, Part II.A.1.  Even standing alone, these pleadings are sufficient to allege conscious misbehavior, and therewith scienter, with respect to this anticompetitive activity.  *See Novak*, 216 F.3d at 308. Additional allegations cement this conclusion.  That Mylan's sales of EpiPen are part of its core operations (SAC ¶ 30) "buttress the allegations of scienter."  *In re Salix Pharm., Ltd.*, No. 14-cv-8925, 2016 U.S. Dist. LEXIS 54202, at *50 (S.D.N.Y. Apr. 22, 2016).  Defendants' SOX certifications likewise support an inference of scienter in the Court's holistic analysis.  *See, e.g.*,

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004).

        **2.**      **Defendants, Including Defendant Malik, Unquestionably Knew About Mylan's Allocation of the Market for Doxy DR**

Allegations in the SAC make clear not only that Mylan knew about its allocation of the market for Doxy DR, but also that Mylan's own President, Defendant Malik, personally participated extensively in the illegal market allocation. The SAC alleges that on May 8, 2013, Defendant Malik spoke to Heritage's President and CEO Jeffrey Glazer on a call and agreed to give up two pharmacy accounts, representing approximately thirty percent of the market for Doxy DR, to Heritage as compensation for Heritage's prior agreement to allow Mylan to enter the market for another drug without competition. (SAC ¶¶ 129-31.) The knowledge of Defendant Malik, Mylan's President, may be "readily attributed" to Mylan. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015).

In response, Defendants attempt to dodge and argue that the allegations impermissibly rely on other unadjudicated complaints. (Defs.' Mem. 21-23.) As an initial matter, these allegations come from multiple sources, and the SAC does not specify to what extent these allegations are based on complaints in other actions. Plaintiffs are not required to reveal their sources of information in complaints. *See Novak*, 216 F.3d at 313. Yet in any event, the Court already has found that allegations relying on the State AGs' Complaint may properly serve as the basis for pleadings in this action. *See, e.g.*, MTD Op. 31 ("Relying on information contained in a joint complaint filed by the attorneys general of many different states, Plaintiffs allege [. . .]. These allegations are sufficient to plausibly plead the existence of a market allocation arrangement . . . .").[9]

---

[9] *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 284 (S.D.N.Y. 2008) ("The law of the case doctrine generally forecloses relitigation of issues expressly or impliedly decided earlier in the proceeding.").

The Court acted soundly in permitting Plaintiffs to rely on allegations in the State AGs' AC.[10]  The weight of authority in this District and others holds that reliance on well-pleaded factual allegations in complaints in other actions is appropriate.[11]  The reasoning behind this consensus is clear and persuasive:  "[i]t makes little sense to say that information from . . . a study [or investigation]—which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint." *In re Bear Stearns*, 851 F. Supp. 2d at 768 n.24 (S.D.N.Y. 2012).  While journalists have a motive to exaggerate facts so as to tell a more engaging story for readership, Courts have no trouble recognizing that journalists usually aim to report the facts accurately and accepting journalists' factual assertions.  *See id*.  Similarly, while litigants, as advocates, are motivated—indeed required—to make legal assertions in their complaints that favor their cases, litigants certainly may not make up detailed factual allegations without risking serious professional repercussions.  *See* Fed. R. Civ. P. 11; ABA Mod. R. Prof. Conduct 3.3.

---

[10]  Defendants speculate that certain allegations relating to Mylan's conditional rebates were drawn from the complaint in *In re EpiPen*, No. 17-md-02785 (D. Kan. Oct. 17, 2017).  (Defs.' Mem. 6-7.)  In fact, Plaintiffs allegations relating to Mylan's anticompetitive rebates come from a number of sources.  (*See* SAC at 1.)  In any event, to the extent, if any, that certain allegations derive from the complaint in *In re EpiPen*, Plaintiffs reliance on that complaint is wholly appropriate for the reasons explained in this section.

