UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MYLAN N.V. SECURITIES
LITIGATION

16-CV-7926 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

A group of plaintiffs bring this putative securities class action against the drug manufacturer Mylan N.V. and several of its officers, in connection with the alleged misclassification of the EpiPen, a rebate scheme involving the EpiPen, and the alleged inflation of prices for various generic drugs.  On March 28, 2018, the Court granted in part and denied in part Defendants' motion to dismiss the prior class action complaint (Dkt. No. 69), and Plaintiffs subsequently filed the operative amended complaint (Dkt. No. 89).

Defendants now move to dismiss the new allegations in the amended complaint.  (Dkt. No. 95.)  For the reasons that follow, the motion is granted in part and denied in part.

I.    **Background**

A.    **Procedural History**

Plaintiffs are purchasers of Mylan's common stock.  On October 11, 2016, Plaintiff Stef Van Duppen initiated this action against Mylan N.V., Mylan Inc., and officers Heather Bresch and John Sheehan.  (Dkt. No. 1.)  Separately, Plaintiff Landon W. Perdue filed an action against Mylan N.V., Mylan Inc., and officers Heather Bresch, Paul B. Campbell, Robert J. Coury, Kenneth S. Parks, and John D. Sheehan on October 13, 2016.  (*See Perdue v. Mylan N.V.*, No. 16 Civ. 8000, Dkt. No. 1.)  On January 9, 2017, the Court consolidated the two cases for pre-trial purposes, appointed Lead Plaintiffs, and approved Lead Counsel.  (Dkt. No. 26.)  Lead Plaintiffs subsequently filed an Amended Class Action Complaint (Dkt. No. 39) asserting claims under:

(1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b),

and Rule 10b-5, 17 C.F.R. § 240.10b 5, against all Defendants; (2) Section 20(a) of the Exchange

Act, 15 U.S.C. § 78t(a), against the individual Defendants; and (3) Section 1 of the Israeli

Securities Law of 1968, against all Defendants.

Defendants jointly moved to dismiss the complaint (Dkt. No. 45), and the Court granted

the motion in part (Dkt. No. 69).  The Court dismissed Plaintiffs' securities claims to the extent

they relied on an alleged "pay-for-delay" agreement with Teva Pharmaceuticals, alleged

agreements with schools regarding the EpiPen, and an alleged agreement to allocate the market

for the generic drug doxycycline hyclate delayed release ("Doxy DR").  (Dkt. No. 69 at 27–30,

34.)  The Court also determined that certain statements alleged in the complaint were not

actionable.  (Dkt. No. 69 at 11–12, 17, 20.)  Finally, the Court declined to exercise supplemental

jurisdiction over the Israeli securities law claim, given the complex issues and exceptional

circumstances presented in this case.  (Dkt. No. 69 at 36–40.)  Plaintiffs' remaining securities

claims—premised on the misclassification of the EpiPen in the Medicaid rebate scheme and the

alleged price-fixing agreements concerning five generic drugs—survived the motion to dismiss.

On July 6, 2018, Plaintiffs filed the operative Second Amended Class Action Complaint

("Amended Complaint").  (Dkt. No. 89 ("Compl.").)  Defendants now move to partially dismiss

the Amended Complaint (Dkt. No. 95), challenging the sufficiency of its new allegations (Dkt.

No. 96 at 1 & n.1).

###    B.    Factual Background

The facts of this case are described in this Court's prior opinion.  *See In re Mylan N.V.*

*Sec. Litig.*, No. 16 Civ. 7926, 2018 WL 1595985, at *1–3 (S.D.N.Y. Mar. 28, 2018).  Here, the

Court recounts background necessary to resolving the instant motion, as well as those new facts

alleged for the first time in the Amended Complaint.  The factual allegations in the Amended

Complaint are assumed true for the purposes of this motion.

Mylan is a developer, manufacturer, and distributor of brand-name and generic

pharmaceuticals.  (Compl. ¶ 2.)  This action arises out of Mylan's conduct regarding the drug

EpiPen Auto-Injector ("EpiPen") and several generic drugs.  (*Id.*)  Mylan is a public company,

trading on the NASDAQ Global Select Market.  (Compl. ¶ 30.)  Lead Plaintiffs Menorah

Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., Phoenix Insurance

Company Ltd., Meitav DS Provident Funds and Pension Ltd., and Dan Kleinerman ("Plaintiffs")

bring this action on behalf of themselves and a class of individuals who purchased the common

stock of Mylan N.V. or Mylan, Inc. between February 21, 2012, and October 30, 2017.  (Compl.

¶¶ 1, 29.)  Defendants in this action include Mylan N.V., Mylan, Inc., and various Mylan

executives who served during the class period (collectively, "Mylan").  (Compl. ¶¶ 30–37.)

The conduct giving rise to this action falls into two categories of alleged wrongdoing:

(1) Medicaid misclassification, and (2) antitrust violations.  First, the Amended Complaint

alleges that Mylan unlawfully misclassified the EpiPen as a generic drug for purposes of the

Medicaid Drug Rebate Program ("MDRP").  (Compl. ¶ 5; Dkt. No. 69 at 2–3; *see generally*

Compl. ¶¶ 39–97.)  The previous complaint outlined the details of this alleged misclassification,

along with various statements that Plaintiffs alleged to have misled investors in connection with

the misclassification.  (*See, e.g.*, Dkt. No. 39 ¶¶ 33–90, 201–04.)  Plaintiffs repeat those

allegations in the Amended Complaint, and present several additional statements that Plaintiffs

contend were also rendered misleading by the failure to disclose the alleged misclassification.

(*See, e.g*., Compl. ¶¶ 242–43, 289–91.)

