**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Mylan N.V. Securities Litigation | No. 16-cv-07926 (JPO) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' PARTIAL MOTION TO DISMISS

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants*

July 31, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................. 3

    A.    First and Second Amended Complaints.................................................. 3

    B.    The Right Rebate Act........................................................................... 4

    C.    Third Amended Complaint. .................................................................. 6

ARGUMENT ..................................................................................................... 7

I.      CERTAIN OF PLAINTIFFS' EPIPEN CLASSIFICATION ALLEGATIONS
      CANNOT SUPPORT A SECURITIES CLAIM AGAINST ANY DEFENDANT........... 7

    A.    Plaintiffs' Allegations Are Insufficient To Plead that Mylan's Statements of
        Risks of Errors Were Misleading.......................................................... 8

    B.    Plaintiffs' Allegations Are Insufficient To Plead that Mylan's Statements of
        Risks of Errors Were Made with Scienter. ............................................ 9

II.     PLAINTIFFS' ALLEGATIONS REGARDING MYLAN'S AGREEMENTS WITH
      PBMs CANNOT SUPPORT A SECURITIES CLAIM AGAINST ANY
      DEFENDANT................................................................................................ 10

    A.    Plaintiffs Fail To Plead Scienter Regarding PBM Rebates. .................... 10

    B.    Plaintiffs Fail To Plead Loss Causation Regarding PBM Rebates. .......... 12

III.    PLAINTIFFS' MARKET ALLOCATION ALLEGATIONS REGARDING
      ENALAPRIL CANNOT SUPPORT A SECURITIES CLAIM AGAINST ANY
      DEFENDANT................................................................................................ 13

IV.    CERTAIN OF PLAINTIFFS' PRICE-FIXING ALLEGATIONS CANNOT
      SUPPORT A SECURITIES CLAIM AGAINST ANY DEFENDANT. .......................... 14

    A.    Plaintiffs' Divalproex Allegations Are Insufficient To Plead Conspiracy by
        Circumstantial Evidence. ..................................................................... 15

    B.    Plaintiffs Do Not Assert Any Specific Factual Allegations Regarding
        Budesonide DR, Buspirone Hydrochloride, Fluoxetine HCL, Haloperidol,
        Ketoconazole, Nitrofurantoin MAC Capsules, Pentoxifylline or Tamoxifen
        Citrate............................................................................................... 16

C.      Plaintiffs Do Not Assert Circumstantial or Direct Evidence of Conspiracy To Fix Prices of Diclofenac Potassium, Diltiazem HCL, Estradiol, Flurbiprofen, Prochlorperazine or Tolmetin Sodium..................................................................17

D.      Plaintiffs' Allegations Regarding Cimetidine Tablets, Fluvastatin Sodium and Prazosin HCL Are Insufficient To Plead a Price-Fixing Agreement. ..................19

V.      CERTAIN OF PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH RESPECT TO DEFENDANTS BRESCH, COURY, CAMPBELL, PARKS, MALIK, NESTA AND SHEEHAN. ...............................................................................20

A.      All Claims Against Jim Nesta Should Be Dismissed. ..........................................20

B.      Claims Based on Allegations of Market Allocation Should Be Dismissed with Respect to Heather Bresch, Robert Coury, Paul Campbell, Kenneth Parks and John Sheehan.........................................................................................22

C.      Claims Based on Allegations Regarding EpiPen and All Drugs Except Doxy DR Should Be Dismissed as to Rajiv Malik..........................................................23

VI.     PLAINTIFFS' LOSS CAUSATION ALLEGATIONS REGARDING THE MAY 28, 2019 UBS REPORT ARE INSUFFICIENT TO SUPPORT A 10(b) CLAIM...................................................................................................................24

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of Home Appliance Mfrs. v. City of N.Y.*,
    36 F. Supp. 3d 366 (S.D.N.Y. 2014)..................................................................................5

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................................24

*Becker v. Cephalon, Inc.*,
    No. 14-CV-3864 (NSR), 2015 WL 5472311 (S.D.N.Y. Sept. 15, 2015) ...............................16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................13, 14, 15, 16

*Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*,
    137 S. Ct. 2042 (2017)....................................................................................................22

*Conn. Fine Wine & Spirits, LLC v. Seagull*,
    916 F.3d 160 (2d Cir. 2019)............................................................................................19

*Dura Pharma., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................................24

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)............................................................................................12

*Fears v. Wilhelmina Model Agency, Inc.*,
    No. 02 Civ. 491 (HB), 2004 WL 594396 (S.D.N.Y. Mar. 23, 2004) .............................17, 18

*Holbrook v. Trivago N.V.*,
    No. 17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) .................................11

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)...............................................................................13

*In re Axis Capital Hldgs. Ltd. Sec. Litig.*,
    456 F. Supp. 576 (S.D.N.Y. 2006) ..................................................................................12

*In re Commodity Exchange Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)...............................................................................17

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 420 (S.D.N.Y. 2017)...............................................................................15

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016)...............................................................................17

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)..................................................................................24, 25

*In re Smith Barney*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)..................................................................21

*In re UBS AG Sec. Litig.*,
   No. 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ........................21

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016)..................................................................20

*Janbay v. Canadian Solar, Inc.*,
   No. 10 CIV. 4430 RWS, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)................24

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)......................................................................................20, 21

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)................................................................................5

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)..............................................................................13

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)..............................................................................17

*Porrazzo v. Bumble Bee Foods LLC*,
   822 F. Supp. 2d 406 (S.D.N.Y. 2011)................................................................16

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007)............................................................................................9

*SEC v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011)................................................................20

*SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*,
   829 F.3d 173 (2d Cir. 2016)..............................................................................22

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................................10

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)................................................................................5

*Tyler v. Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011)................................................................11

**Statutes & Rules**

15 U.S.C. § 78u-4(b)(2) ..............................................................................................10

28 U.S.C. § 1658(b)(2) ...............................................................................................22

42 U.S.C. 1396r-8(k) ...................................................................................................6

Fed. R. Civ. P. 8(a)(2) ................................................................................................16

Fed. R. Civ. P. 9(b) ......................................................................................................7

Fed. R. Civ. P. 12(b)(6) ................................................................................................7

**Other Authorities**

165 Cong. Rec. S2469-04 (2019) .................................................................................6

77 Fed. Reg. 5318 (Feb. 2, 2012) .................................................................................5

81 Fed. Reg. 5170-01 (Feb. 1, 2016) ........................................................................5, 9

CMS FY2016 Congressional Justification of Estimates for Appropriations
    Committees to Congress at, available at https://www.cms.gov/About-
    CMS/Agency-Information/PerformanceBudget/Downloads/FY2016-CJ-
    Final.pdf ................................................................................................................5

H.R. 1839, 116th Cong. (2019) .....................................................................................6

## PRELIMINARY STATEMENT

Plaintiffs have amended their Complaint by once again copying and pasting unproven allegations from a non-securities action brought in a different court by attorneys general from a collection of states (the "State AG Complaint"). The Third Amended Complaint ("TAC") includes Sections 10(b) and 20(a) claims based on allegations regarding EpiPen classification, allegedly anticompetitive agreements with PBMs and allegedly anticompetitive conduct related to 39 of Mylan's generic drugs. Even though this is Plaintiffs' fourth bite at the apple,[1] the TAC still suffers from deficiencies that are fatal to many of Plaintiffs' claims.

