UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Mylan N.V. Securities Litigation | Case No. 1:16-CV-07926 (JPO) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT .................................................................................. 1

II.     STATEMENT OF FACTS ...................................................................................... 3

        A.      Mylan Knowingly Misclassified the EpiPen for the Purposes of the MDRP ........ 3

        B.      Mylan Engaged in Anticompetitive Conduct To Allow It To Inflate the Price of
                the EpiPen ......................................................................................................... 4

        C.      Mylan Was a Leader of an Unprecedented Cartel Among Generic Drug
                Companies ........................................................................................................ 5

III.    PROCEDURAL HISTORY .................................................................................... 6

IV.     ARGUMENT:  THE CLASS SHOULD BE CERTIFIED PURSUANT TO  FEDERAL
        RULE OF CIVIL PROCEDURE 23 ......................................................................... 7

        A.      The Rule 23(a) Requirements Are Satisfied ....................................................... 8

                1.      The Proposed Class Is So Numerous That Joinder of All Members Is
                        Impracticable ........................................................................................ 8

                2.      Questions of Law or Fact Are Common to the Class ................................. 9

                3.      Plaintiffs' Claims are Typical of the Class ............................................. 10

                4.      Plaintiffs Will Fairly and Adequately Protect the Interests of the Class .. 11

        B.      The Requirements of Rule 23(b)(3) Are Satisfied ............................................. 12

                1.      Common Questions of Law and Fact Predominate ................................. 12

                        a.      Mylan's NASDAQ-GS Listing is Strong Evidence of Market
                                Efficiency ................................................................................ 15

                        b.      The Five *Cammer* Factors Confirm Market Efficiency ............... 17

                        c.      The *Krogman* Factors Also Demonstrate Market Efficiency ....... 22

                        d.      Mechanical Damage Tabulations for Individual Class Members
                                Will Not Defeat Predominance ................................................... 23

                2.      A Class Action Is Superior to Other Available Methods for the Fair and
                        Efficient Adjudication of the Controversy ............................................. 23

V.      ARGUMENT:  POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR
        APPOINTMENT AS CLASS COUNSEL .................................................................. 25

VI.     CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAL High Yield Bond Fund v. Ruttenberg*,
    229 F.R.D. 676 (N.D. Ala. 2005) ........................................................................................14

*Amchem Products, Inc., v. Windsor*,
    117 S. Ct. 2231 (1997) ..........................................................................................7, 11, 12

*Amgen v. Conn. Ret. Plans and Trust Funds*,
    133 S. Ct. 1184 (2013) .........................................................................................2, 8, 13

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) ...............................................................................................11

*Basic Inc. v. Levinson*,
    108 S. Ct. 978 (1988) ...................................................................................13, 14, 16

*Basic v. Levinson*,
    485 U.S. 224 (1988) .......................................................................................................15, 16

*Burke v. China Aviation Oil Corp.*,
    421 F. Supp. 2d 649 (S.D.N.Y. 2005) ..............................................................................17

*Califano v. Yamasaki*,
    99 S. Ct. 2545 (1979) ........................................................................................................2

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) .............................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ..........................................................................14, 17, 23

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
    Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) .............................................................................................9

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003) ......................................................................................18

*Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*,
    2009 U.S. Dist. LEXIS 71653 (C.D. Cal. Aug. 12, 2009) .................................................11

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ................................................................................................23

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) ........................................................13

*Darquea v. Jarden Corp.*,
    2008 U.S. Dist. LEXIS 17747 (S.D.N.Y. Mar. 6, 2008) ..........................8

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) ......................................................10

*Dirks v. Clayton Brokerage Co. of St. Louis Inc.*,
    105 F.R.D. 125 (D. Minn. 1985)........................................................23

*Dura Pharmaceuticals, Inc. v. Broudo*,
    125 S. Ct. 1627 (2005) ....................................................................13

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
    89 F.R.D. 87 (S.D.N.Y. 1981) .........................................................13

*Epifano v. Boardroom Business Products, Inc.*,
    130 F.R.D. 295 (S.D.N.Y. 1990) .......................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)................................................................8, 13

*Gen. Tel. Co. of Southwest v. Falcon*,
    102 S. Ct. 2364 (1982) ....................................................................10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ....................................................................15

*In re Agent Orange Prod. Liab. Litig.*,
    818 F.2d 145 (2d Cir. 1987)...............................................................10

*In re Baldwin-United Corp. Litig.*,
    122 F.R.D. 424 (S.D.N.Y. 1986) ......................................................11

*In re Beacon Assoc. Litig.*,
    282 F.R.D. 315 (S.D.N.Y. 2012) ......................................................13

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ..........................................................9

*In re Diamond Foods, Inc., Sec. Litig.*,
    295 F.R.D. 240 (N.D. Cal. 2013)........................................................23

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011)...............................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
　245 F.R.D. 147 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d
　29 (2d Cir. 2009)........................................................................................................10

*In re Flag Telecom Holdings, Ltd.Sec. Litig.*,
　574 F.3d 29 (2d Cir. 2009)......................................................................................1, 10

*In re Indep. Energy Holdings PLC, Sec. Litig.*,
　210 F.R.D. 476 (S.D.N.Y. 2002) ..............................................................................2, 8

*In re JPMorgan Chase*,
　2015 U.S. Dist. LEXIS 132181 ..................................................................................23

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*,
　MDL No. 1658 (SRC), 2013 WL 396117 (D.N.J. Jan. 30, 2013)..........................13

*In re Oxford Health Plans, Inc.*,
　191 F.R.D. 369 (S.D.N.Y. 2000) ...............................................................................10

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
　163 F.R.D. 200 (S.D.N.Y. 1995) .................................................................................9

*In re SCOR Holding (Switzerland) AG Litig.*,
　537 F Supp. 2d 556 (S.D.N.Y. 2008)...................................................................10, 24

*In re Sumitomo Copper Litig.*,
　182 F.R.D. 85 (S.D.N.Y. 1998) .................................................................................10

*In re Visa Check/MasterMoney Antitrust Litig.*,
　280 F.3d 124 (2d Cir. 2001)........................................................................................11

