# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Mylan N.V. Securities Litigation | Case No. 1:16-CV-07926 (JPO) |

EXPERT REPORT OF ZACHARY NYE, PH.D.

August 29, 2019

## Table of Contents

I.     Background and Qualifications ........................................................................1

II.    Scope of Engagement .....................................................................................1

III.   Bases for Opinions ........................................................................................2

IV.    Summary of Opinions .....................................................................................3

V.     Overview of Mylan's Business Operations ....................................................3

VI.    The Market for Mylan Stock Was Efficient Throughout the Class Period................7
       A.   Cammer Factor 1: Weekly Trading Volume .....................................13
       B.   Cammer Factor 2: Number of Securities Analysts .........................14
       C.   Cammer Factor 3: Number of Market Makers and the Potential for Arbitrage .........17
       D.   Cammer Factor 4: Eligibility to File SEC Form S-3....................22
       E.   Cammer Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship
            Between Unexpected Corporate Events or Financial Releases and the Price
            Reaction of Mylan Stock ...............................................................24
       F.   Additional Factor 1: Market Capitalization.................................28
       G.   Additional Factor 2: Bid/Ask Spread.............................................29
       H.   Additional Factor 3: Public Float ................................................30

VII.   Damages Can Be Measured on a Class-Wide Basis and in a Manner
       Consistent with Plaintiffs' Theory of Liability.............................................30

VIII.  Conclusion ...................................................................................................34

       Appendix A: Description of Regression Analyses .................................................35

## I.  Background and Qualifications

1.      I am a financial economist and Vice President at Stanford Consulting Group, Inc.

("SCG").  Since 1981, SCG has provided economic research and expert testimony for business

litigation, and regulatory and legislative proceedings.  All SCG professionals hold masters or

doctoral degrees in business, economics, finance or operations research, and certain senior

consultants have testified as experts in these fields.  I have an A.B. in Economics from Princeton

University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from

the Paul Merage School of Business at the University of California, Irvine.  I have co-authored

academic research published in peer-reviewed conference proceedings, as well as working

papers with finance faculty at various universities.  My research areas include the market

efficiency of financial and derivative securities, volatility forecasting, risk management, financial

econometrics, valuation and corporate finance.  I have previously served as an expert witness in

matters involving securities litigation, as well as business and intellectual property valuation.

My curriculum vitae, which includes my academic research, publications in the past ten years,

and prior expert testimony in the past four years, is attached hereto as Exhibit 1.

2.      My current hourly rate is $675.  I have received assistance from individuals at SCG, who

worked under my direction; their fees charged for this project are their standard hourly rates.

Neither my compensation nor that of any individual at SCG is contingent on the outcome of this

litigation.

## II.  Scope of Engagement

3.      I have been retained by Counsel for Plaintiffs in this matter to opine as to whether the

common stock of Mylan N.V. and/or Mylan N.V.'s predecessor, Mylan Inc., (collectively

"Mylan," or the "Company") traded in an efficient market during the period February 21, 2012

through May 24, 2019, inclusive (the "Class Period").  I also have been asked by Counsel to

opine on whether damages under §10(b) of the Securities Exchange Act of 1934 ("Exchange

Act"), and Rule 10b-5 promulgated thereunder by the SEC, can be calculated using a method

that is common to each Class member and in a manner consistent with Plaintiffs' theory of

liability,[1] for investors who purchased Mylan stock during the Class Period.  However, I have not

been asked at this time to calculate or opine on the amount of such damages.

### III.    Bases for Opinions

4.      My opinions are based upon my professional knowledge and experience, my review of

documents and information relevant to this matter (*see* Exhibit 2), and the analyses described in

this Report and its Exhibits.  Documents, data, and other information that I have relied upon as

bases for my opinions are cited in this Report and its Exhibits.  Such documents and information

are typically relied upon by financial experts in securities class actions and by financial

economists in their research.

5.      Counsel for Plaintiffs has informed me that the record in this matter continues to be

developed and that fact discovery is ongoing.  To the extent they are relevant, I would expect to

review additional information that may become available through discovery as well as the

reports and depositions of other expert witnesses.  The opinions offered in this Report are subject

to refinement or revision based on continuing analysis of the documents and information listed

above, as well as new or additional information that may be provided to or obtained by me in the

course of this matter.

---

[1] The claims in this action are set forth in the "Third Amended Class Action Complaint for
Violations of Securities Laws," dated June 17, 2019 (the "Complaint").

## IV.    Summary of Opinions

6.      As discussed below in §VI, based on my review of the available evidence in this matter, and careful analysis of data specific to Mylan relating to the efficiency factors detailed throughout this Report, I conclude that the market for Mylan stock was efficient during the Class Period.  Furthermore, it is my understanding that while the Complaint alleges a Class Period ending May 24, 2019, Plaintiffs are also moving for an alternative Class Period ending 14 calendar days earlier on May 10, 2019.  Similar to my findings with respect to the Class Period as defined in the Complaint (*i.e.*, February 21, 2012 through May 24, 2019), my analysis of data specific to Mylan relating to the efficiency factors detailed throughout this Report also finds strong evidence that the market for Mylan stock was efficient during the period February 21, 2012 through May 10, 2019.

7.      As discussed in §VII, it is my opinion that damages, under §10(b) of the Exchange Act, for investors who purchased Mylan stock during the Class Period, can be calculated using a methodology that is common to the Class and in a manner that is consistent with Plaintiffs' theory of liability.

## V.    Overview of Mylan's Business Operations

8.      At the start of the Class Period, Mylan, along with its subsidiaries, was "a fully integrated global pharmaceutical company that develop[ed], license[d], manufacture[d], market[ed] and distribute[d] generic, branded generic and specialty pharmaceuticals."[2]  The Company described its business operations as follows:

> Mylan ranks among the leading generic and specialty pharmaceutical companies in the world and provides products to customers in approximately 150 countries and territories.  We maintain one of the industry's broadest and highest quality product portfolios, supported by a robust product pipeline and one of the world's

---

[2] Mylan Inc., SEC Form 10-K for year-end 2011, filed February 21, 2012, p. 3

largest vertically integrated active pharmaceutical ingredient ("API") operations. Additionally, we operate a specialty business which is focused on respiratory, allergy and psychiatric therapies.  Mylan was incorporated in Pennsylvania in 1970. …

Throughout its history, Mylan has been recognized as a leader in the United States ("U.S.") generic pharmaceutical market.  Since 2007, Mylan has transformed itself into an established worldwide pharmaceutical leader and is currently the third largest generic and specialty pharmaceuticals company in the world, in terms of revenue.  This transformation has taken place through organic growth and external expansion.  Our leadership position in the U.S. generic pharmaceutical industry is the result of our ability to obtain Abbreviated New Drug Application ("ANDA") approvals, as well as our reliable and high quality supply chain.[3]

9.      Until October 2016, the Company operated in two business segments, "Generics" and "Specialty," with revenues "primarily derived from the sale of generic and branded generic pharmaceuticals, specialty pharmaceuticals and API."[4]  The Company's Generics segment "develop[ed], manufacture[d], [sold] and distribute[d] generic or branded generic pharmaceutical products in tablet, capsule, injectable, transdermal patch, gel, cream or ointment form, as well as API."[5]  Mylan's Specialty segment "compete[d] primarily in the respiratory and severe allergy markets."[6]  During the Class Period, the sale of the EpiPen® Auto-Injector, an epinephrine auto-injector "used in the treatment of severe allergic reactions," made up a "significant portion" of the Company's revenues within its Specialty segment.[7]

---

[3] *Ibid*.

[4] *Id*., p. 4.  *See also*, Mylan N.V., SEC Form 10-K for year-end 2015, filed February 16, 2016, p. 4.

[5] Mylan N.V., SEC Form 10-K for year-end 2015, filed February 16, 2016, p. 5.

[6] *Id*., p. 9.

