UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MYLAN N.V. SECURITIES
LITIGATION

16-CV-7926 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

A group of plaintiffs brings this putative securities class action against the drug

manufacturer Mylan N.V. and several of its officers (collectively, "Mylan"), in connection with

the alleged misclassification of the EpiPen, a rebate scheme involving the EpiPen, and

anticompetitive activity with respect to various generic drugs. On March 29, 2019, this Court

granted in part and denied in part Mylan's motion to dismiss the prior complaint (Dkt. No. 102),

and Plaintiffs subsequently filed the operative third amended complaint (Dkt. No. 114 ("TAC")).

Mylan now moves for partial dismissal of the third amended complaint. (Dkt. No. 123.)

Plaintiffs move for class certification. (Dkt. No. 129.) For the reasons that follow, the motion to

dismiss is granted in part and denied in part, and the motion for class certification is granted.

## I.      Background

The Court assumes familiarity with the factual background of this case, as set forth in this

Court's prior opinions. (*See* Dkt. No. 69 ("MTD Op. I"); Dkt. No. 102 ("MTD Op. II")).

Accordingly, this Court will simply briefly recount the distinguishing features of the operative

complaint here. The Third Amended Complaint greatly expands the scope of Plaintiffs' price-

fixing and market allocation allegations — alleging that "Mylan engaged in a wide-ranging

scheme to allocate the market and fix the prices for virtually every generic drug that it

marketed." (TAC ¶ 121.) To support that claim, the operative complaint now includes price-

fixing allegations with respect to 32 generic drugs,[1] and market allocation allegations with respect to 7 generic drugs.[2] (*See* TAC ¶¶ 121–422.) The Third Amended Complaint also adds James Nesta, the Vice President of Sales and National Accounts at Mylan, as a Defendant and alleges that he was a "central player in Mylan's market allocation and price-fixing scheme." (TAC ¶¶ 41, 183; *see also* TAC ¶¶ 187, 198, 206, 203.)

## II.    Legal Standard

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).

The Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003)). However, "the tenet that a court must accept as true all of the allegations contained in a

---

[1] Albuterol Sulfate, Benazepril, Clomipramine, Divalproex, Propranolol, Amiloride Hydrochloride, Doxazosin Mesylate, Ketorolac, Levothyroxine Sodium, Loperamide HCL, Methotrexate, Nadolol, Tizanidine, Trifluoperazine HCL, Budesonide DR, Buspirone Hydrochloride, Cimetidine Tablets, Diclofenac Potassium, Diltiazem HCL, Estradiol, Fluoxetine HCL, Flurbiprofen, Fluvastatin Sodium, Haloperidol, Ketoconazole, Ketoprofen, Nitrofurantoin MAC capsules, Pentoxifylline, Prazosin HCL, Prochlorperazine, Tamoxifen Citrate, and Tolmetin Sodium.

[2] Doxy DR, Fenofibrate, Clonidine-TTS Patch, Tolterodine Extended Release, Capecitabine, Enalapril, and Valsartan HCTZ.

complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are [also] subject to the heightened pleading standards established by Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act ("PSLRA")], 15 U.S.C. § 78u-4." *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 322 (S.D.N.Y. 2018). Where a claim alleges "fraud or mistake," Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA requires a claim for securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

## III.    Discussion

### A.    Motion to Dismiss

#### 1.    EpiPen Classification

First, Mylan moves to dismiss Plaintiffs' claims that Mylan's statements that its Medicaid Drug Rebate Program ("MDRP") rebate calculations carried "risk of errors" were misleading. (*See* TAC ¶ 88.) Plaintiffs allege that these statements were misleading because Mylan implied that its rebate calculations could be correct without disclosing that Mylan knew or was reckless in not knowing that it misclassified the EpiPen as a generic drug. (*Id*.) Mylan argues that Plaintiffs have not adequately pleaded either that those statements were in fact misleading or the necessary scienter to support its allegations. (Dkt. No. 124 at 7–10.) As this Court discussed in a previous opinion, to adequately state a claim for the violation of the securities laws for these statements, Plaintiffs "must adequately plead that (1) the EpiPen was, in fact, misclassified, (2) that Mylan knew EpiPen was misclassified, and (3) that Mylan acted with the requisite scienter

in misleading investors about Mylan's knowledge of the misclassification." (MTD Op. I at 24–25.) Indeed, "[i]f Mylan knew for certain that the EpiPen was misclassified, then warning about the 'risk of errors' could have misle[d] a reasonable investor." (MTD Op. I at 20.) In that opinion, this Court held that Plaintiffs had "clear[ed] these high hurdles," and the allegations survived. (MTD Op. I at 25.)