[11]  *See, e.g.*, *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 516 n.10 (S.D.N.Y. 2016) (""[n]either Circuit precedent nor logic supports such an absolute rule" against use of allegations in separate complaints); *HSH Nordbank AG v. RBS Holdings USA Inc.*, No. 13-cv-3303 (PGG), 2015 U.S. Dist. LEXIS 36087, at *7 (S.D.N.Y. Mar. 20, 2015) (denying motion to strike and rejecting argument that plaintiffs could not include allegations from another complaint); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) ("Permitting plaintiffs to borrow allegations from the NYAG's complaint is warranted at this stage in the litigation.  The facts are derived from a credible complaint based on facts obtained after an investigation.  In addition, counsel for plaintiffs have indicated that they have reached out to attorneys at the NYAG to verify the allegations in the Complaint."); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 620-21 (S.D.N.Y. 2014) (holding that a complaint may reference allegations from a separate proceeding); *VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11 Civ. 6805 (DLC), 2013 U.S. Dist. LEXIS 132250, at *9 (S.D.N.Y. Sep. 16, 2013) (same); *In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (same); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (same); *Rodriguez v. City of N.Y.*, No. 16-cv-00214, 2016 WL 3264166, at *3 (E.D.N.Y. June 13, 2016) (same); *Martinez v. LVNV Funding LLC*, No. 14-CV-00677 (RRM) (ST), 2016 U.S. Dist. LEXIS 136613, at *10 (E.D.N.Y. Sept. 30, 2016) (same); *see also, e.g.*, *In re Herbal Supplements Mktg. & Sales Practices Litig.*, No. 15-cv-5070, 2017 U.S. Dist. LEXIS 76207, at *29 (N.D. Ill. May 19, 2017) ) (same); *Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 193 (D.D.C. 2017) (same).

Here, there is no question that the allegations in the State AGs' AC referenced by Plaintiffs are reliable.  They are highly detailed factual allegations, not legal conclusions, and they are based on an extensive investigation conducted by a non-partisan group of 46 state attorneys general and include citations to dozens of emails, phone records, and other documents.[12]  *See id*.  Moreover, Plaintiffs verified the allegations in the complaint by discussing them with their source, the office of the CT AG.  None of the cases on which Defendants rely (Defs.' Mem. 21-23) addressed the propriety of referencing allegations as reliable as those in the State AGs' AC, and they are readily distinguishable on that basis.[13]  Defendants' cases also all rely on a misreading of *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976). *See, e.g.*, *In re OSG*, 12 F. Supp. 3d at 620-21 (explaining misplaced reliance on *Lipsky*).

### 3. The SAC Adequately Pleads Scienter with Respect to Mylan's Price-Fixing of Glip-Met, Verapamil and Doxy Mono

Defendants rightly do not contest that Plaintiffs have adequately pleaded scienter with respect to Mylan's price-fixing of Glip-Met, Verapamil and Doxy Mono for all Defendants other than Defendant Malik.  Indeed, the Court already has held that allegations from CW regarding the involvement of top executives in all pricing decisions were sufficient to allege Defendants' scienter with respect to the Company's price-fixing activity, MTD Op. 33-34, and that holding applies with equal force to Plaintiffs' new price-fixing allegations.

Defendants argue that Plaintiffs nevertheless have failed adequately to plead Malik's

---

[12] Notably, the reliability of these allegations is further confirmed by the guilty pleas of Glazer and Malek, who have admitted in the DOJ's investigation to conspiring to manipulate prices of a glyburide and doxycycline between April 2013 and December 2015.  (SAC ¶ 390.)

[13] For example, in *Low v. Robb*, No. 11-cv-2321, 2012 U.S. Dist. LEXIS 6836, at **25-27 (S.D.N.Y. Jan. 20, 2012), the Court struck allegations from "unrelated disputes and lawsuits involving [the defendant]" that concerned a "financial dispute between [the defendant] and his siblings."  The allegations were mostly conclusory, *ad hominem* attacks, such as "Robb Jr. had already successfully squeezed his family out of the proceeds of the sale of the family business and now he was going to do the same thing to Low," that bore none of the indicia of reliability the allegations here have.  Compl. ¶ 7, *Low v. Robb*, No. 11-cv-2321 (S.D.N.Y. Apr. 5, 2011), ECF No. 1.  In *RSM Production Corp. v. Fridman*, 643 F. Supp. 2d 382, 403-04 (S.D.N.Y. 2009), the Court actually refused to strike allegations, like those at issue here, that were not alleged to have been based *solely* on complaints in other actions.

scienter with respect to Mylan's price-fixing of these drugs.  Yet the same allegations in the SAC from CW that the Court found to be adequate to plead the scienter of the other Individual Defendants likewise support Malik's scienter.  CW reports that "pricing decisions at Mylan occurred frequently and involved all of Mylan's top executives," and that when it came to price, "[e]verything went up through the top."  (MTD Op. 33; SAC ¶ 122.)  Defendant Malik, as President, was certainly one of Mylan's "top executives."  Moreover, the SAC expressly alleges, as an example of the President's involvement in pricing decisions, that "the president" discussed at what price to sell the generic drug doxycycline.  (SAC ¶ 122.)  Indeed, given Malik's direct involvement in manipulating the market for Doxy DR, it is difficult to imagine that Malik did not at least recklessly disregard the price fixing of these other generic drugs.  (SAC ¶¶ 123-52.)