Second, the Amended Complaint alleges that Mylan entered into a number of anticompetitive agreements to block competitors from the market and inflate the prices of various drugs.  (Compl. ¶¶ 12–13, 15–18; *see also* Dkt. No. 69 at 3–4.)  The Amended Complaint repeats allegations from the previous complaint that Mylan schemed to manipulate the market to maintain a supracompetitive price for the generic drug Doxy DR, and schemed to fix prices for the generic drugs albuterol sulfate, benazepril, clomipramine, divalproex, and propranolol.  (Compl. ¶ 115; Dkt. No. 39 ¶ 104.)  Although Plaintiffs' claims regarding market allocation of Doxy DR were previously dismissed for failure to plausibly allege scienter, the Amended Complaint contains new allegations regarding the agreement of Mylan executives to engage in market allocation with respect to Doxy DR, in an attempt to cure the pleading deficiency.  (Compl. ¶¶ 127, 130–31, 134–45.)

The Amended Complaint includes new allegations regarding Mylan's alleged antitrust misconduct.  Among these are allegations that Mylan engaged in price fixing in the markets for three other generic drugs: doxycycline monohydrate ("Doxy Mono"), glipizide-metformin, and verapamil.  (Compl. ¶¶ 187–200, 405.)

Plaintiffs' new allegations also include claims that Mylan engaged in anticompetitive conduct regarding the EpiPen and a competing epinephrine autoinjector—the Auvi-Q produced by Sanofi-Aventis.  (Compl. ¶¶ 12–13.)  Specifically, the Amended Complaint alleges that Mylan offered EpiPen at a rebate of 30% or more to third-party payors in the medical insurance market, on the express condition that the payors would decline to reimburse for the Auvi-Q.  (Compl. ¶ 104.)  As a result, Mylan blocked the Auvi-Q from accessing half of the market for epinephrine autoinjectors, and caused its market share to drop.  (Compl. ¶¶ 107–08, 110.)  Sanofi

decided not to relaunch Auvi-Q, and is suing Mylan for antitrust violations in connection with the alleged conduct.  (Compl. ¶ 113.)

Furthermore, the Amended Complaint adds an additional corrective disclosure relevant to allegations of loss causation:  On October 31, 2017, a group of 47 state attorneys general issued a press release publicizing new allegations from an amended complaint that the group would be filing in their ongoing antitrust action against Mylan ("State AG action").  (Compl. ¶ 394.)  On that day, Mylan shares fell $2.53, or 6.62%.  (Compl. ¶ 395.)

Finally, the previous complaint brought claims against five of Mylan's executives.  (Dkt. No. 39 ¶¶ 28–32.)  To that group of individual Defendants, the Amended Complaint also adds Rajiv Malik, who served as the President of Mylan from January 1, 2012, to the present, and has served as an Executive Director of Mylan since 2013.  (Compl. ¶ 35.)  The Amended Complaint adds allegations about Malik's involvement in the challenged conduct, including six allegedly misleading statements made by Malik and Malik's sale of Mylan stock in a manner potentially evidencing his scienter.  (Compl. ¶¶ 127, 130, 141–42, 307–08, 409.)

## II.    Legal Standard

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).

The Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir.

5

2006) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are [also] subject to the heightened pleading standards established by Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act ("PSLRA")], 15 U.S.C. § 78u-4."  *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 322 (S.D.N.Y. 2018).  Where a claim alleges "fraud or mistake," Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The PSLRA requires a claim for securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).

## III.   Discussion

Under Rule 10b-5(b), it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  To state a claim for relief under Section 10(b) and Rule 10b-5, "a plaintiff must show '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 576 (S.D.N.Y. 2016) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157 (2008)).

Mylan contends that the new allegations in the Amended Complaint fail to state a claim under this standard for several reasons, including that: (1) certain alleged misstatements are not actionable; (2) conduct that Mylan was purportedly required to disclose is not adequately alleged to violate antitrust laws; (3) certain loss causation allegations are deficient; (4) allegations against Defendant Rajiv Malik are not actionable, unsupported by scienter, or time-barred; and (5) allegations regarding the generic drug Doxy DR are unsupported by scienter.  The Court addresses each in turn.

### A.   Actionable Statements

As the Court explained in its previous opinion in this case (Dkt. No. 69 at 8), Section "10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Rather, "omissions are actionable under § 10(b) only when a corporation has a duty to disclose."  *Menaldi*, 164 F. Supp. 3d at 579.  As relevant here, a company has a duty to disclose material information when "necessary to avoid rendering existing statements misleading by failing to disclose material facts."  *Id.*

Mylan identifies two categories of alleged misstatements in the Amended Complaint which it contends are not actionable in light of this Court's previous opinion: (i) statements of historical income; and (ii) statements respecting future regulatory scrutiny.  (Dkt. No. 96 at 11–12.)  First, Mylan contends that the Amended Complaint continues to include quantitative statements of earnings from Mylan's Form 10-K and Form 10-Q filings, which the Court previously determined to be "not actionable" in its prior opinion.[1]  (Dkt. No. 96 at 11; Dkt. No.

---

[1]    For these statements about historical income, see Compl. ¶¶ 249, 254, 259, 262, 271, 274, 277, 281, 290, 293, 296, 299, 310, 315, 322, 328, 337, 343, 349, 355, 359, 361, 365.

69 at 11 ("[T]he mere statement of historical financial information does not give rise to a duty to disclose illegal conduct that may have contributed to that performance.").)

Mylan requests that these statements from 10-K and 10-Q reports about Mylan's financial performance—both those repeated from the prior complaint and alleged for the first time in the Amended Complaint—be dismissed.  (Dkt. No. 96 at 12.)  As Mylan observes, Plaintiffs do not respond to this argument.  (Dkt. No. 101 at 5.)  Accordingly, for the reasons given in the Opinion of March 28, 2018 (Dkt. No. 69 at 11), the Court reiterates that quantitative statements of earnings contained in Mylan's Forms 10-K and 10-Q are not actionable misstatements.  Mylan's request to dismiss these allegations from the Amended Complaint is granted.