*First*, the passage of the Right Rebate Act ("RRA") in April 2019, confirms that Plaintiffs can no longer plead that Defendants (i) "knew for certain" that EpiPen Auto-Injector® products ("EpiPen") were misclassified under the Medicaid Drug Rebate Program ("MDRP") or (ii) knowingly misled investors regarding EpiPen's classification, and therefore Plaintiffs fail to state a Section 10(b) claim based on Mylan's warnings that its EpiPen rebate calculations were "subject to the risks of errors".

*Second*, Plaintiffs' allegations regarding rebates paid to Pharmacy Benefit Managers ("PBMs") fail to state a Section 10(b) claim because Plaintiffs do not adequately allege scienter or loss causation. Plaintiffs' sole scienter allegation regarding PBM rebates is that EpiPen was part of Mylan's "core business" and therefore Defendants "would have had robust knowledge" of the PBM rebates. Because this Court has already determined that "core business" allegations are insufficient to support an inference of scienter, this claim fails as a matter of law. Moreover, Plaintiffs fail to plead loss causation because Plaintiffs do not allege a

---

[1] Defendants respectfully maintain that Plaintiffs have failed to plead any securities violations in the TAC. Mylan respectfully disagrees with the Court's conclusions to the contrary in its first and second Motion to Dismiss opinions, and Mylan incorporates here and preserves for appeal each argument raised in its Motions to Dismiss dated May 30, 2017 and August 6, 2018, without waiving any of its prior arguments or defenses.

single corrective disclosure regarding PBM rebates to which the market supposedly reacted negatively.

*Third*, Plaintiffs do not plead underlying misconduct or scienter regarding the alleged market allocation of Enalapril.  Plaintiffs fail to allege that Mylan entered an agreement to allocate the market for Enalapril.  In addition, Plaintiffs' allegations refer to an unnamed, unidentified Mylan employee, "M.A."  As this Court has explained, allegations that rely on the activities of unnamed Mylan employees are insufficient to support an inference of scienter.

*Fourth*, Plaintiffs' price-fixing allegations regarding many of the drugs mentioned in the TAC are insufficient to plead the alleged misconduct underlying Plaintiffs' Section 10(b) claims.  For one drug, Divalproex, Plaintiffs ignore that the alleged "parallel conduct" resulted from a supply shortage that occurred after a major competitor exited the market.  For 17 of the drugs mentioned in the TAC,[2] Plaintiffs do not allege the parallel price change required to plead conspiracy through circumstantial evidence and offer nothing akin to the "smoking gun" evidence required to plead conspiracy through direct evidence.

*Fifth*, Plaintiffs assert claims against certain defendants without regard to whether those defendants "made" the alleged misstatements or had the requisite scienter to be held liable under the securities laws.  Accordingly, (1) all claims against Nesta should be dismissed; (2) claims based on allegations of market allocation should be dismissed with respect to Bresch, Campbell, Coury, Parks and Sheehan; and (3) all claims based on allegations of misconduct other than the alleged market allocation of Doxy DR should be dismissed with respect to Malik.

---

[2] Budesonide DR, Buspirone Hydrochloride, Cimetidine Tablets, Diclofenac Potassium, Diltiazem HCL, Estradiol, Fluoxetine HCL, Flurbiprofen, Fluvastatin Sodium, Haloperidol, Ketoconazole, Nitrofurantoin MAC capsules, Pentoxifylline, Prazosin HCL, Prochlorperazine, Tamoxifen Citrate and Tolmetin Sodium.

*Finally*, Plaintiffs' loss causation allegations regarding the May 28, 2019 UBS analyst report fail because it did not present any new information to the market.

This motion seeks to dismiss (1) all claims predicated on the alleged "knowing" misclassification of EpiPen (*see infra*, Part I); (2) all claims predicated on allegations of agreements with PBMs (*see infra*, Part II); and (3) all claims predicated on allegations of anticompetitive conduct with respect to 19 of the drugs mentioned in the TAC.[3] (S*ee infra*, Parts III and IV).  In addition, Mylan seeks to dismiss claims against certain Defendants, including: (1) all claims against Nesta; (2) claims against Bresch, Campbell, Coury, Parks and Sheehan based on allegations of market allocation; and (3) claims against Malik based on allegations of misconduct other than Doxy DR market allocation.  (*See infra*, Part V.)  Finally, Mylan seeks to dismiss Plaintiffs' Section 10(b) claims to the extent they rely on the May 28, 2019 UBS report to satisfy the element of loss causation.  (*See infra*, Part VI.)

## STATEMENT OF FACTS[4]

### A.    First and Second Amended Complaints.

Plaintiffs filed their First Amended Complaint on March 20, 2017, alleging securities claims on behalf of two putative classes of Mylan shareholders who acquired their shares between February 21, 2012 and January 29, 2017.  Plaintiffs brought claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 and under Israeli securities law against Mylan N.V., Mylan Inc. and several Mylan officers.[5]  These claims were rooted in

---

[3] Enalapril, Divalproex, Budesonide DR, Buspirone Hydrochloride, Cimetidine Tablets, Diclofenac Potassium, Diltiazem HCL, Estradiol, Fluoxetine HCL, Flurbiprofen, Fluvastatin Sodium, Haloperidol, Ketoconazole, Nitrofurantoin MAC capsules, Pentoxifylline, Prazosin HCL, Prochlorperazine, Tamoxifen Citrate and Tolmetin Sodium.

[4] Mylan incorporates by reference the Statement of Facts in its Memorandum of Law in Support of Defendants' Motion to Dismiss, dated May 30, 2017 and the Statement of Facts in its Memorandum of Law in Support of Defendants' Partial Motion to Dismiss, dated August 6, 2018.

[5] Heather Bresch, Robert J. Coury, Paul B. Campbell, Kenneth S. Parks and John D. Sheehan.

allegations related to (1) Mylan's MDRP classification of EpiPen; (2) Mylan's EpiPen4Schools program; (3) a patent settlement between Pfizer and Teva; (4) Mylan's pricing of Albuterol Sulfate, Benazepril, Clomipramine, Divalproex and Propranolol; and (5) the alleged market allocation of Doxy DR.  Mylan moved to dismiss, and on March 28, 2018, this Court dismissed ("MTD Op. I") Plaintiffs' federal securities claims in part and Plaintiffs' Israeli securities law claims in full.  The only claims that survived were claims regarding (1) EpiPen classification and (2) alleged price-fixing of five generic drugs.