*In re Vivendi Universal, S.A.*,
　242 F.R.D. 76 (S.D.N.Y. 2007) ...................................................................................9

*In re Winstar Communications Sec. Litig.*,
　290 F.R.D. 437 (S.D.N.Y. 2013) ...............................................................................14

*In re WorldCom, Inc. Sec. Litig.*,
　219 F.R.D. 267 (S.D.N.Y. 2003) ............................................................................2, 24

*Krogman v. Sterritt*,
　202 F.R.D. 467 (N.D. Tex. 2001) ..............................................................................22

*Lumen v. Anderson*,
　280 F.R.D. 451 (W.D. Mo. 2012).........................................................................16, 17

*Maywalt v. Parker & Parsley Petroleum Co.*,
　147 F.R.D. 51 (S.D.N.Y. 1993) ...................................................................................2

*Menaldi v. Och-Ziff Capital Magmt. Grp. LLC*,
   328 F.R.D. 86 (S.D.N.Y. 2018) ....................................................................22

*Menkes v. Stolt-Nielsen S.A.*,
   270 F.R.D. 80 (D. Conn. 2010)......................................................................9

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006)..........................................................13

*Phillips Petroleum Co. v. Shutts*,
   105 S. Ct. 2965 (1985)................................................................................2, 7

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)..........................................................................23

*Smilovits v. First Solar, Inc.*,
   295 F.R.D. 423 (D. Ariz. 2013) ..............................................................16, 24

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008)......................................................................8, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007)..................................................................................24

*UFCW Local 1776 v. Eli Lilly and Co.*,
   620 F.3d 121 (2d Cir. 2010)..........................................................................13

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).................................................................15, 20, 23

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) .................................................................9, 10

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)....................................................................................8

**Statutes**

15 U.S.C. § 78j(b)...............................................................................6, 13, 23

15 U.S.C. § 78t(a) ...................................................................................7, 13

**Rules**

Fed. R. Civ. P. 23 ................................................................................ *passim*

**Other Authorities**

17 C.F.R. § 240.10b 5 ......................................................................................6

Lead Plaintiffs Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., Phoenix Insurance Company Ltd., and Meitav DS Provident Funds and Pension Ltd. ("Plaintiffs" or "Lead Plaintiffs")[1] submit this memorandum in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs seek certification of the following class (the "Class"):

> All persons or entities that acquired the securities of Mylan N.V. and/or Mylan N.V.'s predecessor, Mylan Inc., between February 21, 2012 and May 24, 2019, both dates inclusive (the "Class Period"), excluding Defendants, current and former officers and directors of Mylan, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.[2]

Lead Plaintiffs also seek the appointment of Lead Counsel, Pomerantz LLP, as Class Counsel.

## I.    PRELIMINARY STATEMENT

This lawsuit is a textbook example of a case warranting class action treatment.  Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct—the issuance of false and misleading statements and material omissions by Defendants concerning Mylan's wrongdoing.  The questions of law and fact relevant to the merits—issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss—are identical for each and every member of the putative Class.  Indeed, class

---

[1] On August 23, 2019, the Court granted Dan Kleinerman's motion to withdraw from his role as Co-Lead Plaintiff. Dkt. No. 128.  Mr. Kleinerman does not seek to be appointed a Class Representative.

[2] Plaintiffs seek certification of the Class for the Class Period as defined in the Third Amend Complaint ("TAC"). Defendants have moved to dismiss the TAC in part (*see* Dkt. No. 123).  Defendants do not dispute that Plaintiffs have adequately alleged claims supporting a Class Period that extends, at a minimum, from February 21, 2012 to May 10, 2019, both dates inclusive.  Defendants argue only that Plaintiffs have failed to allege claims supporting a Class Period extending an additional 11 days to May 24, 2019.  In ruling on Defendants' motion to dismiss, if the Court holds that Plaintiffs have failed adequately to plead loss causation with respect to the share price drop on May 28, 2019, the Class Period alleged in the TAC would be shortened by fourteen days, to May 10, 2019.  Accordingly, Plaintiffs seek certification as well of the alternative Class Period of between February 21, 2012 and May 10, 2019, both dated inclusive (the "Alternative Class Period"), to apply in the event that Court grants Defendants' loss causation argument with respect to the drop on May 28, 2019.  *See In re Flag Telecom Holdings, Ltd.Sec. Litig.*, 574 F.3d 29, 37 (2d Cir. 2009) (The Court has "the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C)" at any time prior to judgment.)

action treatment is especially appropriate because many members of the putative Class have relatively small losses and cannot individually pursue their claims in a cost-effective manner.

The use of class action procedures to adjudicate claims under federal securities law has been upheld by the Supreme Court, as well as by the Second Circuit. *See, e.g.*, *Califano v. Yamasaki,* 99 S. Ct. 2545, 2557 (1979); *Phillips Petroleum Co. v. Shutts,* 105 S. Ct. 2965, 2973 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."); *In re Indep. Energy Holdings PLC, Sec. Litig.,* 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (Class action treatment is "particularly appropriate" for securities fraud claims, and under such circumstances courts should err in favor of certifying a class).  The Supreme Court has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text.  *Amgen v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1202 (2013) ("We have no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress, despite its extensive involvement in the securities field, has not sanctioned.").  Likewise, "the Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well-financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a):  numerosity; commonality; typicality; and adequacy of representation.  This action also satisfies the two core requirements for certification under Rule 23(b)(3):  predominance of

common questions of law or fact and superiority of a class action over other available methods for adjudication.  Class certification is warranted.

## II.    STATEMENT OF FACTS

In the TAC, Plaintiffs allege three categories of misconduct on the part of Mylan that make statements by Defendants to investors false and misleading:  (1) Mylan knowingly misclassified the EpiPen for the purposes of the MDRP, (2) Mylan offered anticompetitive rebates on EpiPen in order to eliminate competition and inflate the price of the EpiPen, and (3) Mylan was a central participant in a massive cartel among generic drug companies that allocated the markets for, and fixed the prices of, generic drugs.

### A.    Mylan Knowingly Misclassified the EpiPen for the Purposes of the MDRP

The EpiPen® is a brand-name epinephrine auto-injector for the emergency treatment of anaphylaxis.  (TAC ¶ 3.)  It is Mylan's most important product:  sales of the EpiPen accounted for between 28% and 95% of Mylan's operating profits during the Class Period.  (TAC ¶ 45.)