[7] Mylan Inc., SEC Form 10-K for year-end 2012, filed February 28, 2013, p. 7.  *See also*, Mylan Inc., SEC Form 10-K for year-end 2013, filed February 27, 2014, p. 8; Mylan Inc., SEC Form 10-K for year-end 2014, filed March 2, 2015, p. 8; and Mylan N.V., SEC Form 10-K for year-end 2015, filed February 16, 2016, p. 9.

10.    Beginning October 2016, "[a]s a result of [its] acquisition of Meda on August 5, 2016 and the integration of [the Company's] portfolio across [its] branded, generics and OTC platforms in all of [its] regions," the Company began reporting its financial results on a geographical basis, as follows: North America; Europe; and "Rest of World."[8]  The Company's North America segment was primarily made up of its U.S. and Canadian operations, and also included its previously reported Specialty segment.  Mylan's Europe segment included its operations in 35 countries within the region.  Mylan's Rest of World segment was primarily made up of its India, Australia, Japan and New Zealand operations, as well as emerging markets.[9]

11.    The Company described its "transformation strategy" during the Class Period as involving several significant acquisitions:

> Approximately a decade ago, in response to industry changes, Mylan developed and began executing a transformation strategy.  Our goal was to create a durable business model that would harness the power of competition to drive innovations capable of increasing access to medicine.
>
> Our strategy involved creating robust research, manufacturing, supply chain and commercial platforms on a global scale; substantially expanding our portfolio of medicines; diversifying by geography, product type and channel; maintaining our commitment to quality; cultivating our corporate culture and workforce; and continuing to manage for the long-term.
>
> Acquisitions, including that of Matrix Laboratories Limited (2007); Merck KGaA's generics and specialty pharmaceutical business (2007); the EPD Business … (2015) and Meda AB (publ.) ("Meda") (2016), have played a significant role in our transformation.  We continue to acquire complementary products and product-development capabilities.  As part of our acquisition-integration efforts, Mylan has focused on how to best optimize and maximize all of our assets across the organization and all geographies.[10]

---

[8] Mylan N.V., SEC Form 10-K for year-end 2016, filed March 1, 2017, p. 4.

[9] *Ibid.*

[10] Mylan N.V., SEC Form 10-K for year-end 2018, filed February 27, 2019, p. 3.

12.     As of December 2018, the Company's had approximately 35,000 employees and external contractors, and its product portfolio included more than 7,500 products marketed in more than 165 countries and territories, "including prescription generic, branded generic, brand-name drugs and over-the-counter ('OTC') remedies."[11]

13.     At the start of the Class Period, Mylan Inc.'s common stock was listed on the NASDAQ Global Select Market under the symbol "MYL."  On February 27, 2015, Mylan completed the acquisition of Abbott Laboratories' "non-U.S. developed markets specialty and branded generics business (the 'EPD Business') … in exchange for 110 million ordinary shares of Mylan N.V."[12] In connection with the closing of the acquisition, "Mylan Inc. became an indirect wholly owned subsidiary of Mylan N.V., and Mylan Inc.'s outstanding common stock was exchanged on a one to one basis for Mylan N.V. ordinary shares."[13]  Effective February 27, 2015, Mylan Inc.'s common stock ceased trading, and on March 2, 2015, Mylan N.V.'s ordinary shares began trading on the NASDAQ Global Select Market under the symbol "MYL."  On November 4, 2015, Mylan N.V.'s shares began also trading on the Tel Aviv Stock Exchange (the "TASE") under the symbol "MYL."[14]  However, effective February 12, 2018, the Company voluntarily delisted its shares from the TASE.[15]

---

[11] *Ibid.*

[12] Mylan N.V., SEC Form 10-K for year-end 2015, filed February 16, 2016, p. 3.

[13] *Ibid.*

[14] *Id.*, p. 52.

[15] Mylan N.V., SEC Form 10-K for year-end 2018, filed February 27, 2019, p. 38.

**VI.     The Market for Mylan Stock Was Efficient Throughout the Class Period**

14.     In this case, Plaintiffs have asserted the "fraud-on-the-market" presumption of reliance.

The "fraud-on-the-market" theory was first addressed by the U.S. Supreme Court in *Basic, Inc.*

*v. Levinson*:

> In an open and developed securities market, the price of a company's stock is
> determined by the available material information regarding the company and its
> business…. Misleading statements will therefore defraud purchasers of stock even
> if the purchasers do not directly rely on the misstatements…. The causal
> connection between the defendants' fraud and the plaintiffs' purchase of stock in
> such a case is no less significant than in a case of direct reliance on
> misrepresentations.[16]

15.     Since *Basic*, academic economists have debated various forms of the efficient capital

market hypothesis ("ECMH").[17]   In 2014, the Supreme Court clarified that *Basic* did not

"endorse 'any particular theory of how quickly and completely publicly available information is

reflected in market price.'"[18]   To the contrary, the "fraud-on-the-market" theory is based "on the

fairly modest premise that 'market professionals generally consider most publicly announced

---

[16] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241–242 (1988).

[17] Generally speaking, academic economists consider there to be three forms of market
efficiency: "weak" form; "semi-strong" form; and "strong" form market efficiency.  (*See* Elton,
E., M. Gruber, S. Brown and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis*,
6th Ed., John Wiley and Sons, Inc., 2007, p. 400.)  In "fraud-on-the-market" litigation, several
courts reference the semi-strong form of efficiency, which implies that market prices incorporate
all publicly available information.  In academic finance literature, this is referred to as
"informational efficiency."  This hypothesis has been empirically validated in numerous studies.
(*See, e.g.,* Fama, Eugene F., 1970 "Efficient Capital Markets: A Review of Theory and Empirical
Work," *Journal of Finance,* Vol. 25, Issue 2, pp. 383–417.)  The ECMH also has stood up
against its critics; while anomalies have occurred in financial markets, they appear to be random
and do not allow for trading strategies that would create abnormal profits.  (*See, e.g.,* Fama,
Eugene F., 1998, "Market Efficiency, Long-term Returns, and Behavioral Finance," *Journal of
Financial Economics,* Vol. 49, pp. 283–306; Malkiel, Burton G., 2003, "The Efficient Market
Hypothesis and Its Critics," *Journal of Economic Perspectives,* Vol. 17, pp. 59–82.)

[18] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014) ("*Halliburton II*"),
quoting *Basic*, 485 U.S. at 248, n. 28.

material statements about companies, thereby affecting stock market prices.'"[19]  Under this theory, investors' reliance on any public material misrepresentations and/or omissions may be presumed for purposes of a Rule 10b-5 action since the effects of those misrepresentations and/or omissions will already be impounded in the market price.[20]

16.     While the Supreme Court in *Halliburton II* stated that a market need only be "generally efficient" to invoke the "fraud-on-the-market" presumption, it did not adopt any particular test of general market efficiency.[21]  Accordingly, I consider in this Report direct and indirect tests of efficiency that courts have commonly used in securities litigation for over 30 years.  A direct empirical test of market efficiency is to examine price responsiveness to the release of new and material information about the company in question.  If the security price responds quickly, the response supports a conclusion that the market for the security is efficient.  As an indirect test of efficiency, one can examine whether market conditions promote efficiency.

17.     Consistent with *Basic* and *Halliburton II*, the oft-cited *Cammer v. Bloom* decision considered "efficient markets" to be "markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price."[22]  The court in *Cammer* identified five non-exhaustive factors that may be considered in determining whether the market for a security is efficient and, therefore, whether security prices respond quickly to new relevant information.[23]  These factors include indirect indicators of market efficiency, as

---

[19] *Id.,* quoting *Basic*, 485 U.S. at 246, n. 24.

[20] *Basic*, 485 U.S. at 241–242, 244, quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir. 1986).  *See also*, *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804 (2011).

[21] *Halliburton II*, 134 S. Ct. at 2404.

[22] *Cammer v. Bloom*, 711 F. Supp. 1264, 1273 n.11 (D.N.J. 1989).