Mylan now argues that intervening law, the Right Rebate Act ("RRA"), Pub. L. No. 116-16, § 6, 133 Stat. 852, 859 (2019), demonstrates that the MDRP was ambiguous at the time that Mylan made the "risk of error" statements at issue. Specifically, Mylan argues that the RRA "resolv[ed] the ambiguity in the MDRP by replacing the term 'original new drug application' in the statute with 'new drug application.'" (Dkt. No. 124 at 9.) Because of this "[c]ongressionally recognized" ambiguity, Mylan first argues that Plaintiffs have not properly pleaded that Mylan knew for certain that the EpiPen was misclassified. (*Id.*) In particular, Mylan points to a document in which the Centers for Medicare & Medicaid Services ("CMS") recognized that the term "original" "created ambiguity." Centers for Medicare & Medicaid Services, Fiscal Year 2016 Justification of Estimates for Appropriations Committees 159, https://www.cms.gov/About-CMS/Agency-Information/PerformanceBudget/Downloads/FY2016-CJ-Final.pdf; (*see* Dkt. No. 124 at 5 & n.7.)[3] Even if this Court finds that Mylan's statements were misleading or false, Mylan posits, Plaintiffs cannot plead the requisite scienter required to sustain its claims because the ambiguity of the statute makes the inference of "a mental state embracing intent to deceive, manipulate, or defraud" not "at least as compelling as any opposing inference of

---

[3] This document is properly considered on a motion to dismiss as a public document that forms part of the RRA's legislative history. *See Ass'n of Home Appliance Mfrs. v. City of New York*, 36 F. Supp. 3d 366, 371 (S.D.N.Y. 2014) ("Judicial notice may be taken of material that is a matter of public record such as legislative history." (citations omitted)).

nonfraudulent intent." (Dkt. No. 124 at 9–10 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 319 (2007)).)

Both of these arguments are unavailing. The RRA was passed for the express purpose of preventing Mylan from misclassifying the EpiPen and other drugs by "[c]los[ing] the loophole that Mylan, and others, exploited by providing [enforcement] authority to the Secretary of HHS." Senate Finance Committee, The Right Rebate Act of 2019, https://www.finance.senate.gov/imo/media/doc/Right%20Rebate%20Act%20of%202019%20On e-pager.pdf.[4] It beggars belief that Mylan would be able to hide behind the RRA in order to defeat Plaintiffs' allegations regarding the "risk of error" statements — statements that have already survived a motion to dismiss in one of this Court's prior opinions. (*See* MTD Op. I at 16–20, 24–26.) And the notion that the deletion of the word "original" constitutes congressional recognition of inherent ambiguity in the statute is unpersuasive in terms of negating either the misleading nature of the statement or scienter. Plaintiffs plead that CMS explicitly told Mylan on multiple occasions that EpiPen was misclassified. (TAC ¶ 77; *see* MTD Op. I at 25 ("The most important of [the evidence of scienter] is the allegation that CMS 'repeatedly informed Mylan that Mylan was misclassifying the EpiPen for purposes of the MDRP.'" (citation omitted)).) The deletion of a single word from the statute that may or may not have clarified some ambiguity is largely irrelevant if the CMS did indeed directly and repeatedly inform Mylan that the EpiPen was misclassified.

In short, the RRA does not diminish the plausibility of the allegations that (1) Mylan knew the EpiPen was misclassified or (2) Mylan acted with requisite scienter when the

---

[4] This document is properly considered on a motion to dismiss as a public document that forms part of the RRA's legislative history. *See Ass'n of Home Appliance Mfrs.*, 36 F. Supp. 3d at 371.

statements were made — the inference of "a mental state embracing intent to deceive,

manipulate, or defraud" is to such a level that it is not "at least as compelling as any opposing

inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314, 319 (citation omitted).