### 4. Mylan's Widespread Anticompetitive Schemes Reinforce the Strong Inference of Scienter for All Such Activity

Moreover, that anticompetitive activity was rampant at Mylan further supports scienter. (SAC *passim*.)  *Tellabs* teaches that scienter allegations are to be judged "holistically."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).  Here, allegations of Mylan's exclusionary rebates, market allocation and price-fixing activity, in addition to the extensive allegations already sustained regarding Mylan's price fixing of generic drugs, add up to an inescapable inference of scienter.  Indeed, even beyond these allegations, the court overseeing antitrust suits against Mylan recently held that allegations substantially similar to those previously alleged in the FAC regarding Mylan's pay-for-delay scheme with Teva and its exclusive dealing agreements with schools stated claims for antitrust violations, and this holding further supports a reasonable inference of scienter here.  *See In re EpiPen*, 2018 U.S. Dist. LEXIS 140323, at *93.  In that case, the Court found that such conduct was part of an overall anticompetitive scheme to inflate the price of EpiPen and exclude competitors.  *Id.*

### C.    Plaintiffs Have Adequately Pleaded Loss Causation for Each of the Dates Specified in the Amended Complaint

The third element of Plaintiffs' Section 10(b) claims, loss causation, "is not intended to impose a great burden on a plaintiff," as Plaintiffs need only meet Rule 8 notice pleading standards, which are met by "provid[ing] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind . . . ." MTD Op. 35-36 (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015)); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).   "Whether the truth comes out by way of a corrective disclosure describing the precise fraud . . . , or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi*, 838 F.3d at 262.

The Court already has held that Plaintiffs have sufficiently pleaded loss causation, and rightly "defer[red] questions about the robustness of Plaintiff's selection of corrective disclosures to a later stage of litigation, after the aid of discovery." MTD Op. 35-36. For this reason, Defendants' loss causation arguments here are barred by the law of the case doctrine. *In re Initial Pub. Offering*, 544 F. Supp. 2d at 284. Defendants nevertheless argue: (1) that Plaintiffs have not adequately pleaded loss causation with respect to statements made between February 2012 and March 2013, and (2) that losses based on the newly alleged October 31, 2017 corrective disclosure must be dismissed. Both arguments fail.

### 1.    Plaintiffs Have Adequately Pleaded Loss Causation with Respect to Statements Made Between February 2012 and March 2013

Defendants argue that the price of Mylan's stock between February 2012 and March 2013 was lower than the price of the stock during the remainder of the Class Period, so Plaintiffs could not have suffered any actual losses on stock purchased during this period. (Defs.' Mem. 13-14.) Where Plaintiffs have suffered no actual losses, Defendants argue, Plaintiffs cannot recover for drops in the value of their stock attributable to Mylan's fraud. (*Id.*)

22

Beyond being barred by the law of the case doctrine and Rule 12(g),[14] Defendants' argument fails because neither the Exchange Act nor the PSLRA limits damages to the difference between purchase price and sale price. (Defs.' Mem. 13-14.) To be sure, the PSLRA contains a 90-day bounce-back provision that caps damages for Section 10(b) fraud claims to the difference between what a Plaintiff paid for a share and the average price of the share in the 90-day period following the end of the Class Period where the plaintiff held his shares beyond the end of the class period. 15 U.S.C. § 78u-4(e)(1). However, that change to the traditional jurisprudence of loss causation is limited by its terms. *Id.* The provision does not limit a Class members' losses if she or he held shares through a partial corrective disclosure and sold the shares prior to the end of the Class Period, as such a sale would not trigger the 90-day bounce-back provision.[15] *See Acticon AG v. China N. E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012) ("Aside from imposing the 'bounce back' cap . . . , Congress did not otherwise disturb the traditional out-of-pocket method for calculating damages in the PSLRA[,] . . . which consist[s] of the difference between the price paid and the 'value' of the stock when purchased.")

## 2.   Plaintiffs Have Adequately Pleaded Losses Based on the October 31, 2017 Corrective Disclosure

The SAC alleges that Mylan's stock dropped significantly when the CT AG announced on October 31, 2017 that the States intended to file an amended complaint in their action against Mylan, and attached the proposed State AGs' AC. The State AGs' AC contained numerous

---

[14] Defendants' argument is barred by Rule 12(g), as it could have been raised in Defendants' first motion to dismiss, but was not. *See* Fed. R. Civ. P. 12(g); *Arcadia Aviation PHF, LLC v. Aero-Smith, Inc.*, No. 12-cv-6177, 2013 WL 3717651, at *4 (S.D.N.Y. July 16, 2013) (rejecting, under Rule 12(g), dismissal argument that could have been made earlier but was not); *see also* 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1384 (3d ed. 2018) ("[Under] Subdivision (g) . . . [a]ny defense that is available at the time of the original motion, but is not included, may not be the basis of a second pre-answer motion.").