Second, with respect to certain statements about sources of income, Mylan contends that Plaintiffs have merely repackaged already-dismissed allegations that Mylan misleadingly "failed to disclose an 'acute risk' of fines" (Dkt. No. 69 at 12), as allegations that Mylan misleadingly failed to disclosed that its actions were "likely to raise regulatory scrutiny" (Dkt. No. 96 at 12 (quoting Compl. ¶ 320).)[2]  Plaintiffs acknowledge the Court's holding "that Mylan was not obligated to disclose *that* its past conduct put it at risk of future regulatory scrutiny" (Dkt. No. 100 at 15), but nonetheless argues that being unable to accurately judge the risk of regulatory scrutiny through Mylan's omissions about past conduct made the omissions material (Dkt. No. 100 at 16).

It appears that the parties do not actually disagree about *whether* certain statements are actionable, but would benefit from clarification about *the grounds on which* they are actionable. The Court thus reiterates that "Mylan's statements explaining income" are actionable because the

---

[2]      For these allegations about future regulatory risk, see Compl. ¶¶ 263, 272, 275, 278, 282, 286, 291, 294, 297, 300, 304, 308, 311, 316, 320, 323, 325, 329, 331, 338, 340, 344, 346, 350, 352, 356, 358, 362, 366.

statements "put its sources of income at issue," and the statements were misleading for failing to

disclose the extent to which Mylan's income was inflated by its misclassification of the EpiPen

and its other alleged anticompetitive activities.  (Dkt. No. 69 at 12.)  Although the concealment

of the risk of regulatory scrutiny may contribute to the materiality of the omissions for investors,

the statements explaining income were not themselves misleading for failing to disclose a risk of

future regulatory scrutiny.  As such, insofar as the Amended Complaint could be read to allege

that certain statements are *misleading* due to a failure to disclose future regulatory risk, those

allegations are dismissed.

### B.      Legality of Underlying Misconduct

Corporations are under no general duty "to disclose corporate mismanagement or

uncharged criminal conduct."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y.

2016).  However, a corporation's failure to disclose underlying unlawful conduct can be

actionable under Section 10(b) and Rule 10b-5 where affirmative statements were made

misleading by the corporation's failure to disclose the alleged wrongdoing.  *See Menaldi*, 164 F.

Supp. 3d at 581.  To state a claim for failure to disclose unlawful conduct, a plaintiff must plead

with particularity the statements that were made misleading by the defendant's failure to

disclose, and must adequately plead that the underlying misconduct occurred and was unlawful.

*See id.* at 578–79.

Here, the Amended Complaint alleges two new sources of unlawful conduct which,

Plaintiffs contend, rendered certain of Mylan's affirmative statements misleading: (1) an

anticompetitive rebate scheme whereby Mylan's rebates on the EpiPen excluded Sanofi's

Auvi-Q from a large segment of the market for epinephrine autoinjectors, in violation of Section

2 of the Sherman Act (Compl. ¶¶ 103–114); and (2) agreements to fix the prices of three generic

drugs, in violation of Section 1 of the Sherman Act (Compl. ¶¶ 18, 187–200).  Mylan contends

that Plaintiffs failed to adequately plead the existence and illegality of this underlying misconduct.  (Dkt. No. 96 at 5–11.)

As an initial matter, Plaintiffs contend that they need not allege that these two bases of conduct constituted antitrust violations, because in any event Mylan's failure to disclose their existence to investors was misleading.  (Dkt. No. 100 at 2, 10–11, 14.)  According to Plaintiffs, the Amended Complaint makes clear that "these omissions were misleading regardless of whether or not the conditional rebates" or pricing agreements "constituted antitrust violations." (Dkt. No. 100 at 11.)

The Court disagrees with this construction of the Amended Complaint.  Paragraph 14, which Plaintiffs rely on for this argument as to the EpiPen rebate scheme, provides that:

> Mylan repeatedly failed to tell the whole truth about the ways in which it competed and about the reasons for its financial success, including in the market for epinephrine autoinjectors, by failing to disclose this anticompetitive conduct. While Mylan's conduct certainly violated U.S. antitrust laws, including Sherman Act Section 2, investors cared about this conduct in any event due to the significant liability to which it exposed Mylan.

(Compl. ¶ 14.)  This paragraph clearly states that the challenged failure "to tell the whole truth" was premised on "anticompetitive conduct."  (*Id.*)  And such conduct would only "expose[]  Mylan" to "significant liability" (*id.*), if it was, indeed, in violation of antitrust laws. Furthermore, the remainder of the allegations in the Amended Complaint involving the Sanofi rebate scheme clearly portray the conduct as an antitrust violation.  (*See, e.g.*, Compl. ¶ 114.)

Paragraph 18 contains similar language regarding the alleged price-fixing agreements: "Mylan's statements suggested that it did not compete through collusion with competitors on prices, when in fact it did, and while Mylan's collusion certainly violated U.S. antitrust laws, investors cared about such collusion in any event due to the significant liability to which it

exposed Mylan."  (Compl. ¶ 18.)  But again, the agreements only exposed Mylan to liability if they were, in fact, unlawful.[3]

Because the Amended Complaint alleges that omissions regarding the EpiPen rebate scheme and generic drug price-fixing agreements were misleading because the underlying conduct violated antitrust laws, then, Plaintiffs must adequately allege that such conduct occurred and was unlawful in order to survive a motion to dismiss.  *See Menaldi*, 164 F. Supp. 3d at 578.