On July 6, 2018, Plaintiffs filed their Second Amended Complaint, adding allegations (largely lifted from earlier-filed lawsuits) regarding (1) Mylan's rebates to PBMs for EpiPen products (SAC ¶¶ 98-114); (2) Mylan's scienter regarding the alleged market allocation of Doxy DR (*id.* ¶¶ 134-52); and (3) alleged price-fixing with respect to three additional generic drugs.  (*Id.* ¶¶ 187-200.)  The Second Amended Complaint also extended the putative class period by nine months to October 30, 2017, and added Rajiv Malik, Mylan's President, as an individual defendant.  Mylan moved to dismiss in part, and on March 29, 2019, this Court dismissed ("MTD Op. II") the claims related to the three additional generic drugs because Plaintiffs failed to assert direct evidence of conspiracy.  The Court also dismissed all allegations regarding EpiPen and generic price-fixing against Malik, allowing only Plaintiffs' market allocation allegations with respect to a single drug, Doxy DR, to proceed against him.

**B.    The Right Rebate Act.**

Throughout this litigation, Mylan has maintained that its decision to classify EpiPen as a "Non-Innovator" was reasonable in light of the statutory language and guidance that it received from the Centers for Medicare and Medicaid Services ("CMS").[6]  Specifically, Mylan

---

[6] At the time Mylan received this guidance, CMS was known as the Health Care Financing Agency.

explained in its first Motion to Dismiss that, under the statute governing the MDRP, drugs were "Innovators" if they were approved under an "*original* new drug application" ("original NDA"). (Dkt. No. 46 at 2.)  It further explained that "original" was not defined in the statute governing the MDRP and that CMS had recognized that this term had "created" ambiguity.  (*Id.*)[7]  Due to this ambiguity, Dey (which marketed EpiPen until Mylan acquired the company in 2007), sought confirmation from CMS that it was proper to classify EpiPen as a Non-Innovator Drug.  CMS issued a written decision that "*it is entirely fitting and proper for you to report [EpiPen] to the Drug Rebate Program with a Drug Category of 'N' (Non-Innovator, Multiple Source) and be subject to the lowest rebate amount.*"[8]  While the Court allowed Plaintiffs' EpiPen classification claims to proceed, it noted that "Mylan may yet be proven correct" that "EpiPen could not have been knowingly misclassified both because [1] the classification rules are complex and . . . [2] Mylan relied on 'longstanding advice from CMS' indicating that the EpiPen was classified correctly."  (MTD Op. I at 26.)

---

[7] *See also* CMS FY2016 Congressional Justification of Estimates for Appropriations Committees to Congress at 159, available at https://www.cms.gov/About-CMS/Agency-Information/PerformanceBudget/Downloads/FY2016-CJ-Final.pdf; *see also, e.g.*, 81 Fed. Reg. 5170-01, 5193 (Feb. 1, 2016) (final rule "is designed to clarify" definition of "original NDA"); 77 Fed. Reg. 5318, 5323 (Feb. 2, 2012). The Court may consider legislative materials in connection with this motion. *See, e.g.*, *Ass'n of Home Appliance Mfrs. v. City of N.Y.*, 36 F. Supp. 3d 366, 371 (S.D.N.Y. 2014) ("Judicial notice may be taken of material that is a matter of public record . . . , such as legislative history."); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("In considering a motion to dismiss . . . , a district court . . . may . . . consider matters of which judicial notice may be taken under Fed. R. Evid. 201.").

[8] Atkinson Decl., Ex. 3, Inside Health Policy, *CMS Tells Mylan It Incorrectly Classified EpiPen To Pay Lower Medicaid Rebates, Lawmakers Upset* at 2 (Sept. 2, 2016) (Dkt. No. 47-03) (quoting 1997 letter from CMS (emphasis added)).  This article is incorporated into the TAC by reference (*see* TAC ¶¶ 21, 555 & n.54), and, in fact, serves as a basis for Plaintiffs' claimed losses (*id.* ¶ 555).  Furthermore, Mylan disclosed in its 2016 8-K—another document relied on by Plaintiffs (*see id.* ¶ 102)—that "EpiPen Auto-Injector has been classified with CMS as a non-innovator drug since before Mylan acquired the product in 2007 based on longstanding written guidance from the federal government."  Atkinson Decl., Ex. 2, Mylan N.V. Form 8-K at 6 (Oct. 7, 2016) (Dkt. No. 47-02).  The Court may consider CMS's guidance on this motion. *See, e.g.*, *Kramer*, 937 F.2d at 773; *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (holding that, on a motion to dismiss a securities action, a court may consider the complaint, "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit").

Sure enough, in April 2019, less than a month after this Court issued its second Motion to Dismiss opinion, Congress passed the RRA to resolve the ambiguity of the MDRP and to clarify that all drugs approved under a "new drug application" (an "NDA") now will be classified as Innovators.  In discussing the importance of amending the MDRP, Senator Chuck Grassley pointed out that, under the former MDRP regime, 885 NDA drugs had been classified as Non-Innovator.  165 Cong. Rec. S2469-04, at *S2471 (2019).  Thus, Congress clarified the MDRP by deleting the word "original" from the definition of Innovator Drugs.  H.R. 1839, 116th Cong. (2019) (enrolled) ("Clarifying Definitions—Section 1927(k) of the Social Security Act (42 U.S.C. 1396r-8(k)) is amended . . . by striking 'an original new drug application' and inserting 'a new drug application'").

### C.    Third Amended Complaint.

After the State AG Complaint was filed on May 10, 2019, Plaintiffs amended their complaint yet again by cutting and pasting allegations from that complaint.  The TAC here adds as a defendant James ("Jim") Nesta, a Mylan employee who is not alleged to have played a role in authorizing or preparing the statements at issue.[9]  The TAC also alleges circumstantial evidence of price-fixing regarding fourteen drugs[10] and briefly mentions eighteen others.[11]

---

[9] Jim Nesta, Heather Bresch, Robert J. Coury, Paul B. Campbell, Rajiv Malik, Kenneth S. Parks and John D. Sheehan, together with Mylan N.V. and Mylan Inc. (collectively "Mylan") are the "Defendants".  The TAC defines "Individual Defendants" as "Bresch, Coury, Campbell, Malik, Parks and Sheehan", specifically excluding Jim Nesta.  (TAC ¶ 44.)

[10] Albuterol Sulfate, Benazepril, Clomipramine, Divalproex, Propranolol, Amiloride Hydrochloride, Doxazosin Mesylate, Ketorolac, Levothyroxine Sodium, Loperamide HCL, Methotrexate, Nadolol, Tizanidine and Trifluoperazine HCL.

[11] Budesonide DR, Buspirone Hydrochloride, Cimetidine Tablets, Diclofenac Potassium, Diltiazem HCL, Estradiol, Fluoxetine HCL, Flurbiprofen, Fluvastatin Sodium, Haloperidol, Ketoconazole, Ketoprofen, Nitrofurantoin MAC capsules, Pentoxifylline, Prazosin HCL, Prochlorperazine, Tamoxifen Citrate and Tolmetin Sodium.

Plaintiffs further allege market allocation of seven drugs.[12]  Plaintiffs' new allegations extend the putative class period by 18 months, to May 28, 2019.