The MDRP is a government program associated with Medicaid under which a drug company may receive state Medicaid coverage for the manufacturer's drugs if the manufacturer rebates a portion of its sales to Medicaid.  (TAC ¶¶ 53-55.)  Under the MDRP, manufacturers are responsible for classifying their drugs as brand-name ("S" or "I") drugs or as generic ("N") drugs, and for rebating Medicaid's purchases of brand-name drugs at a rate of 23.1%, and generic drugs at a rate of 13%.  (TAC ¶¶ 56-65.)

Classification for the purposes of the rebate is simple.  (TAC ¶¶ 71-75.)  As Mylan itself repeatedly explained in no uncertain terms in its 10-K filings throughout the Class Period:

> The required rebate [under the MDRP] is currently 13% of the [AMP] for sales of [] products marketed under ANDAs . . . .   Sales of [] products marketed under NDAs require manufacturers to rebate . . . 23% . . . .

(TAC ¶ 76.)  Nevertheless, Mylan consistently misclassified the EpiPen as a generic N drug.  (TAC

¶¶ 69-77.)  Mylan knew the EpiPen was misclassified.  (TAC ¶¶ 69-87.)  *CMS itself*, the agency

responsible in the first instance for interpreting and implementing the 1990 Act, *expressly told*

*Mylan* prior to the start of the Class Period that its classification of the EpiPen as a generic N drug

was incorrect.  (TAC ¶ 77.)  On March 16, 2009, the HHS IG provided CMS with a list of eight

drugs, including the EpiPen, that it had determined to be misclassified.  (*Id*.)  Subsequently, CMS

notified Mylan about the misclassification:  as CMS stated to a member of Congress, "CMS has,

on multiple occasions . . . . expressly told Mylan that [the EpiPen] is incorrectly classified."  (*Id*.)

Senator Grassley recently confirmed that "CMS provided records to the [Senate Judiciary]

Committee that show CMS told Mylan on several occasions that the EpiPen was misclassified, yet

Mylan failed to correct the classification," and that Mylan had "overcharged the taxpayers *for*

*years* with the knowledge EpiPen was misclassified."  (*Id*.)

## B.     Mylan Engaged in Anticompetitive Conduct To Allow It To Inflate the Price of the EpiPen

During the Class Period, Mylan engaged in anticompetitive conduct in an attempt to hinder

competition against the EpiPen.  (TAC ¶ 104.).  Specifically, when the drug company Sanofi-

Aventis U.S. LLC ("Sanofi") introduced an epinephrine autoinjector, the Auvi-Q, to compete with

the EpiPen and sold it for roughly the same price as the EpiPen's (TAC ¶ 109), Mylan responded

to this new competitive threat by excluding the Auvi-Q from the market.  (TAC ¶ 110.)  Shortly

following the release of the Auvi-Q, Mylan began offering massive rebates to third-party payors

on the express condition that the third-party payors not include the Auvi-Q in their formularies.

(*Id*.)  These highly unusual rebates amounted to 30% or more of the price that Mylan otherwise

would have offered.  (*Id*.)  Mylan had no legitimate business reason to offer these unprecedented

rebates conditioned expressly on excluding the Auvi-Q from the market; they were offered to block

that device from competing.  (*Id*.)  Due to Mylan's price increases, the net, after-rebate price of

EpiPen actually *rose* after Mylan began its exclusionary rebates.  (TAC ¶ 111.)  Sanofi was unable to match the Mylan's massive rebates for EpiPen.  (TAC ¶ 112.)  In October 2015, as a result of Mylan's conduct, Sanofi decided not to relaunch Auvi-Q.  (TAC ¶ 120.).

### C.   Mylan Was a Leader of an Unprecedented Cartel Among Generic Drug Companies

During the Class Period, Mylan was a central participant in a massive cartel that allocated the market for, and fixed the prices of, generic drugs sold in this country.  Mylan repeatedly misled investors about its central role in this cartel.  Mylan and its co-conspirators' anticompetitive activity was so widespread that it was the standard procedure by which these companies operated in the marketplace:  each company agreed not compete with one another and was entitled to its "fair share" of the market.  (TAC ¶ 25.)  The companies agreed to "play nice in the sandbox."  (*Id.*)  These rules about "fair share" applied equally to price increases.  (TAC ¶ 134.)  As long as all co-conspirators were playing fair, and the competitors believed that they had their "fair share," they would not seek to compete or take advantage of a each other's price increase by bidding a lower price to take business.  (*Id.*)  Mylan's market allocation and price-fixing activity were two sides of the same coin.

#### 1.   Market Conspired with Other Drug Companies To Allocate the Market for Various Generic Drugs

During the Class Period, Mylan misled investors about its scheme to allocate the market between itself and competitors for virtually every generic drug that it marketed by agreeing with competitors not to compete for certain businesses the competitors targeted in exchange for their reciprocal agreement not to compete for customers Mylan targeted.  (TAC ¶ 121-41.)  The TAC alleges that Mylan allocated the market for at least the following drugs:  Doxy DR (TAC ¶¶ 151-79); Fenofibrate (TAC ¶¶ 180-91); Clonidine-TTS Patch (TAC ¶¶192-206); Tolterodine Extended

Release (TAC ¶¶ 207-19); Capecitabine (TAC ¶¶ 220-33); Enalapril (TAC ¶¶ 234-50); and

Valsartan HCTZ (TAC ¶¶ 251-58.)

### 2. Mylan Entered into Price Fixing Agreements with Competitors To Fix the Price of Generic Drugs

Beginning in or around the first half of 2013 and continuing throughout the Class Period,

Mylan entered into and maintained price fixing agreements with the other major participants in the

market for generic drugs.  (TAC ¶¶ 259-422.)  For years prior to 2013, prices for the generic drugs

had remained stable.  (TAC ¶¶ 262, 268, 274, 280, 286, 296, 302, 308, 314, 320, 326, 332, 341,

347.)  Immediately or soon after Defendants entered these agreements, Mylan and all other

industry participants increased the prices of the Fixed-Price Drugs synchronously and

astronomically, in each case by hundreds or thousands of percentage points.  (TAC ¶¶ 259-422.)