[23] "The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.'  Indeed, not even the *Cammer* court considered the fifth factor necessary, stating

well as a direct empirical test.  I understand that courts throughout the country assessing the applicability of the "fraud-on-the-market" doctrine, including courts in the Second Circuit, have widely adopted these five factors in evaluating market efficiency.[24]  In concluding that the market for Mylan stock was efficient during the Class Period, I considered each of the following five *Cammer* factors as applied to the stock:

> i.     whether the security trades at a large weekly volume;
>
> ii.    whether analysts follow and report on the security;
>
> iii.   whether the security has market makers and whether there is a potential for arbitrage activity;
>
> iv.   whether the company is eligible to file SEC Form S-3; and
>
> v.    whether empirical facts show a cause-and-effect relationship between the release of new, material information about the company in question and a response in the security's price.

18.     In addition to these five *Cammer* factors, I have considered three other factors which have also been considered by courts in evaluating market efficiency.[25]  These additional factors are:

> vi.   the company's market capitalization;
>
> vii.  the bid/ask spread for stock sales; and

---

only that 'it *would be helpful* to a plaintiff seeking to allege an efficient market . . . .'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015).  "Different contexts require courts to place greater importance on some factors than on others.  No other court has adopted a per se rule that any one factor is dispositive.  At the same time, courts have found market efficiency in the absence of an event study or where the event study was not definitive." *Id., 310 F.R.D.* at 84.

[24] *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005); *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 214-217 (E.D. Pa. 2008), *aff'd* 659 F.2d 623 (3d Cir. 2011).

[25] *Unger*, 401 F.3d 316 at 323, HN10; *Bell*, 422 F.3d 307 at 313, n10; *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

viii.   the security's public float.

As demonstrated below in §VI.A–§VI.H, an analysis of these factors supports my conclusion that the market for Mylan stock was informationally efficient during the Class Period.

19.      Though not necessarily conclusive of market efficiency, it is worth noting that throughout the Class Period, Mylan stock was listed and traded on the Nasdaq Global Select Market, which is the highest tier of the broader Nasdaq Stock Market ("NASDAQ"), under the symbol "MYL."[26]  The NASDAQ is an electronic stock market that displays the bid and ask quotes of market makers through a worldwide network of thousands of computer terminals.  NASDAQ investors have access to real-time pricing and continuous trading.  In addition, companies that are listed on the NASDAQ must meet certain financial, trading, and corporate governance criteria.  The NASDAQ was the listing market for 2,666 and 3,071 public companies in February 2012 and May 2019, respectively.[27]  The Nasdaq Global Select Market has the most stringent initial financial and liquidity listing requirements of the NASDAQ's three-market tier designations:

---

[26] *See*, *e.g.*, Mylan Inc., SEC Form DEF 14A, filed April 5, 2012, p. 32; Mylan N.V., SEC Form S3ASR, dated February 27, 2015, p. 4 of PDF file; Mylan N.V., SEC Form 10-K for year-end 2018, filed February 27, 2019, pp. 38, 89.

[27] World Federation of Exchanges, Monthly Reports for February 2012 and May 2019, available at https://www.world-exchanges.org/our-work/statistics.

> The Nasdaq Stock Market has three distinctive tiers: The Nasdaq Global Select Market®, The Nasdaq Global Market® and The Nasdaq Capital Market®. Applicants must satisfy certain financial, liquidity and corporate governance requirements to be approved for listing on any of these market tiers. … [T]he initial financial and liquidity requirements for the Nasdaq Global Select Market are more stringent than those for the Nasdaq Global Market and likewise, the initial listing requirements for the Nasdaq Global Market are more stringent than those for the Nasdaq Capital Market.  Corporate governance requirements are the same across all Nasdaq market tiers.[28]

20.    A security's listing on a national securities exchange such as the NASDAQ means that financial information about that company is readily available to investors, at a minimum, through the company's SEC filings, and that investors have access to trading prices and volumes throughout the trading day.[29]  Rules of the U.S. National Market System ("NMS") also require that investor orders in NASDAQ-listed securities be filled at the best price that can be executed immediately, even if that price is available in a different market.[30]  Because listing on a national

---

[28] http://business.nasdaq.com/Docs//Nasdaq%20Initial%20Listing%20Guide_tcm5044-13919.pdf.

[29] According to the Consolidated Tape Association's website (https://www.ctaplan.com/index):

> The Consolidated Tape Association (CTA) oversees the dissemination of real-time trade and quote information in New York Stock Exchange LLC (Network A) and Bats, NYSE Arca, NYSE American and other regional exchange (Network B) listed securities.  Since the late 1970s, all SEC-registered exchanges and market centers that trade Network A or Network B securities send their trades and quotes to a central consolidator where the Consolidated Tape System (CTS) and Consolidated Quote System (CQS) data streams are produced and distributed worldwide.

> The current Participants include the Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc., Investors Exchange LLC, Nasdaq BX, Inc., Nasdaq ISE, LLC, Nasdaq PHLX LLC, Nasdaq Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc. (collectively, the "Participants").

[30] Bodie, Zvi, Alex Kane and Alan J. Marcus, *Investments*, McGraw-Hill/Irwin, 7th Ed., 2008, Ch. 3, pp. 73, 74.

securities exchange brings together many thousands (or millions) of investors, trading prices reflect a consensus opinion as to a security's value.

21.     As is the case with all NASDAQ-listed equities, Mylan stock also traded on other national securities markets as well as Alternative Trading Systems ("ATS") in the U.S. during the Class Period.  SEC Regulation NMS requires all trading centers in the U.S. "to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the execution of trades at prices inferior to protected quotations displayed by other trading centers."[31]  According to the SEC:

> The NMS is premised on promoting fair competition among individual markets, while at the same time assuring that all of these markets are linked together, through facilities and rules, in a unified system that promotes interaction among the orders of buyers and sellers in a particular NMS stock.  The NMS thereby incorporates two distinct types of competition – competition among individual markets and competition among individual orders – that together contribute to efficient markets.  Vigorous competition among markets promotes more efficient and innovative trading services, while integrated competition among orders promotes more efficient pricing of individual stocks for all types of orders, large and small.  Together, they produce markets that offer the greatest benefits for investors and listed companies.[32]

22.     The market for securities trading on the NASDAQ is widely recognized as efficient.  At least one authority has commented that:

> at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[33]

---

[31] SEC Regulation NMS, Securities Exchange Act Release No. 51808 (Jun. 9, 2005), 70 FR 37496 (Jun. 29, 2005) at 37496.

[32] *Id.*, at 37498–9.

[33] Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, Section 8.6 (Aug. 1988) (quoted in *Cammer*, 711 F. Supp. at 1292).

Similarly, the court in *Cammer* stated:

> some may concur with [Defendant's] suggestion … that companies listed on national stock exchanges or companies entitled to issue new securities using SEC Form S-3 would almost by definition involve stocks trading in an "open and developed" market.[34]

23.    The fact that Mylan stock was listed and traded on a major exchange supports my conclusion that the market for the stock was efficient during the Class Period.  Furthermore, my analyses of the efficiency factors set forth below confirm the attributes of market efficiency that Mylan's listing on the NASDAQ strongly implies.

### A.  *Cammer* Factor 1: Weekly Trading Volume

24.    A market for a security is liquid if investors can trade a large number of shares on demand.  Liquidity allows investors to buy and sell shares quickly when their assessments about the value of a company have changed, facilitating the prompt price reaction to new, material information that is characteristic of an efficient market.  The large weekly trading volume of Mylan stock during the Class Period indicates the presence of a liquid market.

25.    According to the *Cammer* decision:

> [T]he existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market … because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.[35]

26.    Under *Cammer*, "turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an

---

[34] *Cammer*, 711 F. Supp. at 1276–1277.

[35] *Cammer*, 711 F. Supp. at 1286.

efficient one; 1% would justify a substantial presumption."[36]  During the Class Period, the total

number of Mylan shares issued and outstanding ranged from approximately 371.9 million to

536.4 million shares.[37]  The average weekly reported trading volume for the shares, excluding

weeks not entirely contained within the Class Period, was as follows:[38]

| Mylan Stock | |
|---|---|
| Average Weekly Trading Volume in Dollars | $1,088,584,760 |
| Average Weekly Trading Volume in Shares | 26,662,112 |
| Average Weekly Share Trading Volume as a % of Shares Outstanding | 5.8% |

Thus, the average weekly reported trading volume for Mylan stock is nearly three times the 2%

"strong presumption" of market efficiency set out by *Cammer*.