Accordingly, Plaintiffs' Section 10(b) claims on the basis of Mylan's statements that Mylan's

MDRP rebate calculations carried "risk of errors" survive.

### 2. EpiPen Rebate Scheme

Second, Mylan moves to dismiss Plaintiffs' claims that the rebates Mylan paid to

Pharmacy Benefit Managers ("PBMs") were anticompetitive on the basis that Plaintiffs do not

adequately plead scienter or loss causation sufficient to sustain a Section 10(b) claim.

Mylan argues that Plaintiffs' sole scienter allegation with respect to the PBM rebates is

that the EpiPen was part of Mylan's core business. (*See* TAC ¶ 580.) And this Court has already

acknowledged that a core business allegation, standing alone, cannot support a strong inference

of scienter. (*See* MTD Op. II at 22.) However, Mylan's argument misses the other allegations

Plaintiffs make that support a strong inference of scienter. Plaintiffs allege that Mylan's

executives were aware of all EpiPen pricing decisions (*see* TAC ¶¶ 149, 546), and that Mylan

engaged in the rebate scheme for the purpose of forcing Sanofi from the market and inflating the

price of EpiPen (*see* TAC ¶¶ 104, 110). And this Court has already held that Plaintiffs

adequately plead that the rebate scheme was anticompetitive. (*See* MTD Op. II at 11–12.)

Plaintiffs can show scienter "by alleging facts that constitute[] strong circumstantial

evidence of conscious misbehavior or recklessness on the part of defendants." *Novak v. Kasaks*,

216 F.3d 300, 308 (2d Cir. 2000). Here, Plaintiffs have adequately alleged that Mylan

consciously engaged in an anticompetitive rebate scheme for the purpose of forcing Sanofi from

the market, and that Mylan's top executives were personally involved in pricing and thus would

have been well aware of the PBM rebates. Because the inference that Mylan knew about the

anticompetitive character of the agreements is "at least as compelling as any opposing inference," Plaintiffs have adequately alleged scienter. *See Tellabs, Inc.,* 551 U.S. at 314.

Next, Mylan argues that Plaintiffs have not adequately alleged loss causation because Plaintiffs have not identified a corrective disclosure related to Mylan's agreements with PBMs. "Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 197 (2d Cir. 2003). To satisfy the loss causation requirement, Plaintiffs' allegations need only "provide [the] defendant[s] with some indication of the loss and the causal connection that the plaintiff[s] ha[ve] in mind." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015). Here, Plaintiffs allege that as a result of public outcry due to the high price of EpiPen, which was caused by Mylan's anticompetitive conduct, "Mylan stock fell $6.17, or 12.51% between August 19 and August 24, 2016. When the FTC announced on January 30, 2017 that it was investigating Mylan, Mylan's stock fell even further." (TAC ¶ 20; *see also* TAC ¶ 554.) Mylan argues that because Sanofi pulled Auvi-Q from the market due to product defects in October 2015, the loss is too attenuated for Plaintiffs to properly allege loss causation. (Dkt. No. 134 at 5.) However, that Auvi-Q was pulled for product defects is irrelevant to the question of loss causation. At a minimum, "investigation into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice." *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 428 (S.D.N.Y. 2013). Investigation into wrongdoing is an obvious risk associated with that wrongdoing. And the fact that Auvi-Q was pulled from the market for unrelated reasons does not change that Plaintiffs alleged that the anticompetitive conduct occurred, and was therefore

7

subject to government investigation.  Accordingly, Plaintiffs have adequately alleged loss

causation.