[15] 15 U.S.C. § 78u-4(e)(1)-(2) imposes a cap on damages only where a plaintiff sells its shares after or during the ninety day 'bounce back' period following the final corrective disclosure that is the basis for the action. It does not address—and therefore does not cap—damages for a plaintiff that sells shares after a partial corrective disclosure but before the end of the class period, *i.e.*, before the "information [fully] correcting the misstatement or omission" was disseminated to the market. *Id.*

allegations never previously revealed, including, *inter alia*, that the President of Mylan, Defendant Malik, had personally participated in the Company's illegal market allocation activity. (SAC ¶ 394.)  The State AGs' AC also alleged for the first time that Mylan had participated in fixing the price of three additional generic drugs.  These allegations are more than adequate to "provide [Defendants] with some indication of the loss and the causal connection that the plaintiff has in mind . . . ." *Dura*, 544 U.S. at 347.

In response, Defendants argue, remarkably, that the State AGs' AC did not disclose any new material information.[16]  (Defs.' Mem. 15-16.)  Of course it did.  As explained above, the State AGs' AC alleged for the first time that Defendant Malik personally participated in illegal anticompetitive activity, a revelation implicating the entire Company and strengthening the credibility of the State AGs' AC as a whole.  Likewise, the State AGs' AC first revealed the findings of the State AGs' investigation, including detailed factual allegations concerning the time and manner of Mylan's agreement to fix the price of Glip-Met, Verapamil and Doxy Mono. Investors rightly found this new information to be far more damaging to Mylan than the mere prior revelations that the Company's pricing of these drugs was being investigated.

Even if allegations regarding Malik and these three additional drugs were dismissed (they should not be), the October 31, 2017 disclosure was still corrective as it revealed further bases for the market to recognize that Mylan was involved in widespread anticompetitive activity.

## IV.     ARGUMENT:  PLAINTIFFS HAVE PROPERLY PLEADED VIOLATIONS OF SECTION 20(a) BY THE INDIVIDUAL DEFENDANTS, INCLUDING MALIK

To establish a prima facie case of control person liability, a plaintiff must show "(1) a

---

[16] This "truth on the market" defense is highly disfavored in motions to dismiss.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("[b]ecause the truth on the market defense is intensely fact-specific, it is rarely an appropriate basis for dismissing a § 10(b) complaint."); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (to support the truth on the market defense "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.")

primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015).   With respect to (2), "Plaintiffs need not plead control in accordance with the particularity required under Federal Rule of Civil Procedure 9(b)." *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 413 (S.D.N.Y. 2010).   With respect to (3), "recklessness is the appropriate minimum standard . . . under § 20(a)." *Id.* "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008).

Defendants argue that Plaintiffs have failed to plead a Section 20(a) violation only with respect to Defendant Malik.  (Defs.' Mem. 23-24.)  Plaintiffs have adequately pleaded each of the elements of a claim against Defendant Malik for violation of Section 20(a).  *First*, Plaintiffs have adequately pleaded numerous primary violations of Section 10(b).  *See supra* Part III. *Second*, the SAC expressly alleges Malik's control of the primary violators at SAC ¶¶ 432-33.[17] Allegations of exactly this sort have been found sufficient to allege control.  *See Anwar*, 728 F. Supp. 2d at 413.  *Third*, as described above, *see supra* Part III.B, the SAC adequately alleges scienter on the part of Defendant Malik with respect to the primary violations of Section 10(b), and such scienter is sufficient to allege Malik's culpable participation.  *Id.*

## V.   CONCLUSION

For all the above reasons, Defendants' Motion should be denied.

---

[17] For example, the SAC alleges:  "By virtue of their high-level positions, and . . . awareness of the Company's operations . . . the Individual Defendants . . . did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements [. . .] [E]ach [of the Individual] Defendants had direct and supervisory involvement in the day-to-day operations of the Company." SAC 432-33.

Dated:  September 5, 2018

Respectfully submitted,

POMERANTZ LLP

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
avan@pomlaw.com

Steven J. Toll
Daniel S. Sommers
Times Wang
COHEN MILSTEIN SELLERS
        & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 2005-3964
Tel.:  (202) 408-4600
Fax:  (202) 408-4699
Email:  stoll@cohenmilstein.com
dsommers@cohenmilstein.com
twang@cohenmilstein.com

Laura H. Posner
COHEN MILSTEIN SELLERS
        & TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
Tel.:  (212) 838-7797
Fax:  (212) 838-7745
Email:  lposner@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

Jacob Sabo
LAW OFFICE OF JACOB SABO
No. 3 Daniel Frisch St.
24th Floor
Tel-Aviv 64731
Israel
Tel.: 03-7161555
Fax: 03-7161556

*Additional Counsel for Dan Kleinerman*