### 1.      EpiPen Rebate Scheme

Mylan argues that Plaintiffs have failed to adequately plead that the challenged EpiPen rebate scheme constituted an antitrust violation.[4]  (Dkt. No. 96 at 7–8.)  To allege a violation of Section 2 of the Sherman Act, a plaintiff "must show harm to competition in the relevant market."  *Solent Freight Servs., Ltd. v. Alberty*, 914 F. Supp. 2d 312, 323 (E.D.N.Y. 2012).  As the Court noted in its previous opinion (Dkt. No. 69 at 29), to overcome the presumptive legality of exclusive-dealing agreements, plaintiffs must adequately allege "an actual adverse effect on competition as a whole in the relevant market," *George Haug Co. v. Rolls Royce Motor Cars*

---

[3]        Furthermore, even if the Amended Complaint could be reasonably read to allege *that* the omissions were misleading even if the challenged conduct was not unlawful, the complaint fails to allege with particularity *why*, absent any antitrust violation, such statements would be misleading.  (*See* Dkt. No. 69 at 30 n.10; Dkt. No. 101 at 2.)

[4]        Mylan also contends in its opening brief that Plaintiffs improperly "cut[] and past[ed]" their allegations from a complaint in another case.  (Dkt. No. 96 at 6–7.)  However, Mylan's reply brief states that the other case involved "a different complaint that had different allegations."  (Dkt. No. 101 at 3.)  The Court thus considers any argument about the improper copying of these allegations to have been abandoned.

In addition, Mylan briefly asserts that Plaintiffs fail to allege scienter with respect to these claims.  (Dkt. No. 96 at 8–9.)  But because "a 'single, conclusory, one-sentence argument' [i]s insufficient to adequately raise an issue," *LG Elecs., Inc. v. Wi-LAN USA, Inc.*, No. 13 Civ. 2237, 2014 WL 3610796, at *3 n.3 (S.D.N.Y. July 21, 2014) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 n. 4 (2d Cir. 2000)), the Court does not address it.

*Inc.*, 148 F.3d 136, 139 (2d Cir. 1998), and that the arrangements' "anticompetitive effects outweigh [their] procompetitive effects," *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) (citation omitted).

Mylan contends that Plaintiffs' allegations on both scores are insufficiently conclusory. (Dkt. No. 96 at 8.)  The Court disagrees.

Plaintiffs' Amended Complaint adequately alleges both harm to competition in the relevant market, and the predominance of anticompetitive effects, to survive a motion to dismiss. Plaintiffs allege with particularity that the EpiPen rebate scheme blocked Sanofi from accessing a significant portion of the market for epinephrine autoinjectors.  (Compl. ¶¶ 106–12; *see* Dkt. No. 100 at 12.)  And Plaintiffs also adequately allege that, despite the rebates offered, the ultimate price of EpiPen actually rose as a result of the rebate scheme, resulting in net anticompetitive effects.  (Compl. ¶¶ 100, 105; *see* Dkt. No. 100 at 13.)  The Court agrees with Plaintiffs that these allegations of anticompetitive effects are sufficient to survive a motion to dismiss.  *See In re Namenda Direct Purchaser Antitrust Litig.*, No. 15 Civ. 7488, 2017 WL 4358244, at *10 (S.D.N.Y. May 23, 2017) (describing burden-shifting framework for Section 2 monopolization claims, whereby plaintiff need initially only "establish[] that a monopolist's conduct is anticompetitive or exclusionary" (citation omitted)).[5]

---

[5]       In support of their argument that they have sufficiently alleged an underlying antitrust violation to survive a motion to dismiss, Plaintiffs rely on the fact that a court overseeing an antitrust action challenging the same rebate scheme denied a similar motion to dismiss.  (Dkt. No. 100 at 11 (citing *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17 MD 2785, 2017 WL 6524839, at *12 (D. Kan. Dec. 21, 2017)).)  Mylan contends that this antitrust case is not relevant, because the pleading standards for antitrust and securities actions differ.  (Dkt. No. 101 at 3.)

The particularity pleading requirement in securities actions clearly applies to the facts underlying scienter and the alleged fraud or conspiracy.  *See* 15 U.S.C. § 78u-4(b)(1)–(2); *Gamm v. Sanderson Farms, Inc.*, No. 16 Civ. 8420, 2018 WL 1319157, at *3 (S.D.N.Y. Jan. 19, 2018). But Mylan cites no authority for the proposition that the particularity requirement also applies to

### 2.      Generic Drug Price Fixing

Mylan also contends that Plaintiffs have failed to adequately plead allegations of illegal

price fixing with respect to the generic drugs Doxy Mono, glipizide-metformin, and verapamil.

(Dkt. No. 96 at 9–11.)  Under Section 1 of the Sherman Act, plaintiffs can plead an unlawful

price-fixing agreement by asserting either (1) "direct evidence" of an unlawful agreement, or (2)

"circumstantial facts supporting the *inference* that a conspiracy existed."  *Mayor & City Council*

*of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  "[T]o survive a motion to dismiss

under Rule 12(b)(6), a plaintiff need only allege 'enough factual matter (taken as true) to suggest

that an agreement was made.'"  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir.

2010) (quoting *Twombly*, 550 U.S. at 556).

Here, Plaintiffs purport to rely on "direct evidence" of an alleged price-fixing agreement.

(Dkt. No. 100 at 14–15; Compl. ¶ 405.)  Direct evidence includes, "for example, . . . a recorded

phone call in which two competitors agreed to fix prices at a certain level."  *Citigroup*, 709 F.3d

at 136.  But where a "complaint's references to an agreement . . . mention[] no specific time,

place, or person involved in the alleged conspiracies," a plaintiff has failed to allege direct

evidence sufficient to put a defendant on notice.  *Twombly*, 550 U.S. at 565 n.10.