## ARGUMENT

Plaintiffs assert a wide range of allegations in support of their Sections 10(b) and 20(a) claims.  However, despite their breadth, these allegations cannot support Plaintiffs' claims. Therefore, Plaintiffs' claims should be dismissed in part under Federal Rule of Civil Procedure 12(b)(6).  To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  (MTD Op. I at 7-8 (citations omitted).)  To state a claim under Section 10(b), a plaintiff must plead with particularity[13] "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." (*Id.* at 6-7 (citations omitted).)  Under Section 20(a), "every person who, directly or indirectly, controls any person liable" for securities fraud may also be held liable.  (*Id.* at 7 (citation omitted).)  As a general rule, there can be no control person liability under Section 20(a) without a primary violation of Section 10(b) and the alleged control person's culpable participation in that violation.  (*See id.*)

## I.    CERTAIN OF PLAINTIFFS' EPIPEN CLASSIFICATION ALLEGATIONS CANNOT SUPPORT A SECURITIES CLAIM AGAINST ANY DEFENDANT.

In the TAC, Plaintiffs allege that Mylan "led investors to believe that the classification of its drugs for the purposes of the MDRP was 'complex and involve[d] subjective

---

[12] Doxy DR, Fenofibrate, Clonidine-TTS Patch, Tolterodine Extended Release, Capecitabine, Enalapril and Valsartan HCTZ.

[13] "Claims for securities fraud are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act."  (MTD Op. I at 7.)

decisions' and was 'subject to the risk of errors'." (TAC ¶ 88.) They further allege that "Mylan repeatedly stated that there could be ambiguity with regard to how to properly calculate . . . payments to Medicaid." (*Id.*) Plaintiffs allege that these statements were "misleading" because the MDRP classification regime was not complex or ambiguous when these statements were made. These allegations fail. As an initial matter, this Court already has ruled that "Mylan's statements about the complexity, ambiguity, and subjectivity of the rebate calculation" are not actionable. (MTD Op. I at 17.) Further, in light of the RRA, Plaintiffs have not pleaded, and cannot plead, that Mylan's statements concerning the risks of errors ("Statements of Risks of Errors") were false or misleading or made with scienter.

### A. Plaintiffs' Allegations Are Insufficient To Plead that Mylan's Statements of Risks of Errors Were Misleading.

This Court has previously ruled that Statements of Risks of Errors "could have misled a reasonable investor" only if "Mylan *knew for certain* that the EpiPen was misclassified." (*Id.* at 20 (emphasis added).) The Court added, "Plaintiffs must plead not only Mylan's knowledge of the *fact* of EpiPen's classification as an N drug, but also—more significantly—knowledge of the *legal conclusion* that such a classification was incorrect." (*Id.* at 25.) Given that the RRA was enacted to resolve the very ambiguity at issue here, Plaintiffs cannot plead (and have not pleaded) that Mylan was "certain" of the "legal conclusion" that EpiPen products were misclassified such that its Statements of Risks of Errors were false or misleading under Section 10(b).

Prior to April 2019, the statute that governed MDRP classification provided that Innovator Drugs—which are subject to the higher Medicaid rebate formula—were only those drugs approved by the FDA under an "original" NDA. As discussed *supra*, "original" was not defined in the Medicaid rebate statute, which CMS expressly recognized "created ambiguity" in

8

the law.  CMS also expressly recognized in a 2016 Final Rule, issued after notice-and-comment rulemaking, that some NDAs were not "original".  *See* 81 Fed. Reg. at 5191.  According to CMS, whether an NDA was "original" depended on "the unique facts and circumstances" of a drug's approval, and certain NDAs (including "certain types of literature-based 505(b)(2) [NDA] approvals" and "paper NDA[s]") were more likely than others to be non-original.  *Id.*  In April 2019, Congress passed the RRA, resolving the ambiguity in the MDRP by replacing the term "original new drug application" in the statute with "new drug application".

Given the Congressionally recognized ambiguity in the statute and the written decision from CMS confirming that it was appropriate to classify EpiPen as a Non-Innovator Drug, Mylan reasonably interpreted the MDRP in applying the rebate for Non-Innovator Drugs. Plaintiffs offer no allegations that the "unique facts and circumstances" of EpiPen's approval would have led Mylan to believe that EpiPen's NDA was "original"; nor have they alleged the type of NDA under which EpiPen was approved.  Where "statutory text and relevant . . . agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator [of the law]."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007).

**B.**     **Plaintiffs' Allegations Are Insufficient To Plead that Mylan's Statements of Risks of Errors Were Made with Scienter.**

Even if Plaintiffs had sufficiently pleaded that the Statements of Risks of Errors were false or misleading (they have not), Plaintiffs have not pleaded scienter.  As this Court has stated, Plaintiffs' claims regarding Statements of Risks of Errors can survive only if Plaintiffs plead "that (1) the EpiPen was, in fact, misclassified, (2) that Mylan knew EpiPen was misclassified, and (3) that Mylan acted with the requisite scienter in misleading investors about Mylan's knowledge of the misclassification."  (MTD Op. I at 24-25.)  Scienter, in a  Section

10(b) action, is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). "To adequately plead scienter, the Complaint must 'state with particularity facts giving rise to a strong inference that the defendant[s] acted with the requisite state of mind.'" (MTD Op. I at 22 (quoting 15 U.S.C. § 78u-4(b)(2)).) "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Given the ambiguity in the law, it was logical and prudent for Mylan to warn investors that its "calculations were subject to risk of errors and differing interpretations", despite its own belief in their accuracy. Particularly in light of the statutory ambiguity, the inference that Defendants made Statements of Risks of Errors in order to alert investors to the potential for disagreement is far more "cogent" and "compelling" than the opposing inference that Statements of Risks of Errors were made "with the intent to deceive, manipulate or defraud" investors.

## II. PLAINTIFFS' ALLEGATIONS REGARDING MYLAN'S AGREEMENTS WITH PBMs CANNOT SUPPORT A SECURITIES CLAIM AGAINST ANY DEFENDANT.

Plaintiffs' allegations regarding allegedly anticompetitive rebates paid to PBMs fail to state a Section 10(b) claim because Plaintiffs do not allege scienter and loss causation.

### A. Plaintiffs Fail To Plead Scienter Regarding PBM Rebates.

Plaintiffs' allegations regarding Mylan's agreements with PBMs are insufficient to plead scienter. The sole scienter allegation relating to PBM rebates is that "[b]ecause Mylan's sales of EpiPen were part of Mylan's core business, the Individual Defendants, and through them Mylan, would have had robust knowledge of . . . Mylan's . . . anticompetitive rebates to third-party payors expressly conditioned on their excluding Sanofi's Auvi-Q." (TAC ¶ 580.) This allegation cannot support an inference of scienter.