These price increases followed industry meetings attended by Mylan senior executives in February

and June 2013.  (*Id.*)  Mylan and its co-conspirators had numerous opportunities to meet to plan

their conspiracy, at industry meetings, trade shows and private "industry dinners" among high-

level executives.  (TAC ¶¶ 396-400.)

### III.    PROCEDURAL HISTORY

On October 11, 2016, Plaintiff Stef Van Duppen initiated this action against Defendants

Mylan, Bresch and Sheehan.  Dkt. No. 1.  Separately, Plaintiff Landon W. Perdue filed an action

against Defendants Mylan, Bresch, Campbell, Coury, Parks, and Sheehan on October 13, 2016.

*See Perdue v. Mylan N.V.*, No. 16 Civ. 8000, Dkt. No. 1.  On January 9, 2017, this Court

consolidated the two cases for pre-trial purposes, appointed Lead Plaintiffs, and approved Lead

Counsel.  Dkt. No. 26.  Lead Plaintiffs subsequently filed the Amended Complaint ("AC") (Dkt.

No. 39) asserting claims under:  (1) Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b 5, against all

Defendants; (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants; and (3) Section 1 of the Israeli Securities Law of 1968, against all Defendants.  On May 30, 2017, Defendants moved to dismiss the AC.  Dkt. No. 45.  On August 8, 2017, Plaintiffs opposed Defendants' motion.  Dkt. No. 49.  On March 28, 2018, the Court issued an Opinion and Order, granting in part, and denying in part Defendants' motion.  Dkt. No. 69.  On July 6, 2018, Plaintiffs filed the SAC.  Dkt. No. 89.  On August 6, 2018, Defendants moved to dismiss the SAC. Dkt. No. 95.  On September 5, 2018, Plaintiffs opposed Defendants' motion.  Dkt. No. 100.  On March 29, 2019, this Court issued an Opinion and Order granting in part, and denying in part the SAC.  Dkt. No. 102.

On June 17, 2019, Plaintiffs filed the TAC adding new allegations as stated in the May 10, 2019 attorneys general action alleging anticompetitive conduct on the part of Mylan and other generic drug companies with respect to numerous generic drugs (*see Connecticut v. Teva Pharma. USA, Inc*., No. 3:19-cv-00710 (MPS) (D. Conn.)), added Defendant Nesta and extended the Class Period.  Dkt. No. 114.  Plaintiffs now seek certification of the Class.

## IV.   ARGUMENT:  THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *Amchem Products, Inc., v. Windsor*, 117 S. Ct. 2231, 2245 (1997).  In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3).  *Id.*  Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually.  [M]ost of the plaintiffs would have no realistic day in court if a class action were not available."  *Phillips Petroleum Co.*, 105 S. Ct. at 2973.  "The preponderance of the evidence

standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws." *Epifano v. Boardroom Business Products, Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990). Thus, Courts in the Second Circuit have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, 2008 U.S. Dist. LEXIS 17747, at *12 (S.D.N.Y. Mar. 6, 2008) (citation omitted).   In a securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification.  *See In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. at 479.

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the class certification stage." *Amgen*, 133 S. Ct. at 1194-95 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195.  Accordingly, while the Court may consider whether a market was efficient to support a presumption of reliance, the Court should not delve into merits issues such as scienter, materiality or loss causation.  *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*"); *Amgen*, 133 S. Ct. at 1193-94.

### A.    The Rule 23(a) Requirements Are Satisfied

#### 1.  The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable."  Impracticable does not mean impossible, but only that the difficulty of joining

all class members make use of the class action appropriate. *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). Further, a plaintiff need not allege the exact number or identity of class members. *See In re Blech Sec. Litig.*, 187 F.R.D. 97 at 103 (S.D.N.Y. 1999). "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010), *citing Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997). "[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

During the Class Period, the common stock of Mylan was listed on the NASDAQ-GS and traded under the ticker symbol "MYL." *See* Declaration of Austin P. Van ("Van Decl.") Ex. 1, Expert Report of Zachary Nye. ("Nye Report"), at ¶ 13. During the Class Period, the Company's market capitalization ranged between $8.8 billion (in May 2012) and $37.2 billion (in April 2015). *Id. ¶* 53. Also, during the Class Period, the total number of Mylan shares issued and outstanding ranged from approximately 371.9 million to 536.5 million shares. *Id.* ¶ 26. Although Plaintiffs have not yet ascertained the precise number of potential Class members, they believe that there are thousands of geographically dispersed members of the proposed Class. The identity of the members can be readily determined from securities brokerage and nominee firms' books and records. The proposed Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable. *See Menkes*, 270 F.R.D. at 90.

### 2.  Questions of Law or Fact Are Common to the Class

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted." *See In re Prudential Sec. Inc. Ltd. Partnerships*

*Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995); *see also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation"). A single legal or factual question common to the class suffices. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166-67 (2d Cir. 1987).

Here, common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether the price of Mylan's stock was artificially inflated during the Class Period; and (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses. The misstatements were made to the Class as a whole, and injured market participants in the same way. In comparable matter, including securities class actions, courts have consistently found the commonality requirement to have been satisfied. *See, e.g., In re SCOR Holding (Switzerland) AG Litig.*, 537 F Supp. 2d 556 (S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 157-158 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009).

### 3. Plaintiffs' Claims are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the claims of the class. The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Southwest v. Falcon*, 102 S. Ct. 2364, 2373 n.13 (1982). "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998). A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d at 35. In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investors' perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986) (citations omitted).

Plaintiffs satisfy the typicality requirement. They each purchased Mylan shares during the same period of time as that in which the putative class members purchased or held their shares. Dkt. No. 20, Ex. B. Their claims, like those of all other Class members, derive from the same legal theories and the same misrepresentations and omissions. *Conn. Ret. Plans & Trust Funds v. Amgen, Inc.,* 2009 U.S. Dist. LEXIS 71653, at *14-15 (C.D. Cal. Aug. 12, 2009).