27.     The high trading volume observed during the Class Period demonstrates an actively

traded market for Mylan stock, showing significant investor interest in the Company and

implying a likelihood that many investors executed trades on the basis of newly available or

disseminated corporate information.  These circumstances support my conclusion that Mylan

stock traded in an efficient market during the Class Period.

### B.  *Cammer* Factor 2: Number of Securities Analysts

28.     In demonstrating market efficiency, the *Cammer* decision states:

> [I]t would be persuasive to allege a significant number of securities analysts
> followed and reported on a company's stock during the class period.  The
> existence of such analysts would imply, for example, the [auditor's] reports were
> closely reviewed by investment professionals, who would in turn make buy/sell
> recommendations to client investors. [] In this way the market price of the stock

---

[36] *Cammer*, 711 F. Supp. at 1293, quoting *Bromberg*.

[37] Source: Bloomberg.

[38] *See* Exhibit 4 for a summary of weekly trading volume and shares outstanding.

would be bid up or down to reflect the financial information contained in the [auditor's] reports, as interpreted by the securities analysts.[39]

29.     Securities analysts research and report to investors on the financial condition and prospects of a covered company.  Analysts are conduits to the market for information collected from on-site visits, conference calls accompanying key company announcements, and other contacts with senior management.  Analysts can channel new information to the market rapidly through their published reports, online reporting services, and alerts given to clients and other employees of the same investment firm.  Analysts thus facilitate the dissemination of new information to investors and any corresponding share price reaction.

30.     During the Class Period, several well-known investment firms followed and published research reports on Mylan, including, but not limited to: Bank of America Merrill Lynch; Bank of Jerusalem; Barclays; BMO Capital Markets; BTIG; Canaccord Genuity; Cantor Fitzgerald; Citi; Cowen and Company; Credit Suisse; CRT Capital; Deutsche Bank; Edelweiss Capital Limited; Evercore ISI; Gordon Haskett; Guggenheim Securities LLC; Jefferies; JPMorgan; Morgan Stanley; Morningstar; Needham; Oppenheimer & Co., Inc.; Piper Jaffray; RBC Capital Markets; SunTrust Robinson Humphrey Capital Markets; Susquehanna Financial Group LLLP; SVB Leerink; The Buckingham Research Group; UBS Equities; and Wells Fargo Securities, LLC.[40]  Over 2,900 analyst reports pertaining to Mylan were issued during the Class Period.[41]

---

[39] *Cammer*, 711 F. Supp. at 1286.

[40] *See* Exhibit 5A.

[41] Exhibit 5B lists research reports on Mylan available from Thomson Reuters Eikon, Thomson Reuters Knowledge, and Bloomberg.  These reports are only a subset of all reports pertaining to Mylan published during the Class Period.  Certain restricted databases may carry research reports pertaining to Mylan that are not included in Exhibit 5B.  Furthermore, it is my understanding that certain analyst firms do not make all their reports available through historical and/or public databases.

According to Bloomberg, the following investment firms also followed and issued reports on Mylan during the Class Period: Ameriprise Advisor Services, Inc; Collins Stewart; Goldman Sachs; ISS-EVA; Jyske Bank; Makor Capital; Mizuho Securities USA Inc; Raymond James; S&P Capital IQ; Shore Capital Stockbrokers; and Value Investment Principals.[42]  In addition, Calcion and Sanford C. Bernstein & Company, participated in at least one of the Company's conference calls during the Class Period.[43]

31.     Investors also received information and analyses about Mylan during the Class Period via media coverage, investor conferences, trade magazines, Company presentations and SEC filings. Specifically, articles concerning Mylan appeared in major domestic and international news media, including: *ACCESSWIRE*; *Barron's*; *Benzinga.com*; *Bloomberg*; *Business Wire*; *Canada Newswire*; *CNN*; *CQ FD Disclosure (U.S.)*; *Daily Mail*; *Dow Jones Newswires*; *Drug Industry Daily*; *Drug Store News*; *ENP Newswire*; *Express Pharma*; *FinancialWire (U.S.)*; *Forbes*; *GlobalData*; *GlobeNewswire (U.S.)*; *Investor's Business Daily (U.S.)*; *Los Angeles Times*; *M2 Presswire*; *MarketLine*; *MarketWatch*; *National Post*; *New York Law Journal*; *New York Post*; *News Bites*; *PR Newswire*; *Regulatory News Service (U.K.)*; *Reuters*; *RTT News (U.S.)*; *SeekingAlpha*; *SeeNews Pharmaceuticals*; *SNL Financial*; *StockWatch*; *The Associated Press*; *The Boston Globe*; *The Canadian Press*; *The Independent*; *The New York Times*; *The Telegraph*

---

[42] *See* Exhibit 5C, which lists analysts' price targets and rating actions on selected event dates during the Class Period, as reported by Bloomberg.

[43] *See, e.g., Thomson Reuters StreetEvents*, "MYL – Mylan Inc. Investor Day, Event Date/Time: February 21, 2012 / 6:00PM GMT"; *Thomson Reuters StreetEvents*, "MYL - Mylan NV at Sanford C Bernstein Strategic Decisions Conference, Event Date/Time: May 29, 2015 / 1:00PM GMT."

(U.K.); *The Times of India*; *The Wall Street Journal*; *Theflyonthewall.com*; *US Fed News*; *USA Today*; and the *Washington Post*.[44]

32.     In addition, Mylan's filings with the SEC were publicly available online during the Class Period at no cost.[45]  Mylan's SEC filings during the Class Period included its consolidated quarterly and year-end financial statements and Company press releases.[46]  Mylan's financial statements, press releases and SEC filings are also made available on the Company's website.[47]

33.     The coverage of Mylan by securities analysts and the amount of public reporting on Mylan during the Class Period indicate that Company-specific news was widely disseminated to investors, thereby facilitating the incorporation of such information into the market price of Mylan stock.  Accordingly, this factor supports my conclusion that Mylan stock traded in an efficient market during the Class Period.

### C. *Cammer* Factor 3: Number of Market Makers and the Potential for Arbitrage

34.     The third *Cammer* factor concerns the existence of market makers and arbitrageurs who can react quickly to news and facilitate trading.  As discussed below, the fact that trading in Mylan stock was facilitated by numerous market makers, and the fact that investors could have exploited arbitrage opportunities during the Class Period, support a finding of market efficiency.

<u>Market Makers</u>

35.     Market makers enable investors to trade promptly upon the arrival of new, relevant information, thereby facilitating the incorporation of new information into securities prices.

---

[44] Sources: Dow Jones' Factiva (www.factiva.com); Bloomberg; internet search.

[45] The SEC's EDGAR website is located at http://www.sec.gov/edgar.shtml.

[46] Exhibit 6 includes a list of Mylan's filings with the SEC during the Class Period.

[47] *See* http://investor.mylan.com/financial-information/quarterly-results.

Mylan stock was listed and traded on the NASDAQ.  NASDAQ market participants are made up of market makers, order entry firms, and alternative trading systems that include electronic communication networks and unlisted trading privileges exchanges.  "NASDAQ allows all participants equal access to the market and to market information through a simultaneous broadcast of quotes over computer terminals" to over 1.2 million users in 83 countries.[48]  Market makers are independent dealers competing for investor orders by displaying buy and sell interest in NASDAQ-listed securities.  Market makers help to ensure a liquid market for a particular stock; a market in which willing buyers can readily find willing sellers, and vice versa.  Market makers in a particular stock stand ready to provide stock price quotations and facilitate trading by purchasing that stock from and selling to investors.  They also buy and sell shares and may increase or reduce their inventory when pricing discrepancies exist.  Market makers display both buy and sell quotes in all securities in which they choose to make a market and are subject to disciplinary action if they fail to honor their quoted prices.[49]  Market efficiency can be facilitated by market maker involvement.