### 3.    Generic Drug Market Allocation and Price Fixing

Mylan moves to dismiss Plaintiffs' market allocation and price-fixing claims for 19

generic drugs,[5] on the basis that Plaintiffs' claims lack the requisite specificity to sustain a

Section 10(b) claim.  Under section 1 of the Sherman Act, plaintiffs can plead an unlawful

market allocation or price-fixing agreement by asserting either (1) "direct evidence" of an

unlawful agreement, or (2) "circumstantial facts supporting the *inference* that a conspiracy

existed."  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

Rather than argue that Plaintiffs meet either evidentiary standard for any particular drug,

Plaintiffs simply state that "[t]he TAC pleads that Defendants' market allocation and price-fixing

activity was so rampant that it affected virtually all of the generic drugs Mylan sold," and that the

drug-specific allegations in the complaint are "more than sufficient to support this broader

allegation."  (Dkt. No. 132 at 1–2.)

This Court has previously dismissed Plaintiffs' generic drug allegations for failing to

meet the evidentiary standard required by section 1 of the Sherman Act.  (*See* MTD Op. II at 14–

15.)  Even considering Plaintiffs' position that the generic drug allegations should be assessed as

a whole to support the broader allegation that "virtually all" of Mylan's generic drugs were

affected by anticompetitive activity, that evidentiary standard must still be met.  To survive a

motion to dismiss, a plaintiff must "plead[] factual content that allows the court to draw the

---

[5] Enalapril, Divalproex, Budesonide DR, Buspirone Hydrochloride, Cimetidine Tablets, Diclofenac Potassium, Diltiazem HCL, Estradiol, Fluoxetine HCL, Flurbiprofen, Fluvastatin Sodium, Haloperidol, Ketoconazole, Nitrofurantoin MAC capsules, Pentoxifylline, Prazosin HCL, Prochlorperazine, Tamoxifen Citrate, and Tolmetin Sodium.

reasonable inference that the defendant is liable for the misconduct alleged." *Wilson*, 671 F.3d at

128 (quoting *Iqbal*, 556 U.S. at 678). Allegations about individual generic drugs that fall short

of the evidentiary minimum required by the Sherman Act cannot support the notion that

"virtually all" of Mylan's generic drugs were affected by unlawful anticompetitive conduct. It

would not be a "reasonable inference" to extrapolate wholesale anticompetitive activity from

deficient generic drug allegations. And because Plaintiffs fail to address Mylan's argument that

they have not sufficiently alleged an unlawful market allocation or price-fixing agreement for 18

of the 19 drugs, Plaintiffs have forfeited the argument that they do adequately plead a section 1

violation with respect to these drugs. *See Scott v. JPMorgan Chase & Co*, No. 13 Civ. 646, 2014

WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014) (collecting cases).

The only allegations that Plaintiffs directly address are those related to Divalproex. This

Court has already held that Plaintiffs have adequately alleged that Divalproex was subject to a

price-fixing agreement. (*See* MTD Op. I at 31–33.) As part of that decision, this Court found

persuasive "the lack of an external triggering event (e.g., a supply shortage or spike in demand)"

because it "support[ed] the inference that Mylan's sudden price increases" were the result of

price collusion. (MTD Op. I at 33.) Mylan offers evidence of such an external triggering event.

It argues that a supply shortage occurred when Wockhardt, a major supplier of Divalproex, was

"forced to exit the market after the FDA issued an import ban on one of its manufacturing

facilities in India." (Dkt. No. 124 at 16.) To support that argument, Mylan offers FDA

documentation of the import ban. (Dkt. No. 125-1.)

This Court stands by its earlier holding. This Court may take judicial notice of the FDA

Import Alert because it is a public document that "can be accurately and readily determined from

sources whose accuracy cannot reasonably be questioned." *Becker v. Cephalon, Inc.*, No. 14

9

Civ. 3864, 2015 WL 5472311, at *3 (S.D.N.Y. Sept. 15, 2015) (citation omitted).  However,

"[i]n the motion to dismiss context, a court should generally take judicial notice to determine

what statements the documents contain, not for the truth of the matters asserted."  *Porrazzo v.*

*Bumble Bee Foods, LLC,* 822 F. Supp. 2d 406, 412 (S.D.N.Y. 2011) (internal quotation marks,

citation, and alterations omitted).  As a result, what Mylan offers this Court is evidence

suggesting that the FDA issued an import alert that mentions that three of Wockhardt's facilities

in India were subject to an import ban.  (*See* Dkt. No. 125-1 at 61.)  This Court cannot consider

the truth of the statements made in this document, *see Porrazzo*, 822 F. Supp. 2d at 412, but even

if it could, Mylan's argument fails.  First, the document does not mention Dialproex.  Second, if