---

the illegality of underlying misconduct, including the reasons the conduct had greater
anticompetitive effects than procompetitive effects.  *See Menaldi*, 164 F. Supp. 3d at 578 n.5
(declining to resolve whether "in securities fraud actions premised on a failure to disclose
underlying criminal conduct, the underlying conduct is subject to heightened pleading standards
or plausibility pleading analysis").

But the Court need not resolve this question here.  Regardless of the applicable pleading
standard for antitrust misconduct nestled in a securities case, and in light of the fact that the
Court bases its decision primarily on the substance of the complaint *in this case*, the Court
considers the result in the *In re EpiPen* antitrust litigation as offering only persuasive support for
the conclusion that Plaintiffs' allegations regarding the Sanofi rebate scheme sufficiently allege
anticompetitive conduct to survive a motion to dismiss.

The Amended Complaint alleges that "[a]n employee at Mylan and the employee at Heritage[6] with primary responsibility for communicating with Mylan about Doxy Mono pricing reached an agreement on a call on April 23, 2014 to raise prices for Doxy Mono, in addition to glipizide-metformin and verapamil."  (Compl. ¶ 190; *see also id*. ¶¶ 193, 197.)  The Amended Complaint also alleges that after the call, "the employee at Heritage sent an email to" a specific Mylan executive (Compl. ¶ 190), and that there was "frequent contact" between the sellers of these generic drugs at the time (Compl. ¶ 189; *see also* Compl. ¶¶ 193, 198).

The Court agrees with Mylan that these allegations of direct agreement are insufficient. (Dkt. No. 96 at 10–11; Dkt. No. 101 at 4.)  Plaintiffs' direct evidence boils down to a single April 23, 2014 phone call.  But the allegations surrounding the alleged call do not identify which employees were involved, where the call took place, or the contours of the alleged agreements. Plaintiffs' conclusory allegations regarding that single phone call are thus insufficiently detailed to constitute direct evidence suggesting that an agreement was made.  *See Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 318–19 (S.D.N.Y. 2018) (characterizing four separate pieces of direct evidence—with speakers, dates, and content identified in greater detail—as "slim" but "adequately pleaded").

Plaintiffs often rely on circumstantial evidence of a price-fixing agreement, as opposed to direct evidence, because "this type of 'smoking gun' can be hard to come by, especially at the pleading stage."  *Citigroup*, 709 F.3d at 136.  And Plaintiffs have failed to adequately plead such a smoking gun here.  Therefore, because Plaintiffs have failed to adequately plead the existence

---

[6]     Heritage Pharmaceuticals Inc. is another pharmaceutical company, which sells some of the same generic drugs as Mylan and is alleged to have entered various price-fixing agreements with Mylan.  (*See, e.g*., Compl. ¶¶ 125–26, 188–90.)

of unlawful price-fixing agreements involving Doxy Mono, glipizide-metformin, and verapamil, the Amended Complaint's new allegations involving these three generic drugs are dismissed.

### C.   Loss Causation

To establish loss causation for a claim under Rule 10b-5, a plaintiff must allege "'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted).  At the motion to dismiss stage, a court must determine whether the complaint has sufficiently pleaded "that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." *Id.*

Here, Mylan argues that Plaintiffs have not sufficiently pleaded loss causation as to statements from Mylan during a certain period, or as to a particular corrective disclosure.

*First*, Mylan contends that any of its statements made between February 21, 2012 and February 28, 2013, cannot satisfy loss causation because the price paid for stock during the period from February 2012 to March 2013 was lower than at any other point during the class period.  (Dkt. No. 96 at 13–14.)  Mylan relies on the PSLRA's 90-day bounce-back rule, under which "if the mean trading price of a security during the 90-day period following the [disclosure of information correcting the misstatement] is greater than the price at which the plaintiff purchased his stock then that plaintiff would recover noting." *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) (citation omitted); 15 U.S.C. § 78u-4(e)(1).

Plaintiffs respond that the 90-day bounce-back period limitation does not apply to class members who "held shares through a partial corrective disclosure and sold the shares prior to the

end of the Class period." (Dkt. No. 100 at 23.)[7]  "Aside from imposing the 'bounce back' cap on

recoverable damages, Congress did not otherwise disturb the traditional out-of-pocket method

for calculating damages in the PSLRA," a method "under which damages consist of the

difference between the price paid and the 'value' of the stock when purchased." *Acticon AG*,

692 F.3d at 39–40 (cleaned up).  The Second Circuit has made clear, however, that "a securities

fraud plaintiff who purchased stock at an inflated purchase price must still prove that she

suffered an economic loss, and that that loss was proximately caused by defendant's

misrepresentation." *Id*. at 40.

Plaintiffs satisfy the requisite pleading requirements here because in addition to alleging

purchase at an "inflated price," they "allege[] that the price of [Mylan] stock dropped after the

alleged fraud became known."  *Id*.  Whether certain class members who sold their shares before

full corrective disclosures were made can ultimately demonstrate a proximately caused economic

loss will be decided at a later stage of this litigation.

*Second*, Mylan argues that allegations of loss based on an October 31, 2017

announcement about the State AG action must be dismissed, because the announcement was not

a corrective disclosure.  (Dkt. No. 96 at 14; *see* Compl. ¶¶ 22, 394–395.)  "In order to plead

---

[7]     Plaintiffs also respond that Mylan's challenge to loss causation for misstatements made during this period is barred by the law of the case doctrine or Rule 12(g).  (Dkt. No. 100 at 22.)  A court, in its discretion, can decline to allow parties to relitigate "issues expressly or impliedly decided earlier in the proceeding."  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 284 (S.D.N.Y. 2008).  And Rule 12(g) prevents a party that has made a Rule 12 motion from "mak[ing] another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(g).