*First*, this Court already has held that "with respect to the EpiPen, the allegation that it is part of Mylan's 'core business' is insufficient, by itself, to support a strong inference of scienter . . ." (MTD Op. II at 21-22.)[14]  Moreover, even if a singular "core business" allegation could establish scienter, as a matter of law, EpiPen was *not* part of Mylan's "core business" when Mylan entered into the agreements alleged in the TAC.  In support of their sole scienter allegation, Plaintiffs allege that "during the Class period, EpiPen was responsible for between 28% and 95% of Mylan's operating profits."  (TAC ¶ 580.)  However, this range is misleading.  As alleged in the TAC, from 2012 to 2015 Mylan's profits from EpiPen never exceeded 40%, ranging from 28% to 39%.  (*Id.* ¶ 45.)  In October 2015, Sanofi voluntarily recalled the Auvi-Q from the market due to product defects.  (*Id.* ¶ 119.)  It was only in 2016, after Sanofi recalled Auvi-Q and exited the market, that Mylan's profits from EpiPen allegedly rose to 95%.  (*Id.* ¶ 45.)  Because Mylan's profits from EpiPen never exceeded 40% of its business when Mylan allegedly entered into the PBM agreements, EpiPen was not part of Mylan's "core business" as a matter of law.  *See Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) ("[C]ourts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine'."); *Holbrook v. Trivago N.V.*, No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *22 n.25 (S.D.N.Y. Feb. 26, 2019) (less than 45% of revenue is not a core operation).

*Second*, even if Plaintiffs' "core business" allegation could support the inference that Defendants "would have had robust knowledge of" the PBM rebates (they cannot), nothing

---

[14] In its first Motion to Dismiss opinion, the Court found that Plaintiffs adequately pleaded scienter as to the Defendants named in the First Amended Complaint with respect to EpiPen classification.  (MTD Op. I at 25-26.)  Although this Court considered "the importance of EpiPen to Mylan's business" in its analysis, it analyzed this allegation in conjunction with several other allegations of scienter that all dealt with classification, and had no bearing on the PBM rebate issue.  (*Id.*)

in the TAC suggests the Defendants knew, or were reckless in not knowing, that these

agreements were unlawful.  (*See* MTD Op. I at 21 ("The requisite scienter 'can be established

. . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness.'") (citations omitted).)  Exclusive agreements, which is how Plaintiffs characterize

the agreements between Mylan and PBMs, are presumptively legal (MTD Op. I at 29) and do not

run afoul of the antitrust laws unless they have "an actual adverse effect on competition as a

whole in the relevant market" and their "anticompetitive effects outweigh [their] procompetitive

effects."  (*Id.* (alteration in original).)  Because Plaintiffs do not allege that Mylan knew, or was

reckless in not knowing, that its agreements adversely affected competition or that these effects

outweighed their procompetitive effects, Plaintiffs have not alleged scienter.  *See In re Axis*

*Capital Hldgs. Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 592 (S.D.N.Y. 2006) (finding no scienter

where "plaintiffs appear[ed] to conflate the long-standing use of [allegedly anticompetitive]

agreements with the *misuse* of such agreements" and determining that the open use of such

agreements in the industry "render[ed] implausible any inference that [the defendants] knew that

the agreements were illegal or, more to the point, knew that the disclosures that are the subject of

the complaint were likely fraudulent").

> **B.    Plaintiffs Fail To Plead Loss Causation Regarding PBM Rebates.**

Even if Plaintiffs had adequately pleaded scienter with respect to PBM rebates

(they have not), their allegations fail to state a Section 10(b) claim because Plaintiffs have not

pleaded loss causation.  "Loss causation is the causal link between the alleged misconduct and

the economic harm ultimately suffered by the plaintiff."  (MTD Op. I at 35 (quoting *Emergent*

*Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).)  To

establish loss causation, a plaintiff must allege that "the market reacted negatively to a

'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that

allegedly material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.*, 503

F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175

(2d Cir. 2005)).  Here, Plaintiffs do not identify a single corrective disclosure connected to

Mylan's agreements with PBMs, and Plaintiffs' allegations relating to alleged anticompetitive

agreements with PBMs thus should be dismissed.

### III.   PLAINTIFFS' MARKET ALLOCATION ALLEGATIONS REGARDING ENALAPRIL CANNOT SUPPORT A SECURITIES CLAIM AGAINST ANY DEFENDANT.

Plaintiffs' claims related to Enalapril should be dismissed because Plaintiffs have

failed to plead (1) any underlying agreement between Mylan and competitors to allocate the

market or (2) scienter.  As this Court has held, the statements alleged in the TAC "cannot be

misleading" for failure to disclose alleged wrongdoing "if the misconduct did not happen".

(MTD Op. I at 9.)  "[C]onsequently, a plaintiff must adequately plead that the misconduct did, in

fact, occur."  (*Id.*)  To plead an anticompetitive conspiracy to allocate the market, Plaintiffs must

allege "enough factual matter (taken as true) to suggest that an agreement was made".  *See Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  But there is no allegation in the TAC that

Mylan entered into any agreement to allocate the market for Enalapril.  Plaintiffs merely allege

that a Taro employee reported on an internal Taro phone call that Taro's prior target market

share for Enalapril had changed.  (TAC ¶ 247.)  Plaintiffs allege that the Taro employee made

this report "with the likely consent of Mylan" (*id.*), but provide no basis for this conclusory

allegation, and "likely consent" falls short of alleging an agreement.

In addition, even if Plaintiffs had adequately pleaded an antitrust violation (they

have not), they have not pleaded the requisite scienter to state a claim under Section 10(b).  In its

first Motion to Dismiss opinion, this Court ruled that Plaintiffs failed to adequately plead scienter

with respect to claims regarding the alleged market allocation of Doxy DR because "the

13

Complaint's allegations about the underlying market-allocation agreement identify only amorphous Mylan 'employees' and 'executives'." (MTD Op. I at 34.)  The Court reasoned that allegations regarding unnamed employees could not give rise to an inference of corporate scienter because such employees "are clearly not identified with the requisite particularity that would permit the Court to infer that their seniority is sufficient [to impute their scienter to Mylan]." (*Id*. at 34 n.12 (citations omitted).)  Plaintiffs' Enalapril allegations in the TAC do not name a single Mylan employee and instead refer to "M.A.", an unnamed "Mylan senior account executive". (TAC ¶¶ 241-46.)  Plaintiffs do not allege where "M.A." fell in Mylan's overall corporate structure, what this employee's responsibilities were or any other details that would allow the Court to infer that "M.A." was sufficiently senior for the Court to impute his or her scienter to Mylan, and Plaintiffs allegations thus fail to state a claim under Section 10(b).

## IV.   CERTAIN OF PLAINTIFFS' PRICE-FIXING ALLEGATIONS CANNOT SUPPORT A SECURITIES CLAIM AGAINST ANY DEFENDANT.

Because Plaintiffs have not adequately pleaded price-fixing as to many of the drugs mentioned in the TAC, Plaintiffs' general price-fixing allegations cannot support a Section 10(b) claim.  Plaintiffs allege that "Mylan entered into, and maintained, anticompetitive agreements with its competitors to allocate the market and fix the prices for virtually all of its generic drugs including, but not limited to . . . divalproex . . . budesonide DR, buspirone hydrochloride, cimetidine tablets, diclofenac potassium, diltiazem HCL, estradiol, fluoxetine HCL, flurbiprofen, fluvastatin sodium, haloperidol, ketoconazole, nitrofurantoin MAC capsules, pentoxifylline, prazosin HCL, prochlorperazine, tamoxifen citrate and tolmetin sodium." (TAC ¶ 4.)  Plaintiffs' allegation that "virtually all" of Mylan's drugs were subject to an anticompetitive agreement lacks the specificity required to withstand a motion to dismiss. *Twombly*, 550 U.S. at 558 (explaining that discovery in an antitrust matter can be expensive and

emphasizing the importance of requiring "specificity in pleading" before allowing "a potentially massive factual controversy to proceed") (citations omitted).  Moreover, Plaintiffs' price-fixing allegations regarding the aforementioned drugs are insufficient because Plaintiffs offer neither circumstantial nor direct evidence of conspiracy.