### 4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is met. The focus of the Court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.*, 117 S. Ct. at 2250 (citation omitted). It is important to emphasize that "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem Products, Inc.*, 117 S. Ct. at 2250-51, and no actual or potential conflicts exist. Plaintiffs and all Class members have suffered losses from purchasing Mylan securities at artificially inflated prices. They have been injured by the identical wrongful underlying

misrepresentations and omissions of Defendants.  Each Plaintiff has been actively involved in this litigation, and each is willing to serve as a representative party on behalf of the Class and understands its duties as a Class representative.  Each Plaintiff is willing and able to prosecute this action on behalf of the Class to a successful conclusion.  Moreover, the Plaintiffs' aptitude for stewardship of this case is demonstrated by their prior experience acting as lead plaintiffs in securities class actions.  Menorah served as lead plaintiff in *In re Comverse Technologies, Inc.*, a securities class action that settled for $225 million.  No. 1:06-cv-01825-NGG-RE (E.D.N.Y. Dec. 18, 2009).  Phoenix serves as lead plaintiff in *Costas v. Ormat Technologies, Inc. et al.*, No. 3:18-cv-00271-RCJ-WGC (D. Nev. Mar. 12, 2019), and Meitav serves as lead plaintiff in *Roofers' Pension Fund v. Perrigo Company PLC*,  No. 2:16-cv-02805-MCA-LDW (D.N.J. Feb. 10, 2017).

Plaintiffs have engaged qualified, experienced and capable attorneys.  Proposed Class Counsel are highly experienced in complex class litigation, especially securities fraud actions, and have the ability and willingness to prosecute this action vigorously.[3]  *See infra* Part V; Van Decl., Ex. 2.  Lead Counsel's vigorous pursuit of the Class' interests is evidenced in the proceedings in this Court, including in their defeat of the majority of both of Defendants' motions to dismiss.

### B.      The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

### 1.      Common Questions of Law and Fact Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem Products, Inc.*, 117 S. Ct. at 2250.  "Class-wide issues predominate if

---

[3] Assistance is also provided by Israeli counsel, Guy, Bachar & Co. and Eitan Lavie & Co., who have facilitated communications with Plaintiffs, translated and explained documents to Plaintiffs, and facilitated a stay of the Israeli class action in favor of these proceedings.

resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("[T]o allow various secondary issues of plaintiff's claim to preclude certification . . . would render the rule an impotent tool for private enforcement . . . .").

Plaintiffs will prove, on a common basis, the elements of their Sections 10(b)[4] and 20(a) claims.[5] "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 131 S. Ct. at 2184.[6] Here, reliance (or transaction causation) will be established on a common basis under the "fraud-on-the-market" theory. As explained in *Basic Inc. v. Levinson*, 108 S. Ct. 978 (1988):

> An investor, who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.

---

[4] The elements of a claim for securities fraud under Section 10(b) are: (1) a material omission or misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

[5] In addition to an underlying Section 10 violation by a controlled entity, Section 20(a) liability requires control of the primary violator by the defendant. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006) (Scheindlin, J.). Control can be proved class-wide. *See, e.g.*, *In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[6] Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence. *See In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*, MDL No. 1658 (SRC), 2013 WL 396117, at \*12 (D.N.J. Jan. 30, 2013) ("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information . . . . In addition . . . loss causation for the putative class is also capable of proof through common evidence. Each class member's claim for relief is based on the same corrective disclosures . . . "); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception, [reliance] there is no dispute that each element necessary to establish liability . . . is common to the class . . . . The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct."). Because merits determinations are to be eschewed, the Supreme Court has recently confirmed that neither materiality nor loss causation need be proved at the class certification stage to trigger *Basic*'s presumption of reliance. *See Amgen*, 133 S. Ct. 1184 at 1195-96 (materiality); *Halliburton*, 131 S. Ct. 2179 at 2185-86 (loss causation).

*Id*. at 992.  To invoke the fraud-on-the market-presumption, "plaintiffs must demonstrate that (1) the alleged material misstatements were publicly known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed."  *In re Winstar Communications Sec. Litig*., 290 F.R.D. 437 (S.D.N.Y. 2013).  Plaintiffs demonstrate all three.

In *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989), the court set forth certain factors as an aid to determine whether the market for any stock is open and efficient:  (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption" (*Id*. at 1293); (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period"; (3) whether the company's stock "had numerous market makers"; (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical facts show[ ] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *Id*. at 1284-87.  The *Cammer* factors, however, are not exclusive, and a plaintiff "is not required to show the existence of each of these factors" to establish market efficiency.  *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted).  "The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.'"  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (citing *Cammer*, 711 F. Supp. at 1287) (collecting cases).

As the Second Circuit held, "[w]e have repeatedly—and recently—declined to adopt a particular test for market efficiency." *Waggoner v. Barclays PLC,* 875 F.3d 79, 94 (2d Cir. 2017).

In *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410 (2014) (*"Halliburton II"*) the Supreme Court clarified the standard for invoking the fraud-on-the-market theory. *Halliburton II*, 134 S. Ct. 2398.  Notably, the Court clarified that the three prerequisites to invoking the fraud-on-the market presumption were really proxies for showing that the misrepresentation or omission affected the market price of the security (*i.e.*, "price impact").  *Id.* at 2415.  *Halliburton II* further clarified that a plaintiff can show fraud on the market *either* by providing evidence that the company's stock generally traded on an efficient market, *or* by direct evidence that the misleading statement had a price impact.  *Id.*  Defendants, by the same token, may also show a lack of price impact by direct evidence to rebut the presumption.  *Id.*  The Court also confirmed that market efficiency for purposes of the fraud-on-the-market presumption is not tied to "any particular theory of how quickly and completely publicly available information is reflected in market price."  *Id.* at 2410. Instead, it is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."  *Id.* (quotation and citation omitted).  Accordingly, "[d]ebates about the precise degree to which stock prices accurately reflect public information are thus largely beside the point."  *Id.*  Furthermore, the Supreme Court has held that the presumption of reliance, based on the fraud-on-the-market theory, is a "common sense" proposition for securities traded in a well-developed market.  *Basic v. Levinson,* 485 U.S. 224, 246 (1988).