36.      I obtained NASDAQ market maker activity in Mylan stock from Bloomberg.  During the Class Period, there were more than 350 active market makers that traded Mylan stock (data reported monthly from February 2012 through May 2019, inclusive).  In addition, many of the market makers that facilitated trading in Mylan stock handled a sizeable volume of shares.[50]  The substantial number of market makers for Mylan stock supports my conclusion that the market was efficient during the Class Period.

---

[48] "About NASDAQ," http://www.nasdaq.com/about/about.pdf, p. 44.

[49] *Id.*, pp. 44–46.

[50] *See* Exhibit 7 for the share volume by market maker for Mylan stock.

Arbitrage Activity

37.     Related to *Cammer* Factor 3 is the existence of arbitrageurs, sophisticated investors who can act rapidly to take advantage of security pricing discrepancies.  Arbitrageurs ensure that market prices reflect public information—the fundamental hallmark of market efficiency.[51]  As I demonstrate below, the level of short interest, the degree of institutional ownership and the tightness of bid/ask spreads[52] suggest that arbitrage activity for the Company's stock was prevalent during the Class Period.

38.     One way in which arbitrageurs can exploit mispricing in the market is by engaging in short-sale transactions.  A short sale is a transaction in which an investor sells a stock that he or she does not own and then purchases that stock back in the future.  If the price declines between the time a security is sold short and the time it is purchased, the short seller realizes a gain.  Thus, short selling is an advantageous strategy if an arbitrageur expects a security's price to

---

[51] Arbitrage has been defined as:

> … the process of earning riskless profits by taking advantage of differential pricing for the same physical asset or security.  As a widely applied investment tactic, arbitrage typically entails the sale of a security at a relatively high price and the simultaneous purchase of the same security (or its functional equivalent) at a relatively low price.

> Arbitrage activity is a critical element of modern, efficient security markets. Because arbitrage profits are by definition riskless, all investors have an incentive to take advantage of them whenever they are discovered.  Granted, some investors have greater resources and inclination to engage in arbitrage than others. However, it takes relatively few of these active investors to exploit arbitrage situations and, by their buying and selling actions, eliminate these profit opportunities.  (Sharpe, William F., et al., *Investments,* Prentice Hall, 6th Ed., 1999, p. 284.)

[52] Mylan's bid/ask spreads are discussed in Section VI.G.

decline in the future.[53]  Furthermore, short sales allow arbitrageurs that currently do not own a security to convey their opinions to the market, thereby helping the market to achieve a consensus as to that security's fair value given all publicly available information.

39.     Arbitrageurs were not constrained in their ability to short shares of Mylan stock.  During the Class Period, the average U.S. short interest as a percentage of float was 3.8%.[54]  Similarly, economist Gene D'Avolio found that short interest was, on average, 2.30% of shares outstanding for companies listed in the United States during the period April 2000 to September 2001.[55] D'Avolio also estimated that as much as one-quarter of the U.S. market capitalization was available as loan supply for short-selling and that only 7% of that capacity was utilized, thereby indicating that "[t]he aggregate market is easy to borrow."[56]  In comparison, the average short interest for Mylan stock during the Class Period was 6.2% of both its shares outstanding and public float.[57, 58]

---

[53] Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, Pearson Education, Inc., 1st Ed., 2007, Ch. 11, p. 339.

[54] Bloomberg (*see* Exhibit 8A).

[55] D'Avolio, Gene, 2002, "The market for borrowing stock," *Journal of Financial Economics*, Vol. 66, pp. 271–306.

[56] *Id*., p. 273.

[57] *See* Exhibit 8B for a summary of short interest for Mylan stock during the Class Period. Public float is equal to shares outstanding less insider holdings.  A comparison of short interest to public float is relevant as public float represents the shares available to lend for short sales.

[58] FINRA (the Financial Industry Regulatory Authority) was created in July 2007 from the consolidation of the NASD and various regulatory functions of the NYSE.  It is a non-governmental organization that regulates member brokerage firms and exchange markets, and is overseen by the SEC, the ultimate regulator of the U.S. securities industry, including FINRA. (*See* http://www.finra.org/newsroom/2007/nasd-and-nyse-member-regulation-combine-form-financial-industry-regulatory-authority.)  "Every firm and broker that sells securities to the public in the United States must be licensed and registered by FINRA."  (*See* http://www.finra.org/industry/member-regulation.)  Pursuant to FINRA Rule 4560:

40.     Institutional ownership is another indicator of arbitrage activity in so far as institutional investors, such as pension funds, mutual funds and investment banks, are generally considered to be sophisticated investors that have ready access to minute-to-minute financial news and to online bulletins from analysts.  Relative to most individual investors, institutional investors have significantly greater resources with which to analyze financial information pertinent to the securities in which they invest.  Institutional ownership implies that investment professionals actively review company-specific financial information and, in turn, make buy/sell recommendations to their firm and/or client investors.  In this way, investors bid up or down the market price of a security to reflect all publicly available information, as interpreted by institutional investors.  Moreover, because short sellers often borrow shares from institutions, a high degree of institutional ownership relative to the level of short interest indicates a lack of short-sale constraints, thereby facilitating market efficiency by enabling arbitrageurs to engage in short selling.[59]

41.     According to data provided by Thomson Reuters Eikon, institutions held over 83% of Mylan's public float during the Class Period, and between 636 and 1,006 institutional investors

---

member firms are required to report total short positions in all customer and proprietary firm accounts in all equity securities to FINRA on a bi-monthly basis. These filings are made online using the Short Interest reporting system accessible via Firm Gateway at firms.finra.org … Member firms that have short positions in OTC equity securities and in securities listed on a national securities exchange, such as NASDAQ, NYSE, NYSE American, NYSE Arca, Cboe BZX, and IEX, must file a Short Position Report with FINRA via the Web-based system.  (*See* http://www.finra.org /industry/short-interest/short-interest-reporting-instructions.)

[59] Asquith, Paul, Parag A. Pathak and Jay R. Ritter, 2005, "Short interest, institutional ownership and stock returns," *Journal of Financial Economics*, Vol. 78, pp. 243–76.  Asquith, et al., find that "[i]n a typical year, there are 5,500 domestic operating companies trading on the NYSE, Amex, and the Nasdaq National Market System.  For these stocks, … institutional ownership is greater than short sales for 95% of stocks, suggesting that short-sale constraints are not common."  (*Id.*, p. 245.)

held Mylan stock at the end of each quarter during the Class Period.[60]  Additionally, institutional

holdings were, on average, over 15 times the level of short interest in Mylan stock during the

Class Period, indicating that short selling was not constrained.[61]

### D. *Cammer* Factor 4: Eligibility to File SEC Form S-3

42.     The *Cammer* court discussed the relationship between S-3 eligibility and efficiency,

noting that "[t]he issue is not whether [the company] recently completed a public offering, but

whether, if it did, it would enjoy the benefit of making abbreviated prospectus disclosure because

the SEC viewed it to be in an efficient market where documents 'on file' could be deemed to be

known by the investment community."[62]

43.     Form S-3 is a simplified registration form that may be used by U.S. companies that meet

the following requirements:

    a.  it has been subject to the Securities Exchange Act of 1934 reporting requirements for
        more than one year;

    b.  it has filed all required documents in a timely manner during the prior twelve months;

    c.  it has not, since the last audited statements, failed to pay required dividends or sinking
        fund installments on preferred stock, or defaulted on debts or material leases; and

    d.  it meets certain minimum stock requirements.[63, 64]

---

[60] Institutions which file Form 13F with the SEC report shares held as of the end of each calendar quarter.  *See* Exhibit 9 for a summary of institutional holdings for Mylan stock during the Class Period.

[61] The average number of shares held by institutions for quarters ended during the Class Period was approximately 415.5 million shares; the average short interest during the Class Period was approximately 27.5 million shares.

[62] *Cammer*, 711 F. Supp. at 1284.

[63] http://www.sec.gov/about/forms/forms-3.pdf.