Mylan is correct that Wockhardt was a major supplier (a fact that is not supported by anything

other than Mylan's say-so in its briefing), and that it was forced from the market (another wholly

unsupported fact), it is unclear what, if any, impact the import ban had on the pricing of

Dialproex.  While discovery may prove Mylan right, the Court's prior holding remains

undisturbed at the motion to dismiss stage.  Accordingly, Plaintiffs' allegations regarding

Dialproex survive, but any claims based on the other 18 generic drugs[6] are dismissed.

### 4.  Claims Against Individual Defendants

First, Mylan moves to dismiss all claims against James Nesta.  Plaintiffs allege that Nesta

is liable under a scheme liability theory.  Under a scheme liability theory, "[d]efendants must

have participated in an illegitimate, sham or inherently deceptive transaction where their conduct

or role had the purpose and effect of creating a false appearance."  *SEC v. Wey,* 246 F. Supp. 3d

---

[6] Enalapril, Budesonide DR, Buspirone Hydrochloride, Cimetidine Tablets, Diclofenac
Potassium, Diltiazem HCL, Estradiol, Fluoxetine HCL, Flurbiprofen, Fluvastatin Sodium,
Haloperidol, Ketoconazole, Nitrofurantoin MAC capsules, Pentoxifylline, Prazosin HCL,
Prochlorperazine, Tamoxifen Citrate, and Tolmetin Sodium.

894, 918 (S.D.N.Y. 2017) (citation omitted).  To allege scheme liability, a plaintiff must plead

"(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the

alleged scheme to defraud, (3) with scienter, and (4) reliance."  *Menaldi v. Och-Ziff Capital*

*Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (citation omitted).  A "manipulative

or deceptive act" is "some act that gives the victim a false impression."  *United States v.*

*Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).  Mylan contends that Plaintiffs have not adequately

pleaded that Nesta committed the requisite deceptive or manipulative act.  However, Plaintiffs

argue that Nesta's alleged participation in Mylan's market allocation and price-fixing scheme,

specifically by submitting cover bids to customers — bids that were meant to appear genuine,

but in fact were intentionally anticompetitive — were deceptive acts sufficient to establish that

prong of scheme liability.  (Dkt. No. 132 at 21; *see* TAC ¶ 216.)

    Here, Plaintiffs adequately allege that Nesta participated in Mylan's anticompetitive

scheme by submitting bids that were intended to produce the false impression that they were

competitive.  While Mylan rightly points out that "[c]onduct that is deceptive only because of a

subsequent material misstatement . . . cannot be shoehorned into a claim for scheme liability,"

*SEC v. Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016) (citations omitted), this is irrelevant.  If

Nesta was submitting cover bids to create the false impression that they were competitive, that is

an "inherently deceptive act that is distinct from an alleged misstatement."  *In re Barney Smith*

*Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (citations omitted).  Because

this Court concludes that the submission of cover bids is a deceptive act sufficient to support a

scheme liability claim, Plaintiffs' claims against Defendant James Nesta survive.

    Second, Mylan moves to dismiss the allegations of market allocation against Defendants

Heather Bresch, Robert Coury, Paul Campbell, Kenneth Parks, and John Sheehan for lack of

scienter.  Mylan argues that in adding Fenofibrate, Clonidine-TTS Patch, Tolterodine Extended

Release, Capecitabine, Enalapril, and Valsartan HCTZ to their market allocation allegations,

Plaintiffs failed to connect those allegations to these Defendants.  (Dkt. No. 124 at 22.)  Plaintiffs

argue that because this Court has already held that Plaintiffs adequately alleged the

aforementioned Defendants' scienter with respect to price-fixing activity (*see* MTD Op. I at 33–

34), it follows that Plaintiffs have alleged scienter with respect to market allocation activity.