As Mylan correctly notes, however, this particular question was not actually decided in the Court's previous opinion.  (Dkt. No. 101 at 6 n.3.)  And notwithstanding Rule 12(g), "[a]n amended complaint . . . entitles a defendant to raise substantive arguments aimed at 'judicial resolution of the controversy' in a new responsive pleading, even if those arguments were not raised in response to the original complaint."  *In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006).  The Court will thus address this argument.

corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected, and that the market reacted negatively to the corrective disclosure." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (cleaned up). To constitute a corrective disclosure, a statement must "reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint." *Cent. States Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). For that reason, a "negative characterization of already-public information" does not qualify. *In re Omnicom Grp.*, 597 F.3d at 512.

Here, Mylan contends that the announcement and accompanying amended complaint in the State AG action "did not disclose any new material information relevant to Plaintiffs' claims." (Dkt. No. 96 at 15.) Plaintiffs counter that the announcement and release of the amended complaint contained "never previously revealed" information about (i) the involvement of Defendant Malik in Mylan's "illegal market allocation activity," and (ii) the findings of an investigation about price fixing as to the three new generic drugs. (Dkt. No. 100 at 24.)

Not all of the facts disclosed in the announcement and accompanying amended complaint in the State AG action were previously unknown to the market. For example, as Mylan correctly notes, detailed information about the market allocation of Doxy DR, and existence of investigations into the three new generic drugs, had indeed been publicly released earlier. (Dkt. No. 96 at 15.) Nevertheless, the October 31, 2017 announcement disclosed new information pertaining to Malik's participation in the Doxy DR scheme, as well as the *findings* of an investigation into the price fixing of the three generic drugs. (Dkt. No. 100 at 24.) The Court concludes that Plaintiffs have sufficiently pleaded that the announcement "reveal[ed] some

17

then-undisclosed *fact[s]* with regard to the specific misrepresentations alleged in the complaint." *Cent. States*, 543 F. App'x at 75.  Overall, the Court concludes that these allegations are sufficient, at this stage, "to provide [the] defendant[s] with some indication of the loss and the causal connection that the plaintiff has in mind."  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

However, as noted above, price-fixing allegations regarding those three generic drugs are dismissed for failure to adequately plead underlying misconduct.  The October 31, 2017 corrective disclosure thus applies only to statements rendered misleading as to the alleged unlawful market allocation of Doxy DR.

### D.      Allegations Against Malik

Next, Mylan seeks to dismiss the allegations against newly added Defendant Rajiv Malik, arguing that: (1) certain of Malik's statements are not actionable; (2) the Amended Complaint failed to plead a strong inference of scienter; and (3) the Amended Complaint fails to plead control-person liability under Section 20.

#### 1.      Actionable Statements

Mylan first argues that certain of Malik's statements made during the class period are not actionable as material misrepresentations or omissions.  The Amended Complaint adds six statements by Malik during the class period.  (Compl. ¶¶ 307, 319, 324, 339, 345, 351.)  Mylan characterizes these statements as addressing three topics: (i) historical financial performance; (ii) optimistic characterizations of results and opinions about future performance; and (iii) the performance of Mylan's generics business.  (Dkt. No. 96 at 17.)

These first two categories of statements, according to Mylan, are not actionable in light of the Court's prior opinion and relevant precedent.  (*Id.*)  And Plaintiffs do not dispute that Malik's

statements on such topics, as alleged in the Amended Complaint, cannot form the basis for their claims.  (Dkt. No. 101 at 7; Dkt. No. 100 at 16.)  Accordingly, the Court holds that only Malik's statements in the third category, pertaining to performance of Mylan's generic drug segment, are potentially actionable.

Mylan also contends that any claims against Malik based on statements made before July 2012 are barred by the Exchange Act's five-year statute of repose.  (Dkt. No. 96 at 24–25 (citing 28 U.S.C. § 1658(b)(2).)  Plaintiffs concede this point (Dkt. No. 100 at 2 n.2), and so the Court does not address it further.

### 2.    Scienter

As to the statements by Malik that are not inactionable as a matter of law, Mylan contends that the Plaintiffs insufficiently plead scienter.  (Dkt. No. 96 at 18–23.)

To adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

 "The requisite state of mind in a Rule 10b–5 action is 'an intent to deceive, manipulate or defraud.'"  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  This requisite scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Circumstances that may "give rise to a strong inference of the requisite scienter" include

allegations that the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* at 199 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)) (internal quotation marks omitted).

Here, Plaintiffs attempt to plead scienter as to Defendant Malik through allegations of "conscious misbehavior" (Dkt. No. 100 at 17), *i.e.*, that Malik "knew facts or had access to information suggesting that their public statements were not accurate," *ECA*, 553 F.3d at 199.

### a.  Scienter as to the EpiPen and Generic Drug Price Fixing

Plaintiffs contend that they have adequately pleaded scienter as to all Defendants—including Malik—with respect to the EpiPen and generic drug price fixing.[8]  (Dkt. No. 100 at 17, 20–21.)  Specifically, the Amended Complaint alleges that pricing decisions involved all top executives at Mylan (Compl. ¶¶ 122, 404); that "by virtue of his responsibilities as President," Malik "w[as] privy to, and participated in the fraudulent conduct described in this Complaint" (Compl. ¶ 397); and that EpiPen is part of Mylan's "core business operations" (Compl. ¶¶ 39, 398).

---

[8]      Mylan pointedly does not address "scienter allegations concerning the EpiPen," contending that they "do not apply" to Malik, because his alleged misstatements concern only the generics segment and there are no allegations that he was involved with EpiPen products. (Dkt. No. 96 at 18 n.13.)  Plaintiffs do not directly address this point, instead arguing that the Amended Complaint pleads scienter as to all Defendants for the EpiPen rebate scheme.  (Dkt. No. 100 at 17.)  Because allegations regarding Malik's scienter as to the EpiPen rebate scheme and generic drug price fixing substantially overlap, the Court addresses scienter as to both.  Even assuming that Malik had involvement with EpiPen products, the Court concludes that Plaintiffs have failed to adequately plead scienter to establish Malik's primary liability for misstatements pertaining to EpiPen products.