> **A.  Plaintiffs' Divalproex Allegations Are Insufficient To Plead Conspiracy by Circumstantial Evidence.**

Plaintiffs' allegations regarding Divalproex are insufficient to show that the alleged parallel behavior more likely resulted from price-fixing than from the supply shortage caused by Wockhardt's exit from the market.  As this Court explained in its first Motion to Dismiss opinion, to plead an antitrust conspiracy "Plaintiffs must allege 'parallel behavior that would probably not result from . . . independent responses to common stimuli. . . .'"  (MTD Op. I at 32 (quoting *Twombly*, 550 U.S. at 556 n.4).)  In other words, Plaintiffs must allege circumstances, which, "when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." (*Id.* (citations omitted).)  Such circumstances include "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators.'" (*Id*. (citations omitted).)  "An inference of conspiracy will not arise when the conspirators' parallel conduct made perfect business sense, there are obvious alternative explanations for the facts alleged, or the alleged facts suggests competition at least as plausibly as they suggest anticompetitive conspiracy."  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 420, 462 (S.D.N.Y. 2017) (citations omitted).

In determining that Plaintiffs' allegations "support[ed] the inference that Mylan's sudden price increases 'would have been against its self-interest in the absence of price collusion'", this Court specifically relied on the "lack of an external triggering event (e.g., a *supply shortage* or spike in demand)" that could have otherwise explained the parallel price

increase.  (MTD Op. I at 33 (emphasis added).)  However, with respect to Divalproex, the

alleged parallel price increase did, in fact, coincide with a supply shortage that occurred when

Wockhardt, a major supplier of Divalproex, was forced to exit the market after the FDA issued

an import ban on one of its manufacturing facilities in India.[15]  Given this more plausible

explanation that the alleged parallel price increases resulted from this "external triggering event",

Plaintiffs have not pleaded conspiracy by circumstantial evidence.

    **B.**    **Plaintiffs Do Not Assert Any Specific Factual Allegations Regarding Budesonide DR, Buspirone Hydrochloride, Fluoxetine HCL, Haloperidol, Ketoconazole, Nitrofurantoin MAC Capsules, Pentoxifylline or Tamoxifen Citrate.**

    Plaintiffs do not set forth a single factual allegation that, if true, would tend to

show that Mylan fixed prices or allocated the market for Budesonide DR, Buspirone

Hydrochloride, Fluoxetine HCL, Haloperidol, Ketoconazole, Nitrofurantoin MAC Capsules,

Pentoxifylline or Tamoxifen Citrate.  These drugs appear only twice throughout the TAC in lists

of drugs, unaccompanied by supporting factual allegations.  (TAC ¶¶ 4, 121.)  These conclusory

statements do not even specify whether Plaintiffs are accusing Mylan of fixing prices, allocating

the market or both.  As such, they are insufficient to give Mylan "fair notice of what the

. . . claim is and the grounds upon which it rests" as required by Federal Rule of Civil Procedure

8(a)(2) and thus should be dismissed.  *See Twombly*, 550 U.S. at 555.

---

[15] *See* accompanying declaration of Rory A. Leraris, Ex. 1.  The Court may take judicial notice of FDA documents related to the import bans against Wockhardt's manufacturing facilities.  *See Becker v. Cephalon, Inc.*, No. 14-CV-3864 (NSR), 2015 WL 5472311, at *3 (S.D.N.Y. Sept. 15, 2015) (taking judicial notice of letters on the FDA's website); *Porrazzo v. Bumble Bee Foods LLC*, 822 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2011) (same).

**C.**   **Plaintiffs Do Not Assert Circumstantial or Direct Evidence of Conspiracy To Fix Prices of Diclofenac Potassium, Diltiazem HCL, Estradiol, Flurbiprofen, Prochlorperazine or Tolmetin Sodium.**

Because Plaintiffs have not asserted sufficient direct or circumstantial evidence of a price-fixing conspiracy, the allegations regarding Diclofenac Potassium, Diltiazem HCL, Estradiol, Flurbiprofen, Prochlorperazine and Tolmetin Sodium cannot support a Section 10(b) claim.  To survive a motion to dismiss, Plaintiffs must assert either "(1) 'direct evidence' of an unlawful agreement or (2) 'circumstantial facts supporting the *inference* that a conspiracy existed'."  (MTD Op. II at 13 (quoting *Mayor v. City Council of Balt. v. Citigroup Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).)  "Direct evidence is 'evidence that is explicit and requires *no inferences* to establish the proposition or conclusion being asserted.'"  *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 491 (HB), 2004 WL 594396, at *3 (S.D.N.Y. Mar. 23, 2004) (emphasis added).  The paradigmatic example of direct evidence is "a recorded phone call or email in which two competitors agreed to fix prices."  *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 558 (S.D.N.Y. 2016); *In re Commodity Exchange Inc.*, 213 F. Supp. 3d 631, 659 (S.D.N.Y. 2016).

As this Court has acknowledged, "this type of 'smoking gun' can be hard to come by, especially at the pleading stage" (MTD Op. II at 14 (citation omitted)), and thus plaintiffs often rely on circumstantial evidence.  To plead price-fixing through circumstantial evidence, "[p]laintiffs must allege 'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding of the parties.'"  (MTD Op. I at 32 (citation omitted).)

With respect to the aforementioned drugs, Plaintiffs do not allege a parallel price change between Mylan and Teva.[16]  Accordingly, Plaintiffs have not shown a price-fixing conspiracy by circumstantial evidence.  Instead, Plaintiffs attempt to rely on supposedly direct evidence.  However, the "evidence" Plaintiffs offer is a far cry from a "recorded phone call or email in which [Mylan and Teva] agreed to raise prices."  Plaintiffs' conspiracy allegations boil down to the following:  (1) these drugs allegedly appeared on a list of Mylan drugs created by Teva employees (TAC ¶¶ 353, 356, 358, 364); (2) this list was allegedly circulated internally at Teva (*id.* ¶¶ 353, 355, 358, 367); and (3) Teva employees allegedly communicated with Nesta by phone around the same time period that the list was being circulated.[17]  (*Id.* ¶¶ 354, 355, 357, 360, 365, 368).  Plaintiffs offer no "smoking gun" allegations that, if true, would show that Mylan, through Nesta, conspired with Teva to fix the prices of these drugs.  Instead, Plaintiffs ask this Court to infer from call records that Mylan and Teva agreed to fix drug prices without any supporting evidence and without any allegations of a parallel price change.  The allegations of call records between Nesta and employees at Teva, if true, would establish only that Nesta and Teva communicated with one another about some unknown matter, which, by itself, is not an antitrust violation.  Plaintiffs are asking the Court to make the exact type of inference that is not permitted when a plaintiff attempts to plead price-fixing via direct evidence, *see Fears*, 2004 WL 594396, at *3, and thus their allegations as to Diclofenac Potassium, Diltiazem HCL, Estradiol, Flurbiprofen, Prochlorperazine and Tolmetin Sodium are insufficient.