### a.  Mylan's NASDAQ-GS Listing is Strong Evidence of Market Efficiency

Throughout the Class Period, Mylan stock was listed and traded on NASDAQ-GS, which is the highest tier of the broader NASDAQ stock market, under the symbol "MYL."  Nye Report,

¶ 19.  The NASDAQ is an electronic stock market that displays the bid and ask quotes of market makers through a worldwide network of thousands of computer terminals.  *Id.*  NASDAQ investors have access to real-time pricing and continuous trading.  *Id.*  In addition, companies that are listed on the NASDAQ must meet certain financial, trading, and corporate governance criteria.  *Id.* [7]  A security's listing on a national securities exchange like the NASDAQ means that financial information about that company is readily available to investors, *e.g.*, through the company's SEC filings, and that investors have access to trading prices throughout the trading day.  *Id.* ¶ 20.[8]

Congress, the Supreme Court, and the seminal *Cammer* decision all recognize that such well-developed markets are generally efficient in reflecting publicly-available information in the prices of securities traded on those markets.  In *Basic*, the Supreme Court noted that in "drafting [the 1934 Act, Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets.  [. . .]  Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 246; *see also Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 430-431 (D. Ariz. 2013) (discussing same); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("*Basic* itself recognized the NYSE as an efficient market").  Similarly, *Cammer* quoted with approval treatise commentary that "there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually

---

[7] The NASDAQ was the listing market for 2,666 and 3,071 public companies in February 2012 and May 2019, respectively.  Nye Report, ¶ 19.  The NASDAQ-GS has the most stringent initial financial and liquidity listing requirements of the NASDAQ's three-market tier designations.  *Id.*

[8] Rules of the U.S. National Market System ("NMS") also require that investor orders in NASDAQ-listed securities be filled at the best price that can be executed immediately, even if that price is available in a different market.  *Id.* ¶ 20.  Because national securities exchanges bring together many thousands (or millions) of investors, trading prices on those exchanges reflect a consensus opinion as to a security's value.  *Id.*

all the securities traded there:  the New York and American Stock Exchanges, the Chicago Board

Options Exchange and the NASDAQ National Market System."  711 F. Supp. at 1292.

"The NASDAQ is recognized as maintaining an efficient market." *Burke v. China Aviation

Oil Corp.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005); *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d

623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the

NASDAQ weighs in favor of a finding of market efficiency."); *Carpenters Pension Trust Fund of

St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) ("most courts agree that such listing

is a good indicator of efficiency"); *Lumen*, 280 F.R.D. at 459-60 (cases "too numerous to cite . . .

establish the NYSE and NASDAQ are at least entitled to a *presumption* of efficiency—making it

incumbent upon Defendants to rebut the presumption"); *see also* Nye Report, ¶¶ 19-20.

### b.  The Five *Cammer* Factors Confirm Market Efficiency

Dr. Nye's analysis of the *Cammer* factors and other indicia of market efficiency

demonstrate that Mylan's common stock traded in an efficient market during the Class Period.

**Factor One—Weekly Trading Volume:**  "[A] large weekly volume of stock trades . . .

implies significant investor interest in the company [which] implies a likelihood that many

investors are executing trades on the basis of newly available . . . corporate information." *Cammer*,

711 F. Supp. at 1286; *see also* Nye Report, ¶¶ 24-25.  A weekly volume of 2% supports a "strong

presumption" of market efficiency.  *Id.*  During the Class Period, the average weekly trading

volume of Mylan stock on the NASDAQ-GS was 5.8 % of shares outstanding, Nye Report, ¶ 26,

nearly *three times* that required for a "strong presumption" of market efficiency under *Cammer.*

**Factor Two—Analyst Coverage:**  Analyst coverage on a stock implies that information

about the company is rapidly reflected in the stock price.  *Cammer*, 711 F. Supp. at 1286; *see also*

Nye Report, ¶¶ 28-29.  During the Class Period, at least 42 well-known investment firms followed

Mylan and published reports on Mylan.  *Id.* ¶ 30.  More than 2,900 analysts' reports on Mylan

were issued during the Class Period. *Id.* In addition, Calcion and Sanford C. Bernstein & Company participated in at least one of the Company's conference calls during the Class Period. *Id.* Moreover, during the Class Period, financial information was disseminated to investors via media coverage, investor conferences, trade magazines, Company presentations and SEC filings. *Id.* ¶ 31. Specifically, news articles about Mylan appeared in 47 major domestic and international news media during the Class Period. *Id.* Furthermore, Mylan's filings with the SEC were publicly available online during the Class Period at no cost. *Id.* ¶ 32. This volume of news coverage supports an inference that the stock traded on an efficient market. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (524 news items over two years showed efficient market).

**Factor Three—Market Makers and the Potential for Arbitrage:** The third *Cammer* factor concerns the existence of market makers and arbitrageurs who can react quickly to news and facilitate trading. The high number of market makers, the lack of short-selling constraints and the fact that investors could have exploited arbitrage opportunities during the Class Period support a finding of market efficiency. Nye Report, ¶ 34. Market makers enable investors to trade promptly upon the arrival of new, relevant information, thereby facilitating the incorporation of new information into securities prices. *Id.* ¶ 35. Mylan stock traded on the NASDAQ. *Id.* NASDAQ market participants are made up of market makers, order entry firms, and alternative trading systems that include electronic communication networks and unlisted trading privileges exchanges. *Id.* The listing of a security on the NASDAQ (like Mylan's was) weighs in favor of a finding of market efficiency. Nye Report, ¶¶ 19-20; *see also Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, Fed. Sec. L. Rep. P. 93,935 (S.D.N.Y. Aug. 1, 2006). Mylan also traded on other national securities markets as well as Alternative Trading Systems ("ATS") during the Class Period. During the Class Period, there were more than 350 active market makers

that traded Mylan stock.  *Id.* ¶ 21.  These market makers supports a finding of efficiency.  *See Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers supports presumption of efficiency).