[64] Prior to January 28, 2008, the SEC required a minimum of $75 million in stock be held by non-affiliates.  Effective January 28, 2008, a company with a non-affiliate public float of less than $75 million is permitted to file Form S-3 with certain restrictions.  (*See* Securities and Exchange Commission, 17 CFR Parts 230 and 239 [Release No. 33-8878; File No. S7-10-07],

Companies eligible for filing on Form S-3 are permitted to incorporate prior filings by reference into current filings and need not repeat such information since it is already widely publicly available.

44.     It is the SEC's view that these Form S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—have already disseminated information to the marketplace, and, therefore, that the market operates efficiently for them.[65] Certain courts have also stated that the ability to file Form S-3 is an indicator of market efficiency:

> Corporations permitted to use the S-3 form are thus presumed to be actively traded and widely followed.  *See Harman*, 122 F.R.D. at 525.  Therefore, a company's ability to file an S-3 Registration Statement points to market efficiency.[66]

45.     Mylan Inc., predecessor to Mylan N.V., filed automatic shelf registration statements with the SEC on Form S-3ASR both prior to and during the Class Period, and Mylan N.V. filed Form S-3ASRs during the Class Period, indicating the Company was eligible to file Form S-3 throughout the Class Period.[67]  That Mylan was eligible to file Form S-3 throughout the Class Period supports my conclusion that the market for its stock was efficient during that time.

---

RIN 3235-AJ89, Revisions to the Eligibility Requirements for Primary, Securities Offerings on Forms S-3 and F-3.)

[65] SEC Securities Act Release No. 6331 (August 18, 1981), pp. 5, 6.

[66] *Krogman,* 202 F.R.D. at 476.

[67] Mylan Inc. filed SEC Form S-3ASR on: February 20, 2007; May 20, 2010; and June 13, 2013. Mylan N.V. filed SEC Form S-3ASR on: February 27, 2015 and September 14, 2015.  (Source: Edgar Pro, http://pro.edgar-online.com/.)

### E. *Cammer* Factor 5: Empirical Facts Showing a Cause-and-Effect Relationship Between Unexpected Corporate Events or Financial Releases and the Price Reaction of Mylan Stock

46.     *Cammer* Factor 5 relates to how a security's price reacts to new, material information. The *Cammer* court stated that:

> … one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between the company disclosures and resulting movements in stock price.[68]

47.     A direct test of market efficiency is to conduct what is known as an "event study" to examine whether security prices respond to new, material information released to the market. Expert economists commonly use an event study in securities litigation to correlate the disclosure of new, material information to security price response.  Event studies comprise numerous steps, including: (i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v)

---

[68] *Cammer*, 711 F. Supp. at 1291.

interpretation of empirical results.[69]  Academic research acknowledges that some variation in approaches to event studies is permitted.[70]

48.      I performed a standard event study for Mylan stock to determine whether new, material corporate events or financial releases promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects.  As set forth in Exhibit 10, my event study demonstrates a cause-and-effect relationship between new, material Company-specific disclosures and resulting movements in Mylan's stock price during the Class Period. The regression analyses used in the event study, from which I have estimated Mylan's Company-specific returns (*i.e.*, returns net of market and industry effects), are described in Appendix A and Exhibit 11.[71]

---

[69] As described by Mitchell and Netter (1994):

> The execution of an event study is quite simple.  It involves the identification of an event that causes investors to change their expectations about the value of a firm.  The investigator compares a stock price movement contemporaneous with the event to the expected stock price movement if the event had not taken place. There are three basic steps in conducting an event study: (i) define the event window; (ii) calculate abnormal stock price performance around the event; and (iii) test for statistical significance of the abnormal stock price performance.

*See* Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 557, 558.

[70] However, "[w]hile there is no unique structure, the analysis can be viewed as having seven steps."  Those steps are event definition, selection criteria, normal and abnormal returns, estimation procedure, testing procedure, empirical results, and interpretation and conclusion.  *See* Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, pp. 150–152.

[71] My estimated regression equations appear in Exhibit 11A.  Exhibit 11B shows Mylan's expected and residual returns estimated from the regression models on each day of the Class Period.

49.     To determine which events to include in my analysis, I relied on my knowledge of a large

body of event-study literature that has evaluated what types of information affect stock prices.[72]

Specifically, I examined dates on which Mylan released quarterly or year-end financial results.

Such earnings-related announcements are an objective set of events to examine, which has been

shown in the academic finance literature to impact stock prices.[73]  Exhibit 10 describes each of

my selected event dates in detail and discusses how the observed Company-specific price

reactions in Mylan stock are consistent with those expected in an efficient stock market.[74]

50.     Out of the 30 events I examined, 14 (*i.e.*, 46.7%) are associated with a statistically

significant Company-specific return at or above the 95% confidence level (eight statistically

significant positive returns, six statistically significant negative returns).[75, 76]  At the 95% level of

confidence, a statistically significant return is expected to occur 5% of the time.  Thus, one

should expect a random sample of 30 days to contain 1.5 days with a return that is statistically

---

[72] *See*, *e.g.*, Fama, Eugene F., 1991, "Efficient Capital Markets: II," *The Journal of Finance*, Vol. 46, No. 5, pp. 1575–1617.

[73] *See*, *e.g.*, Ball, R., and P. Brown, 1968, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, pp. 159–78.

[74] For each event date, Exhibit 10 contains the associated stock price movements, both observed and net of market and industry effects, as well as indicators of statistical significance at the 90% and 95% confidence level.

[75] The eight statistically significant positive impact dates are: July 26, 2012 (2nd Quarter 2012 Results); October 25, 2012 (3rd Quarter 2012 Results); February 28, 2013 (4th Quarter/Year-end 2012 Results); February 27, 2014 (4th Quarter/Year-end 2013 Results); August 6, 2015 (2nd Quarter 2015 Results); March 1, 2017 (4th Quarter/Year-end 2016 Results); November 6, 2017 (3rd Quarter 2017 Results); and November 6, 2018 (3rd Quarter 2018 Results).  The six statistically significant negative impact dates are: February 21, 2012 (4th Quarter/Year-end 2011 Results); March 3, 2015 (4th Quarter/Year-end 2014 Results); February 11, 2016 (4th Quarter/Year-end 2015 Results); November 10, 2016 (3rd Quarter 2016 Results); February 27, 2019 (4th Quarter/Year-end 2018 Results); and May 7, 2019 (1st Quarter 2019 Results).

[76] May 1, 2014 (1st Quarter 2014 Results) is statistically significant at the 91.6% confidence level.

significant at the 95% confidence level.  Given that my sample contains more than 9 times as many statistically significant dates as should be expected from a randomly selected 30-day sample (at or above the 95% confidence level), my analysis confirms that Mylan's stock price typically reacted more strongly on event dates than on non-event dates.  Moreover, the estimated probability of observing a statistically significant Company-specific return (at or above the 95% confidence level) on event dates is 46.7% (*i.e.*, 14 out of 30 event dates), while the estimated probability of observing a statistically significant Company-specific return (at or above the 95% confidence level) on non-event dates is 6.1% (*i.e.*, 109 out of 1,797 non-event dates).  Statistical tests of the difference between these two estimated probabilities strongly reject the null hypothesis that event dates and non-event dates are equally likely to be associated with statistically significant Company-specific returns (at or above the 95% confidence level). Indeed, both the "two-sample *z*-test" and "Fisher's exact test," which are commonly used to conduct hypothesis tests for differences between proportions observed in categorical data, reject the null hypothesis ($p$-value $< 0.00000001$) in favor of the alternative that there exists a higher probability of observing statistically significant Company-specific returns (at or above the 95% confidence level) on event dates.[77]

51.     Furthermore, although directionality may not be required to show general market efficiency for purposes of a securities class action,[78] my review of the news and analysts' reports demonstrates that the direction of the Company-specific return observed on each event date was

---

[77] *See, e.g.*, Agresti, Alan, An Introduction to Categorical Data Analysis, John Wiley & Sons, Inc., 2nd Ed., 2007, Ch. 2 Contingency Tables, pp. 21–64.