However, this Court has previously rejected the notion that scienter with respect to price-

fixing and scienter with respect to market allocation go hand in hand.  While the Court upheld

Plaintiffs' allegations regarding price-fixing activity, it found Plaintiffs' allegations regarding

market allocation wanting: "[The confidential witness] alleges only that the individual

Defendants participated in pricing decisions.  [The confidential witness] does not allege that the

individual Defendants participated in decisions about which markets or customers to target for

the sale of *any* generic drug . . . ."  (MTD Op. I at 34.)  Because Plaintiffs have not pleaded

scienter with respect to any market allocation of Fenofibrate, Clonidine-TTS Patch, Tolterodine

Extended Release, Capecitabine, Enalapril, and Valsartan HCTZ, those claims are dismissed as

to Defendants Defendants Heather Bresch, Robert Coury, Paul Campbell, Kenneth Parks, and

John Sheehan.

Third, Mylan moves to dismiss any claims based on EpiPen or any other generic drug

other than Doxy DR against Defendant Rajiv Malik.  This Court has already held that "[t]he

allegations as to the knowledge and involvement of other individual Defendants are insufficient

to plead with particularity a strong inference of scienter as to Malik."  (MTD Op. II at 21.)  And

the Third Amended Complaint does not contain any new allegations implicating Malik.

Accordingly, with the exception of the Doxy DR market allocation claims that this Court has

already upheld in a prior opinion (*see* MTD Op. II at 22–24), all other claims against Defendant Rajiv Malik are dismissed.

### 5. UBS Report

Finally, Mylan moves to dismiss Plaintiffs' allegations of losses resulting from the May 28, 2016 UBS Report (*see* TAC ¶ 576), on the basis that it did not contain any new information and thus was not a corrective disclosure. The UBS report "provided details regarding the potential exposure [Mylan] faced in the 2017 and 2019 antitrust suits by the state attorneys general." (*Id.*) And while Mylan argues that it was obvious that these suits would take years to litigate, and thus did not contain any new information (*see* Dkt. No. 134 at 10), this does not preclude the UBS report's qualification as a corrective disclosure as a matter of law. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) ("[The report] was not, as Defendants contend, merely a journalist's negative opinion, but an analysis of how and why [the] underlying business was weaker than most people realized. It thus qualifies as corrective.") This Court has previously indicated that it would "defer[] questions about the robustness of Plaintiffs' selection of corrective disclosures to a later stage of litigation, after the aid of discovery." (MTD Op. I at 36.) The Court maintains that view. Discovery will reveal whether Plaintiffs are correct that the UBS report disclosed a new depth of information to the public. At this stage of the litigation, this Court will allow claims based on the report to go forward.

### B. Motion for Class Certification

Plaintiffs' motion for class certification is unopposed. (Dkt. No. 139.) The only dispute between the parties is whether the class period will extend to May 10, 2019, or May 24, 2019. (Dkt. No. 139 at 2.) Because this Court has allowed claims of loss based on the May 24, 2019 UBS report, *see supra* Section III.A.5, the class period will extend to May 24, 2019.

Accordingly, the following class is certified pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons or entities that purchased Mylan N.V. and/or Mylan N.V.'s predecessor, Mylan Inc., common stock between February 21, 2012 and May 24, 2019, both dates inclusive (the "Class Period"), excluding Defendants, current and former officers and directors of Mylan, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Further, Menorah Mivtachim Insurance Ltd., Menorah Mivtachim Pensions and Gemel Ltd., Phoenix Insurance Company Ltd., and Meitav DS Provident Funds and Pension Ltd. are hereby appointed as Class Representatives, and Pomerantz LLP is hereby appointed as Counsel for the Class. (*See* Dkt. No. 139 at 2.)

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to partially dismiss the Third Amended Class Action Complaint is GRANTED in part and DENIED in part. Plaintiff's motion for class certification is GRANTED. Defendants shall file an answer to the surviving claims within three weeks from the date of this order.

The Clerk of Court is directed to close the motions at Docket Numbers 123 and 129.

SO ORDERED.

Dated:  April 6, 2020
        New York, New York

_____
                J. PAUL OETKEN
            United States District Judge

14