Mylan contends that there are no allegations—from a confidential witness ("CW") or otherwise—connecting Malik to the alleged price fixing of generic drugs or to EpiPen products. (Dkt. No. 96 at 18 n.13, 20–21.)  Plaintiffs respond that the same allegations that are sufficient to plead a strong inference of scienter as to the other individual Defendants are also sufficient as to Malik.  (Dkt. No. 100 at 17, 20–21.)

Indeed, the Court concluded in its prior opinion that the allegations from the CW about pricing decisions adequately pleaded scienter as to the individual executive Defendants for generic drug price fixing.  (Dkt. No. 69 at 34.)  That conclusion was based on allegations that the CW specifically "confirmed that Defendants Coury and Bresch, as successive CEOs, and Defendants Sheehan and Parks, as successive CFOs, each knew of and approved all material drug pricing decisions made by the Company."  (Compl. ¶¶ 121, 403.)

But it is not alleged that the CW mentioned the involvement of Malik in such decisions; nor is it alleged that the CW had any interactions with Malik.  *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (discounting allegations from CWs where there was "no allegation that those sources ever had any contact with . . . the Individual Defendants").  And even though the CW attested to "work[ing] with Mylan President Tony Mauro on costing decisions," the Amended Complaint omits whether the CW had the same contact with the subsequent president, Malik.  (Compl. ¶ 403.)

The allegations as to the knowledge and involvement of other individual Defendants are insufficient to plead with particularity a strong inference of scienter as to Malik.  *See Kinra v. Chi. Bridge & Iron Co.*, No. 17 Civ. 4251, 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018) ("Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading." (citation omitted)).  Furthermore, with respect to the EpiPen,

the allegation that it is part of Mylan's "core business" is insufficient, by itself, to support a strong inference of scienter as to Malik. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) ("[A]llegations of a company's core operations . . . can provide supplemental support for allegations of scienter, [but] they cannot establish scienter independently.").

Overall, Plaintiffs have failed to adequately plead scienter as to Defendant Malik with respect to the EpiPen, or the alleged price fixing of generic drugs.

### b.  Scienter as to Doxy DR Market Allocation

To establish Malik's scienter as to claims that Mylan engaged in illegal market allocation of the market for the generic drug Doxy DR, the Amended Complaint alleges that Malik was personally involved in a conversation with the president of a competing pharmaceutical company, in which Malik agreed to the market allocation.  (Compl. ¶¶ 129–131.)

Nevertheless, Mylan argues the Amended Complaint fails to plead scienter because the fact that these allegations were taken from the State AG action means that they cannot be considered as factual allegations in this case and must be disregarded.[9]  (Dkt. No. 96 at 21–23.) For this position, Mylan relies on several cases from this District in which courts have held that "unproven allegations" taken from a complaint in another matter "do not constitute factual

---

[9]       Mylan's reply brief also raises "additional reliability problems" with "Plaintiff's scienter allegations."  (Dkt. No. 101 at 8; *see id.* at 9.)  But Mylan's opening brief does not raise these arguments, or otherwise dispute that the allegations in the Amended Complaint as to Malik's involvement in the Doxy DR allocation are sufficient to raise a strong inference of scienter, if they could be properly considered.  (*See* Dkt. No. 96 at 21 ("Plaintiff's allegations . . . do not create an inference of scienter against Mr. Malik because the Doxy DR allegations are based on the unadjudicated complaint filed by the CTAG.").)

"[A]rguments raised for the first time in reply should not be considered, because the plaintiff[] had no opportunity to respond to those new arguments."  *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012).  As such, the Court will not consider these "additional reliability problems" raised for the first time in Mylan's reply brief.

allegations" and are thus immaterial under Rule 12(f).  *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975, 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012); *see, e.g.*, *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 WL 1080306, at *5 (S.D.N.Y. Mar. 30, 2012); *Low v. Robb*, No. 11 Civ. 2321, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012).

Plaintiffs argue to the contrary that "[t]he weight of authority in this District and others holds that reliance on well-pleaded factual allegations in complaints in other actions is appropriate."  (Dkt. No. 100 at 19.)  Indeed, the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because "neither Circuit precedent nor logic supports . . . an absolute rule" against doing so.  *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 516 n.10 (S.D.N.Y. 2016) (brackets and citation omitted); *see, e.g.*, *HSH Nordbank AG v. RBS Holdings USA Inc.*, No. 13 Civ. 3303, 2015 WL 1307189, at *3–4 (S.D.N.Y. Mar. 23, 2015); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012).

The Court agrees that "[i]t makes little sense to say that information from such a study— which [a complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint." *In re Bear Stearns*, 851 F. Supp. 2d at 768 n.24.  To the extent the cases on which Mylan relies suggest that Second Circuit precedent requires a different result, other cases in this District have cogently explained that those decisions emanate from a misconstruction of Circuit precedent. *See id*; *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 620–21 (S.D.N.Y. 2014); *VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11 Civ. 6805, 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013).

In a particularly relevant case, one court "permitt[ed] plaintiffs to borrow allegations from the NYAG's complaint," where the "facts [we]re derived from a credible complaint based on facts obtained after an investigation" and counsel "indicated that they ha[d] reached out to attorneys at the NYAG to verify the allegations." *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015). The same circumstances obtain here: Plaintiffs' allegations regarding Malik's involvement originate from the State AG action, were the result of a government investigation, and were verified by Plaintiffs' counsel in this case. (Compl. ¶¶ 17 n.1, 124; Dkt. No. 100 at 20.) The Court thus treats allegations borrowed from the State AG complaint as a proper basis for the pleadings in this case.