---

[16] While Plaintiffs do allege that Teva raised prices for Diclofenac Potassium Tablets, Flurbiprofen Tablets and Prochlorperazine Tablets (TAC ¶ 376), Plaintiffs fail to allege that Mylan likewise raised its prices.

[17] The TAC also alleges that "[b]ased on all these communications between Mylan and Teva (and at times other competitors), Mylan and Teva successfully increased the prices on seven different drugs on August 9, 2013." (TAC ¶ 370.)  But, Plaintiffs do not allege which seven of the 39 drugs mentioned in the TAC they are referencing.

**D.      Plaintiffs' Allegations Regarding Cimetidine Tablets, Fluvastatin Sodium and Prazosin HCL Are Insufficient To Plead a Price-Fixing Agreement.**

Like the drugs discussed in Parts IV.B and IV.C *supra*, Plaintiffs do not allege a parallel price increase between Teva and Mylan with respect to Cimetidine Tablets, Fluvastatin Sodium and Prazosin HCL[18] and instead rely on allegations of phone calls between Nesta and Teva employees to support their allegations that Mylan and Teva conspired to fix prices of these drugs.  The only distinction between these three drugs and those discussed in Part IV.C *supra* is Plaintiffs' allegation that these drugs were listed on a spreadsheet allegedly created by Mylan, which contained non-public pricing information.  (TAC ¶ 371.)  There are no allegations that Teva acquired this information from Mylan directly, and even if Plaintiffs had pleaded that Mylan provided this information to Teva, this additional allegation alone would be insufficient to plead a price-fixing agreement.  *See Conn. Fine Wine & Spirits, LLC v. Seagull*, 916 F.3d 160, 173 (2d Cir. 2019) ("[T]he exchange of price information among competitors . . . does not constitute a violation of the antitrust laws in all cases" because "[s]uch an exchange . . . might not signify an agreement among them." (internal quotation marks omitted)).  Here, Plaintiffs have not pleaded that Mylan engaged in price-fixing as to Cimetidine Tablets, Fluvastatin Sodium and Prazosin HCL, and thus its allegations relating to these drugs fail to state a claim.

---

[18] The TAC alleges, "Patel's email referenced a list that included the following products, several of which had been the subject of coordinated price increases in 2013 as well:  amiloride HCL/HCTZ Tablets; cimetidine tablets; enalapril maleate tablets; fluvastatin; [sic] sodium capsules; loperamide HCL capsules; prazosin HCL capsules; and sotalol hydrochloride tablets."  (TAC ¶ 371.)  Again, Plaintiffs fail to state which of these drugs are part of the "several" that were allegedly subject to a coordinated price increase in 2013.  As discussed above, this vague allegation is insufficient to put Mylan on notice of the unlawful conduct of which it is accused.

## V.   CERTAIN OF PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH RESPECT TO DEFENDANTS BRESCH, COURY, CAMPBELL, PARKS, MALIK, NESTA AND SHEEHAN.

Plaintiffs' claims against certain Defendants[19] fail to state a claim.  Specifically, (1) all claims against Nesta should be dismissed because Nesta did not "make" the alleged statements and thus is not a proper defendant in a securities action; (2) claims based on market allocation allegations should be dismissed as to Bresch, Campbell, Coury, Parks and Sheehan because, as this Court has already found with respect to Doxy DR, Plaintiffs' allegations are insufficient to show Defendants' knowledge of the market for specific drugs; and (3) all claims against Malik other than those relating to Doxy DR should be dismissed, consistent with this Court's second Motion to Dismiss opinion, because Plaintiffs have added no new factual allegations against him.

### A.   All Claims Against Jim Nesta Should Be Dismissed.

Jim Nesta should be dismissed from this action because Plaintiffs have not alleged that he "made" any of the allegedly misleading statements.  *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 541-42 (S.D.N.Y. 2016) ("Because neither defendant is plausibly alleged to be the maker of any misstatement or omission, the Section 10(b) claims are dismissed against them.").  A person may only be held liable under Rule 10b-5 if he or she "made" the alleged misstatement.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-44 (2011); *SEC v. Kelly*, 817 F. Supp. 2d 340, 342 (S.D.N.Y. 2011) ("*Janus* forecloses a misstatement claim against [certain Defendants] under subsection (b) of Rule 10b-5, because neither defendant 'made' a misleading statement under the new *Janus* standard.").  "[T]he maker

---

[19] Plaintiffs refer to Kevin Green of Teva as a defendant three times in the TAC.  (TAC ¶ 337.)  Mylan assumes that this is an error attributable to Plaintiffs' decision to copy and paste its allegations from the State AG Complaint.  Counsel for Mylan does not represent Mr. Green, and Mr. Green is not a defendant in this case.

of a statement is the person or entity with *ultimate authority* over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142 (emphasis added). Because Nesta is not alleged to have had *any* authority over any of the statements Plaintiffs cited in the TAC, let alone *ultimate* authority, he cannot be liable under Section 10(b) or Rule 10b-5.[20]

Moreover, neither Plaintiffs' vague allegations that Nesta worked with the "highest level executives at the company" (TAC ¶ 588) nor Plaintiffs' allegations regarding Nesta's role in the alleged price-fixing are sufficient to make him liable under the securities laws. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012) ("[I]ndividuals who do not 'make' statements cannot be liable solely on account of their close relationship with the 'maker'."); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) ("[A]lthough the Amended Complaint contains a number of allegations regarding Defendants . . . respective roles in the alleged mortgage-related securities fraud, it does not allege that either executive made any actionable misstatement.").

Further, Plaintiffs do not plead scienter as to Nesta.  Scienter is a mental state specifically tied to the act of making a misstatement. *See id.* at *15 ("Even assuming *arguendo* that [the] statements . . . were materially misleading, Plaintiffs have failed to prove that the UBS Defendants acted with the required scienter *in making them.*" (emphasis added)).  Because Plaintiffs have not alleged that Nesta made any of the alleged misstatements, he cannot have done so with the requisite scienter.  And, even if Nesta had done so (he did not), Plaintiffs have not asserted any allegations regarding Nesta's knowledge of EpiPen classification, PBM rebates or Doxy DR market allocation.

---

[20] Plaintiffs do not assert a Section 20(a) claim against Nesta.  As discussed in note 9 *supra*, the TAC excludes Nesta from its definition of "Individual Defendants".  Count II of the TAC is asserted only against the Individual Defendants.  (TAC ¶¶ 615-19.)