Related to *Cammer* Factor 3 is the existence of arbitrageurs, sophisticated investors who can act rapidly to take advantage of security pricing discrepancies.  Nye Report, ¶ 37.  Arbitrageurs ensure that market prices reflect public information—the fundamental hallmark of market efficiency.  *Id.*  The level of short interest, the degree of institutional ownership and the tightness of bid/ask spreads suggest that arbitrage activity for the Company's stock was prevalent during the Class Period.  *Id.*  Arbitrageurs were not constrained in their ability to short shares of Mylan stock. *Id.* ¶ 39.  During the Class Period, the average short interest[9] for companies listed in the United States as a percentage of float was 3.8%. *Id.*  In comparison, the average short interest for Mylan stock during the Class Period was 6.2% of both its shares outstanding and public float.  *Id.* Institutional ownership is another indicator of arbitrage activity insofar as institutional investors, such as pension funds, mutual funds and investment banks, are generally considered to be sophisticated investors that have ready access to minute-to-minute financial news and to online bulletins from analysts.  *Id.* ¶ 40.  Institutions held over 83% of Mylan's public float during the Class Period, and between 636 and 1,006 institutional investors held Mylan stock at the end of each quarter during the Class Period.  *Id.* ¶ 41.  Furthermore, the fact that institutional holdings, on average, were approximately over 15 times the short interest in Mylan stock in U.S. Markets, during the Class Period, implies that short selling was not constrained.  *Id.*[10]

---

[9] A short sale is a transaction in which an investor sells a stock that he or she does not own and then purchases that stock back in the future.  If the price declines between the time a security is sold short and the time it is purchased, the short seller realizes a gain.  *Id.* ¶ 38.  Thus, short selling is an advantageous strategy if an arbitrageur expects a security's price to decline in the future.  *Id.*  Furthermore, short sales allow arbitrageurs that currently do not own a security to convey their opinions to the market, thereby helping the market to value that security accurately.  *Id.*

[10] Similarly, the cost of trading and arbitrage opportunity for Mylan, demonstrated by the "ask" spread, demonstrates that it traded in an efficient market.  Nye Report ¶ 55.  Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily.  *Id.*  If a security is actively traded and information about the security is readily available, the bid-ask spread will tend to be narrow.  *Id.*  During the Class

**Factor Four—S-3 Eligibility:** The *Cammer* court found that a company's eligibility to file a short-form registration statement, *i.e.*, Form S-3, supports a finding of an efficient market. *Cammer*, 711 F. Supp. at 1285. The SEC's view is that S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—disseminate key information to the marketplace, and, that therefore, the market operates efficiently for them. Nye Report, ¶ 44. Mylan Inc., predecessor to Mylan N.V., filed Form S-3ASR automatic shelf registration statements with the SEC prior to and during the Class Period, and Mylan N.V. filed two Form S-3ASRs during the Class Period, indicating the Company was eligible to file Form S-3 throughout the Class Period. *Id.* ¶ 45. That Mylan was eligible to file Form S-3 throughout the Class Period supports the conclusion that the market for its stock was efficient. *Id.*

**Factor Five—Cause and Effect Relationship of Unexpected Material News and Stock Price:** *Cammer* Factor 5 relates to how a security's price reacts to new, material information. *Id.* ¶ 46. It is worth noting that the Second Circuit has held that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies. *Waggoner,* 875 F. 3d at 97. Such direct evidence of an efficient market is not required when plaintiffs overwhelmingly demonstrate the other four Cammer factors, as Lead Plaintiffs have done here. The *Cammer* court stated that, "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between the company disclosures and resulting movements in stock price." 711 F. Supp. at 1291. Dr. Nye employed an event study covering the Class Period to determine the impact of new material information on Mylan's stock price. *See* Nye Report, ¶ 48. In an efficient market, it would be expected that the

---

Period, Mylan stock on the NASDAQ had an average bid-ask spread of 0.03%/0.03% which was smaller than the average bid-ask spread of a random sample of stocks listed on the NASDAQ, 0.18%/0.13%. *Id.* This further supports the conclusion that the Company's common stock traded in an efficient market during the Class Period. *Id.* ¶ 56.

price of a stock would respond to news. *Id.* ¶ 47.  The event study is a multiple step process to test this response. *Id.*  Those steps include:  "the *a priori* definition and selection of events to study; identification of a study period; estimation of a regression model to remove noncompany-specific effects from the security's return; testing for statistical significance; and interpretation of empirical results." *Id.*  To determine which events to study in his analysis, Dr. Nye relied on a large body of event study literature that has evaluated what types of information affect stock prices. *Id.* ¶ 49. Consistent with this literature, Dr. Nye examined dates on which Mylan released quarterly or year-end financial results.  *Id.*  Such earnings-related announcements are an objective set of events to examine, which has been shown in the academic finance literature to impact stock prices.  *Id.*

Out of the 30 events Dr. Nye examined, 14 (*i.e.*, 46.7%) are associated with a statistically significant Company-specific return at or above the 95% confidence level (eight statistically significant positive returns, six statistically significant negative returns).  *Id.* ¶ 50.  At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time.  *Id.*  Thus, one should expect a random sample of 30 days to contain 1.5 days with a return that is statistically significant at the 95% confidence level.  *Id.*  Given that Dr. Nye's sample contains more than nine times as many statistically significant dates as should be expected from a randomly selected 30-day sample (at or above the 95% confidence level), his analysis confirms that Mylan's stock price typically reacted more strongly on event dates than on non-event dates.  *Id.*  During the Class Period, there was a statistically significant return on 6.1% of the non-event days.  *Id.*  Based on a comparison of these two groupings using the "two sample z-test" and "Fisher's exact test," there was a 99.99% chance that there is a statistically higher probability of observing a statistically significant Company return on an event date as compared to a non-event date, indicating the Mylan's stock prices were sensitive to material new information.  *Id.*

Thus, Dr. Nye's event study finds that a strong cause-and-effect relationship existed between the information disclosed on the event dates during the Class Period and resulting stock price movements.  *Id.*  Dr. Nye concluded, "[b]ased on the event study performed, I find that Mylan's stock price reflected the information disclosed to the market, and promptly responded to the disclosure of new, material, unexpected information, supporting my conclusion that the market for Mylan stock was efficient throughout the Class Period."  *Id.* ¶ 52.