[78] *See, e.g., In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017) (stating that district court finding that directionality was not required was "within the range of permissible decisions"); *Wilson v. LSB Indus.*, 2018 U.S. Dist. LEXIS 138832, at *40 (S.D.N.Y. Aug. 13, 2018) (lack of directionality analysis did not impair usefulness of market efficiency report).

consistent with that expected in an efficient market, thereby providing additional evidence of efficiency.  Specifically, the event dates on which predominantly *positive* Company-specific news reached the market are associated with a statistically significant *positive* return.  The event dates on which predominantly *negative* Company-specific news reached the market are associated with a statistically significant *negative* return.  On event days that are associated with a statistically insignificant Company-specific return,[79] the Company's financial results were generally in line with expectations, and/or conveyed a mix of offsetting positive and negative information, such that the insignificant stock price reaction is consistent with that expected in an efficient market.  Thus, my event study finds that a strong cause-and-effect relationship existed between the information disclosed on the event dates during the Class Period and resulting stock price movements.

52.     Based on the event study performed, I find that Mylan's stock price reflected the information disclosed to the market, and promptly responded to the disclosure of new, material, unexpected information, thereby supporting my conclusion that the market for Mylan stock was efficient throughout the Class Period.

### F.  Additional Factor 1: Market Capitalization

53.     Courts have found that a large market capitalization (*i.e.*, the total value of a company's equity) is an indicator of market efficiency because investors have a greater incentive to purchase the stock of more highly capitalized corporations.[80]  I have discussed above the fact that Mylan

---

[79] The 15 statistically insignificant impact dates are: April 26, 2012; May 3, 2013; August 1, 2013; October 31, 2013; August 7, 2014; October 31, 2014; May 6, 2015; October 30, 2015; May 3, 2016; August 10, 2016; May 10, 2017; August 9, 2017; March 1, 2018; May 9, 2018; and August 8, 2018.

[80] *Krogman*, 202 F.R.D. at 478.

stock exhibited a high degree of institutional ownership and was widely followed by analysts. This is consistent with Mylan's sizeable market capitalization.  During the Class Period, the Company's market capitalization ranged between $8.85 billion (in May 2012) and $37.22 billion (in April 2015).[81]

54.     By comparison, the median market capitalization of the roughly 1,600 companies listed on the NYSE was $2.13 billion at the end of the Class Period, while the median market capitalization of the roughly 2,400 companies listed on the NASDAQ was approximately $347.6 million at the end of the Class Period.  As of May 24, 2019, *i.e.*, the end of the Class Period, Mylan's equity market capitalization was greater than 78.1% and 93.7% of NYSE-listed and NASDAQ-listed stocks, respectively.  Accordingly, Mylan's market capitalization during the Class Period weighs in favor of a finding of market efficiency.

### G.  Additional Factor 2: Bid/Ask Spread

55.     Another indicator of the potential for arbitrage activity to correct market inefficiencies (*i.e.*, arbitrage opportunities) is the size of bid/ask spreads.[82]  Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily.  As shown in the following table, the average and median bid/ask spreads on Mylan stock during the Class Period were smaller than those of a random sample of stocks listed on the NASDAQ Global Select Market.[83]

---

[81] *See* Exhibit 12.

[82] *Unger*, 401 F.3d 316 at 323, *Krogman*, 202 F.R.D. at 478.

[83] The bid/ask spread analysis reported in Exhibit 13 compares the bid/ask spreads of Mylan stock on each day during the Class Period to those of 100 randomly selected stocks listed on the NASDAQ Global Select Market.

|  | Mylan Stock | | NASDAQ Sample | |
|---|---|---|---|---|
|  | Spread ($) | Spread (%) | Spread ($) | Spread (%) |
| Average: | $0.01 | 0.03% | $0.04 | 0.18% |
| Median: | $0.01 | 0.03% | $0.03 | 0.13% |

56.     The fact that Mylan's bid/ask spreads were narrower than those of other stocks listed on the NASDAQ Global Select Market supports my conclusion that Mylan stock traded in an efficient market during the Class Period.

### H.  Additional Factor 3: Public Float

57.     Courts have held that a large public float percentage (*i.e.*, the percentage of shares outstanding held by the public rather than insiders) may be an indicator of market efficiency.[84] During the Class Period, on average, there were approximately 463.7 million Mylan shares outstanding, and insiders held approximately 3.44 million of those shares.  Accordingly, the public float of Mylan stock was, on average, 99.3% of total shares outstanding during the Class Period.[85]

58.     The fact that that majority of the shares were held by the public as opposed to Company insiders throughout the Class Period supports a conclusion that Mylan stock traded in an efficient market during that time.

### VII.    Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Plaintiffs' Theory of Liability

59.     I have not, as of yet, been asked to provide an opinion on loss causation or to calculate Class-wide damages in this matter.  I have been asked, however, to opine on whether damages can be calculated on a Class-wide basis under §10(b) of the Exchange Act for all purchases of Mylan stock during the Class Period in a manner consistent with Plaintiffs' theory of liability.

---

[84] *Unger*, 401 F.3d at 323; *Bell*, 422 F.3d at 313 n.10; *Krogman*, 202 F.R.D. at 478; *O'Neil*, 165 F.R.D. at 503.

[85] *See* Exhibit 14.

60.     In what follows, I set forth the general economic framework for quantifying per-share damages on a Class-wide basis, which reflect methodologies I would propose to use if asked to calculate damages in this matter.  Although damages, if any, for each individual Class member may vary, the methodologies for calculating damages described below would be commonly applicable to each Class member in this matter.

61.     An investor incurs damages when a security is acquired at a price that is inflated as a result of false or misleading statements or omissions, provided that a later corrective disclosure and/or the materialization of a concealed risk causes the price of that security to decline.[86]  Price inflation in a security can be created by material misrepresentations and/or omissions on or before the date of purchase, which remain uncorrected in whole or in part at the time of purchase.  Damages may be mitigated if the security is sold before the price inflation is fully dissipated, given that the investor receives the benefit of any inflation remaining at the date of sale.[87]

62.     Price inflation may be measured on a Class-wide basis by analyzing the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk.[88] The decline in a security's price in response to such events reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions.  An event study can be used to isolate Company-specific price movement caused by the revelation of true facts related to the

---

[86] *See, e.g.*, Gold, Kevin L., Eric Korman and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," *Litigation Services Handbook, The Role of the Financial Expert*, 6th Ed., Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017, Ch. 27, pp. 12–17.

[87] This general economic framework for calculating recoverable damages for a class of shareholders is often referred to as the "out-of-pocket measure of damages."  (*Ibid.*)

[88] *Ibid.*

alleged fraud from price movement caused by other factors. Other factors can include changes in market and industry conditions or the dissemination of material, non-fraud-related, Company-specific information. This event study analysis applies to all Class members, regardless of the extent to which the price movement is due to corrective disclosures and/or the materialization of a concealed risk. After isolating the price impact of the alleged misstatements and omissions, one can estimate the price inflation due to the alleged fraud for each day during the Class Period, and on a Class-wide basis for each member of the Class.[89, 90]

---

[89] "Price impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud." *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013), *vacated and remanded on other grounds*, *Halliburton II*, 134 S. Ct. 2398 (U.S. 2014).

[90] *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal citations omitted):

> Performing an event study can thus help an expert to determine at least two things. First, assuming that the defendant company fraudulently concealed information, the event study shows how much money the fraud caused shareholders to lose. Identifying residual returns on days when allegedly concealed information reached the market indicates that the supposedly withheld information caused the company's stock price to change. If the release of allegedly withheld information causes a stock price decrease, shareholders who purchased the defendant company's stock after the alleged fraud but before the revelation may have paid a higher price than they would have but for the defendant's fraudulent conduct — known as an "artificial[ly] inflat[ed]" price.