Because the Amended Complaint's reliance on allegations from the State AG action was Mylan's sole argument against scienter as to the Doxy DR market allocation in its opening brief, the Court concludes that Plaintiffs have adequately pleaded Malik's scienter as to this conduct.

\* \* \*

Overall, Plaintiff's claims for primary liability under Section 10(b) against Defendant Malik survive Mylan's motion to dismiss to the extent those claims are limited to statements about the performance of the generic segment, and allegations that those statements were misleading for failing to disclose the Doxy DR market allocation conduct.

### 3.    Control-Person Liability

Section 20(a) of the Exchange Act imposes liability on "every person who, directly or indirectly, controls any person liable" for securities fraud. 15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Importantly, "there can be no control person liability without a 'primary violation' of the Exchange Act."  *Menaldi*, 164 F. Supp. 3d at 576 (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011)).

As the Court held above, Plaintiffs have failed to adequately plead a primary violation under Section 10(b) with respect to the alleged price fixing of the three new generic drugs:  Doxy Mono, glipizide-metformin, and verapamil.  Plaintiffs' Section 20(a) control-liability claims against Malik therefore fail as they relate to those three alleged price-fixing agreements.  The Amended Complaint succeeds in pleading a primary violation—and the first element of control liability is thus satisfied—as to the remaining underlying conduct, namely, the EpiPen Medicaid misclassification, the EpiPen rebate scheme, Doxy DR market allocation, and the price fixing of five other generic drugs: albuterol sulfate, benazepril, clomipramine, divalproex, and propranolol.

As to the third element of control liability, "[m]ost courts in this district have held," and the parties agree here, that "culpable participation is a scienter requirement for which a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context in order to survive a motion to dismiss."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15 Civ. 6369, 2018 WL 1449206, at *7 (S.D.N.Y. Mar. 23, 2018) (citation omitted). Mylan contends that the Amended Complaint fails to allege that Malik was a "culpable participant" in the purported primary violations.  (Dkt. No. 96 at 24.)  Plaintiffs respond that because they adequately allege Malik's scienter with respect to the primary violations, they have adequately alleged Malik's culpable participation.  (Dkt. No. 100 at 25.)

Indeed, because Plaintiffs have adequately pleaded Malik's scienter as to the allegations of Doxy DR market allocation, they have adequately pleaded Malik's culpable participation as to

the same conduct, and Malik's six statements allegedly rendered misleading by failure to disclose the conduct.  But the Court has held that the Amended Complaint fails to adequately plead Malik's scienter as to the other conduct, and Plaintiffs have shown no basis for distinguishing between the scienter required for primary liability and control liability.  As such, Plaintiffs have failed to adequately plead Malik's culpable participation regarding the allegations involving the EpiPen and generic drug price fixing, and the statements rendered misleading by the failure to disclose that conduct.

Finally, as to the second element of control liability, Mylan concedes that Malik had control over the six statements that he personally made.  (Dkt. No. 96 at 24; Dkt. No. 101 at 10.) Accordingly, Plaintiffs have adequately pleaded a control-liability claim against Malik, but only to the extent such a claim is premised on allegations that the six statements made by Malik were misleading for failure to disclose the Doxy DR market allocation.

### E.      Claims Against Mylan Regarding Doxy DR

In addition to repleading the allegations that survived the earlier motion to dismiss and adding new allegations premised on different underlying misconduct, the Amended Complaint also attempts to cure a particular deficiency in Plaintiffs' previous complaint.  Plaintiffs claim that certain of Mylan's statements were misleading because they failed to disclose that Mylan engaged in anticompetitive behavior, in violation of antitrust law, in allocating the market for the generic drug Doxy DR.  (Compl. ¶¶ 123–152.)

The Court held in the Opinion of March 28, 2018 that Plaintiffs had "plausibly plead[ed] the existence of a market allocation arrangement between Mylan and Heritage" with respect to Doxy DR.  (Dkt. No. 69 at 30–31.)  However, the Court held that Plaintiff's failed to adequately plead scienter.  (Dkt. No. 69 at 34.)

In the Amended Complaint, borrowing from the State AG action, alleges that Defendant Rajiv Malik, Mylan's President, agreed with the president of Heritage on a May 8, 2013 phone call, to allocate the market for Doxy DR between their two pharmaceutical companies. (Compl. ¶¶ 129–132.) Plaintiffs contend that the Amended Complaint adequately pleads scienter as to the Doxy DR agreement, given the involvement of Malik. (Dkt. No. 100 at 2, 18.)

Mylan argues that the complaint again fails to adequately plead scienter solely because "Plaintiffs rely entirely on the unproven allegations copied from the CTAG's complaint to supplement their previously dismissed allegations of scienter as to Doxy DR." (Dkt. No. 96 at 23.) As explained above, the Court rejects this argument and considers the allegations in the Amended Complaint, regardless of whether they originated in the State AG action.

From those allegations, the Amended Complaint adequately pleads Malik's scienter as to the Doxy DR agreement. And because the Court may "readily attribute[] the scienter of management-level employees to corporate defendants," *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006), the Court imputes the scienter of Malik, the president of Mylan, to the corporation. Accordingly, Plaintiffs have overcome the deficiency of their prior complaint and adequately pleaded scienter as to the Doxy DR claims.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to partially dismiss the Second Amended Class Action Complaint is GRANTED in part and DENIED in part. Defendants shall file an answer to the surviving claims within three weeks from the date of this order.

The Clerk of Court is directed to close the motion at Docket Number 95.

SO ORDERED.

Dated: March 29, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge

27