Finally, claims against Nesta based on statements made prior to June 17, 2014 are time-barred.  Claims under the Exchange Act are subject to a five-year statute of repose, 28 U.S.C. § 1658(b)(2), which cannot be tolled.  *See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 177 (2d Cir. 2016) ("[A]s a statute of repose, § 1658(b)(2) is not subject to equitable tolling"); *see also Cal. Pub. Emps. Ret. Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042, 2052 (2017).  Plaintiffs did not name Nesta as a defendant until June 17, 2019, so any claims based on statements before June 17, 2014 are barred by the statute of repose.  (*See* MTD Op. II at 19 (noting that Plaintiffs conceded that "any claims against Malik based on statements made before July 2012 are barred by the Exchange Act's five-year statute of repose").)

### B.     Claims Based on Allegations of Market Allocation Should Be Dismissed with Respect to Heather Bresch, Robert Coury, Paul Campbell, Kenneth Parks and John Sheehan.

Claims predicated on market allocation allegations should be dismissed with respect to Bresch, Coury, Campbell, Parks and Sheehan because Plaintiffs have not pleaded scienter.  As this Court held in its first Motion to Dismiss opinion, Plaintiffs failed to plead scienter with respect to the Doxy DR market allocation claims because they did not offer any allegations that the defendants named in the First Amended Complaint (*i.e.*, Bresch, Coury, Campbell, Parks and Sheehan) "participated in decisions about which markets or customers to target for the sale of any generic drug, much less Doxy DR in particular."  (MTD Op. I at 34.)  In adding Fenofibrate, Clonidine-TTS Patch, Tolterodine Extended Release, Capecitabine, Enalapril and Valsartan HCTZ to their market allocation allegations, Plaintiffs again fail to connect their allegations to Defendants Bresch, Coury, Campbell, Parks or Sheehan.  Therefore, all claims and allegations relating to the alleged market allocation of any drug should be dismissed as to these Defendants.

**C.      Claims Based on Allegations Regarding EpiPen and All Drugs Except Doxy DR Should Be Dismissed as to Rajiv Malik.**

This Court already held in its second Motion to Dismiss opinion that Plaintiffs "failed to adequately plead scienter as to Defendant Malik with respect to the EpiPen, or the alleged price fixing of generic drugs." (MTD Op. II at 22.) Accordingly, this Court held that the only surviving claims for primary and secondary liability under Sections 10(b) and 20(a) were limited to statements made allegedly misleading by their failure to disclose Doxy DR market allocation. (*Id.* at 24, 26.) The TAC adds nothing new as to Malik, and the Court's conclusion should therefore remain the same as to him.

The TAC asserts claims based on allegations of price-fixing and market allocation for 32 new generic drugs, but does not add any additional statements by Malik or even mention him in connection with the added drugs. Nor does the TAC add any new factual allegations (scienter or otherwise) as to Malik concerning EpiPen or the generic drugs previously alleged in the Second Amended Complaint. (Dkt. No. 96 at 16-17, 18 n. 13 (six alleged misstatements concern only the generics segment, not EpiPen).) Thus, as this Court held in its second Motion to Dismiss opinion, all of Plaintiffs' Section 10(b) claims against Malik should be dismissed except, as this Court previously found, for "those claims [] limited to statements about the performance of the generic segment, and allegations that those statements were misleading for failing to disclose the Doxy DR market allocation conduct." (MTD Op. II at 24.)

Similarly, because Plaintiffs have not adequately alleged scienter against Malik with respect to EpiPen, generic drug pricing fixing or generic drug market allocation other than Doxy DR, "[p]laintiffs have failed to adequately plead Malik's culpable participation regarding" these allegations "and the statements rendered misleading by the failure to disclose that conduct." (*Id.* at 26.) Plaintiffs' Section 20(a) claim against Malik thus should be dismissed

except, as this Court has already held, "to the extent such a claim is premised on allegations that the six statements made by Malik were misleading for failure to disclose the Doxy DR market allocation."  (*Id.*)

## VI.   PLAINTIFFS' LOSS CAUSATION ALLEGATIONS REGARDING THE MAY 28, 2019 UBS REPORT ARE INSUFFICIENT TO SUPPORT A 10(b) CLAIM.

Plaintiffs' allegation of losses resulting from the May 28, 2019 UBS report (TAC ¶ 576) cannot support a Section 10(b) claim because it did not contain "news" or new information and thus is not a corrective disclosure.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (finding that new information is necessary to show loss causation, because "the market price of shares traded on well-developed markets reflects all publicly available information."). Investors cannot establish loss causation by relying on an after-the-fact "negative characterization of already-public information", *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010), because "[the securities] statutes . . . [exist] not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

In the UBS report, an analyst estimated Mylan's potential exposure resulting from lawsuits filed against Mylan and others by various state attorneys general in 2017 and 2019 and lowered Mylan's 12-month price target.  (TAC ¶ 576.)  But the facts that formed the basis of the analyst's estimates and opinions had already been publicly revealed when the state attorneys general filed their complaints.  Investors already knew or should have known that Mylan might be subject to damages; the UBS report merely provided an unfavorable opinion on already public information, and "the raising of questions and speculation by *analysts* and commentators does not reveal any 'truth' about an alleged fraud."  *See Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430 RWS, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) (emphasis added).

In its second Motion to Dismiss opinion, this Court held that Plaintiffs had sufficiently pleaded that the October 31, 2017 announcement regarding the 2017 Connecticut AG action "reveal[ed] some then-undisclosed fact[s] with regard to the specific misrepresentations alleged in the complaint", because it "disclosed new information pertaining to Malik's participation in the Doxy DR scheme, as well as the findings of an investigation into the price fixing of the three generic drugs." (MTD Op. II at 17-18.) By contrast, the UBS report contains no additional, undisclosed facts or findings; it offers merely a negative financial analysis of the already disclosed fact that Mylan was involved in antitrust litigation, which does not constitute a corrective disclosure. *See Omnicom*, 597 F.3d at 512 ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."). Therefore, Plaintiffs' claims stemming from the May 28, 2019 UBS report should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss (1) the claims related to Mylan's Statements of Risks of Errors (TAC ¶¶ 88-89) with respect to all Defendants; (2) the claims related to Mylan's agreements with PBMs (*id.* ¶¶ 109-20) with respect to all Defendants; (3) the claims related to the alleged market allocation of Enalapril (*id.* ¶¶ 234-50) with respect to all Defendants; (4) the claims related to the alleged price-fixing of certain generic drugs (*id.* ¶¶ 4, 121, 278-83, 352-59, 363-77) with respect to all Defendants; (5) all claims against Nesta (*id.* ¶ 41); (6) the claims against Bresch, Coury, Campbell, Parks and Sheehan related to market allocation; (7) all claims against Malik except those related to the alleged market allocation of Doxy DR; and (8) the claims that rely on the May 28, 2019 UBS report to satisfy loss causation (*id.* ¶ 576) with respect to all Defendants.

25

July 31, 2019

Respectfully submitted,


CRAVATH, SWAINE & MOORE LLP,

by

David R. Marriott
Kevin J. Orsini
Rory A. Leraris
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
dmarriott@cravath.com
korsini@cravath.com
rleraris@cravath.com

*Attorneys for Defendants*