### c.      The *Krogman* Factors Also Demonstrate Market Efficiency

In addition to the *Cammer* factors, courts often consider:  (1) the capitalization of the company; (2) the big-ask spread of the stock; and (3) the percentage of stock not held by insiders to determine market efficiency.  *Menaldi v. Och-Ziff Capital Magmt. Grp. LLC,* 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (quoting *Krogman v. Sterritt,* 202 F.R.D. 467, 474 (N.D. Tex. 2001).  Here, each of the additional *Krogman* factors further demonstrates that Mylan's common stock traded on efficient markets.  Mylan's market capitalization peaked at $37.2 billion during the Class Period.  Nye Report ¶ 53.  By comparison, the median market capitalization of the roughly 1,600 companies listed on the NYSE was $2.13 billion at the end of the Class Period, while the median market capitalization of the roughly 2,400 companies listed on the NASDAQ was approximately $347.6 million at the end of the Class Period.  *Id.* ¶ 54.  As of May 24, 2019, *i.e.*, the end of the Class Period, Mylan's equity market capitalization was greater than 78.1% and 93.7% of NYSE-listed and NASDAQ-listed stocks, respectively.  *Id.*  Mylan's large public float, on average 99.3% of total shares outstanding (the majority held by institutional investors), allowed for unconstrained short selling.  *Id.* ¶ 57-58.  Finally, Mylan's average and median bid-ask spreads were smaller than those of a random sample of stocks on the NASDAQ Global Select Market, further demonstrating that Mylan's shares traded in an efficient market during the Class Period.  *Id.* at ¶¶ 55-56.

### d.  Mechanical Damage Tabulations for Individual Class Members Will Not Defeat Predominance

Where liability can be proved class-wide, it is "'well-established' Second Circuit precedent that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (citation omitted).  This is especially true for securities fraud cases, where the process of computing damages after liability is established is "virtually a mechanical task." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013); (*quoting Blackie*, 524 F.2d at 905); *see Carpenters Pension Trust Fund of St. Louis*, 310 F.R.D. at 74 ("[i]ssues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases."); *Waggoner,* 875 F.3d at 106 (finding that damage"[c]alculations need not be exact").  For this reason, courts do not require a formal damages model to demonstrate that damages can be determined on a class wide basis.  Instead, to the extent any evidence is required, an event study like that provided by Dr. Nye (Nye Report, ¶¶ 59-64) will suffice.  *See, e.g.*, *In re JPMorgan Chase*, 2015 U.S. Dist. LEXIS 132181, *23-24; *Diamond Foods*, 295 F.R.D at 251-52.

### 2.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

"Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation." *Dirks v. Clayton Brokerage Co. of St. Louis Inc.*, 105 F.R.D. 125, 136 (D. Minn. 1985). "[T]he superiority requirement 'ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007). Courts have universally recognized the superiority of class actions in cases alleging securities fraud, especially where the fraud-on-the-market presumption applies.  *See supra* at 13.

Under Rule 23(b)(3),the Court analyzes four factors in determining superiority:

A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

These factors weigh in favor of class certification in this case. *First*, the members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action"). *Second*, Plaintiff is aware of only one other litigation concerning the misrepresentations identified in the Amended Complaint. *See MYL Litigation Recovery I LLC v. Mylan N.V.*, No. 1:19-cv-01799-JPO (S.D.N.Y.).

*Third*, the desirability of concentrating the litigation of these claims in this forum is clear— this class action is not only an essential mechanism for investors to redress the injuries they suffered because of Mylan's misconduct, but it also will help achieve the statutory objective of a fair and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2508 n.4, (2007) ("private securities litigation is an indispensable tool with which . . . investors can recover their losses—a matter crucial to the integrity of domestic capital markets") (citations omitted). Moreover, there are thousands of class members. "Litigating each case separately would be wasteful . . . ." *In re Scor Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008). It would also "risk disparate results among those seeking redress." *Id*. *Fourth*, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

## V.    ARGUMENT:  POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

In confirming its appointment of Lead Counsel as Class Counsel, this Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

These factors all weigh in favor of appointing Lead Counsel, Pomerantz LLP as Class Counsel.  The firm has devoted substantial time and resources to identifying and prosecuting the claims in this Action, investigating the legal and factual bases for those claims, drafting the Amended Complaint, defeating in large part Defendants' motions to dismiss, and pursuing discovery.  Moreover, the firm has over seventy years of experience prosecuting complex securities-fraud actions and has achieved historic recoveries for investors in such actions.  *See* Van Decl. Ex. 2 (Pomerantz LLP firm resume); *see e.g.*, *In re Petrobras Securities Litigation*, No. 14-cv-09662-JSR (S.D.N.Y.) ($3 billion settlement, largest securities class action settlement in the past decade); *In re Comverse Technologies, Inc.* No. 1:06-cv-01825-NGG-RER (E.D.N.Y.) ($225 million settlement); *Pirnik v. Fiat Chrysler Automobiles N.V. et al.*, No. 1:15-cv-07199-JMF (S.D.N.Y) ($110 million settlement).  Finally, proposed Class Counsel is willing and able to commit the necessary resources to achieve a successful recovery for investors, as it has in numerous other similar matters.  *See id.*

## VI.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as the Class Representatives; (3) appointing Pomerantz LLP as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated:  August 30, 2019

Respectfully submitted,

POMERANTZ LLP

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
avan@pomlaw.com

*Lead Counsel for Plaintiffs*

Steven J. Toll
Daniel S. Sommers
Times Wang
COHEN MILSTEIN SELLERS
      & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 2005-3964
Tel.:  (202) 408-4600
Fax:  (202) 408-4699
Email:  stoll@cohenmilstein.com
dsommers@cohenmilstein.com
twang@cohenmilstein.com

Laura H. Posner
COHEN MILSTEIN SELLERS
      & TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
Tel.:  (212) 838-7797
Fax:  (212) 838-7745
Email:  lposner@cohenmilstein.com

Jacob Sabo
LAW OFFICE OF JACOB SABO
No. 3 Daniel Frisch St.
24th Floor
Tel-Aviv 64731
Israel
Tel.: 03-7161555
Fax: 03-7161556

*Additional Counsel*