> Second, the event study helps the expert "calculat[e] what the price of [the defendant company's] security would have been had the alleged wrongful conduct not occurred," by estimating the amount of artificial inflation in the company's stock price over time. Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock. As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections. Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between

63.     Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis.  For each Class member, damages incurred on a security acquired during the Class Period and retained through the end of the Class Period are equal to the amount of inflation at purchase.  For a security acquired during the Class Period and sold later in the Class Period, damages are the price inflation at purchase minus the price inflation at sale.  Given my understanding of the Supreme Court's ruling in *Dura*,[91] a security purchased during the Class Period and sold before the first corrective disclosure and/or the materialization of a concealed risk is ineligible for damages.  Similarly, a security that is both purchased and sold between two consecutive disclosures of corrective information is ineligible for damages.

64.     Finally, per-share damages should also incorporate the so-called "90-day lookback" provision of the Private Securities Litigation Reform Act of 1995,[92] which also can be applied on a Class-wide basis.  This provision applies such that losses on securities purchased during the Class Period and held as of the close of the 90-day period subsequent to the Class Period (the "90-Day Lookback Period") cannot exceed the difference between the purchase price paid for the security and the average price of the security during the 90-Day Lookback Period.  Losses on securities purchased during the Class Period and sold during the 90-Day Lookback Period cannot exceed the difference between the purchase price paid for the security and the rolling average price of the security during the portion of the 90-Day Lookback Period elapsed as of the date of

---

what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.

[91] *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*").

[92] 15 U.S.C. § 78u–4(e).

sale.  Section 10(b) damages incurred by purchasers of Mylan stock during the Class Period can

be calculated on a Class-wide basis in this manner.

**VIII.   Conclusion**

65.      In summary, the market for Mylan stock was efficient throughout the Class Period.  In

addition, damages can be calculated for investors who purchased Mylan stock during the Class

Period using a method that is common to the Class and in a manner consistent with Plaintiffs'

theory of liability.

66.      My work in this matter is ongoing.  My opinions in this Report are subject to refinement

or revision based on analysis of new information which may be provided to me, including the

opinions of other experts, receipt of additional documents and data, and based on further analysis

of the data and materials described herein.  I understand that discovery is ongoing.  Should

additional relevant information be provided to me, my opinions may be supplemented at a later

date.

Executed on August 29, 2019, at Redwood City, California.

Zachary Nye, Ph.D.

**Appendix A: Description of Regression Analyses**

67.　　For the purposes of examining market efficiency, I have conducted an event study to determine whether new, material, Company-specific information promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects.  In an effort to isolate Company-specific effects that influenced Mylan's stock price during the Class Period, I performed regression analyses to measure the relationship between Mylan stock returns and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) changes in industry-wide factors that would be expected to impact stocks in the "Generic Pharmaceuticals" industry.  By measuring how Mylan stock returns move in relation to an overall market index and an industry index, I can also measure how it responds to Company-specific news.

68.　　For each event date, the "Control Period" used to estimate the regression equation is the calendar year immediately preceding the impact date (*i.e.*, the first trading day on which the information disclosed could have impacted the market price).[93, 94]  To be consistent with the

---

[93] Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 545–90 at p. 568:

> The market model is estimated with regression analysis.  The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study.

[94] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15:

> Given the selection of a normal performance model, the estimation window needs to be defined.  The most common choice, when feasible, is using the period prior to the event window for the estimation window.  For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.  Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.

academic literature, each of my Control Periods excludes the event dates under study.[95, 96]

Further, in order to mitigate the disclosure of the alleged fraud from contaminating my normal

return measure, and in turn my estimate of abnormal return volatility, each of my Control

Periods excludes the corrective events alleged in the Complaint.[97, 98, 99]

69.     The market index used is the S&P 500, which "includes 500 leading companies and

captures approximately 80% coverage of available market capitalization."[100]  This broad-based

market index is commonly used by economists as a representation of the overall market, which is

---

[95] *See* Exhibit 10 for a list of all the events under study.

[96] *See, e.g.*, MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15; and Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, p. 152.

[97] Complaint, ¶¶545–577.

[98] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 at p. 15:

> Appraisal of the event's impact requires a measure of the abnormal return.  The abnormal return is the actual ex post return of the security over the event window minus the normal return of the firm over the event window.  The normal return is defined as the expected return without conditioning on the event taking place.

[99] Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, p. 158:

> It is typical for the estimation window and the event window not to overlap.  This design provides estimators for the parameters of the normal return model which are not influenced by the event-related returns.  Including the event window in the estimation of the normal model parameters could lead to the event returns having a large influence on the normal return measure.  In this situation both the normal returns and the abnormal returns would reflect the impact of the event.  This would be problematic since the methodology is built around the assumption that the event impact is captured by the abnormal returns.

[100] http://www.spindices.com/indices/equity/sp-500.

theoretically required by the Capital Asset Pricing Model ("CAPM"), for which famed financial

economist, William Sharpe, won a Nobel Prize.[101]

70.     In addition to market-wide factors, my regression analyses also measure the relationship

between Mylan stock returns and changes in industry-wide factors that would be expected to

impact all stocks in Mylan's particular industry.  In constructing the industry index, I considered:

(i) companies identified as industry competitors in analyst reports published during the Class

Period; (ii) companies identified by the Bloomberg Industry Classification System (BICS) as

operating in the "Generic Pharmaceuticals" industry; and (iii) companies identified as peers in

Mylan's SEC filings issued during the Class Period.  The industry index used in this analysis is

the Dow Jones U.S. Pharmaceuticals Index,[102] to which Mylan compared its stock price

performance in its SEC filings during the Class Period.[103]

71.     My estimated regression equations appear in Exhibit 11A.  As indicated by the *t*-statistics

corresponding to each index, Mylan stock returns exhibited a statistically significant association

with both market index returns and residual industry index returns during the Class Period.[104]

---

[101] The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 1990, Press
Release, http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/1990/press.html:

> An important result is that the expected return on an asset is determined by the
> beta coefficient on the asset, which also measures the covariance between the
> return on the asset and the return on the market portfolio. …The CAPM is
> considered the backbone of modern price theory for financial markets.  It is also
> widely used in empirical analysis, so that the abundance of financial statistical
> data can be utilized systematically and efficiently. …Along with Markowitz'
> portfolio model, the CAPM has also become the framework in textbooks on
> financial economics throughout the world.

[102] Bloomberg ticker symbol "DJUSPRT Index."

[103] *See, e.g.*, Mylan, Inc., SEC Form 10-K for year-end 2011, filed February 21, 2012, p. 49; and
Mylan N.V., SEC Form 10-K for year-end 2018, filed February 27, 2019, p. 39.

[104] Residual industry index returns are the portions of daily returns on the industry index which
are not explained by market effects, as determined from a regression of industry index returns on

Exhibit 11B shows Mylan's expected (*i.e.*, "predicted") and residual (*i.e.*, "Company-specific") returns estimated from the regression models on each day of the Class Period.  Expected returns are those changes in stock prices due to market and industry factors that change the values of all stocks in an economy (market effects) or in a particular industry (industry effects).  Mylan's residual returns are a measure of the change in the stock price due to Company-specific events and are calculated as the difference between Mylan's actual return and its expected return.[105]

---

market index returns during the Control Period.  The use of residual industry index returns rather than raw returns eliminates any statistical problems due to multicollinearity.  (*See* Greene, William H., *Econometric Analysis*, Prentice Hall, 7th Ed., 2012, Ch. 4, p. 89.)

[105] Exhibit 11B also provides the confidence level for each day of the Class Period, which measures the statistical significance of Mylan's residual returns.  The confidence level associated with a given Company-specific return is measured as one minus the "p-value" of that return, where the p-value represents the conditional probability of observing a Company-specific return. Thus, consistent with the standard frequently employed by social scientists, statistical significance in context of securities litigation merely indicates that a given company-specific return is a relatively rare occurrence.  (*See* Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," in Federal Judicial Center, *Reference Manual on Scientific Evidence*, National Academies Press, 3rd Ed., 2011, pp. 250–252: "Statistical significance is determined by comparing a *p* [*i.e.*, the probability of getting data as extreme as, or more extreme than, the actual data—given that the null hypothesis is true] to a preset value, called the significance level." Thus, statistical significance "is merely a label for a certain kind of *p